**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OMNICARE, LLC, *et al.*,[1] | ) | Case No. 25-80486 (SWE) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF MATTHEW FRANK IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Matthew Frank, Co-Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

**PRELIMINARY STATEMENT**

1. The Debtors operate a network of pharmacies throughout the United States that provide on-site medication and pharmaceutical services to patients residing in more than 4,000 long-term care facilities ("**LTCFs**") including skilled nursing facilities, assisted-living communities, independent-living communities and institutional facilities. The Debtors' industry leading footprint includes 101 pharmacies (the "**Pharmacies**") operating in 44 states and servicing LTCFs in 46 states.

2. Through its Pharmacies, the Debtors dispense approximately 40 million prescriptions to over 800,000 patients each year. The majority of these patients reside in LTCFs

---

[1] The last four digits of Omnicare, LLC's federal tax identification number are 1351. There are 111 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Omnicare. The location of Omnicare, LLC's corporate headquarters and the Debtors' service address is Attn: Omnicare, LLC, One CVS Drive, Mail Code 1160, Woonsocket, RI 02895.

which offer a range of services tailored to varying medical needs. The Debtors work closely with their health care facility clients to provide customized, comprehensive, cost-effective medication management. In addition to dispensing prescriptions, the Debtors provide clinical consulting, infusion therapy, compounding services, automated prepackaging, and proprietary decision-support software to enhance safety and compliance.

3.      To provide these services, the Debtors employ approximately 6,000 dedicated professionals – including pharmacists, pharmacy technicians, field nurses, administrative staff, and delivery drivers – who perform a wide range of functions critical to the Debtors' operations, including the preparation, packaging, and delivery of medications. Their specialized skills and deep knowledge of the Debtors' infrastructure, customer relationships and business processes are essential to maintaining continuity and quality of care. Additionally, these employees enable the Debtors to maintain a national network of Pharmacies with geographic flexibility to ensure uninterrupted service to facilities and their patients.

4.      In recent years, the Debtors' business has faced challenges stemming from a range of external pressures, including the COVID-19 pandemic, inflation, a tightening labor market, evolving Medicare policies, declining reimbursement rates and industry consolidation. These headwinds have affected the long-term care industry as a whole, and the Debtors been negatively impacted by the recent chapter 11 filings of key customers, including three of the largest operators of long-term care facilities – Petersen Health, LaVie Care Centers, and Genesis Healthcare.

5.      The Debtors have developed and been implementing strategic plans to address these issues, permit them to continue servicing their customers' needs, and expand their market-leading position. Unfortunately, a nearly $1 billion judgment was recently entered against Debtor Omnicare, LLC ("**Omnicare**") in a False Claims Act (the "**FCA**") lawsuit dating back to 2015.

Omnicare was unable to reach a settlement with the United States and has received no assurance that the United States would not immediately begin taking enforcement action with respect to the judgment. As a result, the Debtors made the difficult decision to file these chapter 11 cases (the "**Chapter 11 Cases**").

6. The Debtors' number one priority is, and always has been, ensuring that they meet the needs of the patients they serve. As one of the largest pharmacy providers serving residents of LTCFs across the U.S., the Debtors' services are not easily replaceable, and any disruption in the provision of prescriptions and related healthcare services could negatively impact and threaten the well-being of countless patients. Accordingly, these Chapter 11 Cases are intended to avoid any disruption to the Debtors' patient services business, and to ensure that the Debtors can continue to provide the services their customers and their patients rely on.

7. The Debtors are filing these Chapter 11 Cases in order to give them the breathing room needed to evaluate restructuring options and to implement a restructuring, or most likely, a sale strategy, while addressing claims against them in a controlled manner. To that end, the Debtors have secured proposed post-petition financing to fund operations and administrative costs during the Chapter 11 Cases, so as to ensure that they remain current on post-petition obligations and that their patient-centered business can continue to operate uninterrupted while they evaluate options to maximize the value of their business for their financial stakeholders.

## BACKGROUND AND QUALIFICATIONS

8. I am a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**"), a global restructuring advisory firm and proposed financial advisor to the Debtors in the Chapter 11 Cases. On August 18, 2025, A&M was engaged by the Debtors as financial advisor to help manage

their liquidity and evaluate strategic alternatives, and on September 21, 2025, I, along with Paul Rundell of A&M, were appointed Co-Chief Restructuring Officers of the Debtors.

9. On September 22, 2025 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the Northern District of Texas (the "**Court**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), thereby commencing the Chapter 11 Cases. Each Debtor intends to operate its business and manage its property as a debtor in possession during the pendency of these Chapter 11 Cases.

10. I have over nineteen (19) years of experience providing financial and restructuring services. During my time at A&M, I have worked almost exclusively on company-side engagements. I provide a wide range of services to the companies I advise, and my expertise includes developing business plans, forecasting cash flows, improving liquidity through working capital management, restructurings, and successful bankruptcy reorganizations. I have extensive experience advising companies and their stakeholders in chapter 11 restructurings spanning multiple industries.

11. In addition, my co-CRO, Paul Rundell, leads A&M's healthcare restructuring practice and has over twenty-five (25) years of experience specializing in restructuring, with more than twenty (20) years focused on the healthcare industry. Paul has assisted clients with financial or operational challenges, including business strategy and planning, financial analysis and support, cash management, crisis management, turnaround consulting, market analysis and operational improvement. Paul has served various clients as interim chief executive officer and chief restructuring officer, and has held other positions in the restructuring context both in and out of court. Specifically, Paul has advised and/or served as a senior executive for, among others, Sears

Methodist Retirement System, Erickson Retirement Communities, LLC, Clare Oaks, Lincolnshire Campus, LLC, Naperville Campus, LLC, Hingham Campus, LLC, St. Vincent's Catholic Medical Centers, Sunwest Management Inc., 21st Century Oncology and the National Benevolent Association.

12.     A&M is a leading restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies. Specifically, A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services. A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including: developing or validating forecasts, business plans, and related assessments of strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages. In addition, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications. A&M is known for its ability to work alongside company management and key constituents to evaluate and implement restructuring goals in a manner that maximizes the value of the debtor's estates.

13.     Through my pre-petition engagement with the Debtors, I have become knowledgeable and familiar with the Debtors' day-to-day operations, business, financial affairs, and the circumstances leading to the commencement of these Chapter 11 Cases. I have worked closely with the Debtors' management team and other advisors with respect to evaluating their liquidity and strategic alternatives and preparing the "first day" motions for these Chapter 11 Cases. Except as otherwise indicated, the statements in this Declaration are based on my personal

knowledge, my review of relevant documents, information provided to me by the Debtors or their employees, advisors or professionals, or my opinion based on my experience, knowledge and information concerning the Debtors' operations and the industry in which they operate. I am over the age of eighteen. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

14.     To minimize any disruption or other adverse effect resulting from the filing of these Chapter 11 Cases, on the Petition Date, the Debtors filed various motions with their chapter 11 petitions (collectively, the "**First Day Motions**"). I am familiar with the factual predicates of the First Day Motions and believe that the relief requested is necessary for the Debtors to smoothly transition into chapter 11 and to continue their ordinary course operations on a post-petition basis. I submit this Declaration in support of the First Day Motions and to assist the Court and parties-in-interest in understanding the Debtors, their business and the circumstances leading to these Chapter 11 Cases. To that end, this Declaration is organized as follows:

- <u>Part I</u> provides an overview of the Debtors' history and business operations;
- <u>Part II</u> describes the Debtors' corporate structure;
- <u>Part III</u> describes the Debtors' capital structure;
- <u>Part IV</u> describes the circumstances leading to these Chapter 11 Cases; and
- <u>Part V</u> provides support for the relief requested in the First Day Motions.

**I.     The Debtors' History and Business Operations**

15.     The Debtors were pioneers in the long-term care pharmaceutical industry. Recognizing the need for immediate, on-site medication and pharmacy services at LTCFs, the Debtors were founded in 1981 with a particular focus on serving residents at skilled nursing facilities ("**SNFs**"). As the long-term care industry grew, the Debtors expanded their business –

through strategic acquisition and innovation – to service residents at other types of LTCFs including assisted-living communities, independent-living communities and institutional facilities.

16.     On or about August 18, 2015, CVS Pharmacy, Inc. ("**CVS Pharmacy**"), a wholly owned subsidiary of CVS Health Corporation ("**CVS Health**"), acquired Omnicare. CVS Health is a holding company and has no employees or direct operations. Since that time, the Debtors have continued to operate as a separate business but have been able to take advantage of shared services and certain disbursing and purchasing arrangements provided by CVS Pharmacy and other direct or indirect subsidiaries of CVS Health, other than the Debtors (collectively, "**CVS**," which, for the avoidance of doubt, does not include CVS Health itself).

17.     The Debtors serve the medication management needs of patients residing in more than 4,000 LTCFs using automation technologies, infusion therapy technologies, compounding, advanced clinical systems, and clinical support services. The Debtors leverage advanced technologies including:

- Automated Label Verification ("**ALV**") – A proprietary robotic automation system designed to enhance safety and reliability in pharmacy operations. Since implementation, ALV results have yielded a zero-error dispensing record by: (i) illuminating medication rows to guide accurate pack selection; (ii) scanning barcodes to verify drug details; and (iii) auditing prescriptions prior to final packaging and delivery.

- Automated Prepackaging Systems – Ensure precise, time-specific medication dispensing to support adherence and operational efficiency.

- Infusion Therapy & Compounding Capabilities – Provide specialized pharmaceutical services tailored to complex patient needs. Includes the Debtors' Incubation Services that was created in 2025 as a fully functioning lab to provide Infusion Clean Room surface sampling.

- Clinical Decision-Support Software (OSC 2 OR) – Proprietary technology that enhances medication safety, clinical programs, and supports regulatory compliance through intelligent clinical insights.

- Omniview – A secure, web-based portal that centralizes pharmacy management and communication between long-term care facilities, patients, and pharmacies. Key features include: (i) Medication Management: Tracks costs, refills, returns, destructions and order statuses; (ii) Resident Insights: Accesses profiles with demographics, diagnoses, allergies, and medication orders; (iii) Operational Transparency: Consolidates communications and generates detailed reports; (iv) System Integration: Compatible with major electronic health record (EHR), electronic medical record (EMR), and electronic medical administrative record (eMAR) platforms; and (v) Staff Support: Includes a reference library for ongoing education and training.

- Pharmaceutical Repackager – FDA-registered with national reach (see details below).

18.    As of the Petition Date, the Debtors manage and operate 101 Pharmacies in 44 states. The Debtors' broad network of Pharmacies includes distinct types of pharmacies that enable the Debtors to provide integrated pharmacy services across a variety of geographical locations.

19.    The majority of the Debtors' Pharmacies are "closed-door" pharmacies that do not serve the general public and instead provide medications and related services to residents at LTCFs through the Debtors' direct employee-based delivery services. These include:

- 16 Hub Pharmacies – large volume, automated pharmacies often with 24/7 operations, supporting spoke pharmacies in prescription fulfillment, in addition to other after-hours support offerings.

- 36 Spoke Pharmacies – smaller size pharmacies (not 24/7) typically fulfilling starter doses and STAT orders for new admissions with a majority of prescriptions pre-labeled and received from hub pharmacies for dispensing.

- 33 Independent Pharmacies – hybrid of hub/spoke pharmacies operating independently due to geography and close proximity to customer facilities.

20.    In addition, the Debtors operate sixteen on-site, open-door pharmacies located within senior living communities with limited over-the-counter products (the "**Retail Pharmacies**").

21.     Importantly, the Debtors' national network of Pharmacies provides geographic flexibility, allowing facilities and their patients to receive uninterrupted support from alternate locations during emergencies or service disruptions.

22.     In addition to the Pharmacies, the Debtors uniquely operate an FDA-registered pharmaceutical repackager with national reach, licensed in 41 states and accredited by the National Association of Boards of Pharmacy (NABP). The repackaging operation is a standalone facility that adheres to current Good Manufacturing Practices (cGMP) and operates under rigorous quality systems to ensure product integrity and regulatory compliance. Its services include unit-dose and long-term care packaging for the Debtors' clients.

23.     As part of the Debtors since 2002, the repackaging operation supports compliant pharmaceutical repackaging and distribution, leveraging pharmaceutical-grade materials and industry-standard packaging equipment to meet both regulatory and operational standards.

24.     The Debtors dispense approximately 40 million prescriptions to over 800,000 patients each year. The majority of these patients reside in LTCFs, which offer a range of services tailored to varying medical needs. The Debtors work closely with their health care facility clients to provide customized, comprehensive, cost-effective medication management.

25.     As detailed above, in addition to dispensing, the Debtors provide clinical consulting, infusion therapy, compounding services, automated prepackaging, and proprietary decision-support software to enhance safety and compliance. Their secure Omniview portal streamlines pharmacy operations and communication, while integration with major EHR/eMAR systems supports seamless care coordination.

26.     The Debtors employ approximately 6,000 dedicated professionals – including pharmacists, pharmacy technicians, field nurses, administrative staff, and delivery drivers – who

perform a wide range of functions critical to the Debtors' operations, including the preparation, packaging and delivery of medications. Their specialized skills and deep knowledge of the Debtors' infrastructure, customer relationships and business processes are essential to maintaining continuity and quality of care. Additionally, these employees enable the Debtors to maintain their national network of Pharmacies with geographic flexibility to ensure uninterrupted service to facilities and their patients.

27.     The customized services and skilled employees the Debtors provide their customers cannot be easily replaced, and any disruption could threaten the well-being of residents who depend on the Debtors for their healthcare needs.

## II.     The Debtors' Corporate Structure

### A.     Corporate Structure

28.     Omnicare is the direct or indirect parent of every other Debtor. It conducts business through its subsidiaries, substantially all of which are Debtors in these Chapter 11 Cases.[2] A simplified corporate structure chart for the Debtors is attached hereto as **Exhibit A**.

29.     With respect to Omnicare, (i) Aetna Inc. owns 00.28% of the membership interests in Omnicare; (ii) CVS Cabot Holdings Inc. owns 49.86% of the membership interests in Omnicare; and (iii) CVS Shaw Holdings Inc. owns 49.86% of the membership interests in Omnicare. Each of these entities is a wholly owned indirect subsidiary of CVS Health, the Debtors' ultimate parent corporation.

---

[2] Three non-operating subsidiaries associated with the Debtors' Heartland pharmacy joint venture, which is no longer operating, are non-Debtors. Those non-operating subsidiaries are Heartland Healthcare Services, LLC, Heartland Pharmacy of Maryland, LLC and Heartland Pharmacy of PA, LLC.

**B.   Governance**

30.   Each of the Debtors is a limited liability company. As of the Petition Date, the Omnicare board of managers is composed of three managers: (i) David S. Azzolina, who is also the President and Treasurer of Omnicare; (ii) D. Rob Gerth, who is also Secretary of Omnicare; and (iii) Timothy Pohl, an independent manager of Omnicare with significant restructuring expertise. All of the Omnicare subsidiary Debtors are member-managed and have no managers.

31.   The current officers of Omnicare are: David S. Azzolina (President and Treasurer); Joshua M. Perlin (Vice-President, Chief Financial Officer and Assistant Treasurer); D. Rob Gerth (Secretary); Paul Rundell (Co-Chief Restructuring Officer); and Matthew Frank (Co-Chief Restructuring Officer). The current officers of each Omnicare subsidiary Debtor are: David S. Azzolina (President and Treasurer); Joshua M. Perlin (Vice-President, Chief Financial Officer and Assistant Treasurer); and D. Rob Gerth (Secretary).

**C.   Disbursement Arrangements with CVS**

32.   As detailed further in the Cash Management Motion (defined below), in the ordinary course of business, the Debtors utilize cash management services provided by CVS to process substantially all of the Debtors' vendor, tax, utility, payroll and other disbursements (the "**Disbursing Arrangements**"). Such services are provided to the Debtors pursuant to a global cash management agreement (as amended, the "**Cash Management Agreement**") which permits, among other things, the Debtors to use CVS's disbursement services to pay Debtor obligations, on the condition that the Debtors have pre-funded or promptly reimburse CVS for all disbursements made on their behalf. The Debtors presently do not have systems in place that would permit them to make disbursements on a large-scale directly from their accounts, so the services provided by CVS are essential to the Debtors' ability to operate their business and cannot be easily replaced.

33.     Disbursements made by CVS on behalf of the Debtors – and contemporaneously reimbursed by the Debtors in the ordinary course of business – generally fall into the following categories:

- Accounts Payable: At the Debtors' direction, CVS processes the Debtors' accounts payable in the ordinary course of business. The Debtors generally reimburse CVS on a dollar-for-dollar basis.

- Payroll: As described more fully in the Wages Motion (defined below), at the Debtors' direction, CVS processes the Debtors' employee wages, benefits and related expenses in the ordinary course of business. The Debtors generally reimburse CVS on a dollar-for-dollar basis.

- Taxes and Fees: As described more fully in the Tax Motion (described below), CVS makes payments on the Debtors' behalf to various taxing and regulatory authorities on a monthly, quarterly, annual or as due basis, depending on the nature of the taxes and fees and the taxing authorities to which they are paid. The Debtors generally reimburse CVS on a dollar-for-dollar basis.

- Purchasing Cards: Certain of the Debtors' employees use CVS corporate charge cards ("**P-Cards**") to purchase miscellaneous goods and services used to operate the Debtors' business. The Debtors generally reimburse CVS for charges made on corporate P-Cards on a dollar-for-dollar basis.

34.     If the Debtors cannot continue to reimburse CVS for postpetition disbursements, CVS will stop making disbursements on their behalf, causing immediate and irreparable harm to the Debtors' ordinary course business operations, putting the health and safety of countless patients at risk. Moreover, the large-scale disbursement services provided by CVS cannot be duplicated or replaced without significant effort and expense, making continuation of the current Disbursing Arrangements critical to the Debtors' operations and the patients they serve. The Debtors believe that without the Disbursement Arrangements in place – and the ability to reimburse CVS pursuant to the Cash Management Agreement – the Debtors' business would be unnecessarily disrupted to the detriment of the Debtors, their creditors, and other stakeholders.

**D.      CVS Shared Services**

35.      As subsidiaries of CVS, the Debtors are able to take advantage of various corporate services shared across the entire CVS business enterprise (the "**Shared Services**"). In the ordinary course of business, the cost of the Shared Services provided by CVS is allocated to the Debtors and the Debtors reimburse CVS for the Shared Services. The Shared Services provided by CVS include the following:

- Corporate Support Services: CVS provides legal, compliance (training/policy support and internal audits), insurance, marketing, real estate and government affairs support services on an enterprise-wide basis. The cost of these services is allocated to the Debtors based on an assigned divisional share of the total enterprise-wide costs for these services. The Debtors' share of these services is derived from their proportionate share of total Pharmacy and Consumer Wellness (PCW) segment revenue for the fiscal year 2024. These charges are reimbursed by the Debtors, typically the week following each month-end close.

- Human Resources: CVS provides human resources (HR) services on an enterprise-wide basis. The cost of such services charged to the Debtors is determined by applying the Debtors' proportionate share of total enterprise staffing to the annual Shared Services HR expense. These charges are then reimbursed by the Debtors, typically the week following each month-end close.

- IT: CVS provides information technology (IT) services and equipment on an enterprise-wide basis. The costs of such services and equipment are allocated to the Debtors based on (i) actual Debtor equipment usage, and (ii) analysis of annual server, storage and data center expenses incurred by the Debtors. These charges are then reimbursed by the Debtors, typically the week following each month-end close.

- Finance: CVS provides accounting, financial, planning & analysis (FP&A), accounts payable (AP), procurement, treasury, and tax services on an enterprise-wide basis. The cost of such services charged to the Debtors is based on payroll costs of employees on a full-time equivalent basis (accounting and FP&A) or based on an assigned divisional share of the total enterprise-wide costs for these services (AP, procurement, treasury, and tax). These charges are then reimbursed by the Debtors, typically the week following each month-end close.

36.      As with the Disbursement Arrangements described above, the Shared Services are essential to the Debtors' business operations. Such services cannot be easily replicated or replaced,

and the Debtors would be unduly burdened both financially and logistically if the Debtors were required to halt such Shared Services arrangements at this time and to undertake the reorganization or sale process without them. The Debtors believe that without the Shared Services provided by CVS – and the ability to reimburse CVS for such Shared Services on a postpetition basis as described herein – the Debtors' business would be disrupted unnecessarily to the detriment of the Debtors, their patients, creditors, and other stakeholders.

**E.      Purchasing Arrangements with CVS.**

37.      As subsidiaries of CVS, the Debtors are able to take advantage of contracts that CVS has negotiated with certain suppliers, vendors and other counterparties (the "**Purchasing Arrangements**"). As detailed further in the Cash Management Motion, in the ordinary course of business, the Debtors are able to directly order goods and services for their Pharmacies and business operations under a number of contracts CVS has negotiated with third party suppliers, vendors and other counterparties. The Debtors reimburse CVS on a dollar-for-dollar basis, and typically on a weekly basis, for all goods and services ordered pursuant to the Purchasing Arrangements.

38.      If the Debtors cannot continue to reimburse CVS for goods and services they order postpetition under the Purchasing Arrangements, CVS will discontinue the Purchasing Arrangements, causing immediate and irreparable harm to the Debtors' ordinary course business operations, putting the health and safety of countless patients at risk while alternative agreements are negotiated with vendors and suppliers, including pharmaceutical suppliers. The Debtors believe that without the Purchasing Arrangements in place – and the ability to reimburse CVS pursuant to the Cash Management Agreement – the Debtors' business would be significantly disrupted to the detriment of the Debtors, their creditors, and other stakeholders.

**III.    The Debtors' Capital Structure**

39.    As of the Petition Date, the Debtors have no material secured or unsecured pre-petition funded debt and have issued no outstanding bonds or similar financial obligations. As a result, substantially all of the Debtors' prepetition liabilities are unsecured obligations unrelated to financing, as described further below.

**A.    Trade Debt**

40.    In the ordinary course of business, the Debtors incur trade debt with suppliers and vendors for their business operations. Most of these vendors supply essential services, pharmaceuticals and medical equipment. As of the Petition Date, the Debtors owe approximately $5 million in unsecured debt to vendors and suppliers with whom they have contracted.

41.    In addition, as described above, as CVS subsidiaries, the Debtors historically have been able to take advantage of certain CVS vendor agreements, and order services and supplies under those CVS agreements. The Debtors estimate that they owe roughly $28 million to CVS in reimbursement obligations for purchases made under CVS contracts with vendors.

**B.    Real Estate**

42.    The Debtors are parties to over one hundred leases related to their Pharmacies and other business locations throughout the U.S. The total annual rent due under such leases is over $19 million. The Debtors also own seven properties on which they operate Pharmacies.

**C.    The Judgment**

43.    As described in more detail in section IV. C. below, a judgment has been entered in favor of the United States and against Omnicare in the amount of $948,778,444.10, consisting of $135,592,814.70 in damages which were trebled under the FCA (a total of $406,778,444.10), plus $542,000,000 in statutory penalties, $164,800,000 of which CVS Health was found by the

District Court to be jointly and severally liable with Omnicare. The nearly $1 billion judgment against Omnicare represents the largest unsecured liability in these Chapter 11 Cases.

## IV.   Circumstances Leading to these Chapter 11 Cases

### A.   Industry Headwinds

44.    In recent years, the Debtors have faced mounting challenges stemming from a range of external pressures, including the COVID-19 pandemic, inflation, a tightening labor market, evolving Medicare policies, declining reimbursement rates and industry consolidation. The COVID-19 pandemic was particularly disruptive across the healthcare sector, contributing to higher mortality rates, reduced elective procedures, a shift toward outpatient care and a significant decline in occupied beds at LTCFs – all of which negatively impacted the Debtors' core business.

45.    Additionally, changes in Medicare policy and reimbursement structures have strained financial performance across the industry. A significant portion of the Debtors' revenue is ultimately funded through Medicare and Medicaid programs. However, the continued shift from traditional Medicare (Parts A and B) to Medicare Advantage (Part C) has led to reduced enrollment in stand-alone Medicare Part D plans. This transition has adversely affected pharmacies like the Debtors, which rely on the more predictable reimbursement framework of Part D. Medicare Advantage plans often feature narrower pharmacy networks and less transparent payment terms, increasing financial and operational complexity. Further, recent provisions under the Inflation Reduction Act (IRA) – including drug pricing reforms and out-of-pocket caps – along with changes to the Medicare Savings Program (MSP), have introduced additional reimbursement uncertainty and margin pressure.

46.    Compounding these challenges, the Debtors terminated their largest client relationship as a result of compliance concerns related to mounting unpaid accounts receivable due to the Debtors. This event precipitated the need to optimally reorganize the business – a strategic

16

path the Debtors continue to pursue. Despite these headwinds, the Debtors have seen success in improving client retention and attracting new prospects, driven in part by a market environment where competitors are experiencing significant service disruptions and operational instability.

47. The headwinds described above were felt across the long-term care industry, leading to several recent chapter 11 filings by key Debtor customers that further exacerbated the negative effects on the Debtors and contributed to their own liquidity challenges.

48. In particular, between March 2024 and July 2025, three of the country's largest LTCF operators – Genesis Healthcare, Petersen Health, and LaVie Care Centers – each filed chapter 11 bankruptcies citing contributing factors similar to those described above. Genesis was the Debtors' largest client before termination of the relationship, and both Petersen and LaVie are large LTCF operators. Their bankruptcies significantly impacted the Debtors, resulting not only in lost customers and revenue (only LaVie remains a client), but also bad accounts receivable, as the Debtors hold over $50 million in combined unsecured claims in these three customers' chapter 11 cases.

**B. Prepetition Strategic Initiatives**

49. In response to these industry headwinds, the Debtors have undertaken a series of broad strategic efforts to reorganize their operations. These have included consolidation, regulatory alignment, and financial discipline.

50. The Debtors have reshaped elements of their pharmacy network, making efforts to reduce costs while preserving standards. Since 2023, approximately 40% of underperforming pharmacies have been closed.

51. The Debtors have also begun taking steps to streamline select sites and improve driver supervision and delivery management.

52.     In addition, the Debtors are conducting a review of their administrative and support functions and are focusing on their technology infrastructure to simplify systems, promote consistency across sites, and improve information management.

### C.     False Claims Act Litigation

53.     In August 2025, a nearly $1 billion FCA judgment was entered against Omnicare. Its inability to reach a satisfactory resolution with the United States risked unacceptable disruption to the Debtors' business and necessitated the commencement of these Chapter 11 Cases.

54.     In June 2015, Uri Bassan, an Omnicare pharmacist at that time, filed an FCA action against Omnicare, Inc.[3] in the United States District Court for the Southern District of New York. The United States intervened and took control of the lawsuit in December 2019, adding CVS Health as a defendant. The complaint-in-intervention alleges that Omnicare dispensed prescription drugs to individuals residing in LTCFs without valid prescriptions between 2010 and 2018, in violation of state law and federal regulations. Notably, although the complaint alleged that Omnicare's misconduct resulted in harm to the United States – which Omnicare (and its co-defendant CVS Health) disputed – it did not assert that the alleged misconduct resulted in any harm to Omnicare's patients.

55.     Following a four-week jury trial in April 2025, a jury returned a verdict against both Omnicare and CVS Health. The jury awarded damages against Omnicare in the amount of $135,592,814.70, but none against CVS Health. Following post-trial briefing, on August 18, 2025, the District Court entered a judgment (the "**Judgment**") in the amount of $948,778,444.10 against Omnicare, consisting of $135,592,814.70 in damages which were trebled under the FCA (a total

---

[3] Omnicare, Inc. was converted to Omnicare, LLC in December 2020.

of $406,778,444.10), plus $542,000,000 in statutory penalties, $164,800,000 of which the District Court found CVS Health to be jointly and severally liable with Omnicare.

56.     On September 15, 2025, Omnicare and CVS Health appealed the Judgment. CVS posted an appeal bond for the amount that the District Court found CVS Health to be jointly and severally liable with Omnicare, but Omnicare was unable to post an appeal bond.

57.     To date, Omnicare has been unable to reach a settlement with the United States. To prevent any disruption to the Debtors' patient services business, and to provide the Debtors breathing room to evaluate their restructuring options and a likely section 363 sale, the Debtors made the difficult decision to file these Chapter 11 Cases.

### D.     Restructuring Process.

58.     With the advice of its restructuring professionals, the Debtors are evaluating their restructuring options and expect to make a decision shortly concerning how best to maximize the value of their business for all stakeholders, while at the same time continuing to serve their patients' needs without interruption. The most likely option is a sale of the Debtors' business as a going concern in one or more Bankruptcy Code section 363 sales.

59.     To that end, the Debtors have engaged Houlihan Lokey ("Houlihan") as their investment banker to lead any marketing and sales efforts.

### E.     DIP Negotiations

60.     As part of the Debtors' preparations for a chapter 11 filing, the Debtors focused on ensuring that they obtain necessary financing so that they could continue to meet the healthcare needs of their patients and fund the Chapter 11 Cases, including a restructuring or sale process.

61.     I have worked closely with the Debtors and their advisors to evaluate the Debtors' cash flow forecasts. Based on management's forecasts and A&M's evaluation of the Debtors' cash

needs during the Chapter 11 Cases, the Debtors determined that they would require access to post-petition debtor in possession ("**DIP**") funding of approximately $110 million to provide sufficient liquidity to administer the Debtors' estates, including to fund payroll for the Debtors' employees, pay vendors and make other payments that are essential or appropriate for the continued operation of the Debtors' business. I believe that the Debtors' ability to continue making such payments during the Chapter 11 Cases is essential to the Debtors' continued operations and the preservation of assets during the pendency of the Chapter 11 Cases.

62. As set forth in the DIP Motion (defined below) and declaration in support thereof, Houlihan worked with the Debtors in soliciting potential DIP financing options. Following such solicitation and related negotiations, the Debtors reached agreement with JMB Capital Partners Lending, LLC ("**JMB**") to provide a $110 million debtor in possession financing facility (the "**DIP Facility**"). The terms of the DIP Facility include a maturity date of June 30, 2026, cash interest paid monthly at a rate of 10% per annum, a cash commitment fee of 2.0%, a 5% exit fee and unlimited draws subject to a minimum draw amount of $5 million. The DIP Facility is secured by a lien on substantially all of the Debtors' assets. Upon entry of an interim order, the DIP Facility contemplates availability of up to $25 million with access to the remainder of the DIP Facility (an incremental $85 million) upon entry of a final order approving the DIP Facility. The flexibility in the number of draws combined with the other terms included in the DIP Facility will provide the Debtors with the ability to accommodate various liquidity needs during the Chapter 11 Cases while not causing undue interest expense through an increased outstanding DIP Facility balance.

63. The DIP Facility contains only one key process milestone for the Chapter 11 Cases and sale process:

- Execution of stalking horse purchase agreement or agreements on or before January 31, 2026 that (a) is approved by JMB or (b) generates cash proceeds sufficient for a payment in full of the DIP Facility obligations by the maturity date.

64. Failure to secure post-petition financing could jeopardize patient healthcare should the Debtors lack the resources to continue providing their current services to LTCFs and their residents. I understand that the proposed DIP Facility provides the Debtors with adequate financing to continue their operations, uninterrupted, and to administer these Chapter 11 Cases. In sum, I believe that entry into the DIP Facility will provide comfort to the Debtors' employees, patients, vendors, and suppliers that the Debtors will be able to continue to meet their commitments during the Chapter 11 Cases, and will enable the Debtors to pursue their restructuring goals in a manner that maximizes the value of the Debtors' estates and prioritizes the health and safety of their patients and residents.

## V.   Evidentiary Basis for the Relief Requested in the First Day Motions

65. The Debtors filed the First Day Motions to facilitate a smooth transition into chapter 11 and minimize disruptions to the Debtors' business operations. The First Day Motions seek authority to, among other things, secure post-petition financing, honor work-force related compensation and benefit obligations, pay certain pre-petition claims, continue using the Debtors' bank accounts, and continue other operations in the ordinary course of business.

66. The Debtors have narrowly tailored the relief requested in the First Day Motions to meet their goals of: (a) continuing their operations in chapter 11 with as little disruption as possible to ensure the well-being of the patients they serve; (b) maintaining the confidence and support of their vendors, customers, employees, and other key constituencies; (c) providing adequate runway for the Debtors to effectuate a successful restructuring or sale process; and (d) establishing procedures for the efficient administration of these Chapter 11 Cases.

21

67. I am familiar with each First Day Motion and believe that the relief requested in each: (a) is necessary for the Debtors to (i) minimize disruption and loss of productivity to their business; (ii) effectuate a smooth transition into and operate in chapter 11; and (iii) avoid immediate and irreparable harm; (b) is in the best interests of the Debtors' creditors, estates and other stakeholders; and (c) constitutes a critical element in preserving value during these Chapter 11 Cases until a viable sale or restructuring option can occur.

68. Additionally, several of the First Day Motions request authority to pay certain pre-petition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") provides that the Court shall not consider motions to pay pre-petition claims during the first twenty-one (21) days after the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." Given this requirement, the Debtors have narrowly tailored their requests for immediate authority to those circumstances where the failure to pay pre-petition claims would cause immediate and irreparable harm to the Debtors' estates.

## PROCEDURAL MOTIONS AND APPLICATION

**A.** **Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion")**

69. Pursuant to the Joint Administration Motion, the Debtors seek to jointly administer these Chapter 11 Cases for procedural purposes only. Given the Debtors' affiliation with one another, joint administration is appropriate and will promote administrative convenience and efficiency for all involved without harming the substantive rights of any party. By jointly administering these Chapter 11 Cases, the Debtors can avoid the unnecessary duplication of notices, applications, orders and related filings, thereby saving the Debtors considerable expenses.

70. Joint administration will also relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The U.S. Trustee and other parties in interest will similarly benefit from joint administration as it will spare them the time and effort of reviewing duplicative filings. Accordingly, I believe that joint administration is warranted and will preserve the value of the Debtors' estates by avoiding duplicative expenses.

**B. Debtors' Emergency Motion for Entry of an Order (I) Extending the Deadline to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs; (II) Waiving the Requirement to File 2015.3 Reports; and (III) Granting Related Relief (the "Extension Motion")**

71. Pursuant to the Extension Motion, the Debtors request that the Court (i) extend the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules and Statements**") by 45 days, for a total of 59 days from the Petition Date, through and including November 20, 2025, without prejudice to the Debtors' ability to request further extensions for good cause and (ii) waive the requirement to file Bankruptcy Rule 2015.3 Reports.

72. To prepare the Schedules and Statements, the Debtors must collect and compile information from books, records, and documents pertaining to thousands of assets, leases, and contracts from each of the 111 Debtor entities. The requisite information is spread across numerous places within the Debtors' organization. Collection of the information will therefore require a significant amount of time and effort on the part of the Debtors and their professional advisors, all of whom must concurrently work to stabilize the Debtors' business operations at the outset of these Chapter 11 Cases.

73. While the Debtors and their professional advisors have prepared diligently for these Chapter 11 Cases and have commenced the preparation of the Schedules and Statements, the

Debtors believe that the requested extension will enhance the accuracy of the Schedules and Statements, which will help avoid the potential need to file substantial subsequent amendments. In addition, no party in interest will be prejudiced by the requested extension because even with the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claims in these Chapter 11 Cases.

74.     Further, filing Bankruptcy Rule 2015.3(a) reports for certain non-Debtor entities that are no longer operating would create an unnecessary administrative burden on the estates and will not provide any valuable information to creditors or parties-in-interest. Specifically, the Debtors have a substantial or controlling interest in subsidiaries associated with the Debtors' Heartland Pharmacy joint venture, including Heartland Healthcare Services, LLC, Heartland Pharmacy of Maryland, LLC, Heartland Pharmacy of PA, LLC (including the joint venture, the "**Heartland Entities**"). As described above, the Heartland Entities are not Debtors in these Chapter 11 Cases and are no longer operating. Accordingly, any Bankruptcy Rule 2015.3 Report would reflect that the Heartland Entities have no value, are non-operational, and have no profits.

75.     Accordingly, I believe the relief requested in the Extension Motion is in the best interests of the Debtors, their estates, and all other interested parties and should be approved.

C.      **Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 30 Unsecured Creditors and Consolidated List of Creditors; (II) Authorizing the Debtors to Redact Certain Personal Identification Information of Individual Creditors and Current and Former Employees; (III) Establishing a Complex Service List; (IV) Approving the Form and Manner of Notice of Commencement; and (V) Granting Related Relief (the "Creditor Matrix Motion")**

76.     Pursuant to the Creditor Matrix Motion, the Debtors request authority to (i) file a consolidated list of their 30 largest unsecured creditors (the "**Consolidated Top 30 Creditors List**") and file a consolidated creditor matrix (the "**Consolidated Creditor Matrix**"); (ii) redact

24

certain personal identification information of individuals; (iii) establish a complex service list; and (iv) file a proposed notice to creditors of the commencement of these Chapter 11 Cases.

77.     The Debtors have a significant number of overlapping creditors which supports allowing them to file the Consolidated Top 30 Creditors List and prepare a Consolidated Creditor Matrix. The Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and duplicative service. For the avoidance of doubt, the Debtors are not requesting authority to (i) file consolidated schedules of assets and liabilities and statements of financial affairs or (ii) substantively consolidate the Debtors.

78.     Additionally, redacting the personal identification information – including the name, homes addresses, telephone numbers and email addresses – of individual creditors who are listed on the Consolidated Creditor Matrix, Consolidated Top 30 Creditors List, schedules of assets and liabilities, and any other filings in these Chapter 11 Cases is appropriate and necessary to protect individuals.[4] There is minimal, if any, public benefit of publishing personal identification information of such individuals which would create an undue risk of identity theft for the affected individuals, as well as open the door to other potential risks to such individuals' safety and welfare. Accordingly, I believe the privacy concerns at issue here outweigh the interest in public access to judicial proceedings and support the relief requested.

79.     Further, to reduce administrative costs to the Debtors' estates, while still protecting the rights to notice of parties in interest, the Debtors propose to establish an official complex service list (the "**Complex Service List**") as detailed in paragraph 22 of the Creditor Matrix Motion. The Debtors further propose that notice of any pleading, motion, application, notice, brief, objection, response, affidavit, declaration, or other writings filed in the Chapter 11 Cases (each a

---

[4] Individuals include the Debtors' current and former employees, directors, contractors, creditors, customers, and other parties in interest.

"**Filing**", collectively, the "**Filings**"), other than an event or deadline that must be served on all creditors pursuant to Bankruptcy Rule 2002, be served only on (a) the parties on the Complex Service List, (b) any party who has filed a notice of appearance and request for service of pleadings but has not yet been added to the Complex Service List, and (c) any party whose interests the specific Filing affects. To the extent that any Filing particularly or discretely affects any party's rights, the Debtors will provide proper notice as otherwise required by due process and all applicable rules and procedures.

80. The Debtors anticipate there will be over 11,000 notice parties in these Chapter 11 Cases. The costs associated with photocopying and mailing routine pleadings to all potential creditors and parties in interest going forward would be substantial and burdensome, especially because it is not necessary to inform all creditors and parties-in-interest of routine matters that do not affect their rights. Accordingly, the Debtors believe it is appropriate for the Court to limit notice in these Chapter 11 Cases such that the Debtors and all other parties-in-interest do not incur needlessly large, recurring expenses in serving routine pleadings.

81. Finally, I understand that, in compliance with Bankruptcy Rule 2002(a), the Debtors, through their proposed noticing and claims agent, propose to serve the notice of commencement of these Chapter 11 Cases on all parties entitled to notice of the commencement of these Chapter 11 Cases, to advise them of the filing of these Chapter 11 Cases and the section 341 meeting of creditors (the "**Notice of Commencement**"). Service of a single Notice of Commencement will not only avoid confusion among creditors but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Consolidated Creditor Matrix if required to serve an individual Notice of Commencement for each Debtor.

82.     Accordingly, I believe the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all other interested parties and should be approved.

**D.     Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date (the "Stretto Retention Application")**

83.     Pursuant to the Stretto Retention Application, the Debtors request that the Court appoint Stretto, Inc. ("**Stretto**") as the claims and noticing agent in these Chapter 11 Cases. Stretto's duties will include preparing and serving required notices and documents in these Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules as directed by the Debtors and the Court.

84.     I understand that Stretto is a leading chapter 11 administrator with significant experience in large, complex chapter 11 cases. I also understand that Stretto's professionals have experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of chapter 11 cases and that Stretto's rates are competitive and reasonable given the quality of Stretto's services and expertise.

85.     Based on the foregoing, the relief requested in the Stretto Retention Application should be approved.

**SUBSTANTIVE MOTIONS**

**A.     Debtors' Emergency Motion for Entry of an Order (I) Authorizing but Not Directing the Debtors to (A) Pay Pre-petition Wages, Compensation, Employee Benefits and Other Employee Obligations and (B) Continue Paying Compensation and Benefits Programs in the Ordinary Course of Business; (II) Authorizing All Banks to Honor Reimbursement of Employee Obligations; and (III) Granting Related Relief (the "Wages Motion")**

86.     Pursuant to the Wages Motion, the Debtors seek authority to pay various employee compensation obligations (the "**Employee Compensation Obligations**") and employee benefit obligations (the "**Employee Benefit Obligations**" and together with the Employee Compensation

27

Obligations, the "**Employee Obligations**"). Employee Compensation Obligations include, among other things, salaries and wages, commissions, incentive plans, severance payments, expense reimbursements, payroll taxes and deductions, and related payroll processing fees. Employee Benefit Obligations include, among other things, paid time off, health plans, 401(k) plans, insurance plans, employee assistance plans, and tuition assistance plans. The Debtors seek to pay the Employee Obligations in the ordinary course of business, including payment of certain pre-petition obligations. The Debtors also seek authorization directing banks to receive, process, honor, and pay any and all checks, electronic funds transfer or similar payment requests with respect to the relief requested in the Wages Motion.

87.     The Debtors specifically request authority to satisfy pre-petition Employee Obligations which total approximately $15.6 million. None of the prepetition amounts proposed to be paid exceed the wage and benefits priority cap found in section 507(a)(4) and (5) of the Bankruptcy Code.

88.     I understand that paying the Employee Obligations and continuing the Debtors' employee benefits programs is necessary to ensure the Debtors are able to retain their employees who are critical to both the operation of the Debtors' business and the success of these Chapter 11 Cases. Specifically, many of the employees are highly trained personnel who cannot be easily replaced, and without their continued, uninterrupted services, the Debtors' business operations will suffer and the well-being of the countless patients who depend on the Debtors for their healthcare needs will be threatened. In addition, without the employees' continued services, the Debtors' efforts to implement strategies to maximize the value of their estates in these Chapter 11 Cases will be compromised.

89.     Moreover, the Debtors believe that most of the employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. If the Debtors are not permitted to pay the Employee Obligations, it will not only cause tremendous disruption to the Debtors' operations and these Chapter 11 Cases but will expose employees to significant financial hardship.

90.     Accordingly, I believe the relief requested is imperative in order for the Debtors to retain employees and bolster morale in order to continue their patient-centered healthcare business and preserve and maximize the value of their estates.

**B.      Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees; and (II) Granting Related Relief ("Tax Motion")**

91.     Pursuant to the Tax Motion, the Debtors seek authority to satisfy all taxes and fees (the "**Taxes and Fees**") due and owing to various federal, state, and local taxing and regulatory authorities (the "**Taxing Authorities**") that arose before the Petition Date, including all taxes and fees subsequently determined by audit or otherwise to be owed for periods before the Petition Date, and to pay any postpetition amounts that become due and owing to Taxing Authorities in the ordinary course of business during these Chapter 11 Cases.

92.     The Debtors estimate that they have accrued approximately $2,124,000 in prepetition Taxes and Fees as detailed in the chart in paragraph 13 of the Tax Motion. Payment of pre-petition Taxes and Fees is warranted and essential to the Debtors' continued operations.

93.     *First*, many of the Taxes and Fees are collected or withheld by the Debtors on behalf of the applicable Taxing Authorities and held in trust by the Debtors. As such, these Taxes and Fees are not property of the Debtors' estates, and the Debtors should be permitted to pay those funds to the authorities as they become due.

94.     *Second*, continued payment of the Taxes and Fees is necessary to prevent the Taxing Authorities from taking actions that may interfere with the Debtors' continued business operations, including asserting liens, seeking to lift the automatic stay, or taking action with respect to the Debtors' licenses. Any such actions could disrupt the Debtors' operations and impose significant costs on the Debtors' estates.

95.     *Third*, the Debtors' directors and officers may be subject to personal liability if certain pre-petition taxes and fees are not paid. The dedicated and active participation of the Debtors' directors, officers, and other employees is not only integral to the Debtors' ongoing operations but essential to the orderly administration of these Chapter 11 Cases. The threat of a lawsuit, and any ensuing liability, would distract the Debtors and their personnel from important tasks to the detriment of all parties in interest and could potentially diminish the Debtors' value as a going concern.

96.     *Finally*, paying the Taxes and Fees will ease the administrative burden of these Chapter 11 Cases, and reduce costs and expenses. Given the relatively modest amount of Taxes and Fees due as of the Petition Date (and in particular the Franchise Taxes and Regulatory Fees and Other Taxes (as defined in the Tax Motion)), allowing the Debtors to continue making tax payments in the ordinary course of business would be far more economical than requiring that the Debtors bifurcate tax returns and attempt to allocate between pre- and post-petition liabilities, among other things, particularly given the priority status afforded tax claims.

97.     Accordingly, I believe payment of the Taxes and Fees is in the best interest of the Debtors' estates and creditors and the Tax Motion should be approved.

**C.    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Existing Insurance Programs, Surety Bonds, and Letters of Credit and Pay All Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, or Enter Into New Insurance Programs, Surety Bonds, and Letters of Credit; (II) Authorizing All Banks to Honor Payments of Insurance, Surety Bond and Letter of Credit Obligations; and (III) Granting Related Relief (the "Insurance Motion")**

98.    Pursuant to the Insurance Motion, the Debtors request authority to (i) maintain their existing insurance policies, surety bonds, letters of credit, and related programs and pay all obligations arising thereunder or in connection therewith, (ii) renew, revise, extend, supplement, or enter into new insurance coverage, surety bonds, or letters of credit as needed in their business judgment; and (iii) direct all banks to honor payments of insurance, surety bond, or letter of credit obligations.

99.    In the ordinary course of business, the Debtors maintain comprehensive insurance coverage on the terms described in the Insurance Motion (the "**Insurance Programs**") under policies for, among other things, property, automobile, professional liability, employment practices liability, workers' compensation, cyber liability, crime, directors' and officers' liability, and umbrella excess liability (collectively, the "**Insurance Policies**"). The Insurance Policies are issued in the name of CVS Health and cover all CVS subsidiaries. As described in the Insurance Motion, CVS Health allocates to the Debtors their share of the related premiums and broker's fees, which the Debtors then reimburse to CVS Health in the ordinary course of business.

100.   In 2025, the Debtors' aggregate annual allocation for the Insurance premiums was approximately $11.3 million. The Debtors' continued access to coverage under the Insurance Policies is essential to the preservation of the Debtors' operations and assets. Any failure to honor the Debtors' obligations under the Insurance Programs could result in the Debtors needing to obtain replacement insurance on an emergency basis, likely at a much higher price.

31

101.    In the ordinary course of business, the Debtors provide surety bonds ("**Surety Bonds**") to governmental units or other public agencies to secure the payment or performance of certain obligations in relation to the Insurance Policies. As of the Petition Date, the Debtors maintain five Surety Bonds, which are renewable on an annual basis and provide a total of approximately $5 million in aggregate Surety Bond coverage.

102.    The Debtors also occasionally maintain letters of credit in connection with certain obligations related to lease performance, regulatory requirements, utilities, and insurance-related obligations (the "**Letters of Credit**"). As of the Petition Date, the Debtors had one outstanding Letter of Credit issued by Truist Bank in the amount of $1,455,195 for purposes of collateralizing certain of their workers' compensation and automotive liability policies from the 2000 to 2012 period. The Debtors must maintain this Letter of Credit to operate their business and effectuate their chapter 11 objectives.

103.    As of the Petition Date, the Debtors were current on all amounts owed on account of the Insurance Programs, Surety Bonds and Letters of Credit. The Debtors estimate that approximately $13,713 in prepetition Surety Bond premiums and approximately $43,655.85 in prepetition Letter of Credit fees (of which $29,103.90 will be billed in arrears for the months of July and August 2025) will come due and owing in the ordinary course of business after the Petition Date.

104.    Authorizing the Debtors to continue reimbursing CVS for payments on account of Insurance Programs, Surety Bond premiums, and Letters of Credit is necessary to preserve the value of the Debtors' assets for the benefit of all parties in interest, to meet the U.S. Trustee guidelines described in the Motion, and to minimize the threat to the Debtors' ongoing business operations. I understand that CVS will only agree to continue allowing the Debtors to be named

32

insureds under the Insurance Policies on the condition that the Debtors pay CVS for the Debtors'
allocated share of the Insurance obligations. I further understand that replacement policies (to the
extent they can be obtained at all) would be far more expensive than the amounts allocated to the
Debtors under the existing Insurance Programs and obtaining replacement insurance would be
highly disruptive to the Debtors' business and an unnecessary distraction from their restructuring
or sale efforts.

105.    Accordingly, I believe the Debtors' ability to continue participating in the Insurance
Programs, and to continue paying all amounts owed on account of the Insurance obligations,
Surety Bond premiums, and Letters of Credit is crucial to the Debtors' business operations and
success of these Chapter 11 Cases, and the Tax Motion should be approved.

  **D.**  **Debtors' Emergency Motion for Entry of Interim and Final Orders (I)
Authorizing the Debtors to Maintain and Administer Their Existing Customer
Programs and Honor Certain Prepetition Obligations Related Thereto; and
(II) Granting Related Relief (the "Customer Programs Motion")**

106.    Pursuant to the Customer Programs Motion, the Debtors request authority to (i)
maintain and administer their existing customer programs, process refunds and credits, and honor
certain pre-petition obligations related thereto and (ii) renew, replace, implement, modify, or
terminate any of the customer programs in the ordinary course of business, without further
application to the Court.

107.    In the ordinary course of business, the Debtors maintain certain retail customer
programs to attract new customers and reward existing ones. In addition, in the ordinary course of
business, customers, pharmacy benefit managers and third-party payors may become entitled to
refunds or credits. These programs generally fall into two categories: (i) Retail Programs and
(ii) Refund and Credits (each as defined below and collectively, the "**Customer Programs**").

108.    At the Retail Pharmacies described above, the Debtors offer certain CVS-branded incentives, discounts, and accommodations (the "**Retail Programs**"). The Retail Programs are designed to attract and maintain positive customer relationships. These programs do not independently entail cash expenditure. The Retail Programs are comprised of two loyalty programs – "**ExtraCare**" and "**ExtraCare Plus.**"

109.    In the ordinary course of business, transactions relating to ExtraCare and ExtraCare Plus are reflected in the Debtors' Profit and Loss Statements and recorded in the Debtors' financial systems as a reduction to gross sales. In the ordinary course of business, the Debtors historically net $41,000 against gross sales per month relating to these programs. The Debtors do not accrue for, nor do they anticipate incurring, any liability in connection with the Retail Programs. Accordingly, as of the Petition Date, the Debtors have no outstanding liabilities related to the Retail Programs.

110.    Further, in the ordinary course of business, the Debtors' patients, customers, and payors may from time to time be entitled to refunds or credits. The Debtors offer refunds or credits to settle overpayments, rebate adjustments, and other qualifying discrepancies, and process credits related to audits ("**Refunds and Credits**"). The Refunds and Credits include (i) Private Pay Refunds – private refunds issued directly to patients, which are primarily for overpayments and accepted billing disputes; (ii) Facility Refunds – client refunds issued to LTCFs, primarily for overpayments and accepted billing disputes; and (iii) Audit Credits – credits processed following resolution of routine billing audits by pharmacy benefit managers, LTCFs and third party payors.

111.    As of the Petition Date, the Debtors have approximately $550,000 in obligations related to Private Pay Refunds.

112.    As of the Petition Date, the Debtors have accrued approximately $2,100,000 in obligations relating to Facility Refunds. A significant portion of the accrual relates to ongoing pricing reconciliations and other reviews that are not expected to be concluded and payable within the next year.

113.    Many third-party audits are multi-year audits, and a number of them are ongoing and not expected to be completed within the next year. As of the Petition Date, the Debtors have accrued approximately $4,150,000 in obligations relating to ongoing Audit Credits.

114.    I understand that the Customer Programs are effective tools essential to preserving customer relationships and the value of the Debtors' estates. I further understand that the Debtors' customers have come to expect and rely on the Retail Programs, all of which are standard within the Debtors' industry. Should such programs be discontinued, the Debtors' customers may take their business elsewhere.

115.    Moreover, patients, customers, pharmacy benefit managers and third-party payors routinely receive Refunds and Credits in the ordinary course of business. An allocation of pre-petition and post-petition amounts could be extremely cumbersome, and a failure to provide patients, customers, pharmacy benefit managers and third-party payors with Refunds and Credits would result in set-off and recoupment attempts, extended delays in payment, and involve significant disruption to the Debtors' business. Together, the Customer Programs generate business to the advantage of all of the Debtors' stakeholders, as ongoing customer support is critical to the success of these Chapter 11 Cases.

E.      **Debtors' Emergency Motion for Entry of Interim and Final Orders (I)
Authorizing the Payment of Certain Prepetition Claims of Critical Vendors
and 503(b)(9) Claimants; and (II) Granting Related Relief (the "Critical
Vendor Motion")**

116.    Pursuant to the Critical Vendor Motion, the Debtors request authority to pay in the
ordinary course of business and consistent with customary past practice, based on their sound
business judgment, certain prepetition claims of or in respect of (i) vendors whose goods and
services are necessary to provide essential healthcare services, maintain the safety of their medical
facilities or are otherwise essential to the Debtors' operations (the "**Critical Vendors**," and such
claims, the "**Critical Vendor Claims**"); and (ii) deliveries of goods to the Debtors during the
twenty-day period prior to the Petition Date that are entitled to administrative expense priority
under section 503(b)(9) of the Bankruptcy Code (the "**Section 503(b)(9) Claims**").

117.    To operate their business, the Debtors rely on the Critical Vendors to provide
essential supplies and services. I understand that the Debtors have evaluated their vendor
relationships and supply chain, consulted their operations managers, reviewed their contracts and
supply agreements, and analyzed applicable law, regulations, and historical practices to identify
the Critical Vendors that supply the products and services most vital to the Debtors' operations.
To that end, the Debtors have identified and designated Critical Vendors pursuant to various
criteria detailed in the Critical Vendor Motion.

118.    I understand the Debtors only intend to make payments contemplated herein to the
extent that they believe the Critical Vendors' failure to continue providing supplies and services
to the Debtors would significantly harm the Debtors' business. Accordingly, the Debtors seek
authority, but not direction, to pay up to $1,700,000 on account of prepetition Critical Vendor
Claims solely to the extent that the Debtors determine in an exercise of their reasonable business

36

judgment that such payments are needed to ensure that a particular vendor continues to provide goods and services to the Debtors that are critical to the Debtors' postpetition operations.

119.    Given the nature of the goods and services provided by Critical Vendors, the consequences if Critical Vendors cease providing such goods and services to the Debtors, and the resulting loss of value to the Debtors' estates, I believe the relief requested herein is necessary and appropriate. The Debtors' authority to address Critical Vendor Claims in the initial days of these Chapter 11 Cases will send a clear signal to their suppliers and customers that the Debtors are both willing and able to conduct business after the Petition Date.

120.    Further, the Debtors' ongoing ability to obtain products as provided herein is necessary to preserve the value of their estates. Absent the payment of the Section 503(b)(9) Claims at the outset of these Chapter 11 Cases – which may merely accelerate the timing of payment and not the ultimate treatment of such claims – the Debtors could be denied access to products necessary to maintain the Debtors' operations and maximize the value of the Debtors' estates. The Debtors believe that, as of the Petition Date, approximately $1,200,000 may be owed on account of Section 503(b)(9) Claims.

121.    Accordingly, the Debtors' ability to pay Critical Vendors and Section 503(b)(9) Claims will provide critical and substantial benefits to the Debtors' business, as well as stakeholders in these Chapter 11 Cases, that far outweigh the potential costs of the disruption that non-payment might cause. As such, I believe the relief requested herein is in the best interest of the Debtors' estates, creditors, and other parties in interest and should be approved.

**F.      Debtors' Emergency Motion for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Service; and (IV) Granting Related Relief (the "Utilities Motion")**

122.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) approving the proposed form of adequate assurance of payment to the Debtors' utility companies; (ii) establishing procedures for determining adequate assurance of payment for future utility services; and (iii) prohibiting utility companies from altering, refusing, or discontinuing utility services on account of outstanding prepetition invoices.

123.     In connection with the normal operations of the Debtors' business, the Debtors incur utility expenses including electricity, gas, water, propone, sewerage, internet, telecommunications, and similar services (the "**Utility Services**").

124.     The Debtors propose to hold an adequate assurance deposit totaling $568,768 for the benefit of their utility companies during these Chapter 11 Cases. The proposed adequate assurance deposit represents an amount equal to approximately one half of the Debtors' average monthly cost of the Utility Services.

125.     The relief requested in the Utilities Motion is warranted because the Utility Services are essential for ongoing business operations and therefore the overall success of these Chapter 11 Cases. Additionally, the proposed adequate assurance payment and procedures for resolving any objections by the utility companies, as detailed in the proposed order to the Utilities Motion, are reasonable and should be approved. The utility companies should also be prohibited from altering, refusing, or discontinuing service to the Debtors. Should any utility company refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted.

126. Accordingly, I believe the relief sought in the Utilities Motion is necessary to ensure that the Debtors maintain continued services from their utility service providers to allow the Debtors to continue operating in the normal course during these Chapter 11 Cases.

**G.  Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Making Reimbursements for Disbursing Arrangements, Purchasing Arrangements, and Shared Services, and (D) Maintain Existing Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (III) Granting Related Relief (the "Cash Management Motion")**

127. Pursuant to the Cash Management Motion, the Debtors seek authority to (i) continue to use their Cash Management System (defined below); (ii) honor certain prepetition obligations in accordance with the operation of the Cash Management System; (iii) continue making reimbursements for the Disbursing Arrangements, Purchasing Arrangements and Shared Services in the ordinary course of business; and (iv) maintain existing Bank Accounts and Business Forms (each defined below). The Debtors also request authorization directing the Debtors' banks to honor all related payment requests.

128. The Debtors operate a centralized cash management system (the "**Cash Management System**") to collect, transfer, and disburse funds across the Debtor entities and to facilitate cash monitoring, forecasting, and reporting. A diagram illustrating the flow of funds through the Debtors' Cash Management System is attached as Exhibit C to the Cash Management Motion.

129. As of the Petition Date, the Debtors maintain a total of 30 bank accounts, which are held at seven different banks (the "**Bank Accounts**"). A description of each of the Debtors' Bank Accounts is provided in paragraph 16 of the Cash Management Motion.

130. In the ordinary course of business, each bank charges certain service fees, which are automatically deducted from the Bank Accounts. The Debtors pay approximately $33,000 each

39

month, with fluctuations depending upon transaction volume. The Debtors estimate approximately $16,000 in accrued but unpaid bank fees exist as of the Petition Date. The Cash Management System depends on the ability of the Banks to maintain and administer the Bank Accounts and to honor and process the Debtors' banking transactions. Accordingly, the Debtors request authority to pay the bank fees in the ordinary course of business to avoid any disruption to their Bank Accounts.

131.    Further, as described above, I understand that as subsidiaries of CVS, the Debtors are able to take advantage of the Disbursing Arrangements, Purchasing Arrangements and Shared Services provided by CVS, which are an integral part of the Cash Management System. Such arrangements allow the Debtors to (i) honor their obligations to vendors and suppliers; (ii) make purchases essential to the operation of their business; and (iii) access various corporate support services. Without the Disbursing Arrangements, Purchasing Arrangements and Shared Services in place – and the ability to reimburse CVS as described herein and in the Cash Management Motion – the Debtors' business and the Cash Management System would be unnecessarily disrupted to the detriment of the Debtors, their creditors, and other stakeholders.

132.    Accordingly, to maintain the current Cash Management System, and ensure that the Debtors have the uninterrupted ability to continue receiving access to the such essential services and functions, it is critical that the Disbursing Arrangements, Purchasing Agreements and Shared Services remain in place and that the Debtors are authorized to continue reimbursing CVS for such services and arrangements on a postpetition basis in the ordinary course of business.

133.    Further, as part of the Cash Management System, the Debtors utilize preprinted business forms (the "**Business Forms**") in the ordinary course of their business. The Debtors also maintain books and records to document, among other things, their revenue and expenses. To

minimize expenses to the estates and avoid confusion on the part of customers, employees, vendors, and suppliers during the pendency of these Chapter 11 Cases, the Debtors request that the Court authorize the Debtors' continued use of all correspondence and Business Forms (including, without limitation, letterheads, correspondence forms, purchase orders, and invoices) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, until such preprinted forms are exhausted, at which time they will be updated to include the designation "Debtor in Possession" with the joint case number in these Chapter 11 Cases.

134. The Cash Management System provides material benefits to the Debtors, including the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the quick movement of funds. Disruptions to the Debtors' Cash Management System could lead to delays in satisfying the Debtors' obligations to employees, vendors, and suppliers. To avoid the potential erosion of value that could ensue from any such disruptions, I believe it is imperative that the Debtors continue using their Cash Management System consistent with historical practice as described above.

**H.** **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, Grant Liens, Provide Superpriority Administrative Expense Claims and Use Cash Collateral; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief (the "DIP Motion")**

135. Pursuant to the DIP Motion, the Debtors seek authority to (i) obtain a secured postpetition financing facility, in an aggregate amount of no less than $110 million, plus interest, costs, fees and other expenses and amounts provided for in, and under the terms and conditions set forth in that certain term sheet, attached as Exhibit 1 to the DIP Motion (the "**DIP Term Sheet**"), by and between the Debtors and JMB; (ii) to draw on the DIP Facility, as needed on an interim basis up to $25 million and as needed on a final basis of no less than $85 million, subject to the

conditions precedent set forth in the DIP Term Sheet, and to use proceeds of the DIP Facility to pay for the Debtors' working capital needs and other administrative expenses necessary for the administration of these Chapter 11 Cases; (iii) grant JMB automatically perfected first-priority security interests in and priming liens on substantially all of the Debtors' assets to secure the DIP Facility and the obligations thereunder; (iv) grant JMB superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code; (v) modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide JMB with the relief necessary to implement and effectuate the terms and provisions of the DIP Term Sheet; (vi) use cash collateral in accordance with the DIP documents and orders; and (vii) grant adequate protection in the form of (a) adequate protection liens under sections 361 and 363(e) of the Bankruptcy Code and (b) adequate protection claims under section 507(b) of the Bankruptcy Code.

136.    Post-petition financing is necessary to fund the Debtors' ongoing operations and the administration of these Chapter 11 Cases. As described above, failure to secure post-petition financing could jeopardize patient healthcare should the Debtors lack the resources to continue providing their current services to LTCFs and their residents. I understand that the proposed DIP Facility provides the Debtors with adequate financing to continue their operations, uninterrupted, and to administer these Chapter 11 Cases.

137.    I understand that Houlihan reached out to eleven (11) potential DIP lenders for proposals for DIP financing. Houlihan received four postpetition financing proposals and one insider postpetition financing proposal. None of the non-insider proposals included a commitment to fund on the Debtors' timeline and would require unavailable time and diligence in order to potentially provide a funding commitment on comparable terms as those offered by the DIP Facility, and the insider proposal did not include specific funding commitments. Further, the

Debtors were not able to obtain postpetition financing in the form of unsecured credit as an administrative claim pursuant to section 503(b)(1) of the Bankruptcy Code.

138.    I understand the Debtors have concluded that JMB's proposal is the best alternative available for post-petition financing and that credit cannot be obtained from another party on more favorable terms. And in consultation with the Debtors and other advisors, I believe the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances. Moreover, immediate and irreparable harm would result if the DIP Facility is not approved on an interim basis. The Debtors need immediate access to the DIP Facility for the necessary liquidity to implement and ensure the success of these Chapter 11 Cases and the Debtors' sale or other restructuring efforts.

139.    In sum, I believe that entry into the DIP Facility will provide comfort to the Debtors' employees, patients, vendors, and suppliers that the Debtors will be able to continue to meet their commitments during the Chapter 11 Cases, and will enable the Debtors to pursue their restructuring goals in a manner that maximizes the value of the Debtors' estates and prioritizes the health and safety of their patients and residents.

140.    Accordingly, I believe it is appropriate for the Court to approve and authorize the Debtors to draw on the DIP Facility on an interim basis and in amounts necessary to avoid immediate and irreparable harm pending a final hearing on the DIP Motion.

I.    **Debtors' Motion for Entry of an Order (I) Authorizing Rejection of Certain Unexpired Leases of Non-Residential Real Property; (II) Approving Procedures for Future Rejection of Additional Unexpired Leases or Executory Contracts; and (III) Granting Related Relief (the "Lease Rejection Motion")**

141.    Pursuant to the Lease Rejection Motion, the Debtors request (i) authority to (a) reject certain unexpired leases of non-residential real property (the "**Leases**") and (b) abandon certain equipment, fixtures, furniture, or other personal property (the "**Personal Property**") that may be located on, or have been installed in, the premises that are the subject matter of the Leases,

43

in each case effective as of the date of this Lease Rejection Motion (the "**Rejection Date**"); and

(ii) approval of procedures for future rejection of additional unexpired leases or executory

contracts (the "**Rejection Procedures**").

142.     In connection with these Chapter 11 Cases, the Debtors are evaluating their

executory contracts and unexpired leases related to their business activities. As of the Petition

Date, the Debtors were party to unexpired leases for approximately 115 pharmacy locations. The

Debtors continue to operate at 101 of these locations but have ceased all operations and

decommissioned, but continue to pay rent, for certain additional former pharmacy locations (the

"**Closed Pharmacies**"). The Debtors are also party to an unexpired lease at their former

headquarters, located 900 Omnicare Center, 201 East 4th Street, Cincinnati, OH 45202 (together

the with Closed Pharmacies, the "**Leased Premises**").

143.     I understand that the Debtors have determined, in their business judgment, that the

Leases for the Leased Premises, identified on Exhibit 1 to the proposed order to the Lease

Rejection Motion, are unnecessary and burdensome to the Debtors' estates and should be rejected

as of the Rejection Date. The Leased Premises related to the Leases were decommissioned prior

to the Petition Date and are currently vacant. Given the costs associated with the Leases, and the

lack of strategic value provided by the Leases to the Debtors' go-forward strategy with respect to

these Chapter 11 Cases (including any potential sale transactions related thereto), the Debtors have

concluded, in consultation with their advisors, including myself, that the Leases are unlikely to

generate significant value for their estates. Further, absent rejection, the Leases impose ongoing

obligations on the Debtors and their estates that constitute an unnecessary drain on the Debtors'

resources compared to any benefits therewith. In contrast, rejection of the Leases will represent

significant monthly cost savings to the Debtors' estates moving forward.

144. To the extent any Personal Property remains at the Leased Premises as of the Rejection Date, the Debtors will make prompt arrangements to remove any Personal Property that they opt not to abandon. I understand the Debtors intend to abandon any such Personal Property that they determine either (a) is of inconsequential value or (b) would cost more to remove and store than its likely value to the Debtors' estates. To reduce post-petition administration costs and in the exercise of the Debtors' sound business judgment, the abandonment of such Personal Property, if any, is appropriate and in the best interests of the Debtors, their estates, and their creditors.

145. Further, through their ongoing review process, the Debtors intend to identify any executory contracts or unexpired leases that the Debtors deem, in their business judgment, to be unnecessary for, or burdensome to, the Debtors' go-forward strategy. To streamline future rejection of unexpired leases and executory contracts, and to obviate the need for repeated motion practice, the Debtors seek authority to implement the Rejection Procedures with respect to all unexpired leases and executory contracts as set forth in the Lease Rejection Motion.

146. Under the circumstances, given the number of executory contracts and unexpired leases to which the Debtors are a party, obtaining separate Court approval of each rejection would impose unnecessary administrative burdens on the Debtors and the Court and result in costs to the Debtors' estates that would decrease the economic benefits of rejection. The Debtors, therefore, request approval of the Rejection Procedures as the most efficient and economical way for the Debtors to address rejection of their executory contracts and unexpired leases.

147. Accordingly, I believe that granting the Debtors authority to reject the Leases and abandon the Personal Property, and approving the Rejection Procedures, will result in substantial

savings to the Debtors and their estates by shedding unnecessary costs and avoiding additional administrative expenses in these Chapter 11 estates for the benefit of all stakeholders.

\*\*\*

148.    The success of these Chapter 11 Cases depends on the Debtors' ability to preserve their operations while they pursue a viable restructuring option or, most likely, complete a sale. And importantly, preservation of the Debtors' operations is critical to the welfare of affected patients who may otherwise suffer immediate and irreparable harm. Further, the relief requested in the First Day Motions is a critical component of maintaining the confidence of key constituencies necessary to implement a restructuring or sale strategy.

149.    I respectfully request that the Court grant the relief requested in the First Day Motions and such other and further relief as may be just and proper.

150.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  September 22, 2025                    By: /s/ Matthew Frank_____

                                              Name: Matthew Frank
                                              Title: Co-Chief Restructuring Officer

46

**Exhibit A**



Omnicare

OMNICARE, LLC
(DE)

Med World Acquisition, LLC (DE) · Three Forks Apothecary, LLC (KY) · NeighborCare Pharmacy Services LLC (DE) (Tier continued on next page) · JHC Acquisition LLC (DE) · Badger Acquisition of Kentucky LLC (DE) · D&R Pharmaceutical Services, LLC (KY) · Evergreen Pharmaceutical of California, LLC (CA)

CP Acquisition, LLC (OK) · OCR Services, LLC (DE) · NIV Acquisition, LLC (DE) · CHP Acquisition, LLC (DE) · Omnicare Pharmacies of the Great Plains Holding Company, LLC (DE) · Pharmacy Associates of Glens Falls, LLC (NY) · Omnicare of Nevada, LLC (DE) · Managed Healthcare, LLC (DE) · Medical Arts Health Care, LLC (GA) · Superior Care Pharmacy, LLC (DE) · Williamson Drug Company, LLC (VA) · Geneva Woods Pharmacy, LLC (AK) · Weber Medical Systems LLC (DE) · AMC-Tennessee, LLC (DE) · MHHP Acquisition Company LLC (DE) · Sterling Healthcare Services, LLC (DE) · TCPI Acquisition, LLC (DE) · UC Acquisition, LLC (DE)

50%

Shore Pharmaceutical Providers, LLC (DE) · Heartland Healthcare Services, LLC (OH)[1] · Home Pharmacy Services, LLC (MO) · Omnicare Pharmacy of Nebraska LLC (DE)

Sun Pharmacy Limited Liability Company (OH) · Heartland Pharmacy of PA, LLC (OH) · Heartland Pharmacy of Maryland, LLC (OH)

Geneva Woods Health Services, LLC (DE)

Geneva Woods Retail Pharmacy, LLC (DE) · Geneva Woods LTC Pharmacy, LLC (DE)

Geneva Woods Pharmacy Alaska, LLC (DE) · Geneva Woods Pharmacy Wyoming, LLC (DE) · Geneva Woods Pharmacy Washington, LLC (DE)

Phamed Holdings, LLC (DE)

[1] Heartland Healthcare Services, LLC — OCR Services, LLC (50%) / Heartland Services, LLC (50%) (unaffiliated)

2



¹ Main Street Pharmacy, L.L.C. - NeighborCare Pharmacy Services, LLC (99%) / NeighborCare Pharmacies, LLC (1%)

² Care Pharmaceutical Services, LP - NeighborCare Pharmacy Services, LLC (99%) / Omnicare Indiana Partnership Holding Company LLC (1%)

³ PRN Pharmaceutical Services, LP - NeighborCare Pharmacy Services, LLC (99%) / Omnicare Indiana Partnership Holding Company LLC (1%)



4