

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 13, 2026**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OMNICARE, LLC, *et al.*,[1] | ) | Case No. 25-80486 (SGJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Related to Docket Nos. 288, 398 |

**ORDER (I) APPROVING THE ASSET PURCHASE**
**AGREEMENT BETWEEN THE DEBTORS AND GENIERX HOLDINGS LLC;**
**(II) AUTHORIZING THE SALE OF SUBSTANTIALLY**
**ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,**
**INTERESTS AND ENCUMBRANCES; (III) AUTHORIZING THE ASSUMPTION**
**AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES IN CONNECTION THEREWITH; AND (IV) GRANTING RELATED RELIEF**

---

[1]The last four digits of Omnicare, LLC's federal tax identification number are 1351. There are 110 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Omnicare. The location of Omnicare, LLC's corporate headquarters and the Debtors' service address is One CVS Drive, Mail Code 1160, Woonsocket, RI 02895.

This matter coming before the Court on the *Debtors' Motion for Entry of an Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling the Auction and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof; and (II) Granting Related Relief* [Docket No. 288] (the "**Motion**")[2] filed by Omnicare, LLC and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), seeking, among other things, entry of an order (this "**Sale Order**"): (i) authorizing and approving the sale of the Purchased Assets of the Debtors to GenieRx Holdings LLC or its designees, as applicable (collectively, the "**Buyer**"), in accordance with the terms and conditions set forth in that certain Asset Purchase Agreement, dated as of March 31, 2026, by and among the Debtors and Buyer (as amended, supplemented or otherwise modified by the parties thereto, the "**APA**," and together with the Transition Services Agreement, Powers of Attorney, and all other ancillary agreements, documents and instruments attached thereto or contemplated thereunder, the "**Transaction Documents**"), a copy of which is attached hereto as **Exhibit A**, free and clear of all liens, claims, interests, and encumbrances to the fullest extent permitted by law, except for the Assumed Liabilities and Permitted Encumbrances as set forth in the APA; (ii) authorizing the assumption and assignment of the Assigned Contracts and Assigned Leases; and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having entered the *Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of*

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Bidding Procedures Order, or the APA (as defined below), as applicable.

*Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling the Auction and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof; and (II) Granting Related Relief* [Docket No. 398] (the "**Bidding Procedures Order**"), that, among other things, (i) approved the Bidding Procedures for the sale of the Debtors' Assets, including the process, timeline, and notice thereof and (ii) authorized the Debtors' entry into the Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction in accordance with the Bidding Procedures; and the Debtors having determined pursuant to the Bidding Procedures Order and after extensive marketing and in consultation with the Consultation Parties, that the Auction would be cancelled, the Stalking Horse Bid submitted by the Stalking Horse Bidder is the Successful Bid and the Stalking Horse Bidder is the Successful Bidder, in accordance with the Bidding Procedures, as reflected in the *Notice of Cancellation of Auction and of Successful Bidder* [Docket No. 799] (the "**Successful Bidder Notice**"); and the Debtors having filed and served the *Assumption and Assignment Notice* and *Supplemental Assumption and Assignment Notice* [Docket Nos. 789 and 798] that set forth, among other things, the Cure Costs for the executory contracts and unexpired leases set forth on the Cure Schedules thereto; and upon due, adequate, and sufficient notice of the Motion, the Bidding Procedures Order, the Assumption and Assignment Notice, the Successful Bidder Notice, the APA, and all other related transactions contemplated thereunder and in this Sale Order (such transactions collectively, the "**Sale**"); and this Court having held a hearing to consider the relief requested in the Motion on a final basis (the "**Sale Hearing**"); and this Court having determined that the legal and factual bases set forth in the Motion and the (i) *Declaration of Steven Balash in Support of Debtors' Motion for Entry of an Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the*

*Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling the Auction and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner and Notice Thereof; and (II) Granting Related Relief* [Docket No. 818-4]; (ii) *Declaration of Paul Rundell in Support of Debtors' Motion for Entry of an Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling the Auction and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner and Notice Thereof; and (II) Granting Related Relief* [Docket No. 818-3]; and (iii) *Declaration of Marcy Wilder, Privacy Expert, in Support of the Debtors' Proposed Sale and Transfer of Personally Identifiable Information and PHI* [Docket No. 800] (collectively, the "**Sale Declarations**"), and at the Sale Hearing, establish just cause for the relief granted herein; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and, except as provided in paragraph 3 herein, all objections, responses, and reservations of rights filed or asserted in respect of the Motion, if any, having been withdrawn, resolved, or overruled; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

**I.      Jurisdiction, Venue, Final Order and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Motion and to grant the relief requested therein pursuant to 28 U.S.C. §1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc*, Miscellaneous Order No. 33 (N.D. Tex. August 3, 1984). Venue of these Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408

and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

B.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein. In the absence of a stay pending appeal, Buyer, being a good-faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the APA at any time after entry of this Sale Order, subject to the provisions of the APA, and shall not be subject to any applicable stay, including any stay provided by Bankruptcy Rules 6004(h) and 6006(d).

C.      The statutory predicates for the relief granted herein are sections 105, 363, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and section E of the *Procedures for Complex Cases in the Northern District of Texas* (the "**Complex Case Procedures**").

## II.     Notice

D.      As evidenced by the certificates of service filed with the Court and the relevant information regarding the sale posted on the website of the Debtors' claims and noticing agent, Stretto, Inc., and as demonstrated by the evidence presented and the representations of counsel at the Sale Hearing, (i) proper, timely, and adequate notice of the Motion, the Sale Hearing, the Auction (and cancellation thereof), the Sale, the Assumption and Assignment Procedures, the Assumption and Assignment Notice, the Cure Costs, the Successful Bidder Notice, all related transactions collectively described in the Transaction Documents, and all related deadlines has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 9007, 9008, and 9014, Local Rule 9007-1, section E of the Complex Case

Procedures, and the Bidding Procedures Order; (ii) such notice was good, sufficient, and appropriate under the circumstances and provided parties-in-interest with reasonable and adequate opportunity to object or be heard with respect to the Motion, the Sale, the APA, the Assumption and Assignment Notice, the assumption and assignment of the Assigned Contracts and Assigned Leases, and entry of this Sale Order; and (iii) no other or further notice of the Motion, the Sale Hearing, the Auction (and cancellation thereof), the Sale, the Assumption and Assignment Procedures, the Assumption and Assignment Notice, the Cure Costs, the Successful Bidder Notice, all related transactions collectively described in the APA, and all related deadlines is necessary or shall be required.  The requirements of Bankruptcy Rule 6004(a) and Local Rule 9007-1 are satisfied by such notice.

E.      The Debtors filed with this Court and served the Assumption and Assignment Notice, containing (i) the list of executory contracts and unexpired leases that may be potentially assumed and assigned in connection with the Sale; (ii) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of the executory contracts and unexpired leases; (iii) Cure Costs, where applicable, and (iv) the procedures and deadlines for objecting to the assumption and assignment of the executory contracts and unexpired leases and related Cure Costs, where applicable, on all counterparties to such executory contracts and unexpired leases. The Assumption and Assignment Notice (i) included the Debtors' good faith calculation of Cure Costs with respect to each Assigned Contract or Assigned Lease; (ii) stated that assumption and assignment is not guaranteed and is subject to this Court's approval; and (iii) prominently displayed the Cure Objection Deadline (as defined in the Assumption and Assignment Notice).  The filing and service of the Assumption and Assignment Notice was good, sufficient, and appropriate under the circumstances, and no other or further notice need be given.

F.      Notice, as evidenced by the certificates of service filed with the Court at Docket Numbers 299, 427, 670, 733, 796, and 806, and as posted on the website of the Debtors' claims and noticing agent, Stretto, Inc., has been provided in the form and manner specified in the Motion and required by the Bidding Procedures Order, and the Court finds that the notice is adequate and sufficient in all respects to bind all creditors, bidders and other parties in interest in these Chapter 11 Cases.

**III.     Compliance with Bidding Procedures and Bidding Procedures Order**

G.      As demonstrated by the Sale Declarations, the evidence proffered or adduced at the Sale Hearing, and the arguments of counsel made on the record at the Sale Hearing, the Debtors' marketing and sale process with respect to the Purchased Assets were in accordance with the Bidding Procedures and afforded a full, fair, and reasonable opportunity for any Potential Bidder to make a higher or otherwise better offer to purchase the Purchased Assets and participate in the sale process.

H.      As demonstrated by the Sale Declarations, the evidence proffered or adduced at the Sale Hearing, and the arguments of counsel made on the record at the Sale Hearing, the Debtors and their professionals have adequately marketed the Purchased Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order, and the sale process was conducted in a diligent, non-collusive, fair, reasonable, and good-faith manner. The Debtors afforded Potential Bidders a full and fair opportunity to participate in the bidding process for the Purchased Assets and to make higher or otherwise better offers. The process conducted by the Debtors and their professionals pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Purchased Assets, and there was no other

transaction or combination of transactions available or presented that would have yielded a higher or better result for the Purchased Assets.

**IV.     Highest or Otherwise Best Offer**

I.      As demonstrated by the Sale Declarations, the evidence proffered or adduced at the Sale Hearing, and the arguments of counsel made on the record at the Sale Hearing, (i) the APA constitutes the highest or otherwise best offer for the Purchased Assets, (ii) the Debtors have determined, in consultation with the Consultation Parties, that the transactions contemplated by the APA maximize value for the benefit of the Debtors' estates, creditors, stakeholders, and parties in interest, and constitute the highest or otherwise best offer for the Purchased Assets, and (iii) entry into the APA constitutes a valid and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties and is in accordance and compliance with the Bidding Procedures and the Bidding Procedures Order. No other person, entity, or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors than the Buyer has. The APA provides fair and reasonable terms for the purchase of the Purchased Assets.

**V.     Sale in Best Interests**

J.      Approval of the Transaction Documents, the Sale, and all related transactions together with the actions to be taken by the Debtors and the Buyer in connection therewith, are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their estates, their creditors and other parties in interest. The Debtors have demonstrated (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan of reorganization or liquidation, in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and appropriate to

maximize the value of the Debtors' estates, subject to the regulatory approvals and other conditions set forth in the APA.

K. The Debtors' decision to enter into the APA and pursue and consummate the Sale in accordance with the terms of the APA constitutes a proper exercise of the fiduciary duties of the Debtors and their respective directors, managers, and officers. The Sale must be approved and consummated promptly to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale. Given the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price, the Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved. The consummation of the Sale and the assumption and assignment of the Assigned Contracts and Assigned Leases are legal, valid, and properly authorized under sections 105(a), 363(b), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect to the Sale. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts and Assigned Leases to the Buyer in connection with consummation of the Sale, and the assumption and assignment of the Assigned Contracts and Assigned Leases is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

## VI. Arm's-Length Sale and Good Faith of Buyer

L. None of the Debtors nor the Buyer, their respective affiliates, officers, directors, members, partners, principals, or equityholders (or equivalent) nor any of their respective representatives, attorneys, advisors, successors, or assigns have engaged in any conduct that would cause or permit the APA or the consummation of the Sale and related transactions contemplated in the APA to be avoided, or costs or damages to be imposed, under section 363(n) of the

Bankruptcy Code. The Buyer has not acted in a collusive manner with any Person. The APA was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion or fraud, in good faith, and from arm's-length bargaining positions.

M. None of the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code. Among other things, (i) the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) the Debtors and the Buyer complied with the provisions of the Bidding Procedures Order and the Bidding Procedures, (iii) the Buyer agreed to subject its bid to the Bidding Procedures, (iv) the Debtors and the Buyer, and, as applicable, their respective management, board of directors, board of managers (or comparable governing authority), employees, agents, advisors, and representatives, each actively participated in the marketing and sale process, and each acted in good faith and without collusion or fraud of any kind, (v) all payments to be made by the Buyer, and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed, and (vi) the Buyer was designated the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

N. The Buyer is purchasing the Purchased Assets pursuant to the APA in good faith and for fair and reasonable consideration, and the Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Sale, and the Buyer would not consummate the Sale without such protections. The Buyer is, therefore, entitled to the full rights, benefits, privileges, and protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and nonbankruptcy law in connection with this proceeding, the Sale, each term of the APA and other Transaction Documents, and each term of this Sale Order.

## VII.   Corporate Authority

O.      The Debtors have (i) full requisite corporate or other organizational power and authority to execute, deliver, and perform their obligations under the APA and other Transaction Documents, and to consummate the Sale and other transactions contemplated thereby, and such execution, delivery, and performance have been duly and validly authorized by all necessary corporate or other organizational action of each applicable Debtor, (ii) taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery, and performance of their obligations under the APA and other Transaction Documents and the consummation by the Debtors of the Sale and other transactions contemplated thereby, including as required by their respective organizational documents, and, upon execution thereof, each such agreement executed by such Debtor will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with its terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, will constitute a valid and binding obligation of such Debtor. No additional consents or approvals, other than those provided in the APA, are necessary or required for the Debtors to enter into the APA and other Transaction Documents, perform their obligations therein, and otherwise consummate the Sale and other transactions approved by this Sale Order.

## VIII.   No Merger; Buyer Not an Insider; No Successor Liability

P.      The Buyer is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code. The Buyer is not a "successor" to, a mere continuation of, or an alter ego of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Buyer and the Debtors by reason of any theory of law or equity. There is no common identity of incorporators, directors, or controlling stockholders between the Debtors and the Buyer. The

11

Buyer is not holding itself out to the public as a successor to or a continuation of the Debtors or their estates. The Sale does not amount to a consolidation, succession, merger, or de facto merger of Buyer and the Debtors. The transfer of the Purchased Assets to the Buyer, and the assumption of the Assumed Liabilities by the Buyer, except as otherwise explicitly set forth in the APA, does not, and will not, subject the Buyer to any liability whatsoever (including any successor liability whatsoever), with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, transferee, derivative, vicarious, or assignee liability of any kind or character, including, but not limited to, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, products liability, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise (collectively, the "**Successor or Other Liabilities**").

## IX. Binding and Valid Transfer

Q. The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title, and interest that the Debtors or their estates possess with respect to the Purchased Assets, free and clear, to the fullest extent permitted by law, of all Interests (as defined below) (other than the Permitted Encumbrances and the Assumed Liabilities) in or against such assets and equity interests comprising the Purchased Assets, as set forth in the APA. Immediately prior to consummating the Sale, the

Purchased Assets constituted property of the Debtors' estates, good title was vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code, and the Debtors were the sole and rightful owners of the Purchased Assets. The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 365(f), and 365(m), and all of the applicable requirements of such sections have been satisfied in respect of the Sale. Upon and following the consummation of the Sale, the Buyer shall be vested with good and marketable title to the Purchased Assets and shall be the sole and rightful owner of the Purchased Assets.

### X. No Fraudulent Transfer

R. The Transaction Documents are valid and binding contracts between the Debtors and the Buyer. The Transaction Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction. The consideration provided by the Buyer in respect of the Sale (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors more expeditiously than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, and similar laws and acts). None of the Debtors nor the Buyer is entering into the Sale or other transactions contemplated by the Transaction Documents fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.

13

**XI.**      **Section 363(f) is Satisfied**

S.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full with respect to each Interest (as defined below) in the Purchased Assets; therefore, the Debtors may sell the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities).

T.      The Buyer would not have entered into the Transaction Documents, and would not consummate the transactions contemplated thereby, if the (i) Sale of the Purchased Assets to the Buyer was not free and clear of all Interests (defined below) (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever or (ii) Buyer would, or in the future could, be liable for any of the Interests (other than the Permitted Encumbrances and the Assumed Liabilities). The Buyer will not consummate the transactions contemplated by the Transaction Documents unless this Court expressly orders that none of the Buyer, any of the Buyer's Affiliates or Subsidiaries, or any of their respective officers, directors, partners, principals, direct and indirect equityholders (including any equity sponsor), professionals, or representatives, successors, or assigns, or their respective assets or properties, including, without limitation, the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, recoupment, or otherwise, directly or indirectly, any Interests (other than the Permitted Encumbrances and the Assumed Liabilities), including rights or claims based on any Successor or Other Liabilities. The total consideration to be provided under the APA reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed

Liabilities) of any kind or nature whatsoever (including, without limitation, any potential Successor or Other Liabilities).

U.     Not transferring the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities), including rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state, federal, foreign law, or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

V.     The Debtors may sell the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those holders of Interests that did not timely object to the Sale or the Motion, or withdrew objections to the Sale or the Motion, are deemed to have consented to the Sale and the Motion pursuant to section 363(f)(2) of the Bankruptcy Code. All Interests (except to the extent that such encumbrances are Permitted Encumbrances or Assumed Liabilities) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, therefore, all holders of Interests are adequately protected.

**XII.     Cure Costs and Adequate Assurance of Future Performance**

W.     The assumption and assignment of the Assigned Contracts and Assigned Leases pursuant to the terms of this Sale Order (i) is integral to the APA, (ii) is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and (iii) represents the

reasonable exercise of reasonable and prudent business judgment by the Debtors. The assumption and assignment of the Assigned Contracts and Assigned Leases (i) is necessary to sell the Purchased Assets to the Buyer, (ii) allows the Debtors to maximize the value of the Purchased Assets, including the Assigned Contracts and Assigned Leases, (iii) limits the losses suffered by the counterparties to the Assigned Contracts and Assigned Leases (the "**Counterparties**"), and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Contracts and Assigned Leases. For these reasons, the Debtors have exercised reasonable business judgment in assuming and assigning the Assigned Contracts and Assigned Leases and such assumption and/or assignment is in the best interests of the Debtors' estates.

X.    Pursuant to section 365(f) of the Bankruptcy Code, each Assigned Contract or Assigned Lease to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in such contract prohibiting, restricting, or conditioning its assignment or transfer. No section of any of the Assigned Contracts and Assigned Leases that would prohibit, restrict, or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Assigned Contracts and Assigned Leases in connection with the Sale shall have any force or effect.

Y.    Subject to the terms of the APA, the Debtors or the Buyer, as the case may be, have cured or have demonstrated the ability to cure, any default under any Assigned Contract or Assigned Lease with respect to any act or omission that occurred prior to the date of assignment of such Assigned Contract or Assigned Lease. The Debtors' or Buyer's, as applicable and in accordance with the APA, obligations to pay the Cure Costs upon the Closing Date, and the Buyer's obligations to perform the obligations under the Assigned Contracts and Assigned Leases

16

thereafter, shall constitute adequate assurance of their future performance of and under the Assigned Contracts and Assigned Leases, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. Pursuant to the Bidding Procedures Order, all Counterparties to the Assigned Contracts and Assigned Leases that failed to file with this Court and serve a timely objection are forever barred from asserting any such objection with regard to the assumption or assignment of their Assigned Contract or Assigned Lease. This Court finds that, with respect to all such Assigned Contracts and Assigned Leases, the payment of Cure Costs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the applicable Debtor to the Buyer of each of the Assigned Contracts and Assigned Leases. To the extent any Assigned Contract or Assigned Lease is not an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of this Sale Order that are applicable to the Purchased Assets.

**XIII.    Not a Sub Rosa Plan**

Z.    Neither the APA nor the Sale constitutes a sub rosa chapter 11 plan or an element of such plan for which approval has been sought without the protection that a disclosure statement would afford. Neither the APA nor the Sale impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of the Debtors' subsequent chapter 11 plan.

**XIV.    Necessity of Order**

AA.    The Buyer would not have entered into the APA and would not consummate the Sale without all of the relief provided for in this Sale Order. The consummation of the Sale pursuant to this Sale Order and the APA is necessary for the Debtors to maximize the value of

their estates for the benefit of the Debtors, their estates, their creditors, and all other parties in interest. It is important that the Sale be consummated as expeditiously as possible to preserve the value of the Purchased Assets.

## XV. Compelling Circumstances for an Immediate Sale

BB. The Debtors' decision to enter into the APA and to consummate the Sale represents an exercise of reasonable business judgment. The Debtors have demonstrated both (i) good, sufficient, and reasonable business purposes and justifications for approving the APA, and (ii) compelling circumstances for the immediate approval and consummation of the Sale contemplated by the Transaction Documents outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization or liquidation, in that the prompt consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtors' estates and to expedite distributions to creditors.

## XVI. Waiver of Bankruptcy Rules 6004(h) and 6006(d)

CC. The sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets. Therefore, time is of the essence in consummating the Sale contemplated by the Transaction Documents, and the Debtors and the Buyer intend to close the transactions as soon as reasonably practicable following the entry of this Sale Order. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions as contemplated by the Transaction Documents. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the Sale transaction contemplated by this Sale Order.

## XVII. Final Order

18

DD. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**I.     General Provisions**

1.     **<u>Findings of Fact and Conclusions of Law</u>**. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Chapter 11 Cases pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such. This Court's findings shall also include any oral findings of fact and conclusions of law by this Court during or at the conclusion of the Sale Hearing. Additionally, this Court's findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference as if fully set forth in this Sale Order.

2.     **<u>Motion is Granted</u>**. Subject to paragraph 3 of this Sale Order, the Motion and the relief requested therein is granted and approved, and the Sale transaction contemplated in the Motion and the APA and other Transaction Documents are approved in their entirety, in each case as set forth herein and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this Sale Order.

3.      **Certain Objections Preserved**. Notwithstanding anything to the contrary herein, the specific objections listed on **Exhibit B** are preserved in all respects and will be either consensually resolved or continued to a date to be set by the Court and resolved by separate order of the Court (the "**Preserved Objections**") and all rights of affected parties to appeal such separate orders are also preserved in all respects. The Preserved Objections shall be resolved prior to any Closing of the Sale (unless otherwise separately ordered by the Court after notice and an opportunity for a hearing). Such resolutions shall be set forth in one or more orders of the Court, which may provide that the terms of this Sale Order shall be made applicable to the substantive rights of any party or issue that is the subject of such Preserved Objection (to the extent the Court overrules such Preserved Objection) or provide such other relief as determined by the Court. All valid and timely objections to assumption and assignment of any applicable Assigned Contract or Assigned Lease, including to proposed Cure Costs, are preserved and shall be resolved pursuant to the terms set forth in this paragraph and paragraphs 33 to 35 of this Sale Order.

4.      **All Other Objections Overruled**. All other objections to, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the APA and other Transaction Documents, the Sale, the entry of this Sale Order, or the relief granted herein have been resolved, withdrawn, or overruled. Those parties who did not timely object to the Motion or the entry of this Sale Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy Code.

II.     **Approval of the APA**

5.      **Approval and Authorization**. The APA and other Transaction Documents, including, in each case, any amendments, supplements, and modifications thereto, and all of the

terms and conditions thereof, are hereby approved. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale pursuant to and in accordance with the terms and conditions of the APA and other Transaction Documents, (b) close the Sale as contemplated in the APA and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their obligations as contemplated by the APA and other Transaction Documents, including the assumption and assignment to the Buyer of the Assigned Contracts and Assigned Leases, in each case without further notice to or order of this Court, and including any actions that otherwise would require further approval by the Counterparties, equityholders, members, or boards of directors or managers, or similar governing bodies, as the case may be, without the need to obtain such approvals, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and other Transaction Documents and the Sale. The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any amounts that become payable by the Debtors pursuant to the APA and other Transaction Documents.

6.     **Binding Effect**. The APA and other Transaction Documents and this Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of Claims (whether known or unknown) against the Debtors, all holders of Liens or other Interests against, in, or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors (including all Counterparties), the Buyer, and all successors and assigns of each of the foregoing, including any

trustee subsequently appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and any Person seeking to assert rights on behalf of any of the foregoing or that belong to the Debtors' estates. The APA and the Transaction Documents shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers.

7.      Notwithstanding any other provision of this Sale Order, the Debtors and the Buyer may, at their option, mutually agree, and are hereby authorized (but not required), to modify the APA to provide for the sale or transfer of the equity interests of one or more Subsidiaries that are Asset Sellers, including but not limited to by means of an outright sale or a plan of reorganization or liquidation for such Subsidiaries that are Asset Sellers, so long as any such modification does not have a material adverse effect on the Debtors' estates; *provided*, however, that the Debtors shall provide the Committee with reasonable notice prior to agreeing to any such modification, and the foregoing authorization shall not be deemed a waiver of the Committee's right to object to any such modification and/or confirmation of any such Chapter 11 plan.

## III.      Transfer of Purchased Assets

8.      **Valid Transfer**. The transfer of the Purchased Assets to the Buyer in accordance with the terms of the APA will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets and the Assumed Liabilities and will, subject to the Closing, render the Buyer liable for the Assumed Liabilities. The transfer of each of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets which transfer vests or will vest the Buyer with all right, title, and interest to the Purchased Assets. Pursuant to the APA, in no instance shall the Buyer have any liability for, or be deemed to have assumed, any Excluded Liabilities.

9. Nothing herein, in the APA, any lists of executory contracts to be assumed and assigned and/or any Assumption and Assignment Notices, or any documents relating to any of the foregoing shall permit or otherwise effect a sale, assignment or other transfer of (i) insurance policies issued by ACE American Insurance Company, ACE Property & Casualty Insurance Company, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance Company, Westchester Fire Insurance Company, Illinois Union Insurance Company, Pacific Indemnity Company, Federal Insurance Company, Executive Risk Indemnity Inc., Executive Risk Specialty Insurance Company, and Chubb Custom Insurance Company (collectively, and together with their U.S.-based affiliates and predecessors, the "**Chubb Companies**"), or any related agreements (collectively with such insurance policies, the "**Chubb Insurance Contracts**"), and/or (ii) any rights, proceeds, benefits, interests, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts; provided, however, that the Debtors may pursue claims in accordance with the terms of the Chubb Insurance Contracts, and, if applicable, deliver to the Buyer any proceeds; and provided further that the Debtors shall pursue such claims as described in Section 2.01(p) of the APA.

10. **Free and Clear**. Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors shall transfer the Purchased Assets, including, but not limited to, the Assigned Contracts and Assigned Leases, to the Buyer in accordance with the terms of the APA; such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets; and the Buyer shall take title to and possession of such Purchased Assets free and clear of (a) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising any time prior to the Closing Date (collectively, the "**Liens**"), and (b) all debts (as that term is defined in section 101(12) of the Bankruptcy Code)

arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, credits, allowances, options, limitations, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, easements, rights of way, encroachments, and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether imposed by agreement, understanding, law, equity, or otherwise (including rights with respect to claims and liens (i) that purport to give to any party a right or option to effect a setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Purchased Assets, or any similar rights, if any,  (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership, or (iii) recoupments, arising out of or related to any Healthcare Laws, Permit, or Provider Numbers, as well as participation in any Government Health Program) (collectively, as defined in this clause (b), the "**Claims**" and,

together with the Liens and any other encumbrances or interests of any kind or nature whatsoever, the "**Interests**"), relating to, accruing, or arising any time prior to the Closing Date, with the exception of the Permitted Encumbrances and the Assumed Liabilities. Any and all valid and perfected Interests in the Purchased Assets shall attach to the cash proceeds of the Sale ultimately attributable to the property against or in which such Interests are asserted, with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the assets and equity interests comprising the Purchased Assets, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto. Except as expressly assumed by the Buyer under the APA, the transfer of the Purchased Assets to the Buyer and the assignment to the Buyer of the Assigned Contracts and Assigned Leases will not subject the Buyer to any liability whatsoever that may become due or owing under the Assigned Contracts and Assigned Leases prior to the Closing Date, or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities. Following the Closing, no holder of any Interests (other than those expressly assumed by the Buyer or Permitted Encumbrances) or other party in interest may interfere with the Buyer's use and enjoyment of the Purchased Assets based on or related to such Interests, or any actions that the Debtors may take in these Chapter 11 Cases, and no party may take any action to prevent, interfere with, or otherwise enjoin consummation of the Sale.

11.     Pursuant to the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, Provide Superpriority Administrative Expense Claims and Use Cash Collateral, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 257]

(the "**Final DIP Order**") and the DIP Credit Agreement (as defined in the Final DIP Order), until Payment in Full of the Obligations (as each such term is defined in the DIP Credit Agreement), the Purchased Assets and the proceeds thereof under the Transaction Documents or otherwise, constitute DIP Collateral and Cash Collateral (each as defined in the Final DIP Order). Upon receipt by any Borrower (as defined in the DIP Credit Agreement) or any of its Subsidiaries (as defined in the DIP Credit Agreement) of any Net Cash Proceeds (as defined in the DIP Credit Agreement) received from the sale of the Purchased Assets pursuant to the Transaction Documents, the Borrowers shall pay to the DIP Lender (as defined in the Final DIP Order) the Net Cash Proceeds received in connection with such sale up to an amount equal to the aggregate outstanding amount of the Obligations, in accordance with and subject to the Final DIP Order and, as applicable, the terms and conditions of the DIP Credit Agreement and the other DIP Documents (each as defined in the Final DIP Order).

12. **Valid and Binding**. The APA and other Transaction Documents are valid and binding contracts between the Debtors and the Buyer and shall be enforceable pursuant to their terms. The APA and other Transaction Documents, the Sale, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, or any converted or successor cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person. The APA and other Transaction Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, and similar laws and acts). Neither the

26

Debtors nor the Buyer are entering into the transactions contemplated by the APA with any fraudulent or otherwise improper purpose, including for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer.

13.      **Release of Interests**. Each and every federal, state, local, and other governmental agency, governmental department, administrative agency, filing agent, filing officer, title agent, title company, recording agency, registrar of deeds, registrar of patents, trademarks, or other intellectual property, secretary of state, federal, state, and local official, and any other persons and entity who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets, (i) is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the APA, and (ii) the APA and Sale Order are binding upon and shall govern the acts of such persons. Neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments or documents to effectuate, consummate, and implement the provisions of this Sale Order, and the provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of Interests (other than the Permitted Encumbrances and the Assumed Liabilities) shall be self-executing. The Buyer may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county, or other territory or jurisdiction in which any of the Debtors or their Affiliates is incorporated or has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the Closing Date. On the Closing Date, each of the Debtors' creditors is authorized and directed to

execute such documents and take all other actions as may be reasonably necessary to release its Liens, if any, in the Purchased Assets, as such Liens may otherwise exist. If any Person that has filed a financing statement, mortgage, mechanic's lien, lis pendens, or other statement, document, or agreement evidencing an Interest in any portion of the Purchased Assets (other than statements or documents with respect to Permitted Encumbrances or Assumed Liabilities) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases, and/or other similar documents necessary for the purpose of documenting the release of all Interests that such Person has in the Purchased Assets, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and/or other similar documents on behalf of such Person with respect to the Purchased Assets, (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order that, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests of any kind or nature in the Purchased Assets, and (c) the Buyer and the Debtors may seek in this Court, or any other court of appropriate jurisdiction, to compel the appropriate parties to execute termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Interests that such Person has in the Purchased Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

14. **Conditions Precedent**. The Debtors and the Buyer shall have no obligation to proceed with the Closing until all conditions precedent to their respective obligations to proceed have been met, satisfied, or waived in accordance with the terms of the APA.

15. **Surrender of Purchased Assets**. Unless the Buyer otherwise consents, all Persons that are in or come into possession of any portion of the Purchased Assets, at any time prior to the Closing Date, are hereby directed to surrender possession of such Purchased Assets to the Buyer on the Closing Date, or at such time thereafter as the Buyer may request. Subject to the terms of this Sale Order, all Persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the APA and this Sale Order.

16. **Licenses and Permits**. Upon the Closing, Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in, to, and under the Assigned Permits and the Debtors shall be relieved from any further responsibility or liability with respect to the Assigned Permits arising on or accruing after the Closing (other than as expressly provided for in the APA and other Transaction Documents). Except as otherwise provided for in the Transaction Documents, the Buyer acknowledges and agrees that, from and after the Closing, it shall be responsible for complying with the terms of each Assigned Permit (other than any such terms that are deemed unenforceable under this Order).

17. To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any Assigned Permit (including pursuant to any Power of Attorney with respect to an Assigned Permit that cannot be transferred to Buyer on the Closing Date), and all Assigned Permits are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

18. To the extent that any Assigned Permit or other license or permit necessary for the operation of the Debtors' business is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code or is otherwise unable to be transferred to

29

the Buyer on the Closing Date (each, an "**Untransferable Permit**"), the Buyer shall apply for and obtain a replacement for such Untransferable Permit promptly after the Closing Date, and such Untransferable Permit shall remain in full force and effect for the Buyer's benefit (until a new license or permit is obtained. The Debtors may, at their reasonable discretion, take all steps necessary to cooperate with the Buyer in connection with any such application as provided for in the APA or other Transaction Documents, as applicable.

19. No person or entity (including any Governmental Authority) may deny, revoke, suspend, condition, or refuse to issue or renew any permit, license, approval, agreement, or similar grant relating to the operation of the Purchased Assets on account of (a) the filing or pendency of these Chapter 11 Cases; (b) the consummation of the transactions contemplated by the APA and other Transaction Documents; or (c) the assumption, payment, guaranty, or other satisfaction of any obligation or liability of the Debtors by the Buyer or any other person or entity.

20. Any provision in any Assigned Permit that purports to require or impose any fees, penalties, fines, charges, deposits, or other payments, collateral, security, or guaranties as a result of or as a condition of the assignment of such Assigned Permit to the Buyer shall have no force and effect with respect to the transactions authorized by this Order, and such provisions are unenforceable under sections 363(l), 365(e)(1), 365(f), and/or 541(c)(1) of the Bankruptcy Code, as applicable.

21. **Assumption and Assignment**. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the applicable Debtors' assumption and assignment, to the Buyer, and the Buyer's acceptance of, the Assigned Contracts and Assigned Leases (subject to further Court order with respect to the Nonresidential Real Property Leases described and defined below), on the terms set forth in the APA, is hereby

approved, and the requirements of section 365(b)(1) and 365(f)(2) with respect thereto are hereby found and deemed to be satisfied. The Debtors are hereby authorized and, unless the Debtors and the Buyer otherwise agree, directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing Date, the Assigned Contracts and Assigned Leases free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities and as otherwise required pursuant to the APA) and (b) execute and deliver to the Buyer such documents or other instruments as Buyer deems may be necessary to assign and transfer the Assigned Contracts, Assigned Leases, and Assigned Permits to the Buyer.

22. The foregoing assumption and assignment remains subject to the Court's determination of *the Debtors' Motion for Entry of an Order Authorizing the Assumption of Certain Unexpired Leases of Nonresidential Real Property and Granting Related Relief* [Docket No. 782] (the "**Assumption Motion**") through which the Debtors seek authority to assume, pursuant to section 365 of the Bankruptcy Code, certain unexpired leases of nonresidential real property identified in Schedule 1 attached thereto (the "**Nonresidential Real Property Leases**"). Such Nonresidential Real Property Leases shall only be deemed Assigned Leases that shall be assumed and assigned to the Buyer pursuant to the terms of this Sale Order to the extent the Court grants the relief requested in the Assumption Motion and authorizes the Debtors to assume the Nonresidential Real Property Leases.

23. **Ipso Facto Clauses Ineffective**. With respect to the Assigned Contracts and Assigned Leases, and with respect to the Sale of the Purchased Assets to the Buyer, (a) the Debtors may assume each of the Assigned Contracts and Assigned Leases in accordance with section 365 of the Bankruptcy Code, (b) the Debtors may assign each Assigned Contract or Assigned Lease in

31

accordance with the APA and sections 363 and 365 of the Bankruptcy Code, and, to the extent

provided in section 365 of the Bankruptcy Code, such assignment may occur notwithstanding and

without giving effect to any provisions in any Assigned Contract or Assigned Lease that prohibit

or condition the assignment of such Assigned Contract or Assigned Lease or allow the party to

such Assigned Contract or Assigned Lease to terminate, recapture, impose any penalty, condition

renewal or extension, or modify any term or condition upon the assignment of such Assigned

Contract or Assigned Lease, which provisions constitute unenforceable anti-assignment or ipso

facto provisions which are void and of no force and effect, (c) all other requirements and conditions

under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and

assignment, as applicable, to the Buyer of each Assigned Contract or Assigned Lease have been

satisfied, and (d) effective upon the Closing Date, the Assigned Contracts and Assigned Leases

shall be transferred and assigned to, and from and following the Closing Date remain in full force

and effect for the benefit of, the Buyer, notwithstanding any provision in any Assigned Contract

or Assigned Lease that prohibits, restricts, or conditions such assignment or transfer and, pursuant

to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability

with respect to the Assigned Contracts and Assigned Leases after such assumption and assignment

to the Buyer, except as provided in the APA. To the extent that any provision in any Assigned

Contract or Assigned Lease (y) prohibits, restricts, or conditions, or purports to prohibit, restrict,

or condition, such assumption and assignment or assignment (including, without limitation, any

"change of control" provision), or (z) is modified, breached, or terminated, or deemed modified,

breached, or terminated by any of the following: (i) the commencement of these Chapter 11 Cases,

(ii) the insolvency or financial condition of any of the Debtors at any time before the closing of

these Chapter 11 Cases, (iii) the Debtors' assumption and/or assignment of such Assigned Contract

32

or Assigned Lease, (iv) a change of control or similar occurrence, or (v) the consummation of the Sale, then such provision shall be deemed modified so as not to entitle the non-Debtor party thereto to prohibit, restrict, or condition such assumption and assignment or assignment, to modify, terminate, or declare a breach or default under such Assigned Contract or Assigned Lease, or to exercise any other default-related rights or remedies with respect thereto. With respect to the Sale of the Purchased Assets to the Buyer, all such provisions constitute unenforceable anti-assignment or ipso facto provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

24. **Assumption and Assignment of Assumed Contracts; Cure**. All defaults or other obligations of the Debtors under the Assigned Contracts and Assigned Leases arising or accruing prior to the Closing Date, or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Assigned Leases, shall be cured by the Debtors or the Buyer, as applicable, as set forth in the APA and this Sale Order.

25. All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts and Assigned Leases have been satisfied. Each of the Assigned Contracts and Assigned Leases shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms as of the Closing Date, subject to any amendments or modifications agreed to between a Counterparty to an Assigned Contract and Assigned Lease and the Buyer. Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assigned Contract or Assigned Lease, and each Assigned Contract or Assigned Lease shall be

fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited or modified by this Sale Order. To the extent provided in the APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

26.    Subject to determination of the amount of the Cure Costs (as may be applicable) and payment of the Cure Costs pursuant to the terms hereof and the APA (in the case of the Buyer, subject to the Cure Cost Cap set forth in the APA), and the Debtors' assignment of the Assigned Contracts and Assigned Leases to the Buyer under the provisions of this Sale Order, no default or other obligations arising prior to the Closing Date shall exist under any Assigned Contract or Assigned Lease, and each Counterparty to an Assigned Contract or Assigned Lease is forever barred, estopped, and permanently enjoined from (a) declaring a default by the Debtors or the Buyer under such Assigned Contract or Assigned Lease based on acts or occurrences arising prior to or existing as of the Closing Date, (b) raising or asserting against the Debtors or the Buyer, or the property of either of them, any assignment fee, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts and Assigned Leases, or (c) taking any other action against the Buyer as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contract or Assigned Lease. Each counterparty to an Assigned Contract or Assigned Lease hereby is also forever barred, estopped, and permanently enjoined from (y) asserting against the Debtors or the Buyer, or the property of any of them, any default or Claim arising out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date and (z) imposing or charging against Buyer or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to Buyer of such Assigned Contract or Assigned Lease.

27.     Subject to the terms and conditions of the APA, and upon the Closing Date, the Debtors and/or the Buyer (as applicable) shall have to the extent necessary (a) cured or provided adequate assurance of cure of, any default existing prior to the date hereof under the Assigned Contracts and Assigned Leases, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code and (b) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under the Assigned Contracts and Assigned Leases, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(B) of the Bankruptcy Code. The Debtors' and/or the Buyer's (as applicable) obligations to pay the Cure Costs under the APA and the Buyer's agreement to perform the obligations under the Assigned Contracts and Assigned Leases in accordance with the terms of the APA shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparties.

28.     To the furthest extent permitted by law, any party that may have had the right to consent to the assumption or assignment of an Assigned Contract or Assigned Lease is deemed to have consented to such assumption and assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to timely object to the assumption or assignment of such Assigned Contract or Assigned Lease in accordance with the Bidding Procedures Order, and the Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assigned Contract or Assigned Lease pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Any Counterparty to an Assigned Contract or Assigned Lease who has not timely filed and served an objection shall be barred from objecting, or asserting monetary or non-monetary defaults, with respect to any such applicable Assigned Contract or

35

Assigned Lease, and such applicable agreement, if designated as an Assigned Contract or Assigned Lease in accordance with the terms of the APA, shall be deemed assumed by the Debtors and assigned to the Buyer on the Closing Date pursuant to this Sale Order.

29.     To the extent a Counterparty to an Assigned Contract or Assigned Lease failed to timely object to the Cure Costs for any applicable Assigned Contract or Assigned Lease in accordance with the Bidding Procedures Order, such Cure Costs shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Costs at any time.

30.     The requirements of Bankruptcy Rule 6006(f)(6) are hereby waived, for cause shown, with respect to the Motion and the relief requested therein.

31.     Upon and as of the Closing Date, the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assigned Contract or Assigned Lease and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts and Assigned Leases (except as may be required by the APA).

32.     The Counterparties shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Purchased Assets.

33.     From the date of the entry of this Sale Order, the Debtors may, with the consent of the Buyer, settle objections to assumption and assignment of any applicable Assigned Contract or Assigned Lease, including to proposed Cure Costs, without any further notice to or action by any party or order of this Court (including by paying any agreed Cure Cost); *provided that* notice to

and consent of the Buyer shall be required to the extent that the Buyer is liable for such Cure Costs pursuant to the APA or the Buyer's rights and remedies are otherwise altered in any way by the resolution. Unless this Court orders otherwise, contemporaneously with the resolution of any such objection, the executory contract or unexpired lease underlying such objection shall be deemed an Assigned Contract or Assigned Lease without the necessity of obtaining any further order of this Court.

34.    Notwithstanding anything to the contrary herein (but subject to paragraph 35 of this Sale Order), no executory contract or unexpired lease as to which a Counterparty to an Assigned Contract or Assigned Lease has timely filed and served an objection shall be considered an Assigned Contract or Assigned Lease under this Sale Order unless and until such timely objection to the assumption and assignment of such executory contract or unexpired lease has been resolved or overruled.

35.    If a non-Debtor party to an Assigned Contract or Assigned Lease has objected solely to the proposed Cure Cost, the Debtors or the Buyer, as applicable, may pay the undisputed portion of such Cure Cost and place the disputed amount in a segregated account pending further order of the Court or mutual agreement of the parties. So long as such disputed amounts are held in such segregated account, the Debtors may, without delay, assume and assign such Assigned Contract or Assigned Lease to the applicable assignee in accordance with this Sale Order. Under such circumstances, the objecting non-Debtor Counterparty's recourse shall be limited to the funds held in such segregated account on account of such Assigned Contract or Assigned Lease. In the event of a dispute as of, or after, the Closing Date regarding assumption and assignment or cure of any Assigned Contract or Assigned Lease, any applicable cure payments that are outstanding with respect to such Assigned Contract or Assigned Lease shall be made following the entry of an order

resolving any such dispute (or upon the consensual resolution of such dispute as may be agreed by the Debtors or the Buyer, as applicable, and such non-Debtor Counterparty).

36. Nothing in this Sale Order, the Motion, or any other notice or any other document is or shall be deemed an admission by the Debtors or the Buyer that any contract is an executory contract or must be assumed and assigned pursuant to the APA or in order to consummate the Sale.

## IV. No Successor Liability; Prohibition of Actions Against the Buyer

37. **No Continuity**. The Buyer is not a "successor" to, a mere continuation of, or an alter ego of any of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Buyer and the Debtors by reason of any theory of law or equity. Neither the purchase of the Purchased Assets by the Buyer, nor the fact that the Buyer is using any of the Purchased Assets previously operated by the Debtors, will cause the Buyer to be deemed a successor to, combination of, or alter ego of, in any respect, any of the Debtors or the Debtors' businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, de facto merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or

otherwise, including liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their Affiliates, or in any way relating to the operation of any of the Purchased Assets or ratings experience of the Debtors prior to the Closing Date, in each case other than the Permitted Encumbrances and Assumed Liabilities.

38. Except with respect to Permitted Encumbrances and Assumed Liabilities, the Buyer shall not have, assume, or be deemed to assume, or in any way be responsible for, any liability or obligation of any of the Debtors or their estates, or any of the Debtors' predecessors or Affiliates with respect to the Purchased Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise specifically agreed in the APA, the Buyer shall not have any liability, responsibility, or obligation for any Interests of the Debtors or their estates, including any claims, liabilities, or other obligations related to the Purchased Assets, including, for the avoidance of doubt, and without limiting the generality of the foregoing, any Successor or Other Liabilities, which may become due or owing (a) prior to the Closing Date or (b) from and after the Closing Date but which arise out of or relate to any act, omission, circumstance, breach, default, or other event occurring prior to the Closing Date.

39. Except with respect to Permitted Encumbrances and Assumed Liabilities, or as otherwise specifically set forth in the APA, all Persons (including all debt holders, equity holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, contract counterparties, customers, landlords, licensors, and employees), and other holders of Interests against or in any of the Debtors or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, known or unknown, contingent or noncontingent, liquidated or unliquidated, senior or subordinate, asserted or unasserted, whether arising prior to

or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Purchased Assets to the Buyer (including, without limitation, any Successor or Other Liabilities or rights or claims based thereon) shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing against the Buyer, or their respective assets or properties, including, without limitation, the Purchased Assets, the Interests of any kind or nature whatsoever such Person had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Purchased Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) against the Buyer, or their respective assets or properties, including the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, or their respective assets or properties, including the Purchased Assets; (c) creating, perfecting, or enforcing any Interest against the Buyer, or their respective assets or properties, including the Purchased Assets; (d) asserting any setoff, or right of subrogation, of any kind against the Buyer or its respective assets or properties, including the Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) to the extent prohibited by section 525 of the Bankruptcy Code, revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

40.     Except with respect to Permitted Encumbrances and Assumed Liabilities, or as provided in the APA, and without limiting other applicable provisions of this Sale Order, the Buyer is not, by virtue of the consummation of the Sale, assuming, nor shall it be liable or responsible for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) in any way whatsoever relating to or arising from the Debtors, the Purchased Assets, or the Debtors' operation of their businesses or use of the Purchased Assets on or prior to the Closing Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Closing Date or are to be observed, paid, discharged, or performed on or prior to the Closing Date (in each case, including, without limitation, Successor or Other Liabilities and any liabilities that result from, relate to, or arise out of tort or product liability claims), or any liabilities calculable by reference to the Debtors or their assets or operations (including by reference to the Debtors' experience or similar ratings), or relating to continuing conditions existing on or prior to the Closing Date, including with respect to any of the Debtors' predecessors or Affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to Successor or Other Liabilities.

41.     Notwithstanding, and with all rights specifically reserved by the Buyer, the Debtors and any interested party, nothing herein is intended to, nor shall it be deemed to, preclude the National Labor Relations Board or any court from finding that any purchaser of the Debtors' assets is subject to a successor collective bargaining obligation under the National Labor Relations Act in accordance with *NLRB v. Burns International Security Services*, 406 U.S. 272 (1972) and applicable law.

42.     None of the Buyer nor any of its affiliates, equityholders, successors, and assigns, nor any of their professionals shall have, incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and other Transaction Documents and the entry into and consummation of the Sale, except as expressly provided in the APA and this Sale Order. Neither the Debtors, nor any of their respective affiliates, equityholders, successors, and assigns, nor any of their professionals shall have, incur any liability to, or be subject to any action by, the Buyer arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and other Transaction Documents and the entry into and consummation of the Sale, except as expressly provided in the APA and this Sale Order.

## V.      Other Provisions

43.     **<u>Texas Taxing Authorities</u>**. Notwithstanding anything to the contrary in this Sale Order or the APA, any ad valorem taxes owed to the Texas Taxing Authorities[3] for tax year 2026 that are secured by property being acquired by the Buyer (the "**2026 Ad Valorem Tax Claims**") shall be paid and allocated between the Debtors and Buyer as set forth in the APA. Subject to any claims and defenses of the Debtors or Buyer, the Texas Taxing Authorities shall retain their respective liens arising from the 2026 Ad Valorem Tax Claims, if any, against the Purchased Assets, as applicable, until paid in full, including any applicable penalties or interest. The tax liens of the Texas Taxing Authorities for tax year 2025 and prior years, if any, shall attach to the sale proceeds of any property that is the subject of such liens. All parties' rights to object to the priority,

---

[3] The "Texas Taxing Authorities" are Bexar County, City of Carrollton, Dallas County, Ector County Appraisal District, City of El Paso, Ellis County, Fannin County Appraisal District, Fort Bend County, City of Frisco, Galveston County, Harris County, Hidalgo County, Jefferson County, Kaufman County, Lewisville Independent School District, City of McAllen, McClennan County, Montgomery County, Nueces County, Parker County Appraisal District, Polk County, City of Prosper, Prosper Independent School District, Rockwall County Appraisal District, San Marcos Consolidated Independent School District, Shelby County, Smith County, Tarrant County, Tom Green County Appraisal District, Upshur County, and Van Zandt County Appraisal District.

validity, amount, and extent of any tax claims of the Texas Taxing Authorities and the asserted liens in connection therewith, are fully preserved.

44.    **Reservation of Rights of the United States**. Notwithstanding any provision to the contrary in this Sale Order, the Transaction Documents, or any other document related to the Sale, nothing shall (a) release, nullify, preclude, or enjoin the enforcement of any police or regulatory power or any liability that any entity would be subject to as the owner, lessor, lessee, or operator of property that such entity owns, operates, or leases after the date of entry of this Sale Order; (b) affect the setoff or recoupment rights of the United States; (c) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (d) authorize the assumption, assignment, sale, or other transfer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) agreements, (v) awards, (vi) task orders, (vii) property, (viii) intellectual property, (ix) patents, (x) leases, (xi) certifications, (xii) applications, (xiii) registrations, (xiv) billing numbers, (xv) national provider identifiers, (xvi) provider transaction access numbers, (xvii) licenses, (xviii) permits, (xix) covenants, (xx) inventory, (xxi) guarantees, (xxii) indemnifications, (xxiii) data, (xxiv) records, or any other interests belonging to the United States (collectively, the "**Federal Interests**") without compliance by the Debtors and Buyer with all terms of the Federal Interests and with all applicable non-bankruptcy law; (e) be interpreted to set cure amounts or to require the United States to novate, approve, or otherwise consent to the sale, assumption, assignment, or transfer of any Federal Interests; (f) waive, alter, or otherwise limit the United States' property rights; or (g) expand the scope of 11 U.S.C. § 525. In the event of an inconsistency or conflict between the provisions of the Transaction Documents and any provision of this Sale Order, as to the United States, the provisions of this Sale Order and federal law shall govern.

45. **Good Faith of Buyer**. The transactions contemplated by the APA and this Sale Order are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not alter, affect, limit, or otherwise impair the validity of the Sale (including the assumption, assignment, and/or transfer of the Assigned Contracts and Assigned Leases), unless such authorization and consummation of the Sale are duly stayed pending such appeal. The Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. As a good faith purchaser of the Purchased Assets, the Buyer has not entered into any agreement with any other potential bidders and has not colluded with any potential or actual bidders, and therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyer, and the Sale may not be avoided, pursuant to section 363(n) of the Bankruptcy Code.

46. **Bulk Sales, Bulk Transfer, or Similar Laws**. No "bulk sales," "bulk transfer," or any similar law (including without limitation those relating to taxes) of any state or other jurisdiction shall apply in any way to the transactions authorized herein, including without limitation the APA and Sale.

47. **Bankruptcy Rules Satisfied or Waived**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6006(d) are hereby expressly waived and shall not apply. Time is of the essence

44

in closing the Sale. Accordingly, the Debtors and Buyer are authorized and empowered to close the Sale immediately upon entry of this Sale Order.

48.     **Failure to Specify Provisions**. The failure to include or specifically reference any particular provision of the APA and other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA and other Transaction Documents be authorized and approved in their entirety.

49.     **Conflicts**. To the extent that this Sale Order is inconsistent with the Motion, the terms of this Sale Order shall control and govern. To the extent that there are any inconsistencies between the terms of this Sale Order, on the one hand, and the APA and other Transaction Documents, on the other hand, the terms of this Sale Order shall control and govern. To the extent that any plan of reorganization or liquidation, or any order of any type or kind entered in these Chapter 11 Cases or any subsequent chapter 7 case into which these Chapter 11 Cases may be converted, conflicts with or derogates from the terms of the APA (or any ancillary agreements or instruments delivered pursuant thereto) or this Sale Order, the terms of the APA (or any ancillary agreements or instruments delivered pursuant thereto) and this Sale Order shall control and govern to the extent of any such conflict or derogation. Unless otherwise provided herein, to the extent this Sale Order is inconsistent with the Bidding Procedures Order or the terms of the APA, this Sale Order shall govern.

50.     **Transaction Document Modifications**. The APA and other Transaction Documents may be modified, amended, or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof without further notice to or order of this Court, so long as any such modification, amendment, or supplement does not have a material adverse effect on

the Debtors' estates and does not otherwise conflict with this Sale Order; *provided, however*, that notice shall be provided to the Committee.

51.     **<u>Automatic Stay</u>**. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without the need for further order of this Court, to allow the Buyer and the Debtors to deliver any notice provided for in the APA and to allow the Buyer and the Debtors to take any and all actions permitted under the APA and other Transaction Documents.

52.     **<u>Further Assurances</u>**. From time to time, as and when requested by the other, the Debtors and the Buyer, as the case may be, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including, such actions as may be necessary to vest, perfect or confirm, record, or otherwise, in the Buyer its right, title, and interest in and to the Purchased Assets and the Assigned Contracts and Assigned Leases, subject to the provisions of the APA.

53.     **<u>Retention of Jurisdiction</u>**. This Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the APA and other Transaction Documents, and any amendments thereto and any waivers and consents given thereunder, and to adjudicate, if necessary, any and all disputes concerning or in any way relating to the Sale, including retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) interpret, implement, and enforce the provisions of this Sale Order, including the injunctions and limitations of liability set forth in this Sale Order, (c) decide any disputes concerning this Sale Order and the APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APA and this Sale Order including the

interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets and any Assigned Contract or Assigned Lease and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) and the resolution of the Preserved Objections, and (d) enter any orders under sections 105, 363, and 365 of the Bankruptcy Code, or otherwise, with respect to the Purchased Assets and the Assigned Contracts and Assigned Leases.

# # # END OF ORDER # # #

Order submitted by:

Charles A. Beckham, Jr. (TX #02016600)
Ian T. Peck (TX #24013306)
Martha Wyrick (TX #24101606)
**HAYNES AND BOONE, LLP**
2801 N. Harwood Street
Suite 2300
Dallas, TX 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
Email: charles.beckham@haynesboone.com
      ian.peck@haynesboone.com
      martha.wyrick@haynesboone.com

Vincent E. Lazar (admitted *pro hac vice*)
Derek L. Wright (admitted *pro hac vice*)
Angela M. Allen (admitted *pro hac vice*)
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
Facsimile: (312) 527-0484
Email: vlazar@jenner.com
      dwright@jenner.com
      aallen@jenner.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**APA**

*Execution Version*
*Confidential*

**ASSET PURCHASE AGREEMENT**

By and Among

**Omnicare, LLC,**

(as Seller),

the other Asset Sellers Party Hereto,

and

**GenieRx Holdings LLC**

(as Buyer)

dated as of

**March 31, 2026**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................................... 2

ARTICLE II PURCHASE AND SALE ................................................................................ 18
    Section 2.01.   **Purchase and Sale of Assets**.................................................................... 18
    Section 2.02.   **Excluded Assets** ....................................................................................... 20
    Section 2.03.   **Assumed Liabilities** ................................................................................. 23
    Section 2.04.   **Excluded Liabilities** ................................................................................ 23
    Section 2.05.   **Purchase Price and Deposit; Cure Claims** ........................................... 23
    Section 2.06.   **Withholding Tax** ...................................................................................... 25
    Section 2.07.   **Third Party Consents** .............................................................................. 25
    Section 2.08.   **Inventory** ................................................................................................. 26

ARTICLE III CLOSING ..................................................................................................... 26
    Section 3.01.   **Closing** .................................................................................................... 26
    Section 3.02.   **Closing Deliverables** .............................................................................. 26

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER............................ 28
    Section 4.01.   **Organization and Qualification** ............................................................. 28
    Section 4.02.   **Authority of Seller** ................................................................................. 28
    Section 4.03.   **No Conflicts; Consents** ........................................................................... 29
    Section 4.04.   **Title to Purchased Assets; Ownership**................................................... 29
    Section 4.05.   **Financial Statements; Indebtedness; Accounts Receivable**.............. 29
    Section 4.06.   **Material Contracts** ................................................................................. 31
    Section 4.07.   **Legal Proceedings**.................................................................................. 32
    Section 4.08.   **Legal Compliance** .................................................................................. 32
    Section 4.09.   **Employment Matters**.............................................................................. 32
    Section 4.10.   **Benefit Plans** ........................................................................................... 33
    Section 4.11.   **Real Properties**. ...................................................................................... 34
    Section 4.12.   **Environmental Matters**.......................................................................... 34
    Section 4.13.   **Health Care Matters** .............................................................................. 35
    Section 4.14.   **Permits**.................................................................................................... 36
    Section 4.15.   **Taxes** ....................................................................................................... 37
    Section 4.16.   **Intellectual Property** .............................................................................. 37
    Section 4.17.   **Insurance** ................................................................................................ 37
    Section 4.18.   **Related Party Matters** ............................................................................ 38
    Section 4.19.   **Improper Payments**................................................................................ 38
    Section 4.20.   **Inventory** ................................................................................................. 38
    Section 4.21.   **Absence of Certain Changes**.................................................................. 39
    Section 4.22.   **Material Suppliers** ................................................................................. 39
    Section 4.23.   **Information Laws**. ................................................................................... 40
    Section 4.24.   **Brokers** ................................................................................................... 41
    Section 4.25.   **Exclusivity of Representations and Warranties** ................................. 41

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 41
    Section 5.01.   **Organization of Buyer** .......................................................... 41
    Section 5.02.   **Authority of Buyer** ............................................................ 41
    Section 5.03.   **No Conflicts; Consents** ...................................................... 42
    Section 5.04.   **Financing** ........................................................................... 42
    Section 5.05.   **Certain Arrangements** ...................................................... 42
    Section 5.06.   **WARN Act and Mass Layoffs** ......................................... 42
    Section 5.07.   **Legal Proceedings** ............................................................ 42
    Section 5.08.   **Investigation** ..................................................................... 43
    Section 5.09.   **Solvency** ............................................................................ 43
    Section 5.10.   **Brokers** ............................................................................. 43

ARTICLE VI COVENANTS ............................................................................................. 43
    Section 6.01.   **Conduct of Business Prior to the Closing** ...................... 43
    Section 6.02.   **Seller Access to Information** ............................................ 45
    Section 6.03.   **Buyer Access to Information** ........................................... 46
    Section 6.04.   **Regulatory Notices and Clearances** ............................... 47
    Section 6.05.   **Antitrust Notification** ...................................................... 48
    Section 6.06.   **Employee Matters** ............................................................ 51
    Section 6.07.   **Corporate Name** ............................................................... 53
    Section 6.08.   **Public Announcements** ..................................................... 53
    Section 6.09.   **Enterprise Level Contracts** ............................................. 54
    Section 6.10.   **Post-Closing Receipts** ...................................................... 54
    Section 6.11.   **Reasonable Efforts; Cooperation** ................................... 54
    Section 6.12.   **Privacy and Records Compliance** ................................... 55
    Section 6.13.   **Buyer Designees** ............................................................... 56
    Section 6.14.   **Further Assurances** ......................................................... 56
    Section 6.15.   **Seller Bonds** .................................................................... 57
    Section 6.16.   **Restrictive Covenants** ..................................................... 57
    Section 6.17.   **Transition Services Agreement** ....................................... 58
    Section 6.18.   **Covenant Not to Sue** ........................................................ 59

ARTICLE VII CONDITIONS TO CLOSING ................................................................... 59
    Section 7.01.   **Conditions to Obligations of All Parties** ........................ 59
    Section 7.02.   **Conditions to Obligations of Buyer** ............................... 59
    Section 7.03.   **Conditions to Obligations of Seller** ............................... 60
    Section 7.04.   **Waiver of Conditions** ...................................................... 61

ARTICLE VIII TAX MATTERS ...................................................................................... 61
    Section 8.01.   **Cooperation on Tax Matters; Purchase Price Allocation** ................. 61
    Section 8.02.   **Retention of Tax Records** ................................................ 63
    Section 8.03.   **Transfer Taxes** ................................................................ 63
    Section 8.04.   **Prorations** ......................................................................... 63

ARTICLE IX TERMINATION .......................................................................................... 64
    Section 9.01.   **Termination** ...................................................................... 64
    Section 9.02.   **Effect of Termination** ...................................................... 65

Section 9.03.   Break-up Fee and Expense Reimbursement .................................... 66
Section 9.04.   Payment of Break-up Fee ...................................................... 67

ARTICLE X BANKRUPTCY COURT MATTERS ............................................... 67
Section 10.01.   Sale Order .................................................................. 67
Section 10.02.   Bankruptcy Process ........................................................ 67
Section 10.03.   Approval ................................................................... 67
Section 10.04.   Other ...................................................................... 67

ARTICLE XI MISCELLANEOUS ............................................................... 68
Section 11.01.   Non-Survival .............................................................. 68
Section 11.02.   Notices ................................................................... 68
Section 11.03.   Interpretation ............................................................ 69
Section 11.04.   Disclosure Schedules ...................................................... 70
Section 11.05.   Headings .................................................................. 70
Section 11.06.   Severability .............................................................. 70
Section 11.07.   Entire Agreement .......................................................... 70
Section 11.08.   Successors and Assigns .................................................... 71
Section 11.09.   No Third-Party Beneficiaries .............................................. 71
Section 11.10.   Non-Recourse .............................................................. 71
Section 11.11.   Amendment and Modification; Waiver ........................................ 71
Section 11.12.   Buyer Acknowledgement; Disclaimer of Representations and
                 Warranties ................................................................ 72
Section 11.13.   Governing Law; Submission to Jurisdiction; Waiver of Jury
                 Trial   73
Section 11.14.   Counterparts .............................................................. 74
Section 11.15.   Specific Performance ...................................................... 74
Section 11.16.   Bulk Sales/Tax Clearance Waiver ........................................... 74
Section 11.17.   Expenses; No Right of Set-Off ............................................. 74

EXHIBITS

Exhibit A      **Form of Bill of Sale and Assignment and Assumption Agreement**
Exhibit B      **Form of Intellectual Property Assignment Agreement**
Exhibit C      **Form of Sale Order**
Exhibit D      **Form of Patient Records Custody Agreement**
Exhibit E      **Form of Power of Attorney**
Exhibit F      **Initial Draft of Transition Services Agreement**
Exhibit G      **List of Excluded Transition Services**
Exhibit H      **List of Potential Transition Services**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated March 31, 2026 (the "**Effective Date**") is entered into by and among Omnicare, LLC, a Delaware limited liability company ("**Seller**"), and each of the Subsidiaries of Seller set forth on the signature page hereto (collectively with Seller, the "**Asset Sellers**" and each, an "**Asset Seller**"), on the one hand, and GenieRx Holdings LLC, a Delaware limited liability company ("**Buyer**"), on the other hand. The Asset Sellers and Buyer are sometimes referred to in this Agreement collectively as the "**Parties**" and individually as a "**Party**."

## RECITALS

**WHEREAS**, on September 22, 2025 (the "**Petition Date**") Seller and its direct and indirect Subsidiaries listed on Schedule 1.01(a) hereto (collectively with Seller, the "**Debtors**", and each, a "**Debtor**"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the Northern District of Texas Dallas Division (the "**Bankruptcy Court**") which are being jointly administered under the lead Case No. 25-80486 (SGJ) (the "**Chapter 11 Cases**").

**WHEREAS**, the Asset Sellers are engaged in the provision of prescription drug distribution services, medication management services, and pharmaceutical consulting services to assisted living facilities, skilled nursing facilities, and facilities within the Mental Health Group Home segment and Intermediate Care Facilities for Individuals with Intellectual and Developmental Disabilities segment of the Asset Sellers, which services include (i) dispensing, packaging, labeling, and delivering prescription medications and over-the-counter medications, (ii) providing clinical pharmacy services, medication therapy management, and medication review services, (iii) providing pharmacy consulting services related to regulatory compliance, formulary management, and drug utilization review, (iv) infusion therapy services and specialty infusion services, (v) dispensing of medical supplies, durable medical equipment, and other similar healthcare-related products, and (vi) acting as a pharmaceutical repackager (collectively, the "**Business**").

**WHEREAS**, Debtors remain in possession of their respective businesses and manage their respective properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, the Asset Sellers, subject to the receipt of any higher or better offer received by Seller for the Purchased Assets (as hereinafter defined) in accordance with the Bidding Procedures Order (as hereinafter defined), desire to sell the Purchased Assets to Buyer or Buyer Designees pursuant to the terms and conditions of this Agreement, and Buyer and Buyer Designees desire to so purchase and acquire the Purchased Assets from the Asset Sellers in accordance with Sections 105, 363 and 365 of the Bankruptcy Code.

**WHEREAS**, subject to higher or otherwise better offers as contemplated by the Bidding Procedures Order, Seller intends to seek the entry of the Sale Order (as hereinafter defined) by the Bankruptcy Court approving this Agreement and authorizing the Asset Sellers to consummate the transactions contemplated by this Agreement upon the terms and subject to the

conditions set forth herein and in the Sale Order.

**WHEREAS**, the board of managers of Seller has determined that it is advisable and in the best interests of its bankruptcy estate and the beneficiaries of such estate to consummate the transactions contemplated by this Agreement pursuant to the Bidding Procedures Order and the Sale Order and has approved this Agreement, subject to higher or otherwise better offers as contemplated by the Bidding Procedures Order.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms have the meanings set forth below in this **ARTICLE I**:

"**Accounting Referee**" has the meaning set forth in Section 8.01(c)(2).

"**Active Patient Records**" means all Patient Records created or received by the Asset Sellers in the conduct of the business between January 1, 2019 and the Closing Date.

"**Acquired Avoidance Actions**" means any and all Avoidance Actions of any Asset Seller, except any such Avoidance Actions against any Affiliate of an Asset Seller (other than any other Asset Seller).

"**Acquired Pharmacies**" means all of the Asset Sellers' pharmacies as set forth on Schedule 1.01(b).

"**Acquired Real Property**" has the meaning set forth in Section 2.01(e).

"**Action**" means any claim, action, cause of action, lawsuit, arbitration, audit, proceeding, litigation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a specified Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble of this Agreement.

"**Agreement Dispute**" has the meaning set forth in Section 11.10.

"**Allocation Statement**" has the meaning set forth in Section 8.01(c).

2

"**Alternative Transaction**" has the meaning set forth in Section 9.01(f).

"**Asset Seller Rx Data**" has the meaning set forth in Section 2.01(h).

"**Asset Sellers**" means, collectively, Seller and all Subsidiaries of Seller that own assets, properties or rights that are used or held for use in connection with the Business, excluding the Heartland Entities.

"**Assigned Books and Records**" has the meaning set forth in Section 2.01(i).

"**Assigned Contracts**" has the meaning set forth in Section 2.01(c).

"**Assigned Intellectual Property Assets**" means, collectively, (i) the Intellectual Property Registrations set forth on Schedule 1.01(c)(i); (ii) the Domain Names; and (iii) all other Intellectual Property owned exclusively by the Asset Sellers.

"**Assigned Leases**" has the meaning set forth in Section 2.01(d).

"**Assigned Permits**" has the meaning set forth in Section 2.01(j).

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Assumed PTO Cap**" has the meaning set forth in Section 6.06(f).

"**Auction**" means an auction conducted by Seller in accordance with the Bidding Procedure Order.

"**Audit Provider**" has the meaning set forth in Section 2.08.

"**Avoidance Actions**" means any and all Actions of any Asset Seller arising under Chapter 5 of the Bankruptcy Code or similar state Law claims.

"**Balance Sheet**" has the meaning set forth in Section 4.05(a).

"**Balance Sheet Date**" has the meaning set forth in Section 4.05(a).

"**Bankruptcy Code**" means Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

"**Benefit Plan**" means each employee benefit or incentive plan (including any "employee benefit plan," as defined in Section 3(3) of ERISA, whether or not subject to ERISA, and any bonus, award, incentive, commission, transaction, retention, reimbursement, health and welfare, leave, disability, change in control, deferred compensation, retirement, employment, stock bonus, stock purchase, restricted stock, performance stock unit, stock option, equity or equity-based, profit sharing, and severance plan, contract, agreement or arrangement), that is maintained, contributed to, or required to be contributed to, by Seller or any of its Affiliates for the benefit of any Business Employee; provided, however, that "Benefit Plan" shall not include any plan,

3

program, or arrangement maintained or administered by a governmental entity, including Social Security, Medicare, workers' compensation, and unemployment insurance programs.

"**Bidding Procedures Order**" means that certain Order of the Bankruptcy Court entered on December 3, 2025, at docket number 398 in the Chapter 11 Cases.

"**Bill of Sale**" means a bill of sale and assignment and assumption agreement effecting the transfer of the applicable Asset Seller's right, title and interest in the applicable Purchased Assets to Buyer or Buyer Designee, as applicable, and the assignment to, and assumption by, Buyer or such Buyer Designee of the Assumed Liabilities, substantially in the form of Exhibit A attached hereto.

"**Books and Records**" means books, records, ledgers, files, documents, lists, specifications, sales data, financial data and information, advertising and promotional materials, studies, and reports (in whatever form or medium).

"**Break-up Fee**" has the meaning set forth in Section 9.03(a).

"**Business**" has the meaning set forth in the recitals of this Agreement.

"**Business Associate**" has the meaning set forth in Section 4.23(d).

"**Business Associate Agreement**" has the meaning set forth in Section 4.23(d).

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"**Business Employee**" has the meaning set forth in Section 4.09.

"**Buyer**" has the meaning set forth in the preamble of this Agreement.

"**Buyer 401(k) Plan**" has the meaning set forth in Section 6.06(d).

"**Buyer Closing Certificate**" has the meaning set forth in Section 7.03(d).

"**Buyer Designees**" means those Affiliates of Buyer that are designated by Buyer as purchasers of any portion of the Purchased Assets who are reasonably acceptable to Seller, which designation will be made by Buyer to Seller in writing and in accordance with the terms of this Agreement. For the avoidance of doubt, if any such Affiliate is not acceptable to Seller, such Affiliate will not be a Buyer Designee for purposes of this Agreement.

"**Buyer Designee Notice**" has the meaning set forth in Section 6.13.

"**Cash and Cash Equivalents**" means (a) all cash of the Asset Sellers, including (i) cash on hand and cash deposited in any bank accounts of any Asset Seller, (ii) cash held by any other Person for the benefit of any Asset Seller (including any deposits of any Asset Seller held by such other Person, including security deposits for rent), and (iii) cash of any Asset Seller in transit

4

(including checks and deposits in transit), (b) all cash equivalents and securities of the Asset Sellers, including (i) marketable securities, (ii) certificates of deposits, (iii) bankers' acceptances, (iv) commercial paper, (v) commodity Contracts, and (vi) any other cash equivalents, whether on hand, in transit, in banks or other financial institutions or otherwise held by or on behalf of any Asset Seller, and (c) all deposits, advances, and prepaid items held by any Asset Seller.

"**Chapter 11 Cases**" has the meaning set forth in the recitals of this Agreement.

"**Closing**" and "**Closing Date**" have the meanings set forth in Section 3.01.

"**Closing Cash Consideration**" means $250,000,000.

"**Closing Inventory**" has the meaning set forth in Section 2.08.

"**Closing Payment**" has the meaning set forth in Section 2.05(b).

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the regulations promulgated thereunder.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreements**" has the meaning set forth in Section 6.03(b).

"**Contracts**" means all contracts, agreements, leases, deeds, mortgages, licenses, notes, commitments, undertakings, indentures and all other legally binding arrangements, whether written or oral.

"**Controlled Prescription Inventory**" means any drug or substance included in Schedules I, II, III, IV, or V as defined by the Controlled Substances Act, 21 U.S.C. § 801 et seq., and the regulations promulgated thereunder by the Drug Enforcement Administration, as amended from time to time, or classified as a controlled substance, controlled substance analog, or similarly regulated substance under applicable state or local laws or regulations governing the Acquired Pharmacies.

"**Covered Entity**" has the meaning of the term "covered entity" as set forth in HIPAA.

"**Cure Claims**" has the meaning set forth in Section 2.05(d).

"**CVS**" means CVS Pharmacy, Inc., a Rhode Island corporation.

"**CVS Confidentiality Agreement**" has the meaning set forth in Section 6.03(b).

"**CVS FF&E**" means the furniture, fixtures, and equipment owned by CVS and located at the Acquired Pharmacies except as otherwise set forth on Schedule 1.01(d).

"**Debtors**" has the meaning set forth in the recitals of this Agreement.

"**Deed**" has the meaning set forth in Section 3.02(a)(3).

"**Deposit**" has the meaning set forth in Section 2.05(c).

"**Designated Record Set**" has the meaning of the term "designated record set" as set forth in HIPAA.

"**DIP Credit Agreement**" means that certain that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of November 3, 2025, by and among, Seller, the other borrowers party thereto and JMB Capital Partners Lending, LLC, as lender thereunder, as the same may be amended, modified or supplemented from time to time.

"**Disabled Employee**" has the meaning set forth in Section 6.06(a).

"**Disclosure Schedules**" means all of the disclosure Schedules accompanying this Agreement.

"**Domain Names**" means the internet domain names set forth on Schedule 1.01(e).

"**Effective Date**" has the meaning set forth in the preamble of this Agreement.

"**Effects**" has the meaning set forth in the definition of Material Adverse Effect.

"**Electronic Protected Health Information**" has the meaning set forth in Section 4.23(c).

"**Employee Census**" has the meaning set forth in Section 4.09(a).

"**Encumbrance**" means any charge, claim (as defined in Section 101(5) of the Bankruptcy Code), pledge, condition, lien, option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, transfer restriction or other similar encumbrance.

"**End Date**" means September 30, 2026, as may be extended pursuant to Section 9.01(e).

"**Enterprise Contracts**" has the meaning set forth in Section 6.09.

"**Environmental Law**" means any Law of any Governmental Authority relating to the protection or restoration of the environment, natural resources, safety or health of human beings or other living organisms (as such relates to exposure to Hazardous Substances), or to the manufacture, transportation, storage, handling, generation, disposal, processing, treatment, distribution in commerce, use or Release of Hazardous Substances.

"**Employment Entity**" has the meaning set forth in Section 6.06(a).

"**Equity Interests**" means capital stock, limited liability company interests, partnership interests or other equity interests of any nature whatsoever and all securities or interests convertible or exchangeable into capital stock or other equity interests.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended (together with all rules and regulations promulgated thereunder).

6

"**Escrow**" has the meaning set forth in Section 2.05(c).

"**Escrow Holder**" has the meaning set forth in Section 2.05(c).

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Bank Accounts**" has the meaning set forth in Section 2.02(a)(3).

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Services**" means those services set forth on the list of excluded transition services attached hereto as Exhibit G.

"**Expense Reimbursement**" has the meaning set forth in Section 9.03(a).

"**Extended End Date**" has the meaning set forth in Section 9.01(e).

"**Financial Statements**" has the meaning set forth in Section 4.05.

"**Fraud**" means an actual and intentional fraud (i) by Seller in the making of the express representations and warranties in this Agreement or (ii) by Buyer in the making of the express representations and warranties in this Agreement; provided that such Fraud shall only be deemed to exist if, at the time such representation or warranty was made, (a) such representation or warranty was materially inaccurate, (b) the Party making such representation or warranty had actual knowledge (and not imputed or constructive knowledge), of the material inaccuracy of such representation or warranty, (c) such Party made such materially inaccurate representation or warranty with the specific intent to deceive the other Party and induce such other Party to enter into this Agreement and (d) the other Party acted in justifiable reliance on such materially inaccurate representation or warranty and suffered or incurred actual financial injury as a result of such reliance. For the avoidance of doubt, "Fraud" shall not include any cause of action based on constructive or imputed knowledge, equitable fraud, constructive fraud, promissory fraud or any tort (including a claim for fraud) based on negligence, recklessness or any similar theory.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Government Health Program**" means any federal or state healthcare program as defined in 42 U.S.C. § 1320a-7b(f), including Medicare, Medicaid, state CHIP programs, TRICARE, and CHAMPVA and similar or successor programs with or for the benefit of any Governmental Authority and such other similar federal, state or local reimbursement or governmental programs in which any Asset Seller participates. A complete list of all Government Health Programs in which the Asset Sellers participate is set forth on Schedule 4.13(e).

"**Government Provider Agreements**" means those payor agreements which provide for payment or reimbursement under any Government Health Program (whether exclusively or in addition to providing for payment or reimbursement under any Private Program) to which an Asset Seller is a party that are currently being used in the operations of the Business and that will be assigned to Buyer as part of the transactions contemplated by this Agreement (to the extent assignable). A complete list of all Government Provider Agreements is set forth on

7

Schedule 4.13(e). The Parties acknowledge and agree that "Government Provider Agreements" expressly exclude any Enterprise Contracts.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree or award entered by or with any Governmental Authority.

"**H-1B Employees**" has the meaning set forth in Section 4.09(d).

"**Hazardous Substances**" means any pollutant, contaminant, hazardous substance, hazardous waste, toxic substance, petroleum or petroleum-derived substance, waste or radioactive material, or other compound, element, material or substance in any form whatsoever (including products), regulated or restricted as hazardous or toxic under any applicable Environmental Law.

"**Healthcare Law**" means all healthcare Laws applicable to the management and operation of the Business, including: (i) (A) Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*. (the Medicare statute); (B) Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* (the Medicaid statute); (C) the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) and the Stark Law (42 U.S.C. § 1395nn); (D) the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*; (E) the exclusion Law, 42 U.S.C. § 1320a-7; (F) the civil monetary penalties Law, 42 U.S.C. § 1320 a-7a; (G) the False Claim Law, 42 U.S.C. § 1320a-7b(a); (H) the anti-inducement Law, 42 U.S.C. § 1320a-7a(a)(5); (I) HIPAA (as defined herein); (J) the Patient Protection and Affordable Care Act of 2010; (K) the Food, Drug and Cosmetic Act (21 C.F.R. §§ 301 *et seq.*); (L) the Prescription Drug Marketing Act of 1987, the Medicare Prescription Drug Improvement, and Modernization Act of 2003, the Medicare Improvements for Patients and Providers Act of 2008, and the Drug Quality Security Act (21 U.S.C. § 360eee); and (M) the Federal Program Fraud Civil Remedies Act (31 U.S.C. § 3801 *et seq.*) and the Federal Health Care Fraud Law (18 U.S.C. § 1347); (ii) any Medicare or Medicaid provider legally binding manuals governing suppliers/providers generally, as well as pharmacy, durable medical equipment and medical supply companies; and (iii) any Laws with respect to healthcare-related fraud and abuse, false claims, staffing, corporate practice of medicine and other learned professions, pharmacy operations, qualifications or requirements for the practice of pharmacy or other learned healthcare profession, any applicable state and federal controlled substance and drug diversion Laws, including, the Federal Controlled Substances Act (21 U.S.C. § 801, *et seq.*), Laws governing the use, handling, control, storage, dispensing, administering, transportation, and maintenance of controlled substances, pharmaceuticals, drugs or devices, and applicable state pharmacy laws and regulations including state controlled substance laws and regulations.

"**Healthcare Permit**" means any Permit, enrollment, accreditation, billing number and provider number held by an Asset Seller, including the Provider Numbers, any national provider identifier and National Council for Prescribing Drug Program number, or waiver, in each

8

case, that is required by applicable Law for the operation of the Business and is issued or enforced by a Governmental Authority with jurisdiction over any Healthcare Law.

"**Healthcare Provider**" has the meaning of the term "health care provider" as set forth in HIPAA.

"**Heartland Entities**" means the following Subsidiaries of Seller that are not Debtors: Heartland Healthcare Services, LLC, Heartland Pharmacy of Maryland, LLC and Heartland Pharmacy of PA, LLC.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended by Subtitle D of the Health Information Technology for Economic and Clinical Health Act (Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009), and the respective rules and regulations promulgated thereunder.

"**Historical Patient Records**" means those Patient Records currently held by Asset Sellers which were created or received by the Asset Sellers prior to January 1, 2019 and are required to be retained under the Information Laws following the Closing Date..

"**HITECH**" means the Health Information Technology for Economic and Clinical Health Act of 2009 and the respective rules and regulations promulgated thereunder.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**Indebtedness**" means, without duplication, (i) any indebtedness of any Asset Seller for borrowed money, whether current, short-term or long-term and whether secured or unsecured; (ii) any indebtedness of any Asset Seller evidenced by any note, bond, debenture or other debt security or similar instrument; (iii) any obligations of any Asset Seller with respect to interest rate or currency swaps, collars, caps and similar hedging obligations; (iv) any obligations of any Asset Seller under any performance bond or letter of credit, but only to the extent drawn; and (v) any indebtedness referred to in clauses (i) through (iv) above of any Person that is either guaranteed (including under any "keep well" or similar arrangement) by any Asset Seller, or secured (including under any letter of credit, banker's acceptance or similar credit transaction) by any Encumbrance upon any of the Purchased Assets. Indebtedness shall also include accrued and unpaid interest and any pre-payment penalties, or similar "breakage costs," and other amounts owing pursuant to the instruments evidencing Indebtedness. Notwithstanding anything to the contrary in the foregoing, "Indebtedness" shall not, except to the extent secured by any Encumbrance (other than a Permitted Encumbrance), include: (w) trade payables and accrued expenses arising in the ordinary course of business, (x) deferred revenue, (y) any obligations under any capital lease or finance lease; and (z) any undrawn letters of credit, performance bonds, or payment bonds.

"**Information Laws**" means all Laws applicable to the Asset Sellers concerning the privacy and/or security, integrity, accuracy, protection, management, storage, transmission, or exchange of Personal Data, including, without limitation, HIPAA, state, privacy and breach notification Laws, the Federal Trade Commission Act, state consumer data privacy Laws, state and federal Laws regarding the privacy and security of behavioral or mental health information,

9

sensitive health information, and substance abuse treatment information protection Laws.

"**Integro**" has the meaning set forth in Section 6.03(b).

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, internet domain names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith; (d) all mask works and all applications, registrations, and renewals in connection therewith; (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) all computer software (including source code, executable code, data, databases, and related documentation); and (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"**Intellectual Property Assignment Agreement**" means the intellectual property assignment agreement effecting the transfer of (i) all of the Asset Sellers' right, title and interest in and to the Assigned Intellectual Property Assets (other than the Domain Names) and (ii) all of CVS's right, title and interest in and to the Domain Names, in the case of the each of the foregoing clauses (i) and (ii), to Buyer or Buyer Designee, as applicable, substantially in the form of Exhibit B attached hereto.

"**Intellectual Property Registrations**" means, as to any Intellectual Property, any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, patents and pending applications for any of the foregoing.

"**Interim Financial Statements**" has the meaning set forth in Section 4.05.

"**Inventory Locations**" has the meaning set forth in Section 2.08.

"**Inquiry Procedure**" means the following process, which shall be completed prior to the execution of this Agreement and which, once completed, shall be deemed to constitute "reasonable inquiry" for all purposes under this Agreement:

(a) Seller shall have delivered, or caused to be delivered, to the individuals listed on Schedule 1.01(f) (the "**Inquiry Recipients**") an email inquiry that includes as an attachment the representations and warranties of Seller contained in this Agreement that are qualified by "Knowledge of Seller" (each, a "**Knowledge-Qualified Representation**");

(b) Each Inquiry Recipient shall have been requested to respond via reply email indicating either:

10

i.     that such Inquiry Recipient is not aware of any information that would constitute an exception to any Knowledge-Qualified Representation; or

ii.    that such Inquiry Recipient is aware of information that may be relevant to the accuracy of one or more Knowledge-Qualified Representations, in which case such response shall include some indication of the information that may be relevant; and

(c)  With respect to each Inquiry Recipient who provides a response described in clause (b)(ii) above, the Seller shall have, or shall have caused to have, conducted a follow-up discussion with such Inquiry Recipient to assess whether the information identified by such Inquiry Recipient would constitute a required disclosure under this Agreement and, if so, such information shall be reflected in the applicable Disclosure Schedules prior to the execution of this Agreement.

Notwithstanding the foregoing the Inquiry Procedure shall not impose any obligation on any Knowledge Person to conduct any investigation beyond the inquiry and follow-up discussion procedures described above.

"**Inquiry Recipients**" has the meaning set forth in the definition of Inquiry Procedures.

"**IRS**" has the meaning set forth in Section 4.10(b).

"**Knowledge of Seller**" or any other similar knowledge qualification, means the actual knowledge of David Azzolina, Joshua Perlin, Kathleen Beitzel, Ryan Jeanneret and Brianna Knue (the "**Knowledge Persons**") after completion of the Inquiry Procedure.  For the avoidance of doubt, none of the Knowledge Persons or Inquiry Recipients shall have any personal Liability regarding such knowledge or any other matters hereunder. Notwithstanding the foregoing, "Knowledge of the Seller" shall not be construed to include any knowledge that may be imputed to any Knowledge Person or Inquiry Recipient solely by reason of such person's position or title or by reason of information available in any public records, data rooms, or files of any Asset Seller.

"**Knowledge-Qualified Representation**" has the meaning set forth in the definition of Inquiry Procedures.

"**Law**" means any applicable federal, state, local or foreign law, statute, ordinance, regulation, rule, code, Order, constitution, or treaty of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in Section 2.01(d).

"**Lenders**" means each of the lenders of the Debtors for borrowed money.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, accrued or unaccrued, matured or unmatured or otherwise.

"**Marks**" has the meaning set forth in Section 2.02(a)(8).

11

"**Material Adverse Effect**" means any event, occurrence, state of facts or development, condition or change (collectively, "**Effects**") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the results of operations or condition (financial or otherwise) of the Business, the Purchased Assets, or the Assumed Liabilities; provided, however, that the following shall not be deemed to constitute, and shall not be taken into account in determining whether there has been or would reasonably be expected to be, a "Material Adverse Effect": (i) Effects that affect the industry or industries in which the Business operates, (ii) any Effects arising from general business, political or economic conditions or the financial, credit or securities markets, including any disruptions thereof or changes in monetary policy, inflation, interest rates, exchange rates or stock or bond prices, (iii) Effects arising out of, or attributable to, national or international political or social conditions, including riots, protests, the commencement or escalation of any hostilities or war (whether declared or undeclared), the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel; (iv) Effects arising from or relating to any acts of God, fire, flood, hurricane, earthquake, tornado, windstorm, or other calamity or natural disaster, epidemics, or pandemics; (v) Effects arising from or relating to changes in, GAAP or in accounting rules applicable to any Asset Seller or the interpretation of any of the foregoing; (vi) Effects arising from or relating to any changes in, Law or interpretations thereof, (vii) Effects arising from, (x) any action taken by any Asset Seller on or after the date of this Agreement at the written request or with the written consent of Buyer, whether pursuant to this Agreement or otherwise, (y) the taking of any action expressly contemplated by this Agreement, or (z) the failure to take any action if such action is expressly prohibited by this Agreement or Buyer's unreasonable failure to consent to any of the actions restricted in Section 6.01, (viii) Effects arising from or relating to (A) the commencement or pendency of the Chapter 11 Cases, (B) the financial condition of the Asset Sellers as a result of the commencement of the Chapter 11 Cases or from any action approved by the Bankruptcy Court, (C) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated by this Agreement, (2) the Sale Order or the reorganization or liquidation of Seller or its Affiliates, or (3) the assumption or rejection of any Assigned Contract; (D) any Order of the Bankruptcy Court or any actions or omissions of Seller or its Affiliates in compliance with such Orders, (E) the announcement, pendency or performance of this Agreement or any of the transactions contemplated by this Agreement or any other Transaction Document or (F) the identity, nature or ownership of Buyer, including the impact on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, vendors or other commercial partners, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or Representatives), provided that the underlying Effects causing or contributing to such failure may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect, or (x) any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement or the financing of such transactions or any breach by Buyer of this Agreement, provided further that the Effects described in clauses (i) through (vii) shall be taken into account in determining whether a Material Adverse Effect exists, has occurred or would reasonably be expected to occur only to the extent such Effects have had or would reasonably be expected to have a disproportionate and adverse effect on the Business relative to other participants

in the industries and geographic areas in which the Business operates generally.

"**Material Contract**" has the meaning set forth in Section 4.06(a).

"**Material Customer**" has the meaning set forth in Section 4.06(a)(1).

"**Material Supplier**" has the meaning set forth in Section 4.06(a)(2).

"**Migration**" has the meaning set forth in Section 6.12(c).

"**Non-Recourse Person**" has the meaning set forth in Section 11.10.

"**Omnicare 401(k) Plan**" has the meaning set forth in Section 6.06(d).

"**Omnicare Confidentiality Agreement**" has the meaning set forth in Section 6.03(b).

"**Omnicare Privacy Policies**" means, collectively, the written policies of Seller and its Affiliates governing the collection, use, storage, and protection of Patient Records, as well as any other privacy-related practices or disclosures that Seller or any of its Affiliates has in place as of the Closing Date.

"**Order**" means any award, injunction, judgment, decree, writ, order, ruling, stipulation, subpoena, determination, verdict or other decision issued, promulgated or entered by or with any Governmental Authority.

"**Owned Real Property**" has the meaning set forth in Section 2.01(e).

"**Party**" or "**Parties**" has the meaning set forth in the preamble of this Agreement.

"**Patient Records**" means all patient medical and billing records (paper and electronic), charts, images, films, test results, orders, referrals, consents, schedules, communications, device or app data, care management files, and other records created, received, maintained, or transmitted by or on behalf of any Asset Seller in connection with the provision or payment of health care as reflected in such Asset Seller's records as of the Closing Date.

"**Patient Records Custody Agreement**" has the meaning set forth in Section 3.02(a)(5).

"**Payor Agreements**" means, collectively, the Private Program Payor Agreements and the Government Provider Agreements.

"**Permit**" means any registration, license, exemption, permit, certification, approval, consent, permission, and other authorization issued or granted by a Governmental Authority.

"**Permitted Encumbrances**" means (a) mechanics', carriers', workers', repairers' and similar statutory Encumbrances with respect to amounts not yet due or delinquent or the validity of which is being contested in good faith; (b) Encumbrances arising under worker's

13

compensation, unemployment insurance, social security, retirement and similar Laws for amounts which are not delinquent; (c) Encumbrances arising under purchase price conditional sales contracts and equipment leases with third parties to the extent that the Asset Sellers are not in breach of such contracts or leases; (d) Encumbrances for utilities and Taxes and Tax assessments that are not yet due or payable, or which are being contested in good faith by appropriate proceedings, or the nonpayment of which is permitted or required by the Bankruptcy Code; (e) rights and licenses with respect to Assigned Intellectual Property Assets granted to third-parties in the ordinary course of business consistent with past practice, (f) easements, rights of way, restrictive covenants, encroachments and similar non-monetary Encumbrances or non-monetary impediments against any of the Acquired Real Property, in each case, that do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets and, in the case of the real property, that do not, individually or in the aggregate, adversely affect the use or occupancy of such real property as it relates to the operation of the Business, (g) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (h) matters that would be disclosed by a survey or inspection of the applicable real property, and (i) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order. In addition, Encumbrances of the Lenders shall constitute Permitted Encumbrances prior to the Closing but will be released at Closing to the extent set forth in the Sale Order and shall not constitute Permitted Encumbrances from and after the Closing.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Personal Data**" means all data relating to an individual that is personally identifying (i.e., data that identifies an individual or, in combination with any other information or data reasonably available to any Asset Sellers, is reasonably capable of identifying an individual), including, but not limited to, data that is regulated or protected by one or more Information Laws, including, but not limited to, "Protected Health Information" or "Electronic Protected Health Information" as those terms are defined under HIPAA, and "Personal Information" as such term is defined under the California Consumer Privacy Act.

"**Petition Date**" has the meaning set forth in the recitals of this Agreement.

"**Potential Transition Services**" means those services set forth on the list of transition services attached hereto as Exhibit H, together with such other potential transition services (which shall not include Excluded Services) as may be agreed to by Buyer and Seller in connection with the negotiation of the Transition Services Agreement.

"**Power of Attorney**" has the meaning set forth in Section 3.02(a)(6).

"**Pre-Closing Tax Period**" means any Tax period that ends on or prior to the Closing Date, including the portion of the Straddle Period which ends on the Closing Date.

"**Prior Drafts**" has the meaning set forth in Section 11.07.

"**Privacy and Security Policies and Procedures**" has the meaning set forth in Section 4.23(b).

14

"**Private Program**" means any private sector third-party health care payment or benefit program or plan that is offered or administered by a third-party payor in which the Asset Sellers participate as a provider of certain health care services, including any health care insurance, managed care, HMO, or PPO product or plan or any self-funded health benefit plan that is offered or administered by a third-party payor. "Private Program" shall not mean any Government Health Program or delegation to third party payor or managed care organization as part of any Government Health Program. A complete list of all Private Programs in which the Asset Sellers participate is set forth on Schedule 4.13(d).

"**Private Program Payor Agreements**" means those payor agreements which provide for payment or reimbursement under any Private Program (whether exclusively or in addition to providing or payment or reimbursement under any Government Health Program) to which an Asset Seller is a party that are currently being used in the operations of the Business and that will be assigned to Buyer as part of the transactions contemplated by this Agreement (to the extent assignable). A complete list of all Private Program Payor Agreements is set forth on Schedule 4.13(d). The Parties acknowledge and agree that "Private Program Payor Agreements" expressly exclude any Enterprise Contracts, including payor agreements with the following Private Programs (all of which are Enterprise Contracts): (1) AssistRx, Inc.; (2) Express Scripts, Inc.; (3) Gainwell Technologies LLC; (4) MaxorPlus, Ltd.; (5) MC-21 Healthcare, LLC d/b/a Mc-Rx; (6) Pharmacy Data Management, Inc.; (7) PharmPix; (8) Prescryptive Health, Inc.; (9) Rightway Healthcare, Inc.; (10) Smith Health, Inc.; (11) StatimRx, LLC; and (12) NetCard Systems, a division of WellDyneRx, LLC.

"**Protected Health Information**" has the meaning set forth in Section 4.23.

"**Projections**" has the meaning set forth in Section 11.12(b).

"**Provider Numbers**" means those provider numbers assigned to the Asset Sellers in connection with a Government Health Program.

"**Purchase Price**" has the meaning set forth in Section 2.05(a).

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Recourse Party**" has the meaning set forth in Section 11.10.

"**Regulatory Transaction Approvals and Notifications**" has the meaning set forth in Section 6.04(a).

"**Regulatory Transaction Filing Deadlines**" has the meaning set forth in Section 6.04(a).

"**Regulatory Transaction Filings**" has the meaning set forth in Section 6.04(a).

"**Release**" means any release, pumping, pouring, emptying, injecting, escaping, leaching, migrating, dumping, seepage, spill, leak, flow, discharge or emission into the environment.

15

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Period**" has the meaning set forth in Section 6.16(b).

"**Restrictive Covenants**" has the meaning set forth in Section 6.16(d).

"**Return Date**" has the meaning set forth in Section 6.06(a).

"**Sale Order**" means an Order of the Bankruptcy Court in form and substance reasonably satisfactory to Parties, and substantially similar to the form attached hereto as Exhibit C, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, (i) authorizing and approving the transactions contemplated by this Agreement free and clear of all liens, claims, and encumbrances, (ii) finding and concluding that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, (iii) finding that the Purchase Price is a fair and reasonable price for the Purchased Assets, (iv) confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract or right of entry.

"**Sale Order Date**" means the date the Sale Order is entered by the Bankruptcy Court.

"**Sale Order Extension Period**" means, in the event the Sale Order Date does not occur on or before May 15, 2026, the total number of calendar days elapsed during the period commencing on (and including) May 16, 2026 and ending on (and including) the Sale Order Date.

"**Schedule**" means a schedule to this Agreement that is contained in the Disclosure Schedules and incorporated herein pursuant to Section 11.04.

"**Second Extended End Date**" has the meaning set forth in Section 9.01(e).

"**Seller**" has the meaning set forth in the preamble of this Agreement.

"**Seller Bonds**" has the meaning set forth in Section 4.05(c).

"**Seller Closing Certificate**" has the meaning set forth in Section 7.02(d).

"**Seller Party**" has the meaning set forth in Section 4.18.

"**Specified Court Approval**" shall mean entry of an Order by the Bankruptcy Court to amend the Bidding Procedures Order such that the Bid Protections (as defined in the Bidding Procedures Order) contemplated thereby shall provide for (i) payment to the buyer in a Stalking Horse Agreement (as defined in the Bidding Procedures Order), under the circumstances set out in the Bidding Procedures Order, of a break-up fee equal to 3% of the transaction value, and (ii) reimbursement of such buyer's reasonable and documented out-of-pocket costs and expenses incurred as the Stalking Horse Bidder (as defined in the Bidding Procedures Order) up to an additional amount not to exceed $1,500,000.

"**Specified Regulatory Approvals**" has the meaning set forth in Section 9.01(e).

16

"**State Transaction Notification Laws**" means any Law of any U.S. state, the District of Columbia, or U.S. territory (including any statute, regulation, rule, order, decree, directive, advisory opinion or published guidance of a Governmental Authority) that, in connection with the execution, delivery, performance or consummation of the Transactions, requires or may require (a) a pre-Closing or post-Closing notice, filing, registration or submission; (b) any consent, approval, clearance, waiver, authorization, exemption, license issuance or amendment, certificate of need or determination of need, change-of-control or material change approval; (c) a public notice, publication, hearing or comment period; or (d) the observance of any waiting period, hold-separate, mitigation, or other condition, undertaking or restraint imposed as a prerequisite to, or as a condition of, the Transactions (in each case, including any successor or replacement law). Without limiting the foregoing, State Transaction Notification Laws include state or territorial laws relating to: (i) state antitrust, competition, or merger control; (ii) healthcare or pharmacy transaction review, attorney general, department of health, certificate-of-need or material change review; (iii) any analogous or successor regimes. The State Transaction Notification Laws that are applicable to and triggered by the transactions contemplated by this Agreement are set forth in Schedule 6.04(a).

"**Straddle Period**" means any Tax period that begins before the Closing Date and ends after the Closing Date.

"**Successful Bidder**" has the meaning set forth in the Bidding Procedures Order.

"**Subsidiary**" or "**Subsidiaries**" of any Person means another Person, in which such first Person (i) owns, directly or indirectly, more than fifty percent (50%) of the outstanding voting securities, equity securities, profits interest or capital interest or (ii) is entitled to elect at least a majority of the board of directors, board of managers or similar governing body.

"**Tax**" or "**Taxes**" means a tax or taxes of any kind or nature, or however denominated, including liability for federal, state, provincial, local or foreign income, net or gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, business and occupation, value added, excise, severance, stamp, premium, windfall profit, customs, duties, real property, personal property, capital stock, escheat, unclaimed property, social security, disallowed employer retention tax credits, unemployment, disability, payroll, license, employee or other withholding, or other tax, assessment, levy or duty of any kind in the nature of the foregoing, including any interest, penalties or additions to tax in respect of the foregoing, in each case, whether disputed or not, and including any amount imposed for failure to file a Tax Return.

"**Tax Return**" means, with respect to any Tax, any information return for such Tax, and any return, report, statement, declaration, claim for refund or document filed or required to be filed under the Law for such Tax (including any amendments or supplements thereof).

"**Transaction Documents**" means this Agreement; the Bill of Sale; the Intellectual Property Assignment Agreement; the Confidentiality Agreements; and the other agreements, instruments and documents required to be delivered at the Closing.

"**Transferred Employee**" has the meaning set forth in Section 6.06(a).

17

"**Transferred Records**" means the Historical Patient Records and the Active Patient Records that are transferred and migrated to Buyer pursuant to the Migration, provided that in no event shall Transferred Records include any Patient Records (or copies thereof) that are retained by Seller and/or not part of the Migration.

"**Transfer Taxes**" means all foreign, federal, state and local sales, use, direct and indirect transfer, documentary transfer, excise, value-added, goods or services, registration, recording, stamp, documentation or real estate transfer Taxes, or similar Taxes imposed by reason of the sale, assignment, transfer and delivery of the Purchased Assets.

"**Transition Period**" has the meaning set forth in Section 2.05(e).

"**Transition Services**" mean the post-Closing services, as mutually agreed upon by the Parties, to be provided (or caused to be provided) by CVS and Seller to Buyer, to address the process and mechanism for accomplishing an orderly transfer of the Business, the Purchased Assets, and the Assumed Liabilities to Buyer while allowing for Seller's continued access to resources necessary for the administration of the Chapter 11 Cases, pursuit of confirmation of a Chapter 11 plan, and ultimate wind down of Seller's estate, excluding the Excluded Services.

"**Transition Services Agreement**" means the agreement to be entered into by and among the Buyer, CVS and Seller as of the Closing with respect to any Transition Services, in form and substance reasonably satisfactory to Buyer, Seller, and CVS following good faith negotiations of Buyer, Seller, and CVS with respect to the terms thereof, pursuant to Section 6.17, it being acknowledged that the initial proposed draft of the Transition Services Agreement is attached hereto as Exhibit F, which draft shall serve solely as the starting point of such negotiations and no party shall be bound by the terms set forth therein or restricted from proposing or negotiating new or different terms to be incorporated into the final Transition Services Agreement.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state, local or foreign Law.

**ARTICLE II**
**PURCHASE AND SALE**

**Section 2.01.   Purchase and Sale of Assets**. Subject to the terms and conditions set forth herein and pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, at the Closing, but subject to Section 2.07, (i) Seller shall cause CVS to sell, assign and transfer to Buyer or a Buyer Designee, as applicable, and Buyer shall, or shall cause such Buyer Designee to, purchase from CVS, free and clear of any Encumbrances other than Permitted Encumbrances, all of CVS's right, title and interest in and to the Domain Names and the CVS FF&E, and (ii) the Asset Sellers shall, sell, assign, and transfer to Buyer or the Buyer Designees, as applicable, and Buyer shall, and shall cause the Buyer Designees to, purchase from the Asset Sellers, free and clear of any Encumbrances other than Permitted Encumbrances, all of the Asset Sellers' right, title and interest in and to all assets, properties and rights of the Asset Sellers related to the Business, as the same may exist as of the Closing, excepting the Excluded Assets (collectively, the "**Purchased Assets**"). Without limiting the foregoing, the Purchased Assets shall include the following, as the same may exist as of the Closing, excepting the Excluded Assets:

18

(a)      all accounts receivables, trade receivables, notes and other similar claims for money due to any Asset Seller;

(b)      all inventory owned by the Asset Sellers to the extent used or held for use in connection with the Business, including all prescription merchandise located at the Acquired Pharmacies;

(c)      (i) all Contracts of the Asset Sellers (other than the Assigned Leases) with vendors and suppliers of the Business set forth on Schedule 2.01(c)(i), (ii) all Contracts of the Asset Sellers (other than the Assigned Leases) with customers of the Business related to the Business, and (iii) all other Contracts of the Asset Sellers (other than the Assigned Leases) of the Business set forth on Schedule 2.01(c)(iii) (all Contracts of the Asset Sellers (other than the Assigned Leases) included in the Purchased Assets, whether or not set forth on Schedule 2.01(c)(i) or Schedule 2.01(c)(iii), collectively, the "**Assigned Contracts**");

(d)      all leasehold interests of the Asset Sellers in the real property leased, subleased or licensed by the Asset Sellers set forth on Schedule 2.01(d) (the "**Leased Real Property**") and the leases, subleases, licenses and similar Contracts set forth on Schedule 2.01(d) pursuant to which the Asset Sellers have an interest in or right to occupy the Leased Real Property (the "**Assigned Leases**");

(e)      the real property owned by the Asset Sellers set forth on Schedule 2.01(e) (the "**Owned Real Property**" and together with the Leased Real Property, the "**Acquired Real Property**"), together with the applicable Asset Seller's right, title and interest in and to (i) all facilities, structures, improvements and fixtures thereon, and (ii) all easements and rights of way pertaining thereto or accruing to the benefit of such Asset Seller and all other appurtenances pertaining thereto;

(f)      all furniture, fixtures, equipment, vehicles, and other tangible personal property to the extent used or held for use in connection with the Business, including the tangible personal property set forth on Schedule 2.01(f);

(g)      the Assigned Intellectual Property Assets (other than the Domain Names);

(h)      all prescription files, records and data utilized, maintained, or generated, as applicable, by the Asset Sellers in the course of operating the Acquired Pharmacies (collectively, the "**Asset Seller Rx Data**"); provided, however, that Seller will be entitled to retain copies of any Asset Seller Rx Data reasonably necessary for its accounting or Tax purposes, or as may be required by applicable Law;

(i)      copies of all Books and Records (other than the Asset Seller Rx Data) to the extent exclusively related to the Business (the "**Assigned Books and Records**"); provided, however, that Seller will be entitled to retain copies of any Assigned Books and Records it deems reasonably necessary for its human resources, accounting, Tax, legal or other business purposes;

(j)      solely to the extent assignable or transferable under applicable Law,

19

the Permits (including any applications that are in process) set forth on Schedule 2.01(j) (the "**Assigned Permits**");

(k)     (i) Acquired Avoidance Actions and (ii) all claims, causes of action and other legal rights and remedies against other Persons (other than Acquired Avoidance Actions), in each case, solely to the extent arising from the other Purchased Assets or the Assumed Liabilities;

(l)     the rights to all telephone and facsimile numbers for all of the Acquired Pharmacies;

(m)     all prepaid expenses, credits, advance payments, claims, security, refunds (other than Tax refunds), rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees, in each case;

(n)     all rights of indemnity, warranty rights, guaranties received from vendors, suppliers, or manufacturers, rights of contribution, and other rights of recovery possessed by any Asset Seller against other Persons;

(o)     any other rebates, payments, reimbursements, or refunds (other than Tax refunds);

(p)     rights to receive all insurance benefits, net of any out-of-pocket costs and expenses actually incurred by Seller or any of its Affiliates and paid to third parties that are not Affiliates of Seller or any of its Affiliates (including deductibles) relating directly and exclusively to the recovery of such insurance benefits, including rights to insurance proceeds, in each case, arising from or relating to material damage or destruction tangible personal property or leasehold improvements included in the Purchased Assets with respect to events first occurring after the Effective Date and prior to the Closing to the extent such Purchased Assets are not restored, repaired or replaced prior to Closing less any amounts invested by Seller or any of its Affiliates in restoration, repair, or replacement of such Purchased Asset;

(q)     all bank accounts of each Asset Seller, including any bank accounts of CVS or any other Affiliate of any Asset Seller, that relate exclusively to the Business, except for the Excluded Bank Accounts; and

(r)     all goodwill with respect to the other Purchased Assets.

**Section 2.02.    Excluded Assets**.

(a)     Notwithstanding anything to the contrary in this Agreement, in no event shall Asset Sellers or any of their Affiliates be deemed to sell, assign or transfer, and Asset Sellers and their Affiliates shall retain all right, title and interest in and to, the following assets, properties, and rights of the Asset Sellers and their Affiliates (all such assets, properties and rights collectively, the "**Excluded Assets**"):

(1)     all Cash and Cash Equivalents, including all deposits made by the Asset Sellers in connection with the Chapter 11 Cases (including such deposits made with

20

utilities);

(2)     (i) all accounts receivable and other claims for money due to any Asset Seller from any Affiliates of the Asset Sellers (other than accounts receivable and other claims for money due to any Asset Seller from any other Asset Seller) and (ii) all accounts receivable and other claims for money due to any Asset Seller set forth on Schedule 2.02(a)(2);

(3)     the bank accounts set forth on Schedule 2.02(a)(3) (the "**Excluded Bank Accounts**");

(4)     (i) all drugs, pharmaceuticals and other medical or clinical products that cannot, by Law, be sold by Asset Sellers to Buyer, and (ii) the inventory of the Asset Sellers set forth on Schedule 2.02(a)(4);

(5)     (i) all Enterprise Contracts and (ii) all Contracts set forth on Schedule 2.02(a)(5)(ii);

(6)     all leased real property set forth on Schedule 2.02(a)(6);

(7)     all furniture, fixtures, equipment, vehicles, and other tangible personal property set forth on Schedule 2.02(a)(7);

(8)     any rights in, relating to, or for use or exploitation of, any trademark, service mark, brand name, certification mark, trade name, corporate name, domain name or other indication of source or origin ("**Marks**") that includes, is based on, relates to or is likely to be confused with the terms "CVS" or any other Marks used by CVS or its Affiliates other than the Asset Sellers, or any other similar term or derivative thereof;

(9)     all Books and Records of Seller or any of its Affiliates, other than those exclusively related to the Business;

(10)     all Permits and applications for Permits to the extent not assignable or transferable under applicable Law;

(11)     all Actions and other legal rights and remedies of any kind (including counterclaims, defenses, rights of set-off, rights of recovery and rights of recoupment) against any Person (i) based on facts or circumstances occurring or arising prior to the Closing, including the Avoidance Actions, other than Acquired Avoidance Actions or (ii) to the extent arising out of or related to any of the Excluded Assets or Excluded Liabilities;

(12)     all rights of indemnity, warranty rights, guaranties received from vendors, suppliers, or manufacturers, rights of contribution, and other rights of recovery possessed by any Asset Seller against other Persons to the extent arising out of or related to any of the Excluded Assets or Excluded Liabilities;

(13)     (i) any rights of Seller or its Affiliates with respect to any Tax refund, credit or similar Tax asset (including net operating loss carryovers) attributable to Taxes paid or otherwise borne by Seller or its Affiliates with respect to the Pre-Closing Tax Period,

21

and (ii) any Tax Returns of Seller or its Affiliates, including any Tax Returns related to any consolidated, combined, affiliated or unitary group for Tax purposes that includes any of the Asset Sellers;

(14)   (i) the organizational documents, qualifications to conduct business as a foreign company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, minute books, equity transfer books, and any other documents relating to the governance, organization, maintenance and existence of the Assets Sellers and the Heartland Entities, and (ii) all capital stock, membership interests, limited liability company interests, partnership interests or other equity interests in the Asset Sellers and the Heartland Entities;

(15)   all current and prior property, casualty, workers' compensation, directors and officers and other insurance policies and binders or related insurance services Contracts held by Seller or its Affiliates, and any rights of Seller or its Affiliates under any such insurance policy or Contract, including all rights to recoveries, refunds, credits and to make claims thereunder with respect to any Excluded Assets or otherwise to the extent not described in Section 2.01(p);

(16)   all leased equipment, vehicles and other assets located at any Acquired Real Property or otherwise used in connection with the Business, to the extent the lease related thereto is not an Assigned Contract or an Assigned Lease;

(17)   all rights to assets leased by an Affiliate of Seller (other than the Asset Sellers) set forth on Schedule 2.02(a)(17);

(18)   all Benefit Plans and all corresponding assets and rights of Seller or its Affiliates in, to or in relation of the Benefit Plans;

(19)   (i) all rights, claims and Actions of any Asset Seller under any of the Transaction Documents and (ii) all agreements, reports and other documents prepared, received or entered into by any Asset Seller or any of their Representatives in connection with the sale of the Purchased Assets, this Agreement, the other Transaction Documents or the Chapter 11 Cases, including all bids and expressions of interest received from third parties with respect to the Business, any portion thereof or any of the assets of any of the Asset Sellers and all privileged materials, documents and records of any Asset Seller related to any of the foregoing;

(20)   all Equity Interests owned by any Asset Seller; and

(21)   the assets, properties and rights set forth Schedule 2.02(a)(21).

(b)   Buyer shall have the right, exercisable in Buyer's sole discretion at any time prior to two (2) Business Days prior to the Closing Date to designate any Assigned Contract as an Excluded Asset; provided, however, that (i) if Buyer exercises Buyer's right to designate any Assigned Contract as an Excluded Asset, the Purchase Price shall not be reduced as a result of such designation; and (ii) for the avoidance of doubt, once an Assigned Contract is designated as an Excluded Asset pursuant to the foregoing, such Assigned Contract shall be no

22

longer be deemed an Assigned Contract and shall be deemed an Excluded Asset for all purposes under this Agreement and the Asset Sellers shall have the right to reject such Contract.

Section 2.03. **Assumed Liabilities**. Subject to the terms and conditions set forth herein, at the Closing, Buyer shall assume and agree to pay, perform and discharge when due, and shall cause the applicable Buyer Designees to assume and thereafter pay, perform and discharge when due, only the following Liabilities and obligations of the Asset Sellers (collectively, the "**Assumed Liabilities**"):

(a)     (i) all Cure Claims, (ii) all accounts payable and trade payables to the extent related to goods received by or services rendered to the Business after the Petition Date and prior to the Closing; up to a maximum of either (x) if Specified Court Approval is not obtained within twenty (20) days after the date hereof, $25,000,000, or (y) if Specified Court Approval is obtained within twenty (20) days after the date hereof, $30,000,000, with respect to clauses (i) and (ii) in the aggregate, and (iii) all Liabilities and obligations arising under or relating to the Assigned Contracts and the Assigned Leases (other than the Cure Claims) but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not arise from any failure to perform, improper performance, warranty or other breach, default or violation by any Asset Seller prior to the Closing;

(b)     all Liabilities that Buyer or the Buyer Designees have agreed to assume pursuant to Section 6.06; and

(c)     all other Liabilities and obligations arising out of or relating to the ownership, use or operation of the Purchased Assets after the Closing.

Section 2.04. **Excluded Liabilities**. Neither Buyer nor the Buyer Designees will assume or be responsible to pay, perform or discharge any Liabilities of the Asset Sellers of any kind or nature whatsoever, except to the extent such Liabilities are Assumed Liabilities (the "**Excluded Liabilities**"). For the avoidance of doubt, Liabilities of the Asset Sellers and the Acquired Entities, including recoupments, arising out of or related to any Healthcare Laws, Permit, or Provider Numbers, as well as participation in any Government Health Program, for the period on or prior to the Closing Date shall be Excluded Liabilities.

Section 2.05. **Purchase Price and Deposit; Cure Claims**.

(a)     The aggregate purchase price for the Purchased Assets is (i) the Closing Cash Consideration, plus (ii) the assumption of Assumed Liabilities (collectively, the "**Purchase Price**").

(b)     At the Closing, Buyer (on behalf of itself and the Buyer Designees, if applicable) shall (i) pay to Seller an amount in cash equal to (x) the Closing Cash Consideration, minus (y) the Deposit, by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer no later than one (1) Business Day prior to the Closing Date (collectively, the "**Closing Payment**") and (ii) direct the Escrow Holder to disburse the Deposit to Seller.

(c)     Upon submission of this Agreement for consideration as a bid for

23

the Purchased Assets, Buyer shall, in accordance with the Bidding Procedures Order, deliver into a segregated account (the "**Escrow**") maintained by an escrow holder designated by Seller (the "**Escrow Holder**") the sum of (i) Nineteen Million Six Hundred Seventy Thousand Dollars ($19,670,000), plus (ii) solely in the event that Specified Court Approval is obtained within twenty (20) days after the date hereof, an additional sum, payable promptly (and in any event within 2 Business Days) after Buyer's receipt of notice of Specified Court Approval, of $350,000 (collectively, the "**Deposit**") in immediately available funds. At the Closing, the Parties shall deliver written notice to the Escrow Holder instructing the Escrow Holder to deliver the Deposit to Seller, which will be credited toward payment of the Purchase Price. In the event this Agreement is terminated pursuant to Section 9.01(c) or Section 9.01(d), (A) Seller may deliver written notice to the Escrow Holder instructing the Escrow Holder to disburse the Deposit to Seller to be retained by Seller for Seller's own account and (B) the Parties agree that (x) Seller may deliver such written notice to the Escrow Holder at any time after such termination and (y) following delivery of such notice from Seller, the Escrow Holder shall deliver the Deposit to Seller without Liability to Buyer. If this Agreement is terminated in accordance with Section 9.01 other than due to a termination pursuant to Section 9.01(c) or Section 9.01(d), the Parties shall deliver written notice the Escrow Holder instructing the Escrow Holder to return the Deposit to Buyer as soon as reasonably practicable.

(d)     With respect to each of the Assigned Contracts and Assigned Leases assigned to Buyer or the Buyer Designees (if applicable) on or after the Closing Date pursuant to the Sale Order, Buyer, or the Buyer Designees (if applicable), shall satisfy on the Closing Date or if later, the date of such assignment, as applicable, or, if later, when otherwise due, all Liabilities thereunder (as distinct from curing all defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money) (i) accruing or arising at any time prior to or after the Petition Date, or (ii) arising from or relating to any act, event, or occurrence prior to the Petition Date that are required to be paid pursuant to §365 of the Bankruptcy Code in order to assume and assign the Assigned Contracts and the Assigned Leases to Buyer or the Buyer Designees (if applicable)  (collectively, "**Cure Claims**"), up to a maximum of $1,000,000 in the aggregate.

(e)     At the Closing, the Asset Sellers shall assign to Buyer, and Buyer shall assume, the Asset Sellers' rights and interests under the Payor Agreements. In the event that any assignment of a Payor Agreement has not been effectuated to Buyer as of the Closing Date, and to the extent permitted by applicable Law and the applicable Private Program or Government Health Program, so long as Buyer is utilizing its commercially reasonable efforts to effectuate the assignment of such Payor Agreement and to fulfill its obligations under Section 6.04 hereof, the applicable Asset Seller will, allow Buyer the right to use such Payor Agreement in Buyer's operation of the Business. The Parties shall execute any instruments and agreements as may be mutually agreed upon by Buyer and Seller to effectuate the foregoing provision. Such instruments shall be delivered by the applicable Asset Seller on or before the Closing Date and shall be effective until, in the case of the applicable Payor Agreement, the earlier to occur of: (x) twelve (12) months after the Sale Order Date, or such shorter period which may be ordered by the Bankruptcy Court or any other Governmental Authority; or (y) the receipt of an effective assignment of the Payor Agreement (the "**Transition Period**"). Buyer shall, and shall cause each Buyer Designee to, reimburse each Asset Seller for any reasonable out-of-pocket fees, costs and expenses actually incurred and paid to third parties that are not Affiliates of Seller by such Asset

24

Seller or any Affiliate of such Asset Seller in connection with the compliance of Asset Sellers with this Section 2.05(e).

(f)      From and after the Closing, Buyer shall indemnify, defend and hold harmless the Asset Sellers and their respective Affiliates, equityholders, managers, officers, directors, employees, agents and Representatives from and against any and all Liabilities arising out of or relating to: (i) Buyer or a Buyer Designee's use of, reliance upon, billing under, or operation pursuant to the Payor Agreements pursuant to Section 2.05(e) during the Transition Period; (ii) any services rendered or items furnished by or on behalf of Buyer or a Buyer Designee on or after the Closing Date that are billed or reimbursed under the Payor Agreements, in the name of an Asset Seller pursuant to Section 2.05(e); (iii) any failure by Buyer or a Buyer Designee to comply with applicable Law, program requirements, certification requirements, enrollment requirements, conditions of participation, conditions of coverage, or payor requirements in connection with Buyer's use of the Payor Agreements during the Transition Period pursuant to Section 2.05(e); (iv) any audits, investigations, recoupments, overpayment determinations, penalties, fines, sanctions, payment suspensions, offsets, clawbacks, or other adverse actions by any Governmental Authority, Government Health Program, or Private Program to the extent arising from or relating to Buyer's use of the Payor Agreements during the Transition Period pursuant to Section 2.05(e); and (v) any claims, demands or actions by Governmental Authorities, Government Health Programs, or Private Programs relating to Buyer's use of the Payor Agreements during the Transition Period pursuant to Section 2.05(e).

**Section 2.06.  Withholding Tax**. Other than circumstances under which failure to do so would expose Buyer to personal liability for such Taxes, Buyer shall not be entitled to deduct and withhold any Taxes from the Closing Payment or any other amounts otherwise payable pursuant to this Agreement, except for any Taxes required to be withheld from the amounts payable to Seller under Section 1445 of the Tax Code to the extent resulting from Seller's failure to provide to Buyer an IRS Form W-9, executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes.

**Section 2.07.  Third Party Consents**. If the assignment by an Asset Seller to Buyer or Buyer Designee of an Assigned Contract or an Assigned Lease and such Asset Seller's rights under such Assigned Contract or Assigned Lease, or any other Purchased Asset, would be a violation of applicable Law or require the consent of, or prior notification to, another Person, this Agreement will not constitute an agreement to assign such Assigned Contract, Assigned Lease or other Purchased Asset if an attempted assignment would constitute a breach thereof or be unlawful, and Seller and Buyer shall use commercially reasonable efforts to obtain any such required consent (to the extent that the Sale Order or other Order of the Bankruptcy Court does not eliminate the requirement to obtain the prior consent of or provide notification to any one or more counterparties to an Assigned Contract, Assigned Lease or other Purchased Asset) as promptly as possible. Except to the extent that the Sale Order or other Order of the Bankruptcy Court eliminates the requirement to obtain the prior consent of or provide notification to any one or more counterparties to an Assigned Contract, an Assigned Lease or other Purchased Asset, no such Assigned Contract, Assigned Lease or other Purchased Asset that requires the consent of, or prior notification to, another Person for the applicable Asset Seller to assign such Assigned Contract, Assigned Lease or other Purchased Asset to Buyer or Buyer Designee shall be assigned to Buyer or Buyer Designee pursuant to this Agreement until such consent shall be obtained or notification shall be made. If any

25

such consent shall not be obtained or notification made, or if any attempted assignment would be ineffective or would impair Buyer or Buyer Designee's rights under the Purchased Asset in question so that Buyer or Buyer Designees (if applicable) would not in effect acquire the benefit of the Asset Seller's rights thereunder in accordance with the terms of this Agreement: (i) for a period of up to twelve (12) months following the Closing Date (or until, if sooner, the closing of the Chapter 11 Cases or the dissolution of the applicable Asset Seller), the applicable Asset Seller, as permitted by Law, shall cooperate with Buyer and Buyer Designee in any commercially reasonable arrangement designed to provide such benefits to Buyer or Buyer Designee, as applicable, and (ii) Buyer shall, and shall cause each Buyer Designee to, reimburse each Asset Seller for any reasonable out-of-pocket fees, costs and expenses actually incurred and paid to third parties that are not Affiliates of Seller by such Asset Seller or any Affiliate of such Asset Seller in connection with such cooperation.

Section 2.08.   **Inventory**. Buyer, at its own expense shall engage and cause a third-party provider reasonably acceptable to Seller (the "**Audit Provider**") to take an inventory of the Controlled Prescription Inventory at each Acquired Pharmacy, and each of the Asset Sellers' repackager facilities and infusion centers (such locations, collectively, "**Inventory Locations**") (each such inventory, a "**Closing Inventory**") on the date immediately prior to the Closing Date, which Closing Inventory shall be conducted after normal business hours. Buyer will provide a reasonable notice to Seller in writing, in advance of conducting the Closing Inventory, which notice shall include the individuals who will be involved in conducting the Closing Inventory at each Inventory Location. A representative of Seller shall have the right to observe the conduct of the Closing Inventory. Prior to the commencement of the Closing Inventory, Seller shall reverse and return all filled and undelivered prescriptions at each Inventory Location to stock in accordance with applicable Laws and provide all necessary notice to any third-party as required under applicable Laws. Upon completion of the Closing Inventory, Buyer shall provide to Seller a copy of the results of the Closing Inventory. Notwithstanding anything in this Agreement to the contrary, Seller shall be permitted remove all Excluded Assets from each Inventory Location prior to or following the Closing Inventory (including, for the avoidance of doubt, the Cash and Cash Equivalents at each Inventory Location as of the Closing Date).

**ARTICLE III**
**CLOSING**

Section 3.01.   **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") will take place through the electronic exchange of documents and signatures, which process will be coordinated by Jenner & Block LLP, (i) on the fifth (5th) Business Day following the satisfaction or waiver of each of the conditions set forth in **ARTICLE VII** (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at or prior to the Closing) or (ii) at such other time, date or place as Seller and Buyer may mutually agree upon in writing; provided, however, that such other time or date shall be on or before the End Date. The date on which the Closing actually occurs is herein referred to as the "**Closing Date**," and the Closing shall be deemed to have occurred at 11:59 pm prevailing Eastern Time on the Closing Date.

Section 3.02.   **Closing Deliverables**.

(a)       At the Closing, the Asset Sellers will deliver or cause to be delivered

26

to Buyer the following:

(1) a copy of the Sale Order entered by the Bankruptcy Court;

(2) with respect to any Purchased Assets to be sold or assigned by a particular Asset Seller pursuant to this Agreement, a Bill of Sale, duly executed by such Asset Seller, and with respect to the CVS FF&E to be sold or assigned pursuant to this Agreement, a Bill of Sale, duly executed by CVS;

(3) one or more Intellectual Property Assignment Agreements, duly executed by (i) with respect to the Domain Names, CVS and (ii) with respect to all other Assigned Intellectual Property Assets to be sold or assigned pursuant to this Agreement, the applicable Asset Sellers;

(4) with respect to each Owned Real Property to be sold by a particular Asset Seller pursuant to this Agreement, a copy of a limited warranty deed, in form and substance reasonably satisfactory to the Parties (each a "**Deed**" and collectively, the "**Deeds**"), duly executed by such Asset Seller;

(5) the Patient Records Custody Agreement in substantially the form of Exhibit D attached hereto (the "**Patient Records Custody Agreement**"), duly executed by the applicable Asset Sellers;

(6) subject to Section 6.04(c), for each applicable Acquired Pharmacy, a Power of Attorney in substantially the form of Exhibit E attached hereto (a "**Power of Attorney**"), duly executed by the applicable Asset Seller;

(7) the Transition Services Agreement, duly executed by Seller and CVS, as applicable;

(8) an IRS Form W-9, executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes;

(9) if applicable, a membership interest assignment agreement duly executed by CVS transferring all of the issued and outstanding equity interests of the Employment Entity to Buyer; and

(10) the Seller Closing Certificate, duly executed by an officer of Seller.

(b) At the Closing, Buyer will deliver to Seller the following, each of which shall be duly executed by Buyer or Buyer Designee (if applicable):

(1) the Closing Payment;

(2) instructions to the Escrow Holder to deliver the Deposit to Seller;

27

(3)    each Bill of Sale to be delivered by an Asset Seller pursuant to Section 3.02(a)(2), duly executed by Buyer or the applicable Buyer Designee;

(4)    each Intellectual Property Assignment Agreement to be delivered by the applicable Asset Sellers pursuant to Section 3.02(a)(3), duly executed by Buyer or the applicable Buyer Designee;

(5)    each Deed to be delivered by the applicable Asset Sellers pursuant to Section 3.02(a)(4), duly executed by Buyer or the applicable Buyer Designee;

(6)    the Patient Records Custody Agreement, duly executed by Buyer and the applicable Buyer Designees;

(7)    the Transition Services Agreement, duly executed by Buyer and the applicable Buyer Designees; and

(8)    the Buyer Closing Certificate.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in, and in all cases subject to, the Disclosure Schedules, the Asset Sellers represent and warrant to Buyer, as of the date hereof, as follows:

**Section 4.01.    Organization and Qualification**. Each Asset Seller is duly organized and validly existing under and by virtue of the applicable laws of the place of its incorporation or formation and subject to any restriction on account of such Asset Seller's status as a "debtor" under the Bankruptcy Code, each such Asset Seller has all requisite corporate or limited liability company power and authority necessary to own, operate, or lease the properties and assets now owned, operated, or leased by it. Except as set forth on Schedule 4.01(b), each Asset Seller is duly licensed or qualified to do business and is, to the extent applicable, in good standing in each jurisdiction in which the ownership of the Purchased Assets owned by it or the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing does not, individually or in the aggregate, currently have and would not reasonably be expected to result in a Material Adverse Effect.

**Section 4.02.    Authority of Seller**. Subject to the entry of the Sale Order in the Chapter 11 Cases, (i) each Asset Seller has all necessary power and authority to enter into this Agreement and the other Transaction Documents to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; (ii) the execution and delivery by each Asset Seller of this Agreement and any other Transaction Document to which it is a party, the performance by such Asset Seller of its obligations hereunder and thereunder and the consummation by such Asset Seller of the transactions contemplated hereby and thereby have been duly authorized by any necessary corporate or limited liability company action on the part of such Asset Seller; and (iii) this Agreement has been duly executed and delivered by each Asset Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of each Asset Seller enforceable against each Asset Seller in accordance with its terms, subject to applicable bankruptcy, insolvency,

28

reorganization, moratorium and other applicable laws now or hereafter in effect of general application affecting enforcement of creditors' rights and to general principles of equity.

Section 4.03.   **No Conflicts; Consents**. Except as set forth on Schedule 4.03, subject to (i) the entry of the Sale Order in the Chapter 11 Cases, (ii) the expiration of the applicable waiting or review period under the HSR Act, and (iii) compliance with the State Transaction Notification Laws, the execution, delivery and performance by Seller of this Agreement and each Asset Seller of the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, bylaws, certificate of formation, limited liability company agreements or other organizational documents of any Asset Seller, (b) conflict with or result in a material violation or breach of any Law applicable to any Asset Seller, (c) require the consent, notice or other action by any Governmental Authority, (d) require the consent, notice or other action by any Person under, or conflict with, result in a material violation or breach of, constitute a default or an event that would constitute a default under any Material Contract to which any Asset Seller is a party, or (e) result in the creation or imposition of any Encumbrance on the Purchased Assets other than a Permitted Encumbrance.

Section 4.04.   **Title to Purchased Assets; Ownership**.

(a)      The Asset Sellers have valid title to, or a valid leasehold interest in, all of the tangible personal property that is included in the Purchased Assets and such tangible personal property is (or will be as of the Closing Date) free and clear of Encumbrances except for Permitted Encumbrances. All of the representations and warranties relating to the Acquired Real Property are set forth in Section 4.11.

(b)      Assuming Buyer and Buyer Designees obtain all applicable Permits (including all Healthcare Permits) and Regulatory Transaction Approvals and Notifications, and excluding the rights, property, and assets comprising or including (i) the Enterprise Contracts, (ii) the Excluded Assets, (iii) any services and functions contemplated to be provided under the Transition Services Agreement and the assets used to provide such services and functions, and (iv) the items and functions set forth on Schedule 4.04(b), to the Knowledge of the Seller, the Purchased Assets are sufficient for the continued conduct of the Business immediately after the Closing in substantially the same manner as conducted immediately prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.

(c)      Except as set forth on Schedule 4.04(c) or as pursuant to this Agreement, no Asset Seller is a party to any contract or obligation whereby there has been granted to any Person an absolute or contingent right to purchase, obtain or acquire any rights in any material portion of the Purchased Assets or, to the Knowledge of the Seller, any Purchased Assets.

(d)      CVS owns all of the issued and outstanding Equity Interests of Omnicare.  Omnicare owns all of the issued and outstanding Equity Interests of each other Asset Seller.

Section 4.05.   **Financial Statements; Indebtedness; Accounts Receivable**.

29

(a)        Schedule 4.05(a) contains copies of the following consolidated financial statements of the Asset Sellers (collectively, the "**Financial Statements**"): (a) the unaudited consolidated balance sheet and statement of income as of and for the year ended December 31, 2024, and (b) the unaudited consolidated balance sheet and statement of income as of and for the period ended December 31, 2025 (the "**Balance Sheet Date**" and such balance sheet, the "**Balance Sheet**"). The Financial Statements (x) are based in all material respects on the information contained in the Books and Records of the Asset Sellers, (y) were prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, and (z) fairly present, in all material respects, the financial position of the Asset Sellers as of the dates thereof and the results of operations for the periods then ended. Buyer acknowledges that the Financial Statements (i)  may not necessarily be indicative of the conditions that would have existed or the results of operations that would have been achieved if the Asset Sellers had been operated as "stand-alone" and unaffiliated companies, (ii) may be subject to normal year-end adjustments (including Tax adjustments), (iii) do not include footnotes and other presentation items, and (iv) may include allocations of certain costs and expenses for goods or services provided by, through or on behalf of CVS or other Affiliates of the Asset Sellers that are considered to be reasonable.

(b)        No Asset Seller has any Liabilities with respect to the Business that are required by GAAP to be reflected or reserved against in a balance sheet of the Acquired Companies prepared in accordance with GAAP, except (i) those which are adequately reflected or reserved against in the Balance Sheet, (ii) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount relative to the Business, taken as a whole, or (iii) as set forth on Schedule 4.05(b).

(c)        Except as set forth on Schedule 4.05(c), there is no Indebtedness of any Asset Seller, (other than with respect to Indebtedness that is not secured by any Encumbrance (other than Permitted Encumbrances), and that is (i) owed to Affiliates or incurred in connection with equipment leases, (ii) to otherwise finance the acquisition, development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement of any fixed or capital assets, as a lessee under leases that are required to be capitalized under GAAP, or (iii) Indebtedness assumed in connection with the acquisition of any such assets).  Schedule 4.05(c) sets forth, under the heading "Seller Bonds", a true, correct, and complete list of all outstanding letters of credit, bonds, and sureties as of the date hereof that are issued to third parties by or on behalf of any Asset Seller to secure any obligations of such Asset Seller (the "**Seller Bonds**").

(d)        The accounts receivable of the Asset Sellers reflected on Balance Sheet and the accounts receivable arising after the Balance Sheet Date (i) have arisen from bona fide transactions entered into by the Asset Sellers involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; and (ii) constitute valid claims of the Asset Sellers that are, to the Knowledge of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued, or such claims or offsets arising from audits conducted, in the ordinary course of business consistent with past practice. The reserve for bad debts shown on the Balance Sheet or, with respect to accounts receivable arising after the Balance Sheet Date, on the accounting records of the Business have been determined in

30

accordance with GAAP, consistently applied, subject to normal year-end adjustments and the absence of disclosures normally made in footnotes.

### Section 4.06.   **Material Contracts**.

(a)     Schedule 4.6(a) lists all Contracts that are included in the Purchased Assets as of the date hereof and that fall within one or more categories listed below (the "**Material Contracts**"):

(1)     all Contracts that are Purchased Assets and that are with the top twenty (20) customers of the Business based on annual sales during the twelve (12) month period ended December 31, 2025, not including any Payor Agreements (the "**Material Customers**");

(2)     all Contracts, other than Assigned Leases, that are Purchased Assets and that are with the top five (5) vendors of the Business based on annual expenditures during the twelve (12) month period ended December 31, 2025, not including any vendor which is a party to or beneficiary of an Enterprise Contract or any Payor Agreements (each, a "**Material Supplier**");

(3)     each Contract that is a Purchased Asset pursuant to which any Asset Seller is committed to make capital expenditures in excess of $500,000 in the aggregate;

(4)     any collective bargaining agreement that is a Purchased Asset covering any of the Business Employees;

(5)     any Contract that is a Purchased Assets that creates a partnership or joint venture in respect of the Business;

(6)     any Contract that is a Purchased Assets pursuant to which any Asset Seller has granted most-favored-nation pricing provisions to any Person;

(7)     any such Contract relating to the disposition or acquisition of all or substantially all of the assets of, or any equity interest in, any Person;

(8)     any material purchase price conditional sales Contracts and material equipment leases with third parties relating to any of the Purchased Assets.

(b)     Except as prohibited by Law, by the terms of such Material Contract or under any confidentiality agreement, Seller has made available to Buyer, including through provision in the Datasite virtual data room titled Project Flint and the Salesforce sandbox accounts made available to Buyer, a correct and complete copy of each Material Contract, including, to the Knowledge of Seller, all material exhibits, schedules, amendments and modifications thereto.

(c)     Each Material Contract is a valid, binding and enforceable obligation of the applicable Asset Seller (assuming such Material Contract is a valid and binding obligation of the other party or parties thereto) and, to the Knowledge of Seller, of the other party or parties thereto, except, in each case, as enforceability may be limited by applicable bankruptcy,

31

insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing. Except for the filing of the Chapter 11 Cases, none of the Asset Sellers or, to the Knowledge of Seller, any other party thereto is in breach of or default under in any material respect, or has provided or received any written notice of any intention to terminate, any Material Contract. Except for the filing of the Chapter 11 Cases, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute a material event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other material changes of any right or obligation or the loss of any material benefit thereunder. Except as set forth on Schedule 4.06(c), as of the date hereof, there are no material disputes pending or, to Seller's Knowledge, threatened in writing under any Contract included in the Purchased Assets that are required to be listed in Schedule 4.06(a) pursuant to Section 4.06(a)(1) or Section 4.06(a)(2).

Section 4.07. **Legal Proceedings**. As of the date hereof, except as set forth on Schedule 4.07, there are no Actions pending or, to the Knowledge of Seller, threatened in writing against any Asset Seller (i) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement, (ii) that involve or relate to any Asset Seller and that are material to the Business, taken as a whole, or (iii) that would reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 4.07, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business that are material to the Business, taken as a whole.

Section 4.08. **Legal Compliance**. Except as set forth on Schedule 4.08, (i) each Asset Seller's conduct of the Business and operation of the applicable Purchased Assets complies, and during the past four (4) years has complied, in all material respects with all applicable Laws, and (ii) except for such Actions filed or threatened by parties that are not Governmental Authorities in the ordinary course of business consistent with past practice, no material Action against any Asset Seller has been filed or to the Knowledge of Seller, threatened in writing against such Asset Seller with respect to the conduct of the Business alleging any material failure to comply with applicable Law.

Section 4.09. **Employment Matters**.

(a)      Schedule 4.09(a) sets forth a true, complete and correct list, as of the date of this Agreement, of all of the current employees of CVS and/or its Affiliates who report, directly or indirectly, to the President of Seller and provide services with respect to the Business as of the date hereof, including those individuals who are temporarily absent from active employment or who have rights to return to employment under CVS's or any of its Affiliate's policies or applicable Law (such employees (excluding any such employees who resign or are terminated in accordance with the terms of this Agreement after the date hereof) together with any employees hired in the ordinary course of business after the date hereof who report, directly or indirectly, to the President of Seller and provide services with respect to the Business, the "**Business Employees**"), including the entity that employs them, their respective titles, work location, full/part time status, hourly/salaried status, salary or wage rate, annual bonus opportunity, date of hire and whether or not such employee is on leave of absence. Within thirty (30) and no less than ten (10) days prior to Closing, Seller shall deliver to Buyer an updated Schedule 4.09(a)

32

(the "**Employee Census**") as of such date.

(b) Except as set forth on Schedule 4.09(b) with respect to the Business Employees, (i) there are no collective bargaining agreements to which the Business Employees are a party; and (ii) the Business Employees are not currently represented by any labor union or labor organization. To the Knowledge of Seller, with respect to the Business Employees, (x) no labor union, labor organization or group of employees has made a pending demand in writing for recognition or certification, and (y) there are no representation or certification actions or petitions seeking a representation action presently pending or, the Knowledge of Seller, threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority. There is no labor strike, slowdown, work stoppage or lockout pending or, to the Knowledge of Seller, threatened against or affecting the Business, nor has there been any such activity within the past 12 months.

(c) The Asset Sellers are, and during the past four (4) years have been, in compliance in all material respects with all applicable Laws relating to employment, employment standards and practices, hiring, background investigations, employment of minors, equal employment opportunity, employment discrimination (including harassment and retaliation), employment-related immigration and employment verification/authorization, workplace health and safety, workers' compensation, unemployment compensation and benefits, collective bargaining and/or labor relations, plant closings/mass layoffs, wages, hours, overtime, exempt or non-exempt classification, wage payment, vacation and paid time off, family and medical and other leave of absence, independent contractor classification, postings and recordkeeping, privacy and confidentiality, and termination. Except as set forth on Schedule 4.09(c), there is no pending, nor, to the Sellers' Knowledge, threatened in writing, Action against any Asset Seller reasonably likely to give rise to a Liability asserting that any Asset Seller has committed an unfair labor practice or any other violation of applicable Labor Laws with respect to any current or former Business Employee or former independent contractor.

(d) Schedule 4.09(d) sets forth a list of all Business Employees employed pursuant to H-1B visa status under petitions currently sponsored by Seller or its Affiliates (the "**H-1B Employees**").

Section 4.10. **Benefit Plans**.

(a) Schedule 4.10(a) lists each material written Benefit Plan in existence as of the date of this Agreement. With respect to each material Benefit Plan, Seller has provided to Buyer summaries of each such material Benefit Plan and a copy of the letter or, if none, application referred to in Section 4.10(b).

(b) To the Knowledge of Seller, each Benefit Plan has been administered in material compliance with its terms and with the applicable provisions of applicable Law. Each Benefit Plan that is a savings or retirement plan and is intended to be tax-qualified under the Code is so qualified and has received or timely applied for, which application is pending, a determination letter or opinion letter, as applicable, from the Internal Revenue Service ("**IRS**") to the effect that such Benefit Plan is qualified and the plan and trust related thereto is exempt from federal income Taxes under Sections 401(a) and 501(a) of the Code, respectively. The Seller has

no Liability under or in respect of any plan subject to Title IV or Section 302 of ERISA or Sections 412 or 430 of the Code or any multiemployer plan (within the meaning of Section 3(37) of ERISA) that would reasonably be expected to become a Liability of the Business, the Buyer or its Affiliates after the Closing.

**Section 4.11.   Real Properties**.

(a)      Schedule 4.11(a)(i) sets forth a list of all real property owned by the Asset Sellers. Schedule 4.11(a)(ii) sets forth (i) the addresses of all real property leased, subleased or licensed by any Asset Seller as of the date of this Agreement and (ii) a true and complete list of all leases, subleases and licenses to which any Asset Seller is party with respect to such real property. Each Assigned Lease is valid, binding and enforceable obligation of the applicable Asset Seller (assuming such Assigned Lease is a valid and binding obligation of the other party or parties thereto) and, to the Knowledge of Seller, of the other party or parties thereto, except, in each case, as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights, or by general equity principles, including principles of commercial reasonableness, good faith and fair dealing. None of the Asset Sellers or, to the Knowledge of Seller, any other party thereto is in breach of or default under, in any material respect, any Assigned Lease. To the Knowledge of Seller, except as set forth on Schedule 4.11(a)(iii) or an alleged breach by a landlord under an Assigned Lease as a result of the Chapter 11 Cases, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Assigned Lease.

(b)      Each applicable Asset Seller has good and valid title to the applicable Owned Real Property and the Owned Real Property is (or will be as of the Closing Date) free and clear of Encumbrances except for Permitted Encumbrances. No Asset Seller has subleased, licensed or granted any Person (other than to another Asset Seller) any right to the use or occupancy of any Owned Real Property or Leased Real Property and to the Knowledge of Seller, there is no Person (other than an Asset Seller) in possession of any Owned Real Property or Leased Real Property that will remain in effect as of the Closing Date.

(c)      No Asset Seller has received written notice from any Governmental Authority or, with respect to any of the Leased Real Property, any landlord under an Assigned Lease: (i) of any pending or threatened condemnation Action affecting any Owned Real Property or Leased Real Property; or (ii) of any pending or threatened Actions against any Owned Real Property or Leased Real Property, relating to the ownership, lease, use or occupancy by any Asset Seller of such Owned Real Property or Leased Real Property or any portion thereof which is reasonably likely to result in a material and adverse change in the ownership or operation of the Owned Real Property or operation of the Leased Real Property for its current use.

**Section 4.12.   Environmental Matters**.

(a)      Except where such Release or threatened Release, the failure to be so in compliance or such suit, action, proceeding or investigation, has not had, or would not reasonably be expected to have, a Material Adverse Effect, (i) to the Knowledge of Seller, there has been no Release of any Hazardous Substance at, on, under or from any Acquired Real Property,

34

(ii) each Asset Seller is in compliance with all applicable Environmental Laws, which compliance includes having all Permits required under applicable Environmental Laws to conduct their respective businesses as now conducted, and each Asset Seller is in compliance with all such Permits and (iii) there is no suit, action, proceeding or investigation pending or, to the Knowledge of Seller, threatened in writing asserting any liability under Environmental Law against any Asset Seller.

(b)     The representations and warranties in this <u>Section 4.12</u> are the sole and exclusive representations and warranties of Seller concerning environmental matters.

### Section 4.13.   <u>Health Care Matters</u>.

(a)     Except as set forth on <u>Schedule 4.13(a)</u>, each Asset Seller is conducting, and during the past five (5) years, has conducted, its business and operations in compliance in all material respects with all applicable Healthcare Laws.

(b)     Except as set forth on <u>Schedule 4.13(b)</u>, during the past five (5) years, no Asset Seller has been sanctioned under any Government Health Program or has made a voluntary disclosure to any Governmental Authority for any violation of Healthcare Laws. To the Knowledge of Seller, during the past five (5) years: (i) no Business Employee or independent contractor of any Asset Seller (whether an individual or entity), has been excluded from participating in any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), nor, to the Knowledge of Seller, is any such exclusion threatened or pending and (ii) none of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. § 1320a-5(b)) of any Asset Seller have been excluded from any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b, nor, to the Knowledge of Seller, is any such exclusion, sanction or conviction threatened or pending. During the past five (5) years, no Asset Seller has been excluded from participating in any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)) nor, to the Knowledge of Seller, is any such exclusion threatened or pending. To the Knowledge of Seller, during the past five (5) years, no Business Employee of any Asset Seller or independent contractor currently providing services to any Asset Seller (whether an individual or entity), or any member of Seller's staff (to the extent applicable), has been debarred, excluded, suspended or otherwise rendered ineligible from participation in an U.S. Food and Drug Administration regulated activity. During the past five (5) years, the Asset Sellers have conducted, upon hiring or engagement and once a month thereafter, searches of the Office of Inspector General of the United States Department of Health and Human Services' List of Excluded Individuals/Entities, U.S. Food and Drug Administration debarment list, and any other database checks to the extent required by any Healthcare Laws.

(c)     To the Knowledge of Seller, (i) during the past five (5) years, no Asset Seller has received any written notice from any Governmental Authority alleging noncompliance with any Healthcare Laws; (ii) there is no Action related to noncompliance with any Healthcare Laws pending against any Asset Seller; and (iii) no Asset Seller is subject to any order, judgment, injunction, award, decree or writ handed down, adopted or imposed by any Governmental Authority relating to Healthcare Laws, except for any of the foregoing in <u>clauses</u> <u>(i)</u> <u>(ii)</u> or <u>(iii)</u> that would not reasonably be expected to have a Material Adverse Effect.

35

(d)      As applicable, the Asset Sellers are currently enrolled, certified and have valid credentialing for the Private Programs. As applicable, the Asset Sellers are, and during the past five (5) years have been, in material compliance with the requirements and conditions of participation in the Private Programs and in all material respects with the terms, conditions and provisions of the Private Program Payor Agreements and applicable program guidance and manuals. The Private Program Payor Agreements are each in full force and effect, and, to the Knowledge of Seller, no fact or circumstance exists that would cause any such Private Program Payor Agreement not to remain in force or be renewed on and after Closing, other than as a result of the transactions contemplated by this Agreement.

(e)      As applicable, the Asset Sellers are enrolled, certified and have a valid Provider Number for all Government Health Programs. As applicable, the Asset Sellers are, and during the past five (5) years have been, in material compliance with the requirements and conditions of participation in the Government Health Programs and with the terms, conditions and provisions of the Government Provider Agreements and in all material respects with the applicable program guidance and manuals. The Government Provider Agreements are each in full force and effect, and, to the Knowledge of Seller, no fact or circumstance exists that would cause any such Government Provider Agreement not to remain in force or be renewed on and after Closing, other than as a result of the transactions contemplated by this Agreement.

(f)      Each Asset Seller has taken and continues to take all actions necessary to ensure that each current customer, patient, and service recipient of the Business satisfies in all material respects all of the criteria for medication management, eligibility and billing under the rules and regulations of all Government Health Programs and Private Programs. During the past five (5) years, each Asset Seller has paid or caused to be paid all overpayments or other adjustments which have become due and payable pursuant to any claims or other filings by any Private Program, Governmental Authority, or Government Health Program, including Medicaid and any related overpayments or adjustments. Except as set forth on Schedule 4.13(f), during the past five (5) years, Seller has not received any notices regarding any pending appeals, audits, adjustments, challenges, additional document requests, litigation or notices of intent to audit, notices of program reimbursement or similar notices reflecting any overpayments, penalties, interest or fines with respect to any claims and other filings with any Private Program, Governmental Authority, or Government Health Program, excepting from the foregoing, any notices pertaining to appeals, audits, adjustments that are not material or that are provided in the ordinary course of the Business. During the past five (5) years, all billing practices of Seller with respect to all Government Health Programs have been conducted in compliance in all material respects with all applicable Healthcare Laws and the billing guidelines and requirements of such programs.

(g)      Except as would not reasonably be expected to have a Material Adverse Effect, there are no recoupments with respect to any Government Health Program or any Private Program being sought, requested or claimed, or to the Knowledge of Seller, threatened against any Asset Seller.

**Section 4.14.  Permits**. Schedule 4.14(i) contains a list of each material Permit held by the Asset Sellers. Each Asset Seller is, and during the past five (5) years, has been, in compliance in all material respects with all Permits, including all Healthcare Permits, held by such

36

Asset Seller and each such Permit is, and during the past five (5) years, has been, in full force and effect. Schedule 4.14(ii) contains a description of each material disciplinary action taken by any Governmental Authority during the past five (5) years with respect to each Healthcare Permit.

Section 4.15.   Taxes. Except as set forth on Schedule 4.15, (a) each Asset Seller has timely filed all Tax Returns that it was required to file with respect to the Business and the Purchased Assets, (b) such Tax Returns are true, complete and correct in all material respects, (c) except as prohibited by the Bankruptcy Code, each Asset Seller has timely paid or caused to be paid all material Taxes that are due and owing by it (whether or not shown on such Tax Returns), (d) there is no Encumbrance on the Purchased Assets for Taxes other than Permitted Encumbrances, (e) there is no material pending audit of, or, to the Knowledge of Seller, or tax controversy associated with any Tax Return of any Asset Seller related to the Purchased Assets being conducted by any Governmental Authority, (f) proper and accurate amounts have been withheld by Seller and its applicable Affiliates in compliance with payroll Tax and other withholding provisions of applicable Law, and all such amounts have been timely remitted to the proper taxing authority, and (g) with respect to the Purchased Assets, no Asset Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency which currently remains in effect.

Section 4.16.   **Intellectual Property.**

(a)   Schedule 4.16(a) sets forth a list as of the date hereof of all Intellectual Property Registrations in the name of any Asset Seller and that are included in the Assigned Intellectual Property Assets. Each Intellectual Property Registration is subsisting, in full force and effect with the exception of any copyrights or patents, if any, that expired at the end of their natural term, and to the Knowledge of Seller, valid.

(b)   No Asset Seller has received any written notice during the past four (4) years that the Assigned Intellectual Property Assets infringe upon or otherwise misappropriate or violate any Intellectual Property of any third party that remains unresolved. There is no pending dispute, including any claim or, to the Knowledge of Seller, threatened claim, with respect to the Assigned Intellectual Property Assets: (i) contesting the right of any Asset Seller to use any of the Assigned Intellectual Property Assets; or (ii) challenging the ownership, validity or enforceability of any of the Assigned Intellectual Property Assets.

(c)   No Asset Seller has, during the past four (4) years, brought any legal actions or lawsuits alleging infringement, misappropriation or other violation by another Person of any of the Assigned Intellectual Property Assets that remains unresolved.

Section 4.17.   **Insurance**. Schedule 4.17 sets forth an accurate and complete list of all material insurance policies or self-insurance funds maintained by or for the benefit of any Asset Seller as of the Effective Date covering the ownership and operation of the Business (excluding for the avoidance of doubt, any such insurance policies for self-insurance funding of any Benefit Plan), indicating the types of insurance, policy numbers, terms, and identity of insurers. To the Knowledge of the Seller, no Asset Seller is in breach or default of such insurance policies. All such insurance policies are in full force and effect, and, to the Knowledge of Seller, there is no claim by any Asset Seller pending under any of such insurance policies as to which coverage has

37

been questioned, denied, or disputed by the issuers or underwriters of such policies or bonds of any of such insurance policies. Except as disclosed on Schedule 4.17, to the Knowledge of Seller, (i) there is no threatened termination of, or premium increase with respect to, any such insurance policies and (ii) the consummation of the transactions contemplated hereby will not result in any termination of, or premium increase with respect to, any of such insurance policies or any inability to assess claims that were incurred prior to Closing under any of such insurance policies.

Section 4.18.   **Related Party Matters**. Except as set forth on Schedule 4.18, to the Knowledge of Seller, no director, manager, officer or holder of more than five percent (5%) of the equity interests of any Asset Seller, nor any Affiliate of the foregoing, in each case, excluding the Asset Sellers (each, a "**Seller Party**"): (a) is a party to any material Contract or transaction with any Asset Seller that (i) involves annual payments in excess of $250,000 in the aggregate and (ii) will continue following the Closing Date, other than (A) employment agreements and related compensation arrangements, (B) Benefit Plans, (C) customary director and officer indemnification arrangements, (D) any Contract or transaction solely between or among any Asset Sellers, and (E) agreements or arrangements that will be terminated at or prior to Closing without any liability to Buyer; or (b) directly owns any material tangible property or material intellectual property rights that are used in the conduct of the Business as currently conducted. For purposes of this Section 4.18, ownership of less than five percent (5%) of any class of publicly traded securities shall not be deemed to constitute an ownership interest requiring disclosure, and transactions solely in a Person's capacity as an employee, director or officer of Seller in the ordinary course of business shall not require disclosure.

Section 4.19.   **Improper Payments**.  During the past five (5) years, no Asset Seller nor any manager or officer, nor, to the Knowledge of Seller, any employee, independent contractor or agent providing services related to the Business, has directly or indirectly, in violation of any Healthcare Law (and without meeting the elements of an applicable safe harbor or exception to such Law):  (i) offered, paid or received any remuneration, in cash or in kind to, or made any financial arrangements, with any past, present or potential customers, patients, service recipients, suppliers, staff members, contractors or third-party payors of any Asset Seller in exchange for business or payments from such Persons; (ii) given or agreed to give, received or agreed to receive, any gift or gratuitous payment of any kind, nature or description (whether in money, property or services) to any customer or potential customer, supplier or potential supplier, contractor, or third-party payor of any Asset Seller in exchange for business or payments from such Persons; (iii) made or agreed to make, any contribution, payment or gift of funds or property to, or for the private use of, any governmental official, employee or agent in exchange for business or payments from such Persons; (iv) made, or agreed to make, any improper payment to any Person; or (v) made any payment for or agreed to make any payment for any goods, services, or property in excess of fair market value as reasonably determined by such Seller.

Section 4.20.   **Inventory**. All inventory that is a Purchased Asset, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. All inventory of the Business is owned by the Asset Sellers free and clear of all Encumbrances (other than Permitted Encumbrances), and no such inventory is held on a consignment basis.

38

**Section 4.21.   Absence of Certain Changes**.

(a)     Since the Balance Sheet Date, there has not occurred any Material Adverse Effect and no circumstances have arisen, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

(b)     Between the Balance Sheet Date and the date hereof, (x) the Asset Sellers have in all material respects conducted the Business in the ordinary course of business as debtors in possession, subject to the requirements of the Bankruptcy Code, any Orders of the Bankruptcy Court and the DIP Credit Agreement, and (y) except as set forth on Schedule 4.21(b), no Asset Seller has:

(1)     suffered any theft, damage, destruction or casualty loss to the Purchased Assets, which theft, damage, destruction or casualty loss is material to the Business, taken as a whole;

(2)     sold, assigned, leased, licensed or transferred any material asset used in the Business to any other Person, other than such sales, assignments, leases, licenses and transfers in the ordinary course of business or among the Asset Sellers and their respective Affiliates;

(3)     cancelled, surrendered, allowed to expire or failed to renew any Permit, except in the ordinary course of business consistent with past practice;

(4)     forgiven or canceled any claims or waived any rights, in each case having a value in excess of $1,000,000;

(5)     changed its inventory management practices or allowed levels of inventory of the Business to vary materially outside the ordinary course of business from the levels customarily maintained by it;

(6)     materially changed its billing terms or collection practices;

(7)     had any material loss of, or any material change in relationship with, any Private Program or any material supplier;

(8)     made any changes in accounting principles, practices or methods, other than those consistent with changes to GAAP; nor

(9)     entered into any agreement or commitment (other than this Agreement), whether orally or in writing, to do any of the foregoing.

**Section 4.22.   Material Suppliers**. To the Knowledge of Seller, no Material Supplier has terminated its relationship with the Business or given notice to any Asset Seller or Acquired Company to the effect that such Material Supplier will (and no such Material Supplier has indicated that it intends to or has threatened to) terminate its relationship with the Business or will materially decrease its relationship with the Business, whether as a result of the consummation of the transactions contemplated hereby or otherwise. Schedule 4.22 sets forth, with respect to

each Material Supplier, the dollar value of all purchases from such Material Supplier during the twelve (12) month period ended December 31, 2025. No Asset Seller has received any notice that any of the Material Suppliers has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business (including through non-renewal or expiration of any Contract).

**Section 4.23.  Information Laws**.

(a)      Each Asset Seller has complied in all material respects with applicable Information Laws regarding the creation, access, maintenance, transmission, use and disclosure of Personal Data. Without limiting the foregoing, each Asset Seller has complied in all material respects with restrictions regarding the confidentiality, maintenance, use and disposal of any and all protected health information as defined in HIPAA ("**Protected Health Information**") and patient charts under all applicable Information Laws, including, without limitation, the requirements of HIPAA, HITECH, or any Business Associate Agreements entered into by any Asset Seller in connection therewith. To the Knowledge of Seller, no employee, contractor, customer, patient, service recipient, or any other Person has filed a HIPAA-related complaint or otherwise alleged the existence of any HIPAA breach with any Asset Seller, the Business or, any Governmental Authority that would have a Material Adverse Effect within the past five (5) years. No Asset Seller has discovered any material "security incidents" or "breaches" (as such terms are defined in HIPAA) with regard to any Protected Health Information within the past five (5) years.

(b)      During the past five (5) years, the Asset Sellers have (i) adopted and implemented privacy and security policies and procedures designed to comply in all material respects with HIPAA and Information Laws, as applicable to Seller and the Business ("**Privacy and Security Policies and Procedures**"), (ii) provided training to all workforce in compliance in all material respects with HIPAA and other applicable Information Laws, and (iii) maintained administrative, technical, and physical safeguards that meet in all material respects the standards set forth in HIPAA, as applicable to the current operation of the Business. During the past five (5) years, the Asset Sellers have maintained records reflecting (x) the Privacy and Security Policies and Procedures; (y) evidence of other training relating to compliance with such Privacy and Security Policies and Procedures and Information Laws; and (z) applicable security program documents, including incident response policies, encryption standards, and other computer security protection policies and procedures required under HIPAA and other applicable Information Laws.

(c)      Within the past five (5) years, the Asset Sellers have performed and documented an assessment of the potential risks and vulnerabilities to the confidentiality, integrity and availability of electronic protected health information as defined by HIPAA ("**Electronic Protected Health Information**") held by Asset Sellers in material compliance with HIPAA and in such frequency as required by HIPAA, and have taken reasonably appropriate steps to correct, in a timely manner, all material deficiencies identified in such risk assessments.

(d)      Except as included in Schedule 4.23(d), a business associate agreement in material compliance with HIPAA exists with each Person who has acted as a business associate, as defined by HIPAA ("**Business Associate**"), of any Asset Seller (collectively, the "**Business Associate Agreements**"). The Asset Sellers maintain records of such Business

40

Associate Agreements. To the Knowledge of Seller, no Business Associate has materially breached any Business Associate Agreement.

(e) Except as listed in Schedule 4.23(e), no Asset Seller has received, during the past five (5) years, any written notice from a Governmental Authority that any action has been filed, has been initiated, or is pending against it and which relates directly to the ownership or operation of the Business concerning an alleged material violation of HIPAA or Information Laws, or the rights of any Person with respect to Personal Data, in each case, that remains unresolved.

Section 4.24. **Brokers**. Other than Houlihan Lokey Capital, Inc., no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

Section 4.25. **Exclusivity of Representations and Warranties**. Neither Seller nor any Affiliate or Representative of Seller nor any other Person is making, and none of Buyer or any of its Affiliates or its or their Representatives has relied, is relying or will rely on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to any Asset Seller, the Business, the Purchased Assets or the Assumed Liabilities (including any representation or warranty relating to the condition (financial or otherwise), or results of operations, of any Asset Seller), except as expressly set forth in this **ARTICLE IV** as modified by and subject to the Disclosure Schedules, and Seller hereby disclaims any such other representations or warranties.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the date hereof, as follows:

Section 5.01. **Organization of Buyer**. Buyer is a Delaware limited liability company, duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 5.02. **Authority of Buyer**. Buyer and each Buyer Designee (if applicable) has full power and authority to enter into this Agreement and the other Transaction Documents to which Buyer or any Buyer Designee is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer and any Buyer Designees of this Agreement and any other Transaction Document to which they are a party, the performance by Buyer and each Buyer Designee of its obligations hereunder and thereunder and the consummation by Buyer and each Buyer Designee of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer and each Buyer Designee. This Agreement has been duly executed and delivered by Buyer and each Buyer Designee, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer and each Buyer Designee enforceable against Buyer and each Buyer Designee in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability

41

relating to or effecting creditors' rights and to general principles of equity.

Section 5.03. **No Conflicts; Consents**. Subject to (i) the entry of the Sale Order in the Chapter 11 Cases, (ii) the expiration of the applicable waiting or review period under the HSR Act, and (iii) compliance with the State Transaction Notification Laws, the execution, delivery and performance by Buyer and each Buyer Designee of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, bylaws, certificate of formation, limited liability company agreement or other organizational documents of Buyer or any Buyer Designee; (b) conflict with or result in a violation or breach of any provision of any Law applicable to Buyer or any Buyer Designee; (c) require the consent, notice or other action by any Person under, or conflict with, result in a violation or breach of, constitute a default or an event that would constitute a default under any material Contracts to which Buyer or any Buyer Designee is a party; or (d) require the consent of, or filing with, any Governmental Authority, except for any of the foregoing in the case of clauses (b) through (d) of this Section 5.03 that would not reasonably be expected to have a material adverse effect on Buyer or any Buyer Designee's ability to consummate the transactions contemplated by, and discharge its obligations under, this Agreement and the other Transaction Documents to which it is a party.

Section 5.04. **Financing**. Buyer will have at Closing, access to sufficient funds, through a combination of cash and third-party financing (a) to pay the Closing Payment and all fees and expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated by this Agreement, and (b) to perform all of its obligations pursuant to, and to consummate the transactions contemplated by, this Agreement and each of the other Transaction Documents to which it is a party. Buyer acknowledges that its obligations set forth in this Agreement are not contingent or conditioned upon any Person's ability to obtain financing for or in connection with the transactions contemplated by this Agreement.

Section 5.05. **Certain Arrangements**. There are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any of Buyer, its Affiliates or its and their Representatives, on the one hand, and any member of the management or any member of the board of directors or similar governing body of Seller or any Affiliate of Seller, any holder of equity or debt securities of Seller or any of its Affiliates or any lender or creditor of Seller or any Affiliate of Seller, on the other hand, (a) relating in any way to the acquisition of the Purchased Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

Section 5.06. **WARN Act and Mass Layoffs**. Buyer does not currently plan or contemplate any plant closings, reduction in force, terminations of employees, or similar personnel actions impacting Business Employees that would trigger obligations under the WARN Act or similar Laws.

Section 5.07. **Legal Proceedings**. There are no Actions pending or threatened in writing against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement or that would be reasonably likely

42

to adversely affect Buyer's performance of its obligations under this Agreement.

Section 5.08.  **Investigation**. Buyer has conducted its own independent investigation, review and analysis of the Business, the Purchased Assets and Assumed Liabilities and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, Books and Records, and other documents and data of the Asset Sellers for such purpose. In this regard, Buyer has been given the opportunity to ask questions of, and receive answers from, the Seller, and has made all inquiries and investigations that it deems necessary or appropriate, concerning the transactions contemplated by this Agreement, the Business, the Purchased Assets and the Assumed Liabilities. The Seller has made available to Buyer or its Representatives all documents and information requested by or on behalf of Buyer relating to an investment in the Business and the Purchased Assets and an assumption of the Assumed Liabilities. Buyer acknowledges and agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer (a) has relied solely upon its own investigation and the express representations and warranties of Seller set forth in this Agreement, as modified by the Disclosure Schedules, and the other Transaction Documents, and (b) expressly disclaims any reliance on any other information or the absence thereof in entering into this Agreement and consummating the transactions contemplated this Agreement.

Section 5.09.  **Solvency**. Buyer and each Buyer Designee is, and immediately after giving effect to the transactions contemplated by this Agreement, Buyer and each Buyer Designee shall be, solvent and shall (a) be able to pay its debts as they become due; (b) own property having a fair saleable value greater than the amounts required to pay debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer or any Buyer Designees. In connection with the transaction contemplated hereby, neither Buyer nor any Buyer Designee has incurred, nor does Buyer or any Buyer Designee plan to incur, debts beyond its ability to pay as they become absolute and matured.

Section 5.10.  **Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer or any Buyer Designee.

**ARTICLE VI**
**COVENANTS**

Section 6.01.  **Conduct of Business Prior to the Closing**.

(a)      Except (i) as otherwise set forth Schedule 6.01(a), (ii) as contemplated, required or expressly permitted by this Agreement, (iii) for actions approved by Buyer in writing (which approval will not be unreasonably withheld, conditioned or delayed), (iv) due to any express limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or the DIP Credit Agreement, or (v) as required by applicable Law or an Order of the Bankruptcy Court, from the date hereof through the Closing or this Agreement's earlier termination in accordance with its terms, Seller shall, and shall cause the other Asset Sellers to,

43

use commercially reasonable efforts to conduct the Business in the ordinary course of business substantially consistent with the practices used by Seller since the Petition Date, taking into account the commencement and pendency of the Chapter 11 Cases.

(b)     Except (i) as otherwise set forth Schedule 6.01(b), (ii) as contemplated, required or expressly permitted by this Agreement, (iii) for actions approved by Buyer in writing (which approval will not be unreasonably withheld, conditioned or delayed), (iv) due to any express limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or the DIP Credit Agreement, or (v) as required by applicable Law or an Order of the Bankruptcy Court, from the date hereof through the Closing or this Agreement's earlier termination in accordance with its terms, Seller shall not, and shall cause the other Asset Sellers not to:

(1)     sell, lease, license, mortgage, pledge, transfer or otherwise dispose of any of the Purchased Assets, except for (i) sales, transfers, leases, licenses and other dispositions of assets, properties or rights in the ordinary course of business consistent with past practice, (ii) dispositions of obsolete, surplus or other assets that are no longer used or useful in the conduct of the Business consistent with past practices, and (iii) transfers among Asset Sellers;

(2)     (i) transfer, issue, sell, authorize, pledge, redeem, encumber or dispose of any Equity Interests of any of the Asset Sellers or grant options, warrants, calls or other rights to purchase or otherwise acquire Equity Interests of or any stock appreciation, phantom stock or other similar right with respect to any Asset Seller, or (ii) amend the certificate of incorporation, bylaws, certificate of formation, limited liability company agreement or other governing agreements of any Asset Seller;

(3)     (i) in any material manner adopt, enter into, terminate, or materially amend, any Benefit Plan, or (ii) increase in any material manner the compensation of any Business Employee, except in the case of clauses (i) and (ii), (A) to the extent required by applicable Law, (B) as required under the terms of any Benefit Plan or other Contract as in effect on the date hereof, or (C) in the ordinary course of business consistent with past practice; provided that nothing in this Section 6.01(b)(3) shall restrict any Asset Seller or any of their Affiliates from entering into or making available to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, Benefit Plans and compensation arrangements that are consistent with past practices;

(4)     (i) voluntarily terminate or abandon, (ii) fail to use good faith efforts to maintain, or (iii) fail to use good faith efforts to make any required filings with Governmental Authorities with respect to, any Healthcare Permit held by any Asset Seller as of the date hereof that is necessary for the operation of the Business, except for any such failure to maintain any such Healthcare Permit pursuant to clause (ii) of this sentence, or failure to make such required filings with respect to any such Healthcare Permit pursuant to clause (iii) of this sentence, which would not have a material adverse impact on the Business, taken as a whole;

(5)     terminate or materially amend any of the Assigned Leases; provided, that the Asset Sellers shall be permitted to exercise any right to extend the term of any Assigned Lease in accordance with its terms for which the deadline for such exercise of extension

occurs between the date of this Agreement and the Closing Date;

(6)     grant or convey any easement, lease or license in or to any of the Owned Real Property (other than Permitted Encumbrances);

(7)     (A) make any material changes in its policies with respect to the payment of accounts payable or accrued expenses or the collection of the accounts receivable or other receivables, (B) accelerate in any material respect the collection of notes or accounts receivable of the Business in advance of the dates when the same would have been collected in the ordinary course of business consistent with past practices since the Petition Date, or (C) delay in any material respect the payment of the accounts payable or trade payables of the Business beyond the dates when the same would have been paid in the in the ordinary course of business consistent with past practices since the Petition Date; or

(8)     authorize, commit, or agree to take any of, the foregoing actions.

(c)     For the avoidance of doubt, Buyer acknowledges and agrees that nothing in this Agreement will prohibit or limit any rights of the Asset Sellers to remove or recover any Cash and Cash Equivalents prior to the Closing and that the Asset Sellers shall have the right to remove and recover all Cash and Cash Equivalents.

(d)     Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct any of the Asset Sellers or the Business prior to the Closing, and the Asset Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over the Business and their respective operations. Notwithstanding anything to the contrary contained herein, any commercially reasonable action taken, or omitted to be taken, by any Asset Seller pursuant to any applicable Law or Order issued by any Governmental Authority (including any business closures, "sheltering-in-place" or other actions), that relates to, or arises out of, any pandemic or epidemic arising, escalating, spreading or worsening, after the Effective Date shall in no event be deemed to constitute a breach of this Section 6.01.

Section 6.02.   **Seller Access to Information**. From and after the Closing until the third anniversary of the Closing Date or until, if sooner, the dissolutions of the Asset Sellers, to the extent permitted by applicable Law, Buyer shall, and shall cause its Affiliates (including any Buyer Designees) to, provide to Seller, its Affiliates and its and their respective Representatives reasonable access (after reasonable advance written notice to Buyer, during normal business hours, at the sole cost and expense of Seller or such Affiliate, and solely to the extent such access does not unreasonably interfere with the business of Buyer and its Affiliates) to (a) Buyer's and any of its Affiliate's personnel who have knowledge either of the Business prior to Closing or otherwise relevant to any Action related to the Excluded Assets and (b) all information, data and documents (including the Assigned Books and Records) to the extent related to the Business, the Purchased Assets or the Assumed Liabilities for periods prior to the Closing, but solely to the extent such access is reasonably required (i) in connection with the Chapter 11 Cases, (ii) in connection with the liquidation and winding up of any of the Debtors, (iii) in order for Seller or any of its Affiliates to comply with applicable Law, or (iv) in connection with human resources, accounting, Tax, legal

45

or other business purposes; <u>provided</u>, that (w) all requests for access will be directed to an executive officer of Buyer or such other Persons as any such executive officer may designate in writing from time to time, (x) Buyer not obligated to disclose and may redact or remove any information that is not related to the pre-Closing operations of the Business, (y) nothing herein shall require Buyer or any of its Affiliates to provide Seller or any of its Affiliates or its or their respective Representatives with access to information that is subject to attorney-client privilege, or if such access or disclosure would violate the terms of any Contract or would be a violation of Law. Such access to such information, data and documents (including the Assigned Books and Records) shall include reasonable access to any such information in electronic form to the extent reasonably available. Upon the reasonable request of Buyer, Seller and/or its applicable Affiliates and Representatives shall execute a confidentiality agreement and/or a business associate agreement prior to Buyer providing access to any information, data, or documents pursuant to this Section.

### Section 6.03.   <u>Buyer Access to Information</u>.

(a)   From the date hereof through the Closing or this Agreement's earlier termination in accordance with its terms, to the extent permitted by Law, Seller shall, and shall cause the other Asset Sellers to, provide to Buyer and its Representatives who have need for access and information for purposes of implementing the transactions contemplated by this Agreement reasonable access (after reasonable advance written notice to Seller, during normal business hours, at the sole cost and expense of Buyer, and solely to the extent such access does not unreasonably interfere with the business of Seller and its Affiliates) to the Purchased Assets, including the Books and Records of the Asset Sellers, as Buyer may reasonably request to the extent related to the Business, in order  for Buyer and its Representatives to access such information regarding the Purchased Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the transactions contemplated by this Agreement; <u>provided</u>, that (i) all requests for access will be directed to Houlihan Lokey Capital, Inc. or such other Persons as Houlihan Lokey Capital, Inc. or Seller may designate or consent to in writing from time to time, (ii) Asset Sellers are not obligated to disclose and may redact or remove any information that is not related to the Business, and (iii) nothing herein will require any Asset Seller or any of their respective Representatives to provide access to, or to disclose any information to, Buyer or any of its Representatives if such access or disclosure (A) would reasonably be expected to cause competitive harm to any Asset Seller if the transactions contemplated by this Agreement are not consummated except in accordance with the "clean team" procedures set forth in the Omnicare Confidentiality Agreement (as defined below) if Seller is advised by its antitrust counsel that such procedures adequately address the competitive harm, provided that, if Seller's antitrust counsel advises that such procedures do not adequately address such competitive harm, the Parties will work together in good faith to provide such access and information in a manner that does adequately address any such competitive harm, (B) is unrelated to the Business, (C) would reasonably be expected to waive any attorney-client privilege, or (D) would reasonably be expected to be in violation of applicable Laws (including the HSR Act, the State Transaction Notification Laws, privacy Law, consumer protection Law, or antitrust Law) or the provisions of any Contract to which any Asset Seller is bound or would violate any fiduciary duty. Nothing contained herein will permit Buyer or any of its Affiliates or Representatives to  conduct any sampling or testing of environmental media or any other invasive investigation or assessment, including of the type commonly known as a Phase II Environmental Site Assessment. Any access or investigation pursuant to this <u>Section 6.03</u> shall not affect any representations or warranties made herein or the conditions to the obligations of the respective

Parties to consummate the transactions contemplated by this Agreement or the other Transaction Documents.

(b)     Except for disclosures expressly permitted by the terms of (i) the Confidentiality Agreement, dated December 3, 2025, between Seller and Integro Asset Management LLC, an Affiliate of Buyer ("**Integro**"), as the same was supplemented by the Clean Team Agreement, dated February 9, 2026, between Seller, Integro and Milrose Capital LLC (as the same has been otherwise amended, supplemented or otherwise modified, the "**Omnicare Confidentiality Agreement**") and (ii) the Confidentiality Agreement, dated February 11, 2026, between CVS and Integro (as the same has been amended, supplemented or otherwise modified, the "**CVS Confidentiality Agreement**", and together with the Omnicare Confidentiality Agreement, the "**Confidentiality Agreements**"), Buyer shall hold, and shall cause its Affiliates and Representatives to hold, all information furnished or made available by or on behalf of Seller or any of its Affiliates or Representatives, directly or indirectly, including any information furnished or made available pursuant to Section 6.03(a), in confidence in accordance with the Confidentiality Agreements.

(c)     From the Effective Date until the Closing, Buyer shall not, and shall cause its Affiliates and its and their respective Representatives not to, contact any officer, manager, director, Business Employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Asset Seller with respect to the Business, the Purchased Assets, Assumed Liabilities or the transactions contemplated by this Agreement, without the prior written consent of Seller for each such contact, which consent shall not be unreasonably withheld, conditioned, or delayed.

**Section 6.04.     Regulatory Notices and Clearances**.

(a)     Schedule 6.04(a) sets forth a list of (i) the Governmental Authorities from whom consent is legally required to be obtained, or with whom a filing or notification is legally required to be made, under applicable Laws, including the State Transaction Notification Laws, in connection with the transactions contemplated by this Agreement (such consents and notifications, collectively, the "**Regulatory Transaction Approvals and Notifications**"), (ii) the Regulatory Transaction Approvals and Notifications and the applicable submissions, filings and notifications to be made by Buyer and Seller (where applicable) in connection with transactions contemplated by this Agreement (the "**Regulatory Transaction Filings**"), and (iii) the deadlines for Buyer and Seller (where applicable) to make each Regulatory Transaction Filing (the "**Regulatory Transaction Filing Deadlines**"). Subject to Section 6.05, Buyer shall, and shall cause its Affiliates and Representatives to, and Seller (where applicable to the extent required by applicable Law) shall, and shall cause its Representatives to, submit to the applicable Governmental Authorities, to the extent legally required, the Regulatory Transaction Filings by the applicable Regulatory Transaction Filing Deadline, in each case at Buyer's sole cost and expense. In connection with the foregoing, (A) Buyer shall, and shall cause its Affiliates and its and their respective Representatives to, cooperate with Seller and its Representatives in exchanging such information  and providing such assistance as Seller or its Representatives may reasonably request in connection with any Regulatory Transaction Filings to be made by any Asset Sellers pursuant to this Section 6.04(a), and (B) Seller shall, and shall cause the other Asset Sellers and its and their respective Representatives to, cooperate with Buyer to, among other

47

things, supply to Buyer promptly any information and documentary material that is reasonably requested by Buyer and is legally required in connection with any Regulatory Transaction Filings to be made by Buyer or any of its Affiliates pursuant to this Section 6.04(a).

(b)     Subject to Section 6.05, Buyer shall, and shall cause its Affiliates (including the Buyer Designees) to, use reasonable best efforts to transfer, or apply for and obtain replacements of, as applicable, all Assigned Permits and new Healthcare Permits, as soon as practicable but in any event on or prior to the End Date.

(c)     Subject to the terms of Section 6.04(b), in the event that any Assigned Permit or other Healthcare Permit, in each case, that is set forth on Schedule 6.04(c), shall not have been effectuated to the benefit of Buyer or a Buyer Designee, as applicable, as of the Closing Date, each applicable Asset Seller will allow Buyer or the applicable Buyer Designee the right to use the applicable Permits of such Asset Seller set forth on Schedule 6.04(c) pursuant to a Power of Attorney and any other instruments and agreements as may be mutually agreed upon by Buyer and Seller to allow Buyer or the applicable Buyer Designee to utilize such Permits to the extent permitted under applicable Law, in Buyer and Buyer Designee's ownership or operation of the Business. Such Power of Attorney shall be delivered by the applicable Asset Seller on or before the Closing Date and shall be effective until, in the case of the applicable Provider Numbers, the transfer is completed or, at Buyer's election, Buyer or the applicable Buyer Designee is issued new provider numbers and, in the case of any other applicable Permits, the transfer of such Permit is effectuated by the Governmental Authority, or, at Buyer's election, Buyer or Buyer Designee obtains new Permit directly from the Governmental Authority in the name of Buyer or Buyer Designee, as applicable; provided, that the term of such Power of Attorney shall end upon the earlier to occur of: (x) ninety (90) days after the Closing Date; provided, that if Buyer is using its reasonable best efforts to obtain the applicable provider number or Permit, Buyer may extend such period for up to an additional thirty (30) days by providing written notice to Seller prior to the end of such original ninety (90) day period, or (y) such shorter period which may be ordered by the Bankruptcy Court or any other Governmental Authority (provided that no Asset Seller may request that the Bankruptcy Court of other Governmental Authority order such shorter period); or (z) the receipt of a clearance (or similar actions or instruments) from the appropriate Governmental Authority. Any funds received from a Government Health Program will continue to be deposited into the existing bank account of the applicable Asset Seller that currently receives payments from such Government Health Program for the Business. All such funds shall be handled in accordance with Section 6.10 hereof.

(d)     This Section 6.04 shall not apply to efforts related to the HSR Act, which shall be governed by the obligations set forth in Section 6.05 below.

**Section 6.05.     Antitrust Notification**.

(a)     Seller shall (and shall cause the Asset Sellers, if applicable, to) and Buyer shall (and shall cause its respective Affiliates, if applicable, to), as promptly as practicable and no later than the date that is ten (10) Business Days following the Sale Order Date, file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act for the transactions contemplated by this Agreement, which form will request early termination of the waiting period prescribed by the HSR

48

Act. Seller shall (and shall cause the Asset Sellers, if applicable, to) and Buyer shall (and shall cause its Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other Party may request in connection with its preparation of any filing or submission that is necessary under the HSR Act.

(b)     Subject to the immediately following sentence, Seller and Buyer shall use their reasonable best efforts to as promptly as practicable (and in any event prior to the End Date) obtain any clearances, consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations required under the HSR Act for the consummation of this Agreement and the transactions contemplated hereby and shall keep each other timely apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Authority and shall comply as promptly as practicable with any such inquiry or request. In furtherance of the foregoing, Buyer shall, and shall cause its Affiliates to, take any and all actions necessary to avoid, resolve or eliminate each and every impediment under the HSR Act, privacy Law, or trade regulation Law that may be asserted by any Governmental Authority or any other Person with respect to the transactions contemplated by this Agreement and to obtain all clearances, consents, approvals, and waivers under the HSR Act and such other trade regulation Laws that may be required by any Governmental Authority so as to enable the Parties to consummate the transactions contemplated under this Agreement as promptly as practicable, and in any event no later than the End Date, including (i) proposing, negotiating, committing to and effecting as promptly as practicable, by consent decree, hold separate orders, or otherwise, the sale, divesture, transfer, license, disposition or hold separate (through the establishment of a trust or otherwise) of such assets, properties or businesses of Buyer or any of its Affiliates (including, from and after the Closing, any of the Purchased Assets), (ii) terminating, modifying, or assigning existing relationships, Contracts, or obligations of Buyer or any of its Affiliates, (iii) changing or modifying any course of conduct regarding future operations of Buyer or any of its Affiliates, (iv) entering into such other arrangements as are necessary or advisable in order to avoid the entry of, and the commencement of litigation seeking the entry of, or to effect the dissolution of, any Order in any Action, which would otherwise have the effect of materially delaying or preventing the consummation of the transactions contemplated under this Agreement, or (v) otherwise taking or committing to take any other action that would limit Buyer's or any of its Affiliates' freedom of action with respect to, or their ability to retain, one or more of their respective operations, divisions, businesses, product lines, customers, assets, rights or interests (including, from and after the Closing, the Business and any of the Purchased Assets); provided, that Buyer is not obligated to take any action contemplated in foregoing subsections (i) through (v) unless such action is expressly conditioned upon the Closing of the transactions contemplated by this Agreement. In addition, if any Action is instituted or threatened challenging the transactions contemplated by this Agreement as violating the HSR Act or Clayton Act or if any Order (whether temporary, preliminary or permanent) is entered, enforced or attempted to be entered or enforced by any Governmental Authority that would make the transactions contemplated by this Agreement illegal or otherwise delay or prohibit the consummation of the transactions contemplated by this Agreement, Buyer and its Affiliates shall take any and all actions to contest and defend any such Action to avoid entry of, or to have vacated, lifted, reversed, repealed, rescinded or terminated, any Order (whether temporary, preliminary or permanent) that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement. In addition, Buyer shall not, and shall cause its Affiliates not to, take any action after the date hereof that could reasonably be expected to delay the obtaining of, or increase the risk of not

49

obtaining, any permission, approval or consent (including any Regulatory Transaction Approval and Notification) from any Governmental Authority or other Person required to consummate the transactions contemplated herein.

(c)     Without limiting the foregoing, the Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite obtaining the Regulatory Transaction Approvals and Notifications and any clearances, consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under the HSR Act at the earliest practicable dates (and in any event prior to the End Date). Such reasonable best efforts and cooperation shall include each Party and its respective counsel undertaking to (i) promptly notify the other Party or its counsel of, and, if in writing, furnish such other Party or its counsel with copies of (or, in the case of oral communications, advise such other Party or its counsel of the contents of), any communication received by such Person from a Governmental Authority in connection with the filings made pursuant to this Section 6.05 or Section 6.04 and (ii) keep the other Party or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any developments, meetings or discussions with any Governmental Authority in respect thereof, including with respect to (A) the receipt of any non-action, action, clearance, consent, approval, waiver, or other authorizations, (B) the expiration or termination of any waiting period, (C) the commencement or proposed or threatened commencement of any investigation, litigation or administrative or judicial Action or proceeding under applicable Laws, including any proceeding initiated by a private party, and (D) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Authority with respect to this Agreement and the transactions contemplated hereby. Neither Seller nor Buyer (nor any of their respective Affiliates or Representatives) will participate in any substantive meeting or discussion with any Governmental Authority with respect of any such filings, applications, investigation or other inquiry relating to the transactions contemplated by this Agreement without giving the other Party reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Authority, the opportunity to attend and participate in such meeting or discussion, unless prohibited by such Governmental Authority. Buyer and Seller shall have the right to review and comment on the content of any draft notification, formal notification, filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted to any Governmental Authority in advance of any such submission, and Buyer and Seller shall incorporate all reasonable comments of the other Party in good faith. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other under Section 6.04 and this Section 6.05, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Purchased Assets.

(d)     The Parties shall pay and bear the cost of any fees required in connection with the filing of any notifications, filings and related materials that are required under the HSR Act in accordance with and subject to the provisions in Section 11.17(a).

**Section 6.06.    Employee Matters**

(a)      Prior to the Closing Date, Buyer shall, or shall cause its Affiliates to, make offers of employment, effective as of the Closing Date, to each Business Employee in the same or substantially comparable position with Buyer or such Affiliates as provided by Seller or any of its Affiliates as of the Closing Date, with (i) base salary or wages, and annual cash bonus opportunities that are no less than the base salary or wages and annual cash bonus opportunity provided to such Business Employee by Seller or any of its Affiliates immediately prior to the Closing Date as set forth in the updated Employee Census delivered prior to Closing in accordance with Section 4.09(a) and (ii) employee benefits that are substantially comparable in the aggregate to the employee benefits provided to such Business Employee by Seller or any of its Affiliates immediately prior to the Closing Date (excluding any defined benefit pension plans and any retiree medical arrangements for purposes of determining such comparability). Buyer's offer of employment will be made in a format and timing reasonably acceptable to Seller. Without the prior written consent of Seller, neither Buyer nor any of its Affiliates will communicate directly with the Business Employees; provided, however, that Seller's consent shall not be unreasonably withheld, conditioned or delayed in connection with communications regarding terms of employment being offered to such Business Employees in accordance with this Section 6.06(a); and provided, further, that Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to include one or more Representatives of Seller as designated by Seller upon Seller's request in any such communications regarding terms of employment. As an alternative to the employment offer process set forth above in this Section 6.06(a), to reduce the administrative burden with respect to the foregoing process, upon mutual agreement of the Parties, which agreement, if reached, shall be made not less than thirty (30) days prior to Closing, CVS shall (A) not more than seven (7) days prior to Closing, form a limited liability company as a wholly-owned subsidiary of CVS (the "**Employment Entity**"), which Employment Entity shall not have any other assets, Liabilities, or operations from the date of its formation until the Closing, (B) transfer the employment of all Business Employees (but not any Benefit Plan or other Liabilities) other than Disabled Employees to the Employment Entity, and (C) at Closing, transfer and assign to Buyer all of the equity interests of the Employment Entity to Buyer for no additional consideration. The Business Employees who commence employment with Buyer or any of its Affiliates (including, if applicable, those employees who remain employees of the Employment Entity after Closing) are collectively referred to herein as the "**Transferred Employees**." Notwithstanding the foregoing, nothing in this Agreement will (x) after the Closing Date, impose on Buyer or its Affiliates any obligation to retain any Transferred Employee in his or her employment, guarantee employment for any period of time or preclude the ability of Buyer or its Affiliates to terminate the employment of any Transferred Employee at any time and for any reason or (y) create any third party beneficiary rights in any Business Employees (including any beneficiary or dependent thereof). Notwithstanding the foregoing, Buyer shall not be required to make offers of employment to any Business Employee who, as of the Closing Date, is receiving or is eligible to receive benefits under any short-term or long-term disability plan, program, or policy maintained by Seller or any of its Affiliates (each, a "**Disabled Employee**"). Each Disabled Employee shall remain employed by Seller or its applicable Affiliate following the Closing Date. If any Disabled Employee is released to return to active employment and is able to perform the essential functions of such Disabled Employee's position, with or without reasonable accommodation, within six (6) months following the Closing Date (such date of release and ability to return to active employment, the "**Return Date**"), Buyer shall, or shall cause its Affiliates to, make an offer of employment to such

51

Disabled Employee on the same terms as set forth in this Section 6.06(a) within ten (10) Business Days following receipt of written notice from Seller or any of its Affiliates of such Disabled Employee's Return Date. Any Disabled Employee who accepts such offer of employment shall become a Transferred Employee effective as of such Disabled Employee's actual commencement of employment with Buyer or its Affiliate (which shall be no later than fifteen (15) Business Days following the date of such offer). Any Disabled Employee who (A) does not have a Return Date within six (6) months following the Closing Date, (B) does not accept an offer of employment from Buyer or its Affiliate within fifteen (15) Business Days of receipt of such offer, or (C) otherwise fails to commence employment with Buyer or its Affiliate in accordance with this Section 6.06(a), shall remain an employee of Seller or its applicable Affiliate, and Buyer shall have no further obligations with respect to such Disabled Employee under this Agreement. Buyer agrees to provide Seller and its Affiliates with information upon request as reasonably necessary or appropriate to confirm satisfaction of Buyer's obligations under this Section 6.06(a) and the hiring status of the Business Employees.

(b)    With respect to each H-1B Employee who accepts an offer of employment pursuant to Section 6.06(a), Buyer (i) shall, within three (3) Business Days after the Closing Date, file all required H-1B portability or transfer petitions to obtain H-1B authorization for such H-1B Employees; provided that the Asset Sellers shall have provided to Buyer all information reasonably requested by Buyer that is in such Asset Sellers' possession and that is reasonably required to make such filings, and (ii) shall diligently pursue such authorization. Buyer shall bear all costs and expenses associated with obtaining H-1B authorization for each H-1B Employee who becomes a Transferred Employee, and Buyer shall be solely responsible for any delay, denial or failure to obtain such H-1B authorization following the Closing Date.

(c)    With respect to any welfare benefit plans maintained for the benefit of Transferred Employees or their eligible dependents following the Closing Date, Buyer shall use commercially reasonable efforts to (i) cause there to be waived any pre-existing condition limitations, exclusions, waiting periods and actively-at-work requirements with respect to participation and coverage, to the extent waived or satisfied under the Benefit Plans as of the Closing Date, and (ii) give effect and credit, in determining any deductible and out-of-pocket amounts, to claims incurred and amounts paid by, and amounts reimbursed to, Transferred Employees or their eligible dependents under the Benefit Plans as of the Closing Date for purposes of satisfying any applicable deductible or out-of-pocket requirements or limitations under any similar welfare benefit plans sponsored or maintained by Buyer or its Affiliates in which such Transferred Employees or their eligible dependents participate following the Closing Date.

(d)    If Buyer or its Affiliates maintains or establishes a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (the "**Buyer 401(k) Plan**"), Buyer shall cause the Buyer 401(k) Plan to accept "direct rollovers" (within the meaning of Section 401(a)(31) of the Code) of distributions from a defined contribution plan of Seller or any of its Affiliates that was provided to the Transferred Employees immediately prior to the Closing Date that includes a cash or deferred arrangement within the meaning of Section 401(k) of the Code (each, an "**Omnicare 401(k) Plan**") to Transferred Employees (including direct rollovers of outstanding loans and any promissory notes or other documents evidencing such loans), if such rollovers are elected in accordance with the terms of the applicable Omnicare 401(k) Plan and applicable Law by such

52

Transferred Employees.

(e)     As of the Closing Date, Buyer or its Affiliates shall assume liability for providing and administering all required notices and benefits under COBRA and all Liabilities under COBRA with respect to Transferred Employees and their spouses and dependents for qualifying events occurring on or after the Closing Date including any Liabilities with respect to "M&A qualified beneficiaries" as defined under COBRA (other than those M&A qualified beneficiaries with respect to events that occurred prior to the Closing Date). Seller or its applicable Affiliates shall retain any and all Liabilities under COBRA for qualifying events that occurred prior to the Closing Date.

(f)     As of the Closing Date, Buyer or its Affiliates shall, (i) solely to the extent accrued prior to the Closing Date, assume liability for any unpaid payroll with respect to the Transferred Employees solely to the extent accrued with respect to the payroll period of Seller ending after the Closing Date, and (ii) assume and honor all holidays or holiday pay, and vacation days accrued but not yet taken by Transferred Employees as of the Closing Date up to a maximum of $6,000,000 (the "**Assumed PTO Cap**"). With respect to each Transferred Employee, to the extent Seller or its applicable Affiliates are not permitted by applicable Law to transfer accrued paid time off or vacation of such Transferred Employee, such accrued paid time off or vacation, as applicable, shall be paid out by Buyer to the Transferred Employees in accordance with applicable Law, which amount shall be counted against the Assumed PTO Cap.

(g)     The provisions of this Section 6.06 are for the sole benefit of the Parties to this Agreement and nothing herein, expressed or implied, is intended or shall be construed to (i) constitute an amendment to any of the compensation and benefits plans maintained for or provided to Transferred Employees prior to or following the Closing Date or (ii) confer upon or give to any Person, other than the Parties to this Agreement and their respective permitted successors and assigns, any legal or equitable or other rights or remedies with respect to the matters provided for in this Section 6.06 under or by reason of any provision of this Agreement. Nothing in this Section 6.06 shall be construed to (x) limit any rights that Buyer or any of its Affiliates may have under any plan or arrangement to amend, modify, terminate or adjust any particular plan or arrangement or (y) modify the at-will nature of the relationships for Transferred Employees.

Section 6.07.  **Corporate Name**. Following the Closing, other than as required by any applicable Law or the Bankruptcy Court, each Asset Seller, as applicable, shall as soon as reasonably practicable, and in any event within 30 Business Days after the Closing Date, change its corporate name to a name not including "Omnicare."

Section 6.08.  **Public Announcements**. Notwithstanding anything herein to the contrary, each Party shall not, and shall cause its Affiliates not to, make any press release or public announcement concerning this Agreement or the transactions contemplated herein without the prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed); provided, however, that a Party may make any such release or public announcement without the consent of the other Party that is required by any applicable Law, the Order of the Bankruptcy Court or by the applicable rules of any stock exchange on which Buyer or Seller (or any of their respective Affiliates) lists securities; provided further that if any such release or public announcement is so required or made, the disclosing party shall give the non-disclosing party, to

extent practicable under the circumstances and permitted by applicable Law, prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Seller shall file this Agreement and related pleadings and documents with the Bankruptcy Court in connection with obtaining the Sale Order in accordance with the terms of this Agreement.

Section 6.09. **Enterprise Level Contracts**. Buyer acknowledges that the Asset Sellers are a party to, or beneficiaries of Contracts which (a) have been or will be entered into by an Affiliate of Seller which is not an Asset Seller, (b) are between an Asset Seller and CVS or another Affiliate of Seller which is not an Asset Seller and either (i) relate to cash management or other corporate and/or back office services provided by, or space used by, CVS or another Affiliate of Seller which is not an Asset Seller, or (ii) are oral Contracts, or (c) which relate in part to the Business and in part to any other business or operations of CVS or one of its Affiliates which is not an Asset Seller (each, an "**Enterprise Contract**") and Buyer agrees that (i) such Enterprise Contracts shall not be assigned or transferred, in whole or in part, to Buyer or any Buyer Designee (and shall be Excluded Assets) and (ii) Buyer and its Affiliates shall not be entitled to any of the benefits provided in any Enterprise Contract following the Closing. For the avoidance of doubt and notwithstanding the foregoing to the contrary, the "Caremark Agreement" included, and as defined in, the Disclosure Schedule as an Assigned Contracts is not an Enterprise Contract for any purpose under this Agreement.

Section 6.10. **Post-Closing Receipts**. If after the Closing Date either Party receives any monies or funds properly belonging to the other Party in accordance with the terms of this Agreement or the Transition Services Agreement, the receiving Party will promptly and in no event less than weekly advise the other Party and will promptly and in no event less than weekly deliver such monies and funds to an account or accounts designated in writing by such other Party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such monies or funds, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise).

Section 6.11. **Reasonable Efforts; Cooperation**.

(a)      Subject to the other terms of this Agreement, including any provisions with an express different standard regarding actions to be taken in this Agreement, (i) each Asset Seller shall and shall cause all of their respective Representatives to, and (ii) Buyer shall, and shall cause its Affiliates and its and their respective Representatives to, use their reasonable best efforts to perform their respective obligations under this Agreement and to take, or cause to be taken, and to do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated by this Agreement to be effected as soon as practicable but in any event on or prior to the End Date, in accordance with the terms of this Agreement and to cooperate with the other Party and its Representatives in connection with any step required to be taken as a part of their respective obligations in this Agreement. Notwithstanding anything in this Agreement to the contrary, the "reasonable best efforts" of Seller in this Agreement, including Section 6.05 and this Section 6.11, will not require Seller or any of its Affiliates or Representatives to expend any money, to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy, or condition in this Agreement.

(b)     The obligations of Seller pursuant to this Agreement, including this Section 6.11, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code, Seller's debtor-in-possession financing or use of cash collateral, as the case may be, and Seller's obligations as debtor in possession to comply with any Order of the Bankruptcy Court, and Seller's duty to seek and obtain the highest or otherwise best price for the Purchased Assets as required by the Bankruptcy Code.

**Section 6.12.     Privacy and Records Compliance**.

(a)     The Parties agree that to ensure continuity of care for the patients of the Asset Sellers, to the extent permitted by Law, the custodial interest of the Asset Sellers in, and responsibility for, the Patient Records included within the Purchased Assets shall transfer to and be assumed by Buyer and the applicable Buyer Designees effective as of the Closing Date. Buyer acknowledges the assumption of all HIPAA and applicable Law obligations upon completion of the Migration with respect to all Transferred Records as set forth in the Patient Records Custody Agreement. For the avoidance of doubt, Buyer shall not assume any Liability with respect to (a) any Asset Seller's or their Affiliates' HIPAA and applicable Law obligations or Patient Record obligations arising prior to the completion of the Migration, or (b) any Patient Records that are not Transferred Records.

(i)     The Parties acknowledge and agree that the Transferred Records shall be transferred to Buyer as a continuing Health Care Provider and Covered Entity pursuant to the Patient Records Custody Agreement. As of the Migration Date, Buyer shall be deemed the custodian of Transferred Records in compliance with applicable Laws. All inquiries regarding Transferred Records following the Migration Date, including those related to patient rights or obligations under HIPAA shall be the obligation and responsibility of Buyer as the custodian of records pursuant to the Patient Records Custody Agreement.

(b)     Prior to the Migration Date, Seller shall maintain, safeguard, and administer the Transferred Records in accordance with this Agreement, HIPAA, and applicable Law. Following the Migration Date, Buyer shall maintain, safeguard, and administer the Transferred Records in accordance with this Agreement, HIPAA, and applicable Law. Seller shall provide any legally required notice to patients of the Asset Sellers regarding the transfer of Transferred Records to Buyer, which notice shall be reasonably acceptable to Buyer.

(c)     The Parties shall use reasonable best efforts to complete, as of the Closing Date, the transfer and migration of the Transferred Records as provided by the Asset Sellers to Buyer (the "**Migration**") and Buyer shall be responsible for the Transferred Records on the date on which the Migration is successfully completed (the "**Migration Date**"). Seller will bear all costs and expenses related to extracting the electronic Transferred Records in a machine readable and usable format that is reasonable to migrate to Buyer.  Buyer will bear all costs and expenses related to ingesting the Transferred Records into Buyer's systems during the Migration. Following the Migration Date, (i) neither Seller nor any other Asset Seller shall have any Liability or obligation related to maintenance, handling, or management of Transferred Records, except for Liabilities or obligations arising out of any Asset Seller's or their Affiliates' acts or omissions in possessing or handling any Patient Records, including pursuant to the following clause (ii), and (ii) Buyer shall provide Seller and its Affiliates with reasonable copies of Transferred Records as

may be necessary for billing purposes, to respond to any Action or third-party audit or investigation, or as otherwise contemplated in <u>Section 6.02</u>, in each case, as permitted by applicable Law. Such copies shall be provided by Buyer and its Affiliates after receipt of reasonable advance written notice and at Seller's sole cost. In the course of the Migration, the Parties agree to comply with any and all applicable Laws relating to the transfer and confidentiality of the Transferred Records, including, but not limited to HIPAA.

(d) After the expiration of the retention period required by Law, Buyer may destroy Transferred Records at its discretion unless Seller or any of its Affiliates notifies Buyer in writing, in advance, that Seller or such Affiliate reasonably requires copies of specific Transferred Records at Seller's sole cost. Buyer shall destroy Transferred Records consistent with applicable Law.

**Section 6.13.** <u>**Buyer Designees**</u>. As soon as reasonably practicable and at least twenty (20) days prior to the Closing, Buyer shall deliver to Seller written notice indicating whether Buyer wants to designate Buyer Designee to acquire any of the Purchased Assets and assume the related Assumed Liabilities, the identity of such Buyer Designee and other material information relevant to such Buyer Designee, such as the Permits held by such Buyer Designee and its ability to purchase and acquire the applicable Purchased Assets and Assumed Liabilities as of the Closing Date (such written notice, the "<u>**Buyer Designee Notice**</u>"), it being agreed that, no Buyer Designee Notice shall be required in connection with Buyer's designation of any direct or indirect wholly-owned subsidiary of Buyer as a Buyer Designee so long as the selection of such subsidiary is not reasonably expected to impair, prevent, impede or delay the ability of the Parties (from the perspective of obtaining any Regulatory Transaction Approvals and Notifications or otherwise) to consummate the transactions contemplated herein. As soon as reasonably practicable after Seller receives the Buyer Designee Notice, Seller shall provide written notice to Buyer whether Seller consents to sell and assign any of the applicable Purchased Assets and Assumed Liabilities to such Buyer Designee, which consent shall not be unreasonably withheld, conditioned, or delayed, it being agreed that, Seller shall not have a consent right with respect to Buyer's designation of direct or indirect wholly-owned subsidiary of Buyer as a Buyer Designee so long as the selection of such subsidiary is not reasonably expected to impair, prevent, impede or delay the ability of the Parties (from the perspective of obtaining any Regulatory Transaction Approvals and Notifications or otherwise) to consummate the transactions contemplated herein. With respect to any Purchased Assets and Assumed Liabilities to be acquired and assumed by any Buyer Designee, at the Closing (but contingent upon the consummation thereof), Buyer or the applicable Buyer Designee, on the one hand, as set forth in the Buyer Designee Notice or as modified by the Parties, and the applicable Asset Seller, on the other hand, shall enter into a Bill of Sale to effectuate the transfer of the applicable Purchased Assets and the assumption of the related Assumed Liabilities from the applicable Asset Seller to Buyer or the applicable Buyer Designee.

**Section 6.14.** <u>**Further Assurances**</u>. Following the Closing, Seller shall, and shall cause the other Asset Sellers to, and Buyer shall, and shall cause its Affiliates to, at the sole cost and expense of the requesting Party, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 6.15.** **Seller Bonds**. The Seller Bonds shall be cancelled at Closing. On or prior to Closing, Buyer shall provide to the respective beneficiaries of such Seller Bonds replacement bonds or other collateral in accordance with applicable Law, the applicable Assigned Contract or the reasonable request of such beneficiary.

**Section 6.16.** **Restrictive Covenants**.

(a) From and after the Closing until the earlier of (i) the dissolution of the applicable Asset Seller and (ii) the third (3rd) anniversary of the Closing Date, each Asset Seller shall and shall cause their Representatives to hold in confidence any and all confidential and proprietary information, in any form, of the Business, including this Agreement, the other Transaction Documents, and the transactions contemplated by this Agreement, except to the extent that such information: (a) is generally available to and known by the public through no fault of the Asset Sellers; or (b) is lawfully acquired by the Asset Sellers, any of their Affiliates, or their respective Representatives from and after the Closing from sources which are not known by such Asset Seller, Affiliate or Representative to be prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If any Asset Seller or any of its Affiliates or their respective Representatives is required to disclose any information by Governmental Order or Law, Seller shall, to the extent permissible under applicable Law and reasonably practicable under the circumstances, promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, provided that such Party shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

(b) From the Closing Date until the earlier of (i) the dissolution of the applicable Asset Seller and (ii) the second (2nd) anniversary of the Closing Date (the "**Restricted Period**"), no Asset Seller shall, without the prior written consent of Buyer, either directly or indirectly:

(1) solicit, hire, entice, encourage or otherwise induce any Transferred Employee to resign or terminate his or her employment with Buyer or its Affiliates or otherwise hire, employ, engage or contract with any such Transferred Employee to perform services; provided, however, a solicitation by means of general media advertisement or non-targeted search inquiry shall not constitute a violation of this agreement, nor shall the hiring of any such employee who responds to such general media advertisements or non-targeted search inquiries;

(2) solicit or contact any customers of the Business, wherever located, including actively sought prospective customers as of the Closing Date, for the purpose of selling or providing any products or services competitive with the Business; provided, however, that the foregoing restriction shall only apply to those customers to which the Asset Sellers have sold their products or services as of the Closing Date;

(3) solicit, induce or encourage any customer or supplier of the Business as of the Closing Date to terminate or modify any business relationship with Buyer or its Affiliates; or

(4) otherwise take any action which may reasonably be anticipated to interfere with or disrupt any business relationship of Buyer or its Affiliates with respect to the Business, contractual or otherwise, with any customer, supplier, or agent of the Business as of the Closing Date.

(c) Notwithstanding anything herein the contrary, the Parties acknowledge and agree that nothing in Section 6.16(b) shall bind CVS or any of its Affiliates that are not Debtors (other than any Affiliates that are direct or indirect subsidiaries of Seller), and nothing in this Section 6.16 shall preclude, prevent or limit any Asset Seller from (i) performing their obligations under any of the Transaction Documents, (ii) conducting and winding up the Chapter 11 Cases, or (iii) complying with applicable Law or any Order of the Bankruptcy Court. Each Party, on behalf of itself and its Affiliates, acknowledges that the covenants of the Asset Sellers set forth in this Section 6.16(c) are an essential element of this Agreement and that, but for the agreement of the Asset Sellers to comply with these covenants, Buyer would not have entered into this Agreement.

(d) Subject to Sections 11.10 and 11.13, but notwithstanding anything to the contrary in Section 11.15, in the event of a breach of any of the provisions of Section 6.16 (the "**Restrictive Covenants**"), Buyer and its Affiliates shall have the right and remedy, without regard to any other available remedy, to (i) have the Restrictive Covenants specifically enforced by any court of competent jurisdiction and (ii) have issued an injunction restraining any such breach without posting of a bond; it being understood that any breach of any of the Restrictive Covenants would cause irreparable and material losses to Buyer and its Affiliates, the amount of which cannot be readily determined and as to which neither Buyer nor any of its Affiliates will have any adequate remedy at law or in damages.

(e) It is the desire and intent of the Parties that the Restrictive Covenants be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought and if any Restrictive Covenant shall be adjudicated finally to be invalid or unenforceable, such Restrictive Covenant shall be deemed amended to the extent necessary in order that such provision be valid and enforceable, the remainder of such Restrictive Covenant shall not thereby be affected and shall be given full effect without regard to invalid portions and such amendment shall apply only with respect to the operation of the Restrictive Covenant in the particular jurisdiction in which such adjudication is made.

(f) The Parties acknowledge and agree that the Restrictive Covenants are necessary for the protection and preservation of the value and the goodwill of Buyer and the Business, respectively, and are reasonable and valid in geographical and temporal scope and in all other respects.

**Section 6.17. Transition Services Agreement**. During the period commencing on the date hereof and ending on April 30, 2026, which period shall, provided that Buyer is working in good faith to negotiate and finalize the Transition Services Agreement, be automatically extended through the later of (a) thirty (30) days after the Sale Order Date or (b) June 30, 2026, the Parties will negotiate in good faith the Transition Services Agreement and the Transition Services to be provided under the Transition Services Agreement, including the duration and cost of each Transition Service, in form and substance reasonably acceptable to each

58

Party; provided, however, that any agreement of CVS to provide Transition Services pursuant to the Transition Services Agreement shall not create any obligation by CVS to use extraordinary efforts, engage any third parties, or incur material out-of-pocket expenditures (except to the extent expressly set forth in the Transition Services Agreement). The Parties acknowledge and agree that none of the Excluded Services shall be provided to Buyer or included among the Transition Services. Each Party shall cooperate reasonably and in good faith with the other Party in connection with the negotiation, drafting, and finalization of the Transition Services Agreement and the schedules thereto, including by making available appropriate personnel with knowledge of the services necessary or desirable for accomplishing an orderly transfer of the Business, the Purchased Assets, and the Assumed Liabilities to Buyer, and responding promptly to reasonable requests for information in connection therewith.

Section 6.18. **Covenant Not to Sue**. From and after the Closing, Buyer shall not, and shall cause its Affiliates not to, (a) bring suit or otherwise assert any Acquired Avoidance Action before any Governmental Authority, mediator, or administrative agency, and (b) directly or indirectly assign or otherwise transfer, in whole or in part, any Acquired Avoidance Action to any third party. Except for the Acquired Avoidance Actions, nothing in this Section 6.18 shall impair Buyer or any Buyer Designee's ownership or prosecution of any other claim or cause of action included in the Purchased Assets, or any rights with respect thereto.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.01. **Conditions to Obligations of All Parties**. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, waiver by the Parties), at or prior to the Closing, of each of the following conditions:

(a) The expiration or termination of any required waiting period under the HSR Act and any mandatory State Transaction Notification Laws.

(b) Buyer or the applicable Buyer Designee shall have received the applicable approvals from Governmental Authorities set forth on Schedule 7.01(b).

(c) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order that is then in effect and has the effect of making the transactions contemplated by this Agreement illegal, or otherwise restraining or prohibiting consummation of such transactions, which Order is not otherwise satisfied, resolved or preempted by the Sale Order.

(d) The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed, vacated, reversed, or modified in any material manner.

Section 7.02. **Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, Buyer's waiver), at or prior to the Closing, of each of the following conditions:

(a)     The (i) representations and warranties of Seller contained in this Agreement (other than the representations and warranties contained in Section 4.01, Section 4.02, Section 4.04(a), and Section 4.24) shall be true and correct as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except to the extent that the failure of such representations and warranties to be so true and correct would not reasonably be expected to result in a Material Adverse Effect (it being understood that, for purposes of determining the accuracy of such representations and warranties, for the purpose of this Section 7.02(a)(i), all "Material Adverse Effect" qualifications and other materiality qualifications contained in such representations and warranties shall be disregarded), and (ii) (x) the representations and warranties of Seller contained in Section 4.01, Section 4.02 and Section 4.24 shall be true and correct in all respects as of the Closing Date as though made on the Closing Date and (y) the representations and warranties of Seller contained in Section 4.04(a), shall be true and correct in all but *de minimis* respects as of the Closing Date as though made on the Closing Date, in each case except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date.

(b)     Seller shall have performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)     Seller shall have delivered, or caused to be delivered, to Buyer the documents and deliveries set forth in Section 3.02(a).

(d)     Seller shall have delivered to Buyer a certificate, dated the Closing Date and signed by an authorized officer of Seller that each of the conditions set forth in Section 7.02(a) and Section 7.02(b) have been satisfied (the "**Seller Closing Certificate**").

Section 7.03.   **Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The (i) representations and warranties of Buyer contained in this Agreement (other than the representations and warranties contained in Section 5.01, Section 5.02, and Section 5.10) shall be true and correct as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date), except to the extent that the failure of such representations and warranties to be so true and correct would not reasonably be expected to have a materially adverse effect on Buyer's and the Buyer Designees' ability to consummate the transactions contemplated by, and discharge its obligations under, this Agreement (it being understood that, for purposes of determining the accuracy of such representations and warranties, for the purpose of this Section 7.03(a)(i), all "material adverse effect" qualifications and other materiality qualifications contained in such representations and warranties shall be disregarded), and (ii) the representations and warranties of Buyer contained in Section 5.01, Section 5.02, and Section 5.10 shall be true and correct in all respects as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case as of such earlier date.

60

(b)      Buyer shall have duly performed and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)      Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(b).

(d)      Buyer shall have delivered to Seller a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied (the "**Buyer Closing Certificate**").

Section 7.04.   **Waiver of Conditions**. Upon the occurrence of the Closing, any condition set forth in this **ARTICLE VII** that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Buyer or Seller may rely on the failure of any condition set forth in this **ARTICLE VII**, as applicable, to be satisfied if such failure was primarily caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
## TAX MATTERS

Section 8.01.   **Cooperation on Tax Matters; Purchase Price Allocation**.

(a)      Other than Transfer Taxes, and to the extent Taxes are allocated between the Asset Seller and Buyer pursuant to Section 8.04, the Asset Seller and their Affiliates shall retain responsibility for, and shall bear and pay, all Taxes based upon the operation or ownership of the Purchased Assets for all Pre-Closing Tax Periods and shall file all Tax returns required to be filed for such Pre-Closing Tax Periods. Buyer and its Affiliates shall bear and pay, all Taxes based upon the operation or ownership of the Purchased Assets for any Tax period beginning after the Closing Date, and shall file all Tax Returns required to be filed for Tax periods that include periods after the Closing Date.

(b)      Seller shall and shall cause the other Asset Sellers, or other Affiliates of Seller to, and Buyer shall and shall cause its Affiliates to, reasonably cooperate with each other and make available or cause to be made available to each other for consultation, inspection, and copying (at such other Party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof, and filings, files, books, records, documents, and other information as may be reasonably requested to the extent such data, filings, files, books, records, documents and other information relates to the transactions contemplated by this Agreement or the operation of the Business or the ownership or use of the Purchased Assets prior to the Closing (x) for the preparation by such other Party of any Tax Returns or (y) in connection with any Tax audit or proceeding including one Party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement or the operation of the Business or the ownership or use of the Purchased Assets prior to the Closing; provided, that (i) in providing such cooperation and consultation, and such data, filings, files, books, records,

61

documents and other information, Seller and its Affiliates shall be entitled to redact information that is not related to the Business and shall not be required to provide or disclose any Tax Returns that are Excluded Assets and (ii) the obligations of Seller under this Section 8.01(b) shall terminate on the earlier of the date that is the seventh anniversary of the Closing Date and the date on which the Chapter 11 Cases are closed or the Seller is dissolved.

(c)     The Purchase Price shall be allocated among the Purchased Assets as follows:

(1)     Within sixty (60) days of the Closing Date, Buyer will provide to Seller copies the applicable number of IRS Forms 8594 (if more than one is required) and any required exhibits thereto, prepared in accordance with Section 1060 of the Code and the Tax regulations, with Buyer's proposed allocation of the Purchase Price and all other capitalizable costs among the applicable portion of the Purchased Assets which are owned by each of the Asset Sellers (the "**Allocation Statement**").

(2)     Seller will review the Allocation Statement and, to the extent Seller in good faith disagrees with the content of the Allocation Statement, Seller will, within thirty (30) days after receipt of the Allocation Statement, provide written notice to Buyer of such disagreement or will be deemed to have indicated its concurrence therewith. Seller and Buyer will attempt in good faith to resolve any such disagreement. If Seller and Buyer are unable to reach a good faith agreement within forty-five (45) days after Buyer's receipt of a timely written notice of objection, any remaining disputed matters will be submitted to a nationally recognized accounting firm with no relationship with any Party mutually agreed on by the Seller and Buyer (the accounting firm ultimately chosen, the "**Accounting Referee**") for resolution, in accordance with the requirements of Section 1060 of the Code and the Tax regulations thereunder. Not later than thirty (30) days after such matters are submitted to it for resolution hereunder, the Accounting Referee will determine those matters in dispute and will render a written report as to the disputed matters which shall constitute the final Allocation Statement, and which shall be conclusive and binding upon the Parties. The fees and expenses of the Accounting Referee in respect of such resolution and report shall be paid one-half by Buyer and one-half by Seller.

(3)     Buyer and Seller shall report and file all Tax Returns (including, but not limited to, IRS Forms 8594) in all respects and for all purposes consistent with the Allocation Statement as so finalized. No Party will take a position inconsistent with the Allocation Statement on any income Tax Return provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Tax Allocation, and neither Buyer nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging the Tax Allocation.

(4)     Notwithstanding any other provision of this Agreement, this Section 8.01(c) shall (i) survive the Closing and (ii) not be binding on any allocation of the Purchase Price in the Chapter 11 Cases.

(5)     Notwithstanding any other provision of this Agreement, but solely to the extent Buyer and Seller are required by applicable Law to agree on the amount or

value of a particular Purchased Asset for purposes of any Transfer Tax filings or payments, Buyer and Seller shall mutually agree on a commercially reasonable estimate of the fair market value of such asset prior to the date any such Transfer Tax filing is required to be made or any such Transfer Tax payment is required to be paid (including applicable extensions). Buyer and Seller understand and agree that any agreement reached pursuant to this Section 8.01(c)(5) is reached solely for purposes of Transfer Tax filings and payments required under applicable Law, and shall in no way be regarded by the Parties as conclusive with respect to the allocation described in Section 8.01(c)(1) or Section 8.01(c)(2) unless expressly required under applicable Law.

Section 8.02. **Retention of Tax Records**. From the Closing Date to the earliest of (i) the date that is seventh anniversary of the Closing Date, (ii) the expiration of the relevant statute of limitations, and (iii) the date on which the Chapter 11 Cases are closed or Seller is dissolved, each of Seller and Buyer shall retain possession of all accounting, business, financial, and Tax records and information that (a) relate to the Purchased Assets, the Assumed Liabilities or the Business and are in existence and in possession of a Party on the Closing Date and (b) come into existence and possession of a Party hereto after the Closing Date but relate to the Purchased Assets, the Assumed Liabilities or the Business before the Closing Date, and each of the Parties shall give the other Party notice and a reasonable opportunity to retain any such records in the event that the Party in possession of such records shall make a determination to destroy or otherwise abandon any such records. In addition, from the Closing Date to the earliest of (x) the date that is seventh anniversary of the Closing Date, (y) the expiration of the relevant statute of limitations, and (z) the date on which the Chapter 11 Cases are closed or Seller is dissolved, each Party shall provide to the other Party (after reasonable notice and during normal business hours and without charge) access to the books, records, documents, and other information to the extent related to the Purchased Assets, the Assumed Liabilities or the Business prior to the Closing Date that is necessary to properly prepare for, file, prove, answer, prosecute, and defend any Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding, or answer; provided, that in providing such access, Seller shall be entitled to redact information that is not related to the Business and shall not be required to provide or disclose any Tax Returns that are Excluded Assets. For purposes of this Section 8.02, notice by Seller will be reasonable and sufficient if a motion for authority to abandon or destroy the subject documents is filed on the docket in the Chapter 11 Cases fourteen (14) days prior to the hearing on the motion and provides at least seven (7) days to object to the motion. The provisions contained in this Section 8.02 are intended to, and shall, supplement and not limit the generality of the provisions contained in Section 6.02.

Section 8.03. **Transfer Taxes**. All Transfer Taxes shall be borne by the Parties equally. Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code. Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by Applicable Law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation. Buyer and Seller shall use commercially reasonable efforts to cooperate in the application of any available exemptions or reductions with respect to Transfer Taxes.

Section 8.04. **Prorations**. Other than Transfer Taxes, all real estate taxes, ad valorem taxes or special assessments, as applicable, relating to the Owned Real Property and ad

valorem personal property taxes payable during the year in which the Closing occurs shall be prorated between Seller and Buyer as of the Closing Date. If the Closing occurs before the actual Taxes and special assessments payable during such year are known, the apportionment of Taxes shall be upon the basis of Taxes for the applicable Owned Real Property payable during the immediately preceding year.

**ARTICLE IX**
**TERMINATION**

**Section 9.01.** <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a) by the mutual written consent of Seller and Buyer;

(b) by Buyer by written notice to Seller if Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **ARTICLE VII** and such breach, inaccuracy or failure is either incapable of being cured or has not been cured by Seller in all material respects by the End Date;

(c) by Seller by written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **ARTICLE VII** and such breach, inaccuracy or failure is either incapable of being cured or has not been cured by Buyer in all material respects by the End Date;

(d) by Seller by written notice to Buyer if (i) all of the conditions set forth in <u>Section 7.01</u>, <u>Section 7.02</u>, and <u>Section 7.03</u> have been satisfied or, to the extent permitted by applicable Law, waived (other than those conditions that by their nature are to be satisfied at the Closing), (ii) Seller has indicated to Buyer in writing that Seller is ready, willing and able to consummate the transactions contemplated by this Agreement, and (iii) Buyer fails to consummate the transactions contemplated by this Agreement by the earlier of (x) the date that is three (3) Business Days following the date on which the Closing should have occurred pursuant to <u>Section 3.01</u> and (y) the End Date;

(e) by Seller or Buyer, upon written notice to the other at any time following the End Date if the Closing shall not have occurred on or before the End Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 9.01(e)</u> shall not be available to any Party (i) who is in material breach of this Agreement that would give rise to the failure of any of the conditions specified in **ARTICLE VII** or (ii) whose failure to fulfill any obligation (including failure to satisfy or be ready, willing and able to satisfy any condition set forth in <u>Section 7.02</u>, if such notice is given by Seller, or <u>Section 7.03</u>, if such notice is given by Buyer) under this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the End Date; <u>provided</u>, <u>further</u>, that (A) if, as of the End Date, (x) the waiting period (and any extension thereof) applicable to the transactions contemplated hereby under the HSR Act or any

64

mandatory State Transaction Notification Laws shall not have expired or been terminated or (y) Buyer or the applicable Buyer Designee shall not have obtained the applicable approvals from the Governmental Authorities set forth on Schedule 7.01(b), then the Parties shall have up to two options, collectively, exercisable by written notice from either Party to the other Party on or prior to the End Date, to extend the End Date (as such End Date may have been extended pursuant to the terms of this Section, if applicable) for a period of thirty (30) days, per option, from the then existing End Date and (B) if both options to extend the End Date have been exercised pursuant to the immediately foregoing clause (A) and if, after the final Extended End Date after giving effect to both extensions (the "**Second Extended End Date**"), Buyer or the applicable Buyer Designee shall not have obtained the approvals set forth on Schedule 9.01(e) (the "**Specified Regulatory Approvals**"), then the Parties shall have one additional option, collectively, exercisable by written notice from either Party to the other Party on or prior to the Second Extended End Date, to extend the End Date (as such End Date has been previously extended pursuant to the terms of this Section) for a period of thirty (30) days from the Second Extended End Date.  Notwithstanding anything herein to the contrary, (1) the total period of time extended pursuant to this Section 9.01(e)(A) and Section 9.01(e)B) may not exceed more than 90 days in the aggregate (such extended date pursuant to clauses (A) and (B), to the extent applicable, the "**Extended End Date**"), and upon delivery of such notice, the term "End Date" as used in this Agreement shall be deemed to refer to the Extended End Date, and (2) in the event the Sale Order Date does not occur on or prior to May 15, 2026, the "End Date" of September 30, 2026 shall be automatically extended by the amount of the Sale Order Extension Period;

(f)       by Seller or Buyer, upon written notice to the other if the Bankruptcy Court approves any agreement that contemplates a transaction or series of related transactions, other than the transactions to be consummated under this Agreement, pursuant to which substantially all of the Purchased Assets will be acquired by, or transferred to, a third party, whether pursuant to an asset sale, merger, stock purchase, or otherwise (any such transaction, an "**Alternative Transaction**"); provided that Buyer's right to terminate pursuant to this Section 9.01(f) shall be subject to Buyer's obligation to serve as a Back-Up Bidder (as defined in the Bidding Procedures Order) as set forth in the Bidding Procedures Order, and Buyer hereby agrees that if they are designated a Successful Bidder (as set forth in the Bidding Procedures Order) after becoming a Back-Up Bidder, Buyer shall comply and be bound by all provisions of this Agreement applicable to them as the Successful Bidder after receipt of the Notice of Intent to Proceed with Back-Up Bidder (as defined in the Bidding Procedures Order); or

(g)       by Seller or Buyer, upon written notice to the other if the Bankruptcy Court enters a final non-appealable Order that otherwise precludes the consummation of the transactions contemplated by this Agreement, subject to any limitations set forth in the Bidding Procedures Order or another Order of the Bankruptcy Court; provided that a Party shall not terminate this Agreement pursuant to this Section 9.01(g) if such Party is in material breach of its covenants or agreements contained herein and such material breach is the primary cause or grounds for such Order.

### Section 9.02.    Effect of Termination

(a)       In the event of the termination of this Agreement as provided in Section 9.01 hereof, this Agreement shall become void and have no force or effect and thereafter

there shall be no Liability or obligation on the part of any Party hereto, except that (i) subject to Section 9.02(b), no termination of this Agreement pursuant to Section 9.01 hereof shall relieve any Party of any Liability for a willful and material breach of any provision of this Agreement occurring on or before the effective time of such termination or for any losses, damages, liabilities or other costs or expenses incurred by the other Party as a result of such breach, and (ii) the Confidentiality Agreements and the provisions of Section 2.05(c), Section 6.03(b), this Section 9.02, Section 9.03, Section 9.04, **ARTICLE XI** and any related definitions set forth in elsewhere in this Agreement shall survive any such termination of this Agreement. Nothing in this Section 9.02 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement under Section 11.15.

(b)        Buyer understands and acknowledges that if this Agreement is terminated by Seller pursuant to Section 9.01(c) or Section 9.01(d), Seller will suffer material damages. The Parties agree that such damages are difficult to quantify and thus Seller's retention of the Deposit, and any and all interest that may have accrued thereon, is a reasonable approximation of such damages. Accordingly, if this Agreement is terminated by Seller pursuant to Section 9.01(c) or Section 9.01(d), Seller shall be entitled to retain the Deposit, and any and all interest that may have accrued thereon, as liquidated damages and not as a penalty.

The Parties acknowledge and agree that the agreements contained in this Section 9.02 are an integral part of this Agreement and the transactions contemplated hereby and are a material and necessary inducement to the parties hereto to enter into this Agreement and to consummate the transactions contemplated hereby.

### Section 9.03.    **Break-up Fee and Expense Reimbursement**.

(a)        In consideration of Buyer's due diligence, good faith negotiations of and entering into this Agreement and the other Transaction Documents, and in recognition of Buyer's work in establishing a bid standard or minimum for other bidders, and as reimbursement of Buyer's expenses incurred in connection with the transactions contemplated by this Agreement, subject to Section 9.04, Seller shall pay to Buyer in accordance with Section 9.04, (i) a break-up fee in the amount of either (x) if Specified Court Approval is not obtained within twenty (20) days after the date hereof, $8,430,000, or (y) if event of Specified Court Approval is obtained within twenty (20) days after the date hereof, $8,580,000 (the "**Break-up Fee**"), and (ii) an amount not to exceed either (x) if Specified Court Approval is not obtained within twenty (20) days after the date hereof, $0, or (y) if Specified Court Approval is obtained within twenty (20) days after the date hereof, an amount not to exceed $1,500,000, equal to Buyer's reasonable out-of-pocket expenses incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated herein and therein, including Buyer's legal and accounting expenses, participation at and in the Auction, and the prosecution of Bankruptcy Court approval of Buyer as a good faith buyer under this Agreement (the "**Expense Reimbursement**").

(b)        The parties hereto acknowledge and agree that the Break-Up Fee and the Expense Reimbursement shall constitute administrative expenses allowable pursuant to section 503(b)(1) of the Bankruptcy Code. To the extent that the Break-Up Fee and the Expense Reimbursement have actually been paid by Seller to Buyer, Buyer shall not have any additional

recourse against Seller, or any of its Affiliates or Representatives for any Liabilities relating to or arising from this Agreement, any of the other Transaction Documents or any of the transactions contemplated herein or therein. Further, prior to the Closing in the event of any breach of this Agreement by Seller, the sole and exclusive remedies of Buyer will be, if applicable, to (x) terminate this Agreement pursuant to any applicable provisions in Section 9.01 and (y) receive, if applicable, the Break-Up Fee and Expense Reimbursement.

Section 9.04.  **Payment of Break-up Fee and Expense Reimbursement.** Buyer shall earn the Break-up Fee and Expense Reimbursement upon Seller accepting a bid for an Alternative Transaction and shall be paid by Seller pursuant to this Agreement, without any further Bankruptcy Court approval or order, upon closing of such Alternative Transaction from the proceeds thereof.

ARTICLE X
BANKRUPTCY COURT MATTERS

Section 10.01.  **Sale Order**. Subject to Buyer being designated as the Successful Bidder, Seller shall promptly use commercially reasonable efforts to obtain entry of the Sale Order approving this Agreement.

Section 10.02.  **Bankruptcy Process**. Unless Buyer is in material breach of this Agreement or this Agreement has been terminated, Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation or otherwise supported by Seller shall not conflict with, supersede, abrogate, nullify, or restrict the terms of this Agreement or the rights of Buyer hereunder, or prevent or materially interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Sale Order. If the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement shall be appealed or any petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto, Seller agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion, and Buyer agrees to cooperate in such efforts, and each party agrees to use its reasonable efforts to obtain an expedited resolution of such appeal.

Section 10.03.  **Approval**. Seller's obligations under this Agreement and in connection with the transactions contemplated by this Agreement are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Seller or its Affiliates or Representatives to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

Section 10.04.  **Other**.

(a)  This Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. Buyer acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice to the creditors of Seller and the other Asset Sellers and other interested parties, providing information about the Asset Sellers to prospective bidders,

67

entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an Auction.

(b) Buyer shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assigned Contracts and Assigned Leases. Buyer will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a sufficient demonstration of adequate assurance of future performance under the Assigned Contracts and Assigned Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court. Buyer shall not take any direct or indirect action that would have the effect of causing the Bankruptcy Court to refuse to approve the transactions contemplated by this Agreement.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.01. <u>Non-Survival</u>**. With respect to each Party to this Agreement, the representations and warranties made by such Party contained herein and in any certificate delivered pursuant hereto shall terminate and be of no further force or effect at Closing (and no Party shall have Liability thereunder at or after the Closing, except to the extent arising from Fraud committed by such Party). All covenants and agreements contained herein that by their terms contemplate actions or impose obligations following the Closing, only to the extent such terms so contemplate actions or impose obligations following the Closing, shall survive the Closing and remain in full force and effect in accordance with such terms. All covenants and agreements contained herein that by their terms contemplate performance at or prior to the Closing, to the extent such terms so contemplate performance at or prior to the Closing, shall terminate and be of no further force or effect at Closing (and no Party shall have Liability thereunder at or after the Closing).

**Section 11.02. <u>Notices</u>**. All notices, requests, consents, claims, demands, waivers and other communications hereunder must be in writing and will be deemed to have been given (a) when delivered by hand; (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a Party as may be specified in a notice given in accordance with this <u>Section 11.02</u>):

If to Seller:

> Omnicare, LLC
> One CVS Drive
> Mail Code 1160
> Woonsocket, RI 02895
> Attention: Matthew Lerner
> Email: matthew.lerner@omnicare.com

68

with copies (which shall not constitute notice) to:

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
Attention: Peter Rosenbaum, Vincent Lazar and Derek Wright
Email: prosenbaum@jenner.com, vlazar@jenner.com and
dwright@jenner.com

If to Buyer:   GenieRx Holdings LLC
c/o Integro Asset Management
500 N. 3rd Street
Suite 208B
Fairfield, IA  52556
Attn:   Rowan Farber
Email:  rfarber@integrohcs.com

with a copy (which shall not constitute notice) to:

BakerHostetler LLP
200 South Orange Avenue
Suite 2300
Orlando, FL 32801
Attn:   Andrew V. Layden
Elizabeth A. Green
Douglas S. Eingurt
Email: alayden@bakerlaw.com
egreen@bakerlaw.com
deingurt@bakerlaw.com

**Section 11.03. <u>Interpretation</u>**. For purposes of this Agreement, (a) the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation", whether or not such words are actually included; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder; <u>provided</u> that, for the purposes of the representations and warranties set forth in this Agreement, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance. This Agreement will be construed without regard to any presumption

69

or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein. The words "to the extent" shall mean "the degree by which" and not simply "if." When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, such period will end on the next succeeding Business Day.

Section 11.04. **Disclosure Schedules**. The Disclosure Schedules attached to this Agreement are made a part of this Agreement as if set forth fully herein. The representations and warranties of Seller set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules. Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations or condition (financial or otherwise) of the Business, the Assumed Liabilities or the Purchased Assets, taken in part or as a whole, or as an admission of Liability of Seller or any of its Affiliates to any third party. The specific disclosures set forth in the Disclosure Schedules have been organized to correspond to section references in this Agreement to which the disclosure relates, together with appropriate cross references when disclosure may be applicable to other sections of this Agreement; provided, however, that any disclosure made in the Disclosure Schedules for the purposes of any one section of this Agreement shall be deemed made for the purposes of all other sections of this Agreement so long as the applicability of such disclosure to such other sections of this Agreement is readily apparent on the face of such disclosure.

Section 11.05. **Headings**. The headings in this Agreement are for reference only and will not affect the interpretation of this Agreement.

Section 11.06. **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 11.07. **Entire Agreement**. This Agreement, the other Transaction Documents and the Confidentiality Agreements constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control. This Agreement supersedes all prior drafts hereof. The Parties acknowledge and agree that the negotiating history of this Agreement, including all prior drafts, markups, redlines, term sheets, letters of intent, and other preliminary or intermediate versions of this Agreement (collectively, "**Prior Drafts**"), (a) do not form part of this

Agreement, (b) shall not be used or admitted as evidence in any Action arising out of or relating to this Agreement, and (c) shall not be used to construe, interpret, supplement, or qualify the terms of this Agreement, whether under principles of contractual interpretation, applicable rules of evidence, or otherwise. Each Party waives any right to introduce Prior Drafts in any such Action for any purpose, including to establish the intent of the Parties, to resolve any ambiguity, or to support any claim that a term was inadvertently included or omitted. The Parties further agree that no inference shall be drawn from the addition, deletion, or modification of any language between or among any Prior Draft and the executed version of this Agreement.

Section 11.08. **Successors and Assigns**. This Agreement will be binding upon and will inure to the benefit of Buyer and, subject to the terms of the Bidding Procedures Order and the entry and terms of the Sale Order, Seller and their respective successors and permitted assigns. Neither Party may assign this Agreement or its rights hereunder or delegate its obligations hereunder without the prior written consent of the other Party. Notwithstanding anything in this Agreement to the contrary, the Parties acknowledge and agree that any covenants, agreements or other obligations of Seller under this Agreement or the other Transaction Documents that contemplate actions by or impose obligations on Seller following the Closing, shall not prevent, preclude, or delay (i) the liquidation and winding up of the Debtors or the confirmation or effectiveness of any plan of reorganization of the Debtors under the Bankruptcy Code.

Section 11.09. **No Third-Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, other than, for purposes of Section 11.10, the Non-Recourse Persons.

Section 11.10. **Non-Recourse**. This Agreement may be enforced against, and any legal suit, Action or proceeding arising out of or based upon this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby ("**Agreement Dispute**") may be brought against only Buyer and Seller and any of their respective successors or assigns (each of the foregoing, a "**Recourse Party**") and not any other Persons. No Person who is not a Recourse Party including (i) any director, officer, employee, incorporator, member, partner, manager, unitholder, stockholder, Affiliate, agent, attorney or other Representative of, and any financial advisor or lender to, any Party, or (ii) any director, officer, employee, incorporator, member, partner, manager, unitholder, stockholder, Affiliate, agent or attorney or other Representative of, and any financial advisor or lender to, any of the foregoing (each, a "**Non-Recourse Person**") will have any Liability (whether in contract, tort, equity, or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or Liabilities of any of the parties to this Agreement, any other Transaction Document, or any other Liabilities for any Agreement Dispute and in no event shall any Non-Recourse Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any Recourse Party. The Non-Recourse Persons are intended third party beneficiaries of this Section 11.10 and shall be entitled to enforce this Section 11.10 as if a party directly hereto.

Section 11.11. **Amendment and Modification; Waiver**. This Agreement shall only be amended, modified or supplemented by an agreement in writing signed by each Party

71

hereto. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 11.12. <u>Buyer Acknowledgement; Disclaimer of Representations and Warranties</u>**.

(a) BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE SELLER CLOSING CERTIFICATE, NEITHER SELLER, NOR ANY AFFILIATE OF SELLER, NOR ANY OF ITS OR THEIR RESPECTIVE REPRESENTATIVES (AS DEFINED HEREIN), NOR ANY OTHER PERSON HAS MADE OR IS MAKING ANY, AND BUYER IS NOT RELYING ON, ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER (INCLUDING BY OMISSION), EXPRESS OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS OR ANY OF THE PURCHASED ASSETS OR THE ASSUMED LIABILITIES OR OTHERWISE, OR WITH RESPECT TO ANY INFORMATION PROVIDED TO BUYER AND/OR ITS REPRESENTATIVES, INCLUDING WITH RESPECT TO ANY REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE, ENVIRONMENTAL CONDITION, TITLE OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES (INCLUDING BY OMISSION) ARE EXPRESSLY DISCLAIMED. EXCEPT TO THE EXTENT SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE SELLER CLOSING CERTIFICATE, BUYER IS PURCHASING THE PURCHASED ASSETS ON AN "AS-IS, WHERE-IS", "WITH ALL FAULTS" BASIS. FURTHERMORE, BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSIGNED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

(b) Without limiting the generality of the foregoing, in connection with the investigation by Buyer, Buyer and its Affiliates, and the advisors and Representatives of each of the foregoing, have received or may receive, from or on behalf of Seller, or its Affiliates or Representatives, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the virtual data room set up for this transaction) (collectively, "**Projections**"). Buyer acknowledges and agrees, on its own behalf and on behalf of its Affiliates, that (i) such Projections are being provided solely for the convenience of Buyer to facilitate its own independent investigation of the Asset Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Buyer is familiar with such uncertainties, and (iv) Buyer is taking full responsibility for making their own evaluation of the adequacy and accuracy

72

of all Projections (including the reasonableness of the assumptions underlying such Projections). Buyer acknowledges and agrees, on its own behalf and on behalf of its Affiliates, that it will not assert, institute, or maintain, and will cause its Affiliates not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in Section 11.12.

**Section 11.13.** <u>**Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**</u>

(a) This Agreement will be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) except to the extent the law of the State of New York is superseded by the Bankruptcy Code.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT ACCEPT JURISDICTION TO ADJUDICATE SUCH MATTER MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NEW YORK IN EACH CASE LOCATED IN NEW YORK COUNTY, STATE OF NEW YORK. EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN WILL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION, OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section

11.13(c).

Section 11.14. **Counterparts**. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this Agreement or any Transaction Document delivered by facsimile, e-mail or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement or any Transaction Document.

Section 11.15. **Specific Performance**. Irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the parties to this Agreement fails to take any action required of it under this Agreement. It is accordingly agreed that (a) the parties to this Agreement will be entitled to an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the courts described in Section 11.13 without proof of damages or otherwise, this being in addition to any other remedy to which the parties to this Agreement are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement. Any party to this Agreement pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 11.15 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this Section 11.15 will be in addition to any other remedy to which it is entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. If, prior to the End Date, any party to this Agreement brings any Action, in each case in accordance with Section 11.13, to enforce specifically the performance of the terms and provisions of this Agreement by any other party to this Agreement, the End Date will automatically be extended (i) for the period during which such Action is pending, plus ten Business Days or (ii) by such other time period established by the court presiding over such Action, as the case may be. In no event will this Section 11.15 be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty made by Seller.

Section 11.16. **Bulk Sales/Tax Clearance Waiver**. The parties agree to waive compliance with the provisions of any so-called "bulk transfer law," "bulk sales law," or any similar Tax Law (including any tax clearance or certification of tax compliance Law) of any jurisdiction that may be applicable with respect to the sale of the Purchased Assets as contemplated by this Agreement; it being understood that any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any so-called "bulk transfer law," "bulk sales law," or any similar Tax Law (including any tax clearance or certification of tax compliance Law) of any jurisdiction shall not constitute Assumed Liabilities and shall be treated as Excluded Liabilities.

Section 11.17. **Expenses; No Right of Set-Off**. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the

74

transactions contemplated hereby will be paid by the Party incurring such costs and expenses, whether or not the Closing occurs. Notwithstanding the foregoing, Buyer shall be responsible for the payment and bear the cost of (a) fifty percent (50%) of any fees required in connection with the filing of any notifications and related materials that are required under the HSR Act, excluding fees related to remediation, restructuring and post-closing integration costs, which such fees shall be borne entirely by Buyer, and provided that each Party shall bear responsibility for their own legal fees in connection with any and all such fees described in this Section 11.17(a), (b) any fees required in connection with any Regulatory Transaction Approvals and Notifications, and (c) fifty-percent (50%) of the Transfer Taxes, and other expenses related to the transfer of property in connection with the transactions contemplated hereby. Buyer, on its own behalf and on behalf its Affiliates and its and their Representatives and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Buyer, any such other Person or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Closing Cash Consideration or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

[<em>SIGNATURE PAGE FOLLOWS</em>]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

BUYER

**GENIERX HOLDINGS LLC**

By: _____

Name: Rowan Farber
Title: President

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

**SELLER**

**OMNICARE, LLC**

By: _____
Name: David S. Azzolina
Title: President


**OTHER ASSET SELLERS:**

**AMC-TENNESSEE, LLC**
**APS ACQUISITION LLC**
**APS-SUMMIT CARE PHARMACY, L.L.C.**
**ASCO HEALTHCARE OF NEW ENGLAND**
    **LIMITED PARTNERSHIP**
**ASCO HEALTHCARE, LLC**
**BADGER ACQUISITION LLC**
**BADGER ACQUISITION OF KENTUCKY**
    **LLC**
**BADGER ACQUISITION OF MINNESOTA**
    **LLC**
**BADGER ACQUISITION OF OHIO LLC**
**BEST CARE LTC ACQUISITION COMPANY**
    **LLC**
**CAMPO'S MEDICAL PHARMACY, LLC**
**CARE PHARMACEUTICAL SERVICES, LP**
**CARE4, L.P.**
**CCRX HOLDINGS, LLC**
**CCRX OF NORTH CAROLINA HOLDINGS,**
    **LLC**
**CCRX OF NORTH CAROLINA, LLC**
**CHP ACQUISITION, LLC**
**COMPASS HEALTH SERVICES, LLC**
**COMPSCRIPT, LLC**
**CONTINUING CARE RX, LLC**
**CP ACQUISITION, LLC**
**D&R PHARMACEUTICAL SERVICES, LLC**
**ENLOE DRUGS LLC**

[*Signature Page to Asset Purchase Agreement*]

EVERGREEN PHARMACEUTICAL OF
    CALIFORNIA, LLC
EVERGREEN PHARMACEUTICAL, LLC
GENEVA WOODS HEALTH SERVICES, LLC
GENEVA WOODS LTC PHARMACY, LLC
GENEVA WOODS PHARMACY ALASKA,
    LLC
GENEVA WOODS PHARMACY
    WASHINGTON, LLC
GENEVA WOODS PHARMACY WYOMING,
    LLC
GENEVA WOODS PHARMACY, LLC
GENEVA WOODS RETAIL PHARMACY,
    LLC
GRANDVIEW HEALTHCARE, LLC
GRANDVIEW PHARMACY, LLC
HOME CARE PHARMACY, LLC
HOME PHARMACY SERVICES, LLC
INSTITUTIONAL HEALTH CARE
    SERVICES, LLC
INTERLOCK PHARMACY SYSTEMS, LLC
JHC ACQUISITION LLC
LANGSAM HEALTH SERVICES, LLC
LCPS ACQUISITION LLC
LOBOS ACQUISITION, LLC
LO-MED PRESCRIPTION SERVICES, LLC
MAIN STREET PHARMACY, L.L.C.
MANAGED HEALTHCARE, LLC
MARTIN HEALTH SERVICES, LLC
MED WORLD ACQUISITION, LLC
MEDICAL ARTS HEALTH CARE, LLC
MERWIN IV & SPECIALTY PHARMACY,
    LLC
MERWIN LONG TERM CARE, LLC
MERWIN RX-COMPOUNDING PHARMACY,
    LLC
MHHP ACQUISITION COMPANY LLC
NCS HEALTHCARE OF ILLINOIS, LLC
NCS HEALTHCARE OF IOWA, LLC
NCS HEALTHCARE OF KANSAS, LLC
NCS HEALTHCARE OF KENTUCKY, LLC
NCS HEALTHCARE OF MONTANA, LLC
NCS HEALTHCARE OF NEW MEXICO, LLC
NCS HEALTHCARE OF OHIO, LLC
NCS HEALTHCARE OF SOUTH CAROLINA,
    LLC

[*Signature Page to Asset Purchase Agreement*]

NCS HEALTHCARE OF TENNESSEE, LLC
NCS HEALTHCARE OF WISCONSIN, LLC
NEIGHBORCARE OF INDIANA, LLC
NEIGHBORCARE OF NEW HAMPSHIRE, L.L.C.
NEIGHBORCARE OF VIRGINIA, LLC
NEIGHBORCARE PHARMACIES, LLC
NEIGHBORCARE PHARMACY OF VIRGINIA, LLC
NEIGHBORCARE PHARMACY SERVICES, LLC
NIV ACQUISITION, LLC
NORTH SHORE PHARMACY SERVICES LLC
OCR SERVICES, LLC
OMNICARE INDIANA PARTNERSHIP HOLDING COMPANY LLC
OMNICARE OF NEVADA, LLC
OMNICARE OF NEW YORK, LLC
OMNICARE PHARMACIES OF PENNSYLVANIA WEST LLC
OMNICARE PHARMACIES OF THE GREAT PLAINS HOLDING COMPANY, LLC
OMNICARE PHARMACY AND SUPPLY SERVICES LLC
OMNICARE PHARMACY OF FLORIDA, LLC
OMNICARE PHARMACY OF NEBRASKA, LLC
OMNICARE PHARMACY OF NORTH CAROLINA, LLC
OMNICARE PHARMACY OF PUEBLO, LLC
OMNICARE PHARMACY OF TENNESSEE, LLC
OMNICARE PHARMACY OF TEXAS 1, LP
OMNICARE PHARMACY OF TEXAS 2, LP
OMNICARE PHARMACY OF THE MIDWEST, LLC
OMNICARE PROPERTY MANAGEMENT, LLC
PHARMACY ASSOCIATES OF GLENS FALLS, LLC
PHARMACY CONSULTANTS, LLC
PHARMACY HOLDING #1, LLC
PHARMACY HOLDING #2, LLC
PHARMED HOLDINGS, LLC
PP ACQUISITION COMPANY, LLC

[*Signature Page to Asset Purchase Agreement*]

Docusign Envelope ID: B65B0B08-0044-47C8-84E5-F23B92D64A6F

**PRN PHARMACEUTICAL SERVICES, LP**
**ROESCHEN'S HEALTHCARE LLC**
**SHORE PHARMACEUTICAL PROVIDERS,**
    **LLC**
**SPECIALIZED PHARMACY SERVICES, LLC**
**STERLING HEALTHCARE SERVICES, LLC**
**SUBURBAN MEDICAL SERVICES, LLC**
**SUPERIOR CARE PHARMACY, LLC**
**TCPI ACQUISITION, LLC**
**THREE FORKS APOTHECARY, LLC**
**UC ACQUISITION, LLC**
**UNI-CARE HEALTH SERVICES OF MAINE,**
    **LLC**
**VALUE HEALTH CARE SERVICES LLC**
**VAPS ACQUISITION COMPANY, LLC**
**WEBER MEDICAL SYSTEMS LLC**
**WESTHAVEN SERVICES CO., LLC**
**WILLIAMSON DRUG COMPANY, LLC**
**ZS ACQUISITION COMPANY, LLC**

Each by: _____
Name: David S. Azzolina
Title: President

[*Signature Page to Asset Purchase Agreement*]

**Exhibit A**

**Form of Bill of Sale and Assignment and Assumption Agreement**

## FORM OF

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Bill of Sale"), dated as of [•], 2026, is made by and between [•], a [entity type] ("Buyer"), on the one hand, and [Asset Seller], a [entity type] ("Assigning Asset Seller"), on the other hand, pursuant to that certain Asset Purchase Agreement by and between Omnicare, LLC, a Delaware limited liability company ("Seller"), the subsidiaries of Seller party thereto, and Buyer, dated as of March 31, 2026 (as amended, modified or supplemented in accordance with its terms, the "Purchase Agreement"). All capitalized terms used and not otherwise defined herein will have the respective meanings ascribed to such terms in the Purchase Agreement.

FOR GOOD AND VALUABLE CONSIDERATION as recited in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, effective as of the Closing on the date hereof, Assigning Asset Seller hereby sells, assigns, transfers, conveys and delivers to Buyer all of such Assigning Asset Seller's right, title and interest in, to, and under the Purchased Assets of such Assigning Asset Seller, and hereby assigns all of the Assumed Liabilities held by such Assigning Asset Seller to Buyer, including all of the Assigning Asset Seller's right, title and interest in, to, and under the Assigned Contracts and Assigned Leases of Assigning Asset Seller, if any, free and clear of all Encumbrances other than Permitted Encumbrances. Buyer hereby purchases from Assigning Asset Seller, free and clear of any Encumbrances other than Permitted Encumbrances, all of the Assigning Asset Seller's right, title and interest in, to, and under such Purchased Assets, including the Assigned Contracts and Assigned Leases, and hereby assumes, and agrees to pay, perform and discharge when due such Assumed Liabilities. Nothing in this Bill of Sale shall be construed to transfer any Excluded Liabilities.

This Bill of Sale is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement (including the representations, warranties and covenants and limitations thereof set forth in the Purchase Agreement), all of which are incorporated herein by reference. In the event of any conflict or inconsistency between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement will prevail. Nothing contained herein will be deemed to alter, modify, expand or diminish the terms of the Purchase Agreement.

This Bill of Sale will be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) except to the extent the law of the State of New York is superseded by the Bankruptcy Code.

This Bill of Sale may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, e-mail or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

\*   \*   \*   \*   \*

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale to be executed as of the date first written above.

**ASSIGNING ASSET SELLER**

[•]

By _____
Name:
Title:

[*Signature Page to Bill of Sale and Assignment and Assumption Agreement*]

**BUYER**

[•]

By _____
Name:
Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**Exhibit B**

**<u>Form of Intellectual Property Assignment Agreement</u>**

**FORM OF**
**ASSIGNMENT OF INTELLECTUAL PROPERTY**

This ASSIGNMENT OF INTELLECTUAL PROPERTY (this "IP Assignment"), dated and effective as of [•], 2026, is made by and between Omnicare, LLC, a Delaware limited liability company (the "Assignor") and [•], a [ENTITY TYPE] incorporated under the laws of the state of [•] (the "Assignee"), pursuant to that certain Asset Purchase Agreement, dated as of March 31, 2026, by and between the Assignor, the subsidiaries of Assignor party thereto, and the Assignee (the "Agreement"). All capitalized terms used and not otherwise defined herein will have the respective meanings ascribed to such terms in the Agreement.

WHEREAS, pursuant to the Agreement, the Assignor and the Assignee have agreed to enter into this IP Assignment, pursuant to which Assignor has agreed to sell, assign, transfer, convey and deliver to the Assignee all of the Assignor's right, title and interest in, to, and under the Assigned Intellectual Property Assets.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, effective as of the Closing on the date hereof, pursuant to the terms and subject to the conditions set forth in the Agreement, the parties agree as follows:

1. (i) The Assignor hereby irrevocably sells, assigns, transfers, conveys and delivers to the Assignee, free and clear of any Encumbrance (other than a Permitted Encumbrance), all right, title and interest in, to, and under the Assigned Intellectual Property Assets, including all the Intellectual Property Registrations, in each case, listed on Schedule A attached hereto (which is incorporated into and made a part of this IP Assignment), together with, in each case solely to the extent constituting Acquired Assets, (a) the goodwill of the Business connected with the use of such Assigned Intellectual Property Assets and symbolized thereby, and (b) all rights thereunder, and all remedies and rights therein under the Laws of all jurisdictions including, without limitation, remedies against all past, present, and future infringement and (ii) the Assignee hereby accepts such assignment in the scope as set out herein.

2. The Assignee may record this IP Assignment with the United States Patent and Trademark Office ("USPTO") and with comparable offices in other jurisdictions throughout the world. All costs associated with any such recordations shall be paid by the Assignee. The Assignor hereby authorizes and requests that the USPTO, and any official of any other country whose duty is to record documents evidencing ownership of Intellectual Property, to record Assignee as owner of the Assigned Intellectual Property Assets assigned to Assignee pursuant to this IP Assignment.

3. Nothing in this IP Assignment shall be construed to obligate the Assignor to maintain, support, upgrade, repair or otherwise improve any of the Assigned Intellectual Property Assets. The Assignee and its successors and assigns shall have no right to receive any of the foregoing services from the Assignor.

4. This IP Assignment is subject to all of the terms, conditions and limitations set forth in the Agreement. This IP Assignment and the other Transaction Documents collectively constitute the entire agreement among the parties hereto and supersede any prior and contemporaneous understandings, agreements, representations or warranties by or among the parties, written or oral, that may have related in any way to the subject matter hereof. In the event of any inconsistency between the terms and conditions of this IP Assignment and those in any of the other Transaction Documents, the terms and conditions of the Agreement will control. Nothing contained herein will be deemed to alter, modify, expand or diminish the terms of the Agreement.

5. THIS IP ASSIGNMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) EXCEPT TO THE EXTENT THE LAW OF THE STATE OF NEW YORK IS SUPERSEDED BY THE BANKRUPTCY CODE (AS DEFINED IN THE AGREEMENT).

6. This IP Assignment may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this IP Assignment delivered by facsimile, e-mail or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this IP Assignment.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Assignment of Intellectual Property as of the date first written above.

ASSIGNOR

OMNICARE, LLC

By      _____
Name:
Title:

**ASSIGNEE**

[•]


By _____
Name:
Title:

## SCHEDULE A

Trademarks:

| Trademark | Country (or State) | All Classes | Trademark Status | Application Date | Application Number | Registration Date | Registration number | Owner |
|---|---|---|---|---|---|---|---|---|
| Omnifill | United States | 35 | Pending | 02-29-2024 | 98-427,399 | N/A | N/A | Omnicare, LLC |
| Omnicare Pharmacy Services | United States | 35, 44 | Registered | 04-24-2009 | 77-722,113 | 10-05-2010 | 3,855,469 | Omnicare, LLC |
| Omniview | United States | 35, 42 | Registered | 10-11-2004 | 78-497,921 | 10-10-2006 | 3,154,970 | Omnicare, LLC |
| Omnicare of Northern Illinois | United States | 35 | Registered | 04-30-2003 | 78-243,891 | 06-08-2004 | 2,850,899 | Omnicare, LLC |
| Omnicare | United States | 42 | Registered | 10-08-1996 | 75-178,424 | 11-25-1997 | 2,115,834 | Omnicare, LLC |
| | United States | 42 | Registered | 09-14-1994 | 74-573,485 | 07-16-1996 | 1,986,570 | Omnicare, LLC |
| | United States | 42 | Registered | 09-12-1994 | 74-572,370 | 04-15-1997 | 2,051,791 | Omnicare, LLC |
| Cost Confidence | United States | 35, 44 | Pending | 03-26-26 | 99-725,744 | N/A | N/A | Omnicare, LLC |

| Trademark | Country | All Classes | Trademark Status | Application Date | Application Number | Registration Date | Registration number | Applicant Name |
|---|---|---|---|---|---|---|---|---|
| OMNICARE | AUSTRIA | 16, 35, 42, 44 | Registered | 02-07-2003 | 834/2003 | 11-17-2003 | 213713 | OMNICARE, INC. |
| OMNICARE | CANADA | 42 | Registered | 06-19-2000 | 1063927 | 10/08/2003 | TMA591841 | OMNICARE INC. |
| OMNICARE | DENMARK | 16, 42 | Registered | 02-06-2003 | VA 2003 00514 | 03-21-2003 | VR 2003 01032 | OMNICARE, LLC |
| OMNICARE | FRANCE | 16, 35, 39, 42, 44 | Registered | 02-06-2003 | 3208277 | | 3208277 | OMNICARE, LLC |
| OMNICARE | GREECE | 16, 44 | Registered | 04-04-2003 | F148685 | 04-19-2005 | F148685 | OMNICARE, LLC |

| OMNICARE | IRELAND | 16, 42, 44 | Registered | 02-06-2003 | 2003/00218 | 02-06-2003 | 227413 | OMNICARE LLC |
| OMNICARE | ITALY | 16, 42 | Registered | 03-14-2003 | 2003901095448 | 10-01-2007 | 0001065285 | OMNICARE INC. |
| OMNICARE | SPAI N | 16, 44 | Registered | 02-06-2003 | M2524662 | 10-28-2003 | M2524662 | OMNICARE, LLC |
| OMNICARE | SWEDEN | 16, 35, 42, 44 | Registered | 02-06-2003 | 2003-00764 | 10-03-2003 | 363143 | OMNICARE, LLC |
| OMNICARE | UNITED KINGDOM | 16, 42, 44 | Registered | 02-06-2003 | UK00002323010 | 03-18-2005 | UK00002323010 | OMNICARE, LLC |
| OMNICARE | HUNGARY | 42 | Registered | 06-09-2000 | M0003129 | 11-27-2001 | 167622 | OMNICARE, INC. |
| OMNICARE | SINGAPORE | 42 | Registered | 06-15-2000 | T0010341F | 02-29-2000 | T0010341F | OMNICARE, INC. |

Patents:

| Country | Patent No. | App. No. | Title | App. Date | Published | Issued | Status | Owner |
|---|---|---|---|---|---|---|---|---|
| United States | 12274669 | 15058202 | ADMINISTRATION METHODS FOR ORAL MEDICATIONS | 03-02-2016 | 06-23-2016 | 04-15-2025 | Active | Omnicare, LLC |
| United States | 9367981 | 13585338 | AUTOMATED LABEL VERIFY SYSTEMS AND METHODS FOR DISPENSING PHARMACEUTICALS | 08-14-2012 | 12-06-2012 | 06-14-2016 | Active | Omnicare, LLC |
| United States | 9122783 | 13801070 | AUTOMATED LABEL AND VERIFICATION SYSTEMS AND METHODS FOR FILLING CUSTOMER ORDERS OF MEDICAL ITEMS | 03-13-2013 | 01-23-2014 | 09-01-2015 | Active | Omnicare, LLC |
| United States | 9117016 | 13801017 | UNIVERSAL LABEL AND VERIFICATION SYSTEMS AND METHODS FOR FILLING CUSTOMER ORDERS OF MEDICAL ITEMS | 03-13-2013 | 01-23-2014 | 08-25-2015 | Active | Omnicare, LLC |

| Country | Patent No. | App. No. | Title | App. Date | Published | Issued | Status | Owner |
|---------|-----------|----------|-------|-----------|-----------|--------|--------|-------|
| United States | 9073206 | 13529554 | METHODS AND APPARATUS FOR AUTOMATED FILLING OF PACKAGINGS WITH MEDICATIONS | 06-21-2012 | 12-26-2013 | 07-07-2015 | Active | Omnicare, LLC |
| United States | 8831775 | 10610681 | METHOD AND SYSTEM FOR ELECTRONIC ASSISTANCE IN DISPENSING PHARMACEUTICALS | 07-02-2003 | 01-06-2005 | 09-09-2014 | Active | Omnicare, LLC |
| United States | 8666758 | 10949070 | METHOD OF DISPENSING PHARMACEUTICALS | 09-24-2004 | 08-25-2005 | 03-04-2014 | Active | Omnicare, LLC |
| United States | 8485431 | 13487819 | METHODS FOR FILLING PRESCRIPTIONS TO FULFILL A CUSTOMER ORDER | 06-04-2012 | 10-11-2012 | 07-16-2013 | Active | Omnicare, LLC |
| United States | 8464932 | 13487842 | AUTOMATED LABEL VERIFY SYSTEMS AND METHODS FOR DISPENSING PHARMACEUTICALS | 06-04-2012 | 09-27-2012 | 06-18-2013 | Active | Omnicare, LLC |
| United States | 8215543 | 12640065 | METHODS FOR FILLING PRESCRIPTIONS TO FULFILL A CUSTOMER ORDER | 12-17-2009 | 04-15-2010 | 07-10-2012 | Active | Omnicare, LLC |
| United States | 8215540 | 12235173 | AUTOMATED LABEL VERIFY SYSTEMS AND METHODS FOR DISPENSING PHARMACEUTICALS | 09-22-2008 | 07-09-2009 | 07-10-2012 | Active | Omnicare, LC |
| United States | D683243 | 29397285 | MEDICATION PACKAGING | 07-14-2011 | Not Published | 05-28-2013 | Active | Omnicare, LLC |
| United States | D670178 | 29393507 | MEDICATION PACKAGING ASSEMBLY | 06-06-2011 | Not Published | 11-06-2012 | Active | Omnicare, LLC |

| Country | Patent No. | App. No. | Title | App. Date | Published | Issued | Status | Owner |
|---|---|---|---|---|---|---|---|---|
| United States | | 19039315 | ADMINISTRATION METHODS FOR ORAL MEDICATIONS | 01-28-2025 | 05-29-2025 | | Pending | Omnicare, LLC |

| Country | Patent No. | | Title | App. Date | Published | Granted | Status | Owner |
|---|---|---|---|---|---|---|---|---|
| Canada | 2775248 | | Administration methods and packagings for oral medications | 04-20-2012 | | 03-05-2019 | Active | Omnicare LLC |
| European Community Design | 001305643-0001 | | BODY FOR A MEDICATION PACKAGING and a MEDICATION PACKAGING | 12-05-2011 | | 02-08-2012 | Active | Omnicare, LLC |
| European Community Design | 001305643-0002 | | BODY FOR A MEDICATION PACKAGING and a MEDICATION PACKAGING | 12/05/2011 | | 02-08-2012 | Active | Omnicare, LLC |
| European Community Design | 001309801-0001 | | MEDICATION PACKAGING | 01-10-2012 | | 03-15-2012 | Active | Omnicare, LLC |
| Great Britain | 001305643-0001 | | BODY FOR A MEDICATION PACKAGING and a MEDICATION PACKAGING | 12-05-2011 | | 02-08-2012 | Active | Omnicare, LLC |
| Great Britain | 001305643-0002 | | BODY FOR A MEDICATION PACKAGING and a MEDICATION PACKAGING | 12-05-2011 | | 02-08-2012 | Active | Omnicare, LLC |
| Great Britain | 001309801-0001 | | MEDICATION PACKAGING | 01-10-2012 | | 03-15-2012 | Active | Omnicare, LLC |
| India | 242242 | | MEDICATION PACKAGING | 01-13-2012 | | 07-05-2012 | Active | Omnicare, LLC |

**Exhibit C**

**<u>Form of Sale Order</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| OMNICARE, LLC, *et al.*,[1] | Case No. 25-80486 (SGJ) |
| Debtors. | (Jointly Administered) |
|  | Related to Docket Nos. 288, 398, [ ] |

**ORDER (I) APPROVING THE ASSET PURCHASE
AGREEMENT BETWEEN THE DEBTORS AND [BUYER];
(II) AUTHORIZING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES; (III) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH; AND (IV) GRANTING RELATED RELIEF**

---

[1] The last four digits of Omnicare, LLC's federal tax identification number are 1351. There are 111 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Omnicare. The location of Omnicare, LLC's corporate headquarters and the Debtors' service address is One CVS Drive, Mail Code 1160, Woonsocket, RI 02895.

137915.000001\4938-4395-2794.6

This matter coming before the Court on the *Debtors' Motion for Entry of an Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling the Auction and Sale Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof; and (II) Granting Related Relief* [Docket No. 288] (the "**Motion**")[2] filed by Omnicare, LLC and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), seeking, among other things, entry of an order (this "**Sale Order**"): (i) authorizing and approving the sale of the Purchased Assets of the Debtors to [BUYER] or Buyer's Designees, as applicable (collectively, "**Buyer**") in accordance with the terms and conditions set forth in that certain Asset Purchase Agreement, dated as of [DATE], by and among the Debtors and Buyer (as amended, supplemented or otherwise modified by the parties thereto, the "**APA**," and together with the Transition Services Agreement, Powers of Attorney, and all other ancillary agreements, documents and instruments attached thereto or contemplated thereunder, the "**Transaction Documents**"), a copy of which is attached hereto as **Exhibit A**, free and clear of all liens, claims, interests, and encumbrances to the fullest extent permitted by law, except for the Assumed Liabilities and Permitted Encumbrances as set forth in the APA; (ii) authorizing the assumption and assignment of the Assigned Contracts and Assigned Leases; and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having entered the *Order (I)(A) Approving Bidding Procedures and the Form and Manner of Notice Thereof, (B) Authorizing the Selection of Stalking Horse Bidder(s) and*

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Bidding Procedures Order, or the APA (as defined below), as applicable.

2

137915.000001\4938-4395-2794.6

*Approving Bid Protections, (C) Establishing Bid Deadlines and Scheduling the Auction and Sale*

*Hearing(s), and (D) Establishing Certain Assumption and Assignment Procedures and Approving*

*the Manner of Notice Thereof; and (II) Granting Related Relief* [Docket No. 398] (the "**Bidding**

**Procedures Order**"), that, among other things, (i) approved the Bidding Procedures for the sale

of the Debtors' Assets, including the process, timeline, and notice thereof and (ii) authorized the

Debtors' entry into the Stalking Horse Agreement, subject to higher or otherwise better offers at

the Auction in accordance with the Bidding Procedures; and the Debtors having conducted the

Auction to determine the Successful Bidder and Back-Up Bidder and having determined pursuant

to the Bidding Procedures Order and after extensive marketing and the Auction, that the Buyer has

submitted the highest or otherwise best bid to purchase the Purchased Assets; and having selected

the Buyer as the Successful Bidder [and [BACK-UP BIDDER] (the "**Back-Up Bidder**" and such

bid, the "**Back-Up Bid**"))], in each case in accordance with the Bidding Procedures, as reflected

in the Notice of Auction Results and Designation of Successful Bidder and Back-Up Bidder

[Docket No. ___] (the "**Auction Notice**"); and the Debtors having filed and served the Assumption

and Assignment Notice that set forth, among other things, the Cure Costs for the executory

contracts and unexpired leases set forth on the Cure Schedules thereto; and upon due, adequate,

and sufficient notice of the Motion, the Bidding Procedures Order, the Assumption and

Assignment Notice, the Auction Notice, the APA and all other related transactions contemplated

thereunder and in this Sale Order (such transactions collectively, the "**Sale**"); and this Court having

held a hearing to consider the relief requested in the Motion on a final basis (the "**Sale Hearing**");

and this Court having determined that the legal and factual bases set forth in the Motion and the

*Declaration of* [   ] *in Support of Entry of an Order (I) Approving the Asset Purchase Agreement*

*Between the Debtors and [BUYER]; (II) Authorizing the Sale of Substantially All of the Debtors'*

3

*Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (III) Authorizing the*
*Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection*
*Therewith; and (IV) Granting Related Relief* [Docket No. __] (the "**Sale Declaration**"), and at the
Sale Hearing establish just cause for the relief granted herein; and this Court having found that the
relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors,
and other parties in interest; and, except as provided in paragraph 3 herein, all objections,
responses, and reservations of rights filed or asserted in respect of the Motion, if any, having been
withdrawn, resolved, or overruled; and upon all of the proceedings had before this Court; and after
due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**I.      Jurisdiction, Venue, Final Order and Statutory Predicates**

A.      This Court has jurisdiction to hear and determine the Motion and to grant the relief
requested therein pursuant to 28 U.S.C. §1334 and the *Order of Reference of Bankruptcy Cases*
*and Proceedings Nunc Pro Tunc*, Miscellaneous Order No. 33 (N.D. Tex. August 3, 1984). Venue
of these Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408
and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N)
and (O).

B.      This Sale Order constitutes a final and appealable order within the meaning of 28
U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly
finds that there is no just reason for delay in the implementation of this Sale Order and expressly
directs entry of judgment as set forth herein. In the absence of a stay pending appeal, Buyer, being
a good-faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale
contemplated by the APA at any time after entry of this Sale Order, subject to the provisions of

4

the APA, and shall not be subject to any applicable stay, including any stay provided by Bankruptcy Rules 6004(h) and 6006(d).

C. The statutory predicates for the relief granted herein are sections 105, 363, 365 and 541 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006.

## II. Notice

D. As evidenced by the certificates of service and publication filed with the Court, and as demonstrated by the evidence presented and the representations of counsel at the Sale Hearing, (i) proper, timely and adequate notice of the Motion, the Sale Hearing, the Auction, the Sale, the Assumption and Assignment Procedures, the Assumption and Assignment Notice, the Cure Costs, the Auction Notice, all related transactions collectively described in the Transaction Documents, and all related deadlines has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 9007, 9008, and 9014, Local Rule 9007-1, and the Bidding Procedures Order; (ii) such notice was good, sufficient and appropriate under the circumstances and provided parties-in-interest with reasonable and adequate opportunity to object or be heard with respect to the Motion, the Sale, the APA, the Assumption and Assignment Notice, the assumption and assignment of the Assigned Contracts and Assigned Leases, and entry of this Sale Order; and (iii) no other or further notice of the Motion, the Sale Hearing, the Auction, the Sale, the Assumption and Assignment Procedures, the Assumption and Assignment Notice, the Cure Costs, the Auction Notice, all related transactions collectively described in the APA, and all related deadlines is necessary or shall be required. The requirements of Bankruptcy Rule 6004(a) and Local Rule 9007-1 are satisfied by such notice.

E. The Debtors filed with this Court and served the Assumption and Assignment Notice, containing (i) the list of executory contracts and unexpired leases that may be potentially assumed and assigned in connection with the Sale; (ii) information necessary and appropriate to

5

provide notice of the relevant proposed assumption and assignment of the executory contracts and unexpired leases; (iii) Cure Costs, where applicable, and (iv) the procedures and deadlines for objecting to the assumption and assignment of the executory contracts and unexpired leases and related Cure Costs, where applicable, on all counterparties to such executory contracts and unexpired leases. The Assumption and Assignment Notice (i) included the Debtors' good faith calculation of Cure Costs with respect to each Assigned Contract or Assigned Lease; (ii) stated that assumption and assignment is not guaranteed and is subject to this Court's approval; and (iii) prominently displayed the Cure Objection Deadline (as defined in the Assumption and Assignment Notice). The filing and service of the Assumption and Assignment Notice was good, sufficient, and appropriate under the circumstances, and no other or further notice need be given.

F. Notice, as evidenced by the certificates of service and publication filed with the Court as Docket Nos. [ ], has been provided in the form and manner specified in the Motion and required by the Bidding Procedures Order, and the Court finds that the notice is adequate and sufficient in all respects to bind all creditors, bidders and other parties in interest in these Chapter 11 Cases.

**III. Compliance with Bidding Procedures and Bidding Procedures Order**

G. As demonstrated by the Sale Declaration, the evidence proffered or adduced at the Sale Hearing, and the arguments of counsel made on the record at the Sale Hearing, the Debtors' marketing and sale process with respect to the Purchased Assets were in accordance with the Bidding Procedures and afforded a full, fair, and reasonable opportunity for any Potential Bidder to make a higher or otherwise better offer to purchase the Purchased Assets and participate in the sale process.

137915.000001\4938-4395-2794.6

H.      As demonstrated by the Sale Declaration, the evidence proffered or adduced at the Sale Hearing, and the arguments of counsel made on the record at the Sale Hearing, the Debtors and their professionals have adequately marketed the Purchased Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order, and the sale process was conducted in a diligent, non-collusive, fair, reasonable, and good-faith manner. The Debtors have afforded Potential Bidders a full and fair opportunity to participate in the bidding process for the Purchased Assets and to make higher or otherwise better offers. The process conducted by the Debtors and their professionals pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Purchased Assets, and there was no other transaction or combination of transactions available or presented that would have yielded a higher or better result for the Purchased Assets.

**IV.      Highest or Otherwise Best Offer**

I.      As demonstrated by the Sale Declaration, the evidence proffered or adduced at the Sale Hearing, and the arguments of counsel made on the record at the Sale Hearing, (i) the APA constitutes the highest or otherwise best offer for the Purchased Assets, (ii) the Debtors have determined, in consultation with the Consultation Parties, that the transactions contemplated by the APA maximize value for the benefit of the Debtors' estates, creditors, stakeholders, and parties in interest, and constitutes the highest or otherwise best offer for the Purchased Assets, and (iii) entry into the APA constitutes a valid and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties and is in accordance and compliance with the Bidding Procedures and the Bidding Procedures Order. No other person, entity, or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtors than the Buyer has. The APA provides fair and reasonable terms for the purchase of the Purchased Assets.

7

137915.000001\4938-4395-2794.6

## V.    Sale in Best Interests

J.    Approval of the Transaction Documents, the Sale, and all related transactions together with the actions to be taken by the Debtors and the Buyer in connection therewith, are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their estates, their creditors and other parties in interest. The Debtors have demonstrated (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan of reorganization or liquidation, in that, among other things, the immediate consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtors' estates, subject to the regulatory approvals and other conditions set forth in the APA.

K.    The Debtors' decision to enter into the APA and pursue and consummate the Sale in accordance with the terms of the APA constitutes a proper exercise of the fiduciary duties of the Debtors and their respective directors, managers, and officers. The Sale must be approved and consummated promptly to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale. Given the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price, the Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved. The consummation of the Sale and the assumption and assignment of the Assigned Contracts and Assigned Leases are legal, valid, and properly authorized under sections 105(a), 363(b), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts and Assigned Leases to the Buyer in connection with

8

consummation of the Sale, and the assumption and assignment of the Assigned Contracts and Assigned Leases is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

## VI.    Arm's-Length Sale and Good Faith of Buyer

L.    None of the Debtors nor the Buyer, their respective affiliates, officers, directors, members, partners, principals, or equityholders (or equivalent) nor any of their respective representatives, attorneys, advisors, successors, or assigns have engaged in any conduct that would cause or permit the APA or the consummation of the Sale and related transactions contemplated in the APA to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. The Buyer has not acted in a collusive manner with any Person. The APA was negotiated, proposed, and entered into by the Debtors and the Buyer without collusion or fraud, in good faith, and from arm's-length bargaining positions.

M.    None of the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code. Among other things, (i) the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) the Debtors and the Buyer complied with the provisions of the Bidding Procedures Order and the Bidding Procedures, (iii) the Buyer agreed to subject its bid to the Bidding Procedures, (iv) the Debtors and the Buyer, and, as applicable, their respective management, board of directors, board of managers (or comparable governing authority), employees, agents, advisors, and representatives, each actively participated in the marketing and sale process, and each acted in good faith and without collusion or fraud of any kind, (v) all payments to be made by the Buyer, and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed, and (vi) the Buyer was designated the Successful Bidder for the Purchased Assets in accordance with

9

137915.000001\4938-4395-2794.6

the Bidding Procedures and the Bidding Procedures Order, and for the avoidance of doubt, if the Successful Bidder does not close the Transaction(s), the Back-Up Bidder shall be designated as the Buyer in accordance with the Bidding Procedures and Bidding Procedures Order.

N. The Buyer is purchasing the Purchased Assets pursuant to the APA in good faith and for fair and reasonable consideration, and the Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Sale, and the Buyer would not consummate the Sale without such protections. The Buyer is, therefore, entitled to the full rights, benefits, privileges, and protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and nonbankruptcy law in connection with this proceeding, the Sale, each term of the APA and other Transaction Documents, and each term of this Sale Order.

## VII. Corporate Authority

O. The Debtors have (i) full requisite corporate or other organizational power and authority to execute, deliver, and perform their obligations under the APA and other Transaction Documents, and to consummate the Sale and other transactions contemplated thereby, and such execution, delivery, and performance have been duly and validly authorized by all necessary corporate or other organizational action of each applicable Debtor, (ii) taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery, and performance of their obligations under the APA and other Transaction Documents and the consummation by the Debtors of the Sale and other transactions contemplated thereby, including as required by their respective organizational documents, and, upon execution thereof, each such agreement executed by such Debtor will be duly and validly executed and delivered by such Debtor and enforceable against such Debtor in accordance with its terms and, assuming due

10

authorization, execution, and delivery thereof by the other parties thereto, will constitute a valid and binding obligation of such Debtor. No additional consents or approvals, other than those provided in the APA, are necessary or required for the Debtors to enter into the APA and other Transaction Documents, perform their obligations therein, and otherwise consummate the Sale and other transactions approved by this Sale Order.

**VIII.    No Merger; Buyer Not an Insider; No Successor Liability**

P.    The Buyer is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code. The Buyer is not a "successor" to, a mere continuation of, or an alter ego of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Buyer and the Debtors by reason of any theory of law or equity. There is no common identity of incorporators, directors, or controlling stockholders between the Debtors and the Buyer. The Buyer is not holding itself out to the public as a successor to or a continuation of the Debtors or their estates. The Sale does not amount to a consolidation, succession, merger, or de facto merger of Buyer and the Debtors. The transfer of the Purchased Assets to the Buyer, and the assumption of the Assumed Liabilities by the Buyer, except as otherwise explicitly set forth in the APA, does not, and will not, subject the Buyer to any liability whatsoever (including any successor liability whatsoever), with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, transferee, derivative, vicarious, or assignee liability of any kind or character, including, but not limited to, antitrust, environmental, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative,

11

transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, products liability, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise (collectively, the "**Successor or Other Liabilities**").

## IX.      Binding and Valid Transfer

Q.      The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title, and interest that the Debtors or their estates possess with respect to the Purchased Assets, free and clear, to the fullest extent permitted by law, of all Interests (as defined below) (other than the Permitted Encumbrances and the Assumed Liabilities) in or against such assets and equity interests comprising the Purchased Assets, as set forth in the APA. Immediately prior to consummating the Sale, the Purchased Assets constituted property of the Debtors' estates, good title was vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code, and the Debtors were the sole and rightful owners of the Purchased Assets. The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, sections 105(a), 363(b), 363(f), 365(f), and 365(m), and all of the applicable requirements of such sections have been satisfied in respect of the Sale. Upon and following the consummation of the Sale, the Buyer shall be vested with good and marketable title to the Purchased Assets and shall be the sole and rightful owner of the Purchased Assets.

## X.      No Fraudulent Transfer

R.      The Transaction Documents are valid and binding contracts between the Debtors and the Buyer. The Transaction Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United

12

States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction. The consideration provided by the Buyer in respect of the Sale (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors more expeditiously than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, and similar laws and acts). None of the Debtors nor the Buyer is entering into the Sale or other transactions contemplated by the Transaction Documents fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.

## XI. Section 363(f) is Satisfied

S. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full with respect to each Interest (as defined below) in the Purchased Assets; therefore, the Debtors may sell the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities).

T. The Buyer would not have entered into the Transaction Documents, and would not consummate the transactions contemplated thereby, if the (i) Sale of the Purchased Assets to the Buyer was not free and clear of all Interests (defined below) (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever or (ii) Buyer would, or in the future could, be liable for any of the Interests (other than the Permitted Encumbrances and the Assumed Liabilities). The Buyer will not consummate the transactions contemplated by the Transaction Documents unless this Court expressly orders that none of the Buyer, any of the

13

137915.000001\4938-4395-2794.6

Buyer's Affiliates or Subsidiaries, or any of their respective officers, directors, partners, principals, direct and indirect equityholders (including any equity sponsor), professionals, or representatives, successors, or assigns, or their respective assets or properties, including, without limitation, the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff, recoupment, or otherwise, directly or indirectly, any Interests (other than the Permitted Encumbrances and the Assumed Liabilities), including rights or claims based on any Successor or Other Liabilities. The total consideration to be provided under the APA reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever (including, without limitation, any potential Successor or Other Liabilities).

U.      Not transferring the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities), including rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state, federal, foreign law, or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

V.      The Debtors may sell the Purchased Assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those

14

holders of Interests that did not timely object to the Sale or the Motion, or withdrew objections to the Sale or the Motion, are deemed to have consented to the Sale and the Motion pursuant to section 363(f)(2) of the Bankruptcy Code. All Interests (except to the extent that such encumbrances are Permitted Encumbrances or Assumed Liabilities) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, therefore, all holders of Interests are adequately protected.

## XII. Cure Costs and Adequate Assurance of Future Performance

W. The assumption and assignment of the Assigned Contracts and Assigned Leases pursuant to the terms of this Sale Order (i) is integral to the APA, (ii) is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and (iii) represents the reasonable exercise of reasonable and prudent business judgment by the Debtors. The assumption and assignment of the Assigned Contracts and Assigned Leases (i) is necessary to sell the Purchased Assets to the Buyer, (ii) allows the Debtors to maximize the value of the Purchased Assets, including the Assigned Contracts and Assigned Leases, (iii) limits the losses suffered by the counterparties to the Assigned Contracts and Assigned Leases (the "**Counterparties**"), and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Contracts and Assigned Leases. For these reasons, the Debtors have exercised reasonable business judgment in assuming and assigning the Assigned Contracts and Assigned Leases and such assumption and/or assignment is in the best interests of the Debtors' estates.

X. Pursuant to section 365(f) of the Bankruptcy Code, each Assigned Contract or Assigned Lease to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in

15

137915.000001\4938-4395-2794.6

such contract prohibiting, restricting, or conditioning its assignment or transfer. No section of any of the Assigned Contracts and Assigned Leases that would prohibit, restrict, or condition, whether directly or indirectly, the use, assumption, or assignment of any of the Assigned Contracts and Assigned Leases in connection with the Sale shall have any force or effect.

Y.      Subject to the terms of the APA, the Debtors or the Buyer, as the case may be, have cured or have demonstrated the ability to cure, any default under any Assigned Contract or Assigned Lease with respect to any act or omission that occurred prior to the date of assignment of such Assigned Contract or Assigned Lease. The Debtors' or Buyer's, as applicable and in accordance with the APA, obligations to pay the Cure Costs upon the Closing Date, and the Buyer's obligations to perform the obligations under the Assigned Contracts and Assigned Leases thereafter, shall constitute adequate assurance of their future performance of and under the Assigned Contracts and Assigned Leases, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. Pursuant to the Bidding Procedures Order, all counterparties to the Assigned Contracts and Assigned Leases that failed to file with this Court and serve a timely objection are forever barred from asserting any such objection with regard to the assumption or assignment of their Assigned Contract or Assigned Lease. This Court finds that, with respect to all such Assigned Contracts and Assigned Leases, the payment of Cure Costs is appropriate and is deemed to fully satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption and the assignment by the applicable Debtor to the Buyer of each of the Assigned Contracts and Assigned Leases. To the extent any Assigned Contract or Assigned Lease is not an executory contract or unexpired lease within the meaning of section 365 of the

16

Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of this Sale Order that are applicable to the Purchased Assets.

## XIII. Back-Up Bidder

Z. The Debtors have demonstrated sufficient basis to have selected and designated the bid of the Back-up Bidder as the next highest and otherwise best bid for the Purchased Assets. Such actions are appropriate exercises of the Debtors' business judgment and are in the best interests of the Debtors, their creditors, their estates, and other parties-in-interest. Approval of the Back-up Bidder's bid as the Back-Up Bid, as provided for in the Bidding Procedures Order, and entitling the Back-Up Bid, if such Back-Up Bidder ultimately consummates the Transaction(s) contemplated by this Sale Order, the findings and protections of this Sale Order is in the best interests of the Debtors, their creditors, their estates, and other parties-in-interest.

## XIV. Not a Sub Rosa Plan

AA. Neither the APA nor the Sale constitutes a sub rosa chapter 11 plan or an element of such plan for which approval has been sought without the protection that a disclosure statement would afford. Neither the APA nor the Sale impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of the Debtors' subsequent chapter 11 plan.

## XV. Necessity of Order

BB. The Buyer would not have entered into the APA and would not consummate the Sale without all of the relief provided for in this Sale Order. The consummation of the Sale pursuant to this Sale Order and the APA is necessary for the Debtors to maximize the value of their estates for the benefit of the Debtors, their estates, their creditors, and all other parties in interest. It is important that the Sale be consummated as expeditiously as possible to preserve the value of the Purchased Assets.

17

137915.000001\4938-4395-2794.6

### XVI.    Compelling Circumstances for an Immediate Sale

CC.    The Debtors' decision to enter into the APA and to consummate the Sale represents an exercise of reasonable business judgment. The Debtors have demonstrated both (i) good, sufficient, and reasonable business purposes and justifications for approving the APA, and (ii) compelling circumstances for the immediate approval and consummation of the Sale contemplated by the Transaction Documents outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization or liquidation, in that the prompt consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the Debtors' estates and to expedite distributions to creditors.

### XVII.    Waiver of Bankruptcy Rules 6004(h) and 6006(d)

DD.    The sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets.  Therefore, time is of the essence in consummating the Sale contemplated by the Transaction Documents, and the Debtors and the Buyer intend to close the transactions as soon as reasonably practicable following the entry of this Sale Order.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions as contemplated by the Transaction Documents. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the Sale transaction contemplated by this Sale Order.

### XVIII.    Final Order

EE.    This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), 6006(d), and 7062, and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as

18

137915.000001\4938-4395-2794.6

made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and expressly directs entry of judgment as set forth herein.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

I. **General Provisions**

1. **Findings of Fact and Conclusions of Law**. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Chapter 11 Cases pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such. This Court's findings shall also include any oral findings of fact and conclusions of law by this Court during or at the conclusion of the Sale Hearing. Additionally, this Court's findings of fact and conclusions of law in the Bidding Procedures Order are incorporated herein by reference as if fully set forth in this Sale Order.

2. **Motion is Granted**. Subject to paragraph 3 of this Sale Order, the Motion and the relief requested therein is granted and approved, and the Sale transaction contemplated in the Motion and the APA and other Transaction Documents are approved in their entirety, in each case as set forth herein and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this Sale Order.

3. **Certain Objections Preserved**. Notwithstanding anything to the contrary herein, the specific objections listed on **Exhibit B** are preserved in all respects and will be either consensually resolved or continued to a date to be set by the Court and resolved by separate order of the Court (the "**Preserved Objections**") and all rights of affected parties to appeal such separate

19

orders are also preserved in all respects. The Preserved Objections shall be resolved prior to any

Closing of the Sale (unless otherwise separately ordered by the Court after notice and an

opportunity for a hearing). Such resolutions shall be set forth in one or more orders of the Court,

which may provide that the terms of this Sale Order shall be made applicable to the substantive

rights of any party or issue that is the subject of such Preserved Objection (to the extent the Court

overrules such Preserved Objection) or provide such other relief as determined by the Court. All

objections to assumption and assignment of any applicable Assigned Contract or Assigned Lease,

including to proposed Cure Costs, are preserved and shall be resolved pursuant to the terms set

forth in this paragraph and paragraphs 30 to 32 of this Sale Order.

4.      **All Other Objections Overruled**. All other objections to, reservations of rights

regarding, or other responses to the Motion or the relief requested therein, the APA and other

Transaction Documents, the Sale, the entry of this Sale Order, or the relief granted herein have

been resolved, withdrawn, or overruled. Those parties who did not timely object to the Motion or

the entry of this Sale Order, or who withdrew their objections thereto, are deemed to have

consented to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of

the Bankruptcy Code.

II.     **Approval of the APA**

5.      **Approval and Authorization**. The APA and other Transaction Documents,

including, in each case, any amendments, supplements, and modifications thereto, and all of the

terms and conditions thereof, are hereby approved. Pursuant to sections 105(a), 363, and 365 of

the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, the Debtors are authorized and

empowered to take any and all actions necessary or appropriate to (a) consummate the Sale

pursuant to and in accordance with the terms and conditions of the APA and other Transaction

20

137915.000001\4938-4395-2794.6

Documents, (b) close the Sale as contemplated in the APA and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their obligations as contemplated by the APA and other Transaction Documents, including the assumption and assignment to the Buyer of the Assigned Contracts and Assigned Leases, in each case without further notice to or order of this Court, and including any actions that otherwise would require further approval by the Counterparties, equityholders, members, or boards of directors or managers, or similar governing bodies, as the case may be, without the need of obtaining such approvals, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and other Transaction Documents and the Sale. The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any amounts that become payable by the Debtors pursuant to the APA and other Transaction Documents.

6. **Binding Effect**. The APA and other Transaction Documents and this Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of Claims (whether known or unknown) against the Debtors, all holders of Liens or other Interests against, in, or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors (including all Counterparties), the Buyer, and all successors and assigns of each of the foregoing, including any trustee subsequently appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and any Person seeking to assert rights on behalf of any of the foregoing or that belong to the Debtors' estates. The APA and the

21

137915.000001\4938-4395-2794.6

Transaction Documents shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers.

## III. Transfer of Purchased Assets

7. **Valid Transfer**. The transfer of the Purchased Assets to the Buyer in accordance with the terms of the APA will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets and the Assumed Liabilities and will, subject to the Closing, render the Buyer liable for the Assumed Liabilities. The transfer of each of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, which transfer vests or will vest the Buyer with all right, title, and interest to the Purchased Assets. Pursuant to the APA, in no instance shall the Buyer have any liability for, or be deemed to have assumed, any Excluded Liabilities.

8. **Free and Clear**. Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors shall transfer the Purchased Assets, including, but not limited to, the Assigned Contracts and Assigned Leases, to the Buyer in accordance with the terms of the APA; such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets; and the Buyer shall take title to and possession of such Purchased Assets free and clear of (a) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising any time prior to the Closing Date (collectively, the "**Liens**"), and (b) all debts (as that term is defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining

22

137915.000001\4938-4395-2794.6

agreements, leases, licenses, deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, credits, allowances, options, limitations, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, easements, rights of way, encroachments, and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether imposed by agreement, understanding, law, equity, or otherwise (including rights with respect to claims and liens (i) that purport to give to any party a right or option to effect a setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyer's interests in the Purchased Assets, or any similar rights, if any, (ii) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership, or (iii) recoupments, arising out of or related to any Healthcare Laws, Permit, or Provider Numbers, as well as participation in any Government Health Program) (collectively, as defined in this clause (b), the "**Claims**" and, together with the Liens and any other encumbrances or interests of any kind or nature whatsoever, the "**Interests**"), relating to, accruing, or arising any time prior to the Closing Date, with the exception of the Permitted Encumbrances and the Assumed Liabilities. Any and all valid and perfected Interests in the Purchased Assets shall attach to the cash proceeds of the Sale ultimately

23

attributable to the property against or in which such Interests are asserted, with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the assets and equity interests comprising the Purchased Assets, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto. Except as expressly assumed by the Buyer under the APA, the transfer of the Purchased Assets to the Buyer and the assignment to the Buyer of the Assigned Contracts and Assigned Leases will not subject the Buyer to any liability whatsoever that may become due or owing under the Assigned Contracts and Assigned Leases prior to the Closing Date, or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities. Following the Closing, no holder of any Interests (other than those expressly assumed by the Buyer or Permitted Encumbrances) or other party in interest may interfere with the Buyer's use and enjoyment of the Purchased Assets based on or related to such Interests, or any actions that the Debtors may take in these Chapter 11 Cases, and no party may take any action to prevent, interfere with, or otherwise enjoin consummation of the Sale.

9. Pursuant to the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, Provide Superpriority Administrative Expense Claims and Use Cash Collateral, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 257] (the "Final DIP Order") and the DIP Credit Agreement (as defined in the Final DIP Order), until Payment in Full of the Obligations (as each such term is defined in the DIP Credit Agreement) the Purchased Assets, and the proceeds thereof, under the Transaction Documents or otherwise constitute DIP Collateral and Cash Collateral (each as defined in the Final DIP Order). Upon

receipt by any Borrower (as defined in the DIP Credit Agreement) or any of its Subsidiaries (as defined in the DIP Credit Agreement) of any Net Cash Proceeds (as defined in the DIP Credit Agreement) received from the sale of the Purchased Assets pursuant to the Transaction Documents, the Borrowers shall pay to the DIP Lender (as defined in the Final DIP Order) the Net Cash Proceeds received in connection with such sale up to an amount equal to the aggregate outstanding amount of the Obligations, in accordance with and subject to the Final DIP Order and, as applicable, the terms and conditions of the DIP Credit Agreement and the other DIP Documents (each as defined in the Final DIP Order).

10.      **[Return of Back-Up Bidder Deposit**. Notwithstanding anything to the contrary in the Bidding Procedures Order or the Bidding Procedures, the Good Faith Deposit of the Back-Up Bidder shall be returned on the first business day after the date that is sixty (60) days after entry of this Sale Order.][3]

11.      **Valid and Binding**. The APA and other Transaction Documents are valid and binding contracts between the Debtors and the Buyer and shall be enforceable pursuant to their terms. The APA and other Transaction Documents, the Sale, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, or any converted or successor cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person. The APA and other Transaction Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Voidable

---

[3] To be included if GenieRx Holdings, LLC is named as the Back-Up Bidder.

25

Transactions Act, the Uniform Fraudulent Transfer Act, and similar laws and acts). Neither the Debtors nor the Buyer are entering into the transactions contemplated by the APA with any fraudulent or otherwise improper purpose, including for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer.

12. **Release of Interests**. Each and every federal, state, local, and other governmental agency, governmental department, administrative agency, filing agent, filing officer, title agent, title company, recording agency, registrar of deeds, registrar of patents, trademarks, or other intellectual property, secretary of state, federal, state, and local official, and any other persons and entity who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets, (i) is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the APA, and (ii) the APA and Sale Order are binding upon and shall govern the acts of such persons. Neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments or documents to effectuate, consummate, and implement the provisions of this Sale Order, and the provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of Interests (other than the Permitted Encumbrances and the Assumed Liabilities) shall be self-executing. The Buyer may, but shall not be required to, file a certified copy of this Sale Order in any filing or recording office in any federal, state, county, or other territory or jurisdiction in which any of the Debtors or their Affiliates is incorporated or has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Sale Order as of the

137915.000001\4938-4395-2794.6

Closing Date. On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, if any, in the Purchased Assets, as such Liens may otherwise exist. If any Person that has filed a financing statement, mortgage, mechanic's lien, lis pendens, or other statement, document, or agreement evidencing an Interest in any portion of the Purchased Assets (other than statements or documents with respect to Permitted Encumbrances or Assumed Liabilities) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases, and/or other similar documents necessary for the purpose of documenting the release of all Interests that such Person has in the Purchased Assets, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and/or other similar documents on behalf of such Person with respect to the Purchased Assets, (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order that, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests of any kind or nature in the Purchased Assets, and (c) the Buyer and the Debtors may seek in this Court, or any other court of appropriate jurisdiction, to compel the appropriate parties to execute termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Interests that such Person has in the Purchased Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

13. **Conditions Precedent**. The Debtors and the Buyer shall have no obligation to proceed with the Closing until all conditions precedent to their respective obligations to proceed have been met, satisfied, or waived in accordance with the terms of the APA.

137915.000001\4938-4395-2794.6

14. **Surrender of Purchased Assets**. Unless the Buyer otherwise consents, all Persons that are in or come into possession of any portion of the Purchased Assets, at any time prior to the Closing Date, are hereby directed to surrender possession of such Purchased Assets to the Buyer on the Closing Date, or at such time thereafter as the Buyer may request. Subject to the terms of this Sale Order, all Persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the APA and this Sale Order.

15. **Licenses and Permits**. Upon the Closing, Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in, to, and under the Assigned Permits and the Debtors shall be relieved from any further responsibility or liability with respect to the Assigned Permits arising on or accruing after the Closing (other than as expressly provided for in the APA and other Transaction Documents). Except as otherwise provided for in the Transaction Documents, the Buyer acknowledges and agrees that, from and after the Closing, it shall be responsible for complying with the terms of each Assigned Permit (other than any such terms that are deemed unenforceable under this Order).

16. To the maximum extent permitted under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any Assigned Permit (including pursuant to any Power of Attorney with respect to an Assigned Permit that cannot be transferred to Buyer on the Closing Date) , and all Assigned Permits are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

17. To the extent that any Assigned Permit or other license or permit necessary for the operation of the Debtors' business is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code or is otherwise unable to be transferred to

28

the Buyer on the Closing Date (each, an "**Untransferable Permit**"), the Buyer shall apply for and obtain a replacement for such Untransferable Permit promptly after the Closing Date, and such Untransferable Permit shall remain in full force and effect for the Buyer's benefit (until a new license or permit is obtained. The Debtors may, at their reasonable discretion, take all steps necessary to cooperate with the Buyer in connection with any such application as provided for in the APA or other Transaction Documents, as applicable.

18. No person or entity (including any Governmental Authority) may deny, revoke, suspend, condition, or refuse to issue or renew any permit, license, approval, agreement, or similar grant relating to the operation of the Purchased Assets on account of (a) the filing or pendency of these Chapter 11 Cases; (b) the consummation of the transactions contemplated by the APA and other Transaction Documents; or (c) the assumption, payment, guaranty, or other satisfaction of any obligation or liability of the Debtors by the Buyer or any other person or entity.

19. Any provision in any Assigned Permit that purports to require or impose any fees, penalties, fines, charges, deposits, or other payments, collateral, security, or guaranties as a result of or as a condition of the assignment of such Assigned Permit to the Buyer shall have no force and effect with respect to the transactions authorized by this Order, and such provisions are unenforceable under sections 363(l), 365(e)(1), 365(f), and/or 541(c)(1) of the Bankruptcy Code, as applicable.

20. **Assumption and Assignment**. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the applicable Debtors' assumption and assignment, to the Buyer, and the Buyer's acceptance of, the Assigned Contracts and Assigned Leases, on the terms set forth in the APA, is hereby approved, and the requirements of section 365(b)(1) and 365(f)(2) with respect thereto are hereby found and deemed

29

137915.000001\4938-4395-2794.6

to be satisfied. The Debtors are hereby authorized and, unless the Debtors and the Buyer otherwise agree, directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing Date, the Assigned Contracts and Assigned Leases free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities and as otherwise required pursuant to the APA) and (b) execute and deliver to the Buyer such documents or other instruments as Buyer deems may be necessary to assign and transfer the Assigned Contracts, Assigned Leases, and Assigned Permits to the Buyer.

21. **Ipso Facto Clauses Ineffective**. With respect to the Assigned Contracts and Assigned Leases, and with respect to the Sale of the Purchased Assets to the Buyer, (a) the Debtors may assume each of the Assigned Contracts and Assigned Leases in accordance with section 365 of the Bankruptcy Code, (b) the Debtors may assign each Assigned Contract or Assigned Lease in accordance with the APA and sections 363 and 365 of the Bankruptcy Code, and, to the extent provided in section 365 of the Bankruptcy Code, such assignment may occur notwithstanding and without giving effect to any provisions in any Assigned Contract or Assigned Lease that prohibit or condition the assignment of such Assigned Contract or Assigned Lease or allow the party to such Assigned Contract or Assigned Lease to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract or Assigned Lease, which provisions constitute unenforceable anti-assignment or ipso facto provisions which are void and of no force and effect, (c) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment, as applicable, to the Buyer of each Assigned Contract or Assigned Lease have been satisfied, and (d) effective upon the Closing Date, the Assigned Contracts and Assigned Leases shall be transferred and assigned to, and from and following the Closing Date remain in full force

30

and effect for the benefit of, the Buyer, notwithstanding any provision in any Assigned Contract

or Assigned Lease that prohibits, restricts, or conditions such assignment or transfer and, pursuant

to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability

with respect to the Assigned Contracts and Assigned Leases after such assumption and assignment

to the Buyer, except as provided in the APA. To the extent that any provision in any Assigned

Contract or Assigned Lease (y) prohibits, restricts, or conditions, or purports to prohibit, restrict,

or condition, such assumption and assignment or assignment (including, without limitation, any

"change of control" provision), or (z) is modified, breached, or terminated, or deemed modified,

breached, or terminated by any of the following: (i) the commencement of these Chapter 11 Cases,

(ii) the insolvency or financial condition of any of the Debtors at any time before the closing of

these Chapter 11 Cases, (iii) the Debtors' assumption and/or assignment of such Assigned Contract

or Assigned Lease, (iv) a change of control or similar occurrence, or (v) the consummation of the

Sale, then such provision shall be deemed modified so as not to entitle the non-Debtor party thereto

to prohibit, restrict, or condition such assumption and assignment or assignment, to modify,

terminate, or declare a breach or default under such Assigned Contract or Assigned Lease, or to

exercise any other default-related rights or remedies with respect thereto. With respect to the Sale

of the Purchased Assets to the Buyer, all such provisions constitute unenforceable anti-assignment

or ipso facto provisions that are void and of no force and effect pursuant to sections 365(b), 365(e),

and 365(f) of the Bankruptcy Code.

22. **Assumption and Assignment of Assumed Contracts; Cure**. All defaults or other

obligations of the Debtors under the Assigned Contracts and Assigned Leases arising or accruing

prior to the Closing Date, or required to be paid pursuant to section 365 of the Bankruptcy Code

in connection with the assumption and assignment of the Assigned Contracts and Assigned Leases,

31

shall be cured by the Debtors or the Buyer, as applicable, as set forth in the APA and this Sale Order.

23. All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts and Assigned Leases have been satisfied. Each of the Assigned Contracts and Assigned Leases shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms as of the Closing Date, subject to any amendments or modifications agreed to between a Counterparty to an Assigned Contract and Assigned Lease and the Buyer. Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assigned Contract or Assigned Lease, and each Assigned Contract or Assigned Lease shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited or modified by this Sale Order. To the extent provided in the APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

24. Upon payment of the Cure Costs pursuant to the terms hereof and the APA, and the Debtors' assignment of the Assigned Contracts and Assigned Leases to the Buyer under the provisions of this Sale Order, no default or other obligations arising prior to the Closing Date shall exist under any Assigned Contract or Assigned Lease, and each Counterparty to an Assigned Contract or Assigned Lease is forever barred, estopped, and permanently enjoined from (a) declaring a default by the Debtors or the Buyer under such Assigned Contract or Assigned Lease based on acts or occurrences arising prior to or existing as of the Closing Date, (b) raising or asserting against the Debtors or the Buyer, or the property of either of them, any assignment fee, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to

32

the Assigned Contracts and Assigned Leases, or (c) taking any other action against the Buyer as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Assigned Contract or Assigned Lease. Each counterparty to an Assigned Contract or Assigned Lease hereby is also forever barred, estopped, and permanently enjoined from (y) asserting against the Debtors or the Buyer, or the property of any of them, any default or Claim arising out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date and (z) imposing or charging against Buyer or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to Buyer of such Assigned Contract or Assigned Lease.

25. Subject to the terms and conditions of the APA, and upon the Closing Date, the Debtors and/or the Buyer (as applicable) shall have to the extent necessary (a) cured or provided adequate assurance of cure of, any default existing prior to the date hereof under the Assigned Contracts and Assigned Leases, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code and (b) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under the Assigned Contracts and Assigned Leases, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(B) of the Bankruptcy Code. The Debtors' and/or the Buyer's (as applicable) obligations to pay the Cure Costs under the APA and the Buyer's agreement to perform the obligations under the Assigned Contracts and Assigned Leases in accordance with the terms of the APA shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Counterparties.

33

137915.000001\4938-4395-2794.6

26. To the furthest extent permitted by law, any party that may have had the right to consent to the assumption or assignment of an Assigned Contract or Assigned Lease is deemed to have consented to such assumption and assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to timely object to the assumption or assignment of such Assigned Contract or Assigned Lease in accordance with the Bidding Procedures Order, and the Buyer shall be deemed to have demonstrated adequate assurance of future performance with respect to such Assigned Contract or Assigned Lease pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Any Counterparty to an Assigned Contract or Assigned Lease who has not timely filed and served an objection shall be barred from objecting, or asserting monetary or non- monetary defaults, with respect to any such applicable Assigned Contract or Assigned Lease, and such applicable agreement, if designated as an Assigned Contract or Assigned Lease in accordance with the terms of the APA, shall be deemed assumed by the Debtors and assigned to the Buyer on the Closing Date pursuant to this Sale Order.

27. To the extent a Counterparty to an Assigned Contract or Assigned Lease failed to timely object to the Cure Costs for any applicable Assigned Contract or Assigned Lease in accordance with the Bidding Procedures Order, such Cure Costs shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Costs at any time.

28. The requirements of Bankruptcy Rule 6006(f)(6) are hereby waived, for cause shown, with respect to the Motion and the relief requested therein.

29. Upon and as of the Closing Date, the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assigned Contract or Assigned Lease and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further

liability under the Assigned Contracts and Assigned Leases (except as may be required by the APA).

30. The Counterparties shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Purchased Assets.

31. From the date of the entry of this Sale Order, the Debtors may, with the consent of the Buyer, settle objections to assumption and assignment of any applicable Assigned Contract or Assigned Lease, including to proposed Cure Costs, without any further notice to or action by any party or order of this Court (including by paying any agreed Cure Cost); *provided that* notice to and consent of the Buyer shall be required to the extent that the Buyer is liable for such Cure Costs pursuant to the APA or the Buyer's rights and remedies are otherwise altered in any way by the resolution. Unless this Court orders otherwise, contemporaneously with the resolution of any such objection, the executory contract or unexpired lease underlying such objection shall be deemed an Assigned Contract or Assigned Lease without the necessity of obtaining any further order of this Court.

32. Notwithstanding anything to the contrary herein (but subject to paragraph 32 of this Sale Order), no executory contract or unexpired lease as to which a Counterparty to an Assigned Contract or Assigned Lease has timely filed and served an objection shall be considered an Assigned Contract or Assigned Lease under this Sale Order unless and until such timely objection to the assumption and assignment of such executory contract or unexpired lease has been resolved or overruled.

137915.000001\4938-4395-2794.6

33.     If a non-Debtor party to an Assigned Contract or Assigned Lease has objected solely to the proposed Cure Cost, the Debtors or the Buyer, as applicable, may pay the undisputed portion of such Cure Cost and place the disputed amount in a segregated account pending further order of the Court or mutual agreement of the parties. So long as such disputed amounts are held in such segregated account, the Debtors may, without delay, assume and assign such Assigned Contract or Assigned Lease to the applicable assignee in accordance with this Sale Order. Under such circumstances, the objecting non-Debtor counterparty's recourse shall be limited to the funds held in such segregated account on account of such Assigned Contract or Assigned Lease. In the event of a dispute as of, or after, the Closing Date regarding assumption and assignment or cure of any Assigned Contract or Assigned Lease, any applicable cure payments that are outstanding such respect to such Assigned Contract or Assigned Lease shall be made following the entry of an order resolving any such dispute (or upon the consensual resolution of such dispute as may be agreed by the Debtors or the Buyer, as applicable, and such non-Debtor counterparty).

34.     Nothing in this Sale Order, the Motion, or any other notice or any other document is or shall be deemed an admission by the Debtors or the Buyer that any contract is an executory contract or must be assumed and assigned pursuant to the APA or in order to consummate the Sale.

## IV.     No Successor Liability; Prohibition of Actions Against the Buyer

35.     **No Continuity**. The Buyer is not a "successor" to, a mere continuation of, or an alter ego of any of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Buyer and the Debtors by reason of any theory of law or equity. Neither the purchase of the Purchased Assets by the Buyer, nor the fact that the Buyer is using any of the Purchased Assets previously operated by the Debtors, will cause the Buyer to be deemed a successor to, combination of, or alter ego of, in any respect, any of the Debtors or the Debtors'

businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, de facto merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their Affiliates, or in any way relating to the operation of any of the Purchased Assets or ratings experience of the Debtors prior to the Closing Date, in each case other than the Permitted Encumbrances and Assumed Liabilities.

36. Except with respect to Permitted Encumbrances and Assumed Liabilities, the Buyer shall not have, assume, or be deemed to assume, or in any way be responsible for, any liability or obligation of any of the Debtors or their estates, or any of the Debtors' predecessors or Affiliates with respect to the Purchased Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise specifically agreed in the APA, the Buyer shall not have any liability, responsibility, or obligation for any Interests of the Debtors or their estates, including any claims, liabilities, or other obligations related to the Purchased Assets, including, for the avoidance of

37

doubt, and without limiting the generality of the foregoing, any Successor or Other Liabilities, which may become due or owing (a) prior to the Closing Date or (b) from and after the Closing Date but which arise out of or relate to any act, omission, circumstance, breach, default, or other event occurring prior to the Closing Date.

37.     Except with respect to Permitted Encumbrances and Assumed Liabilities, or as otherwise specifically set forth in the APA, all Persons (including all debt holders, equity holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, contract counterparties, customers, landlords, licensors, and employees), and other holders of Interests against or in any of the Debtors or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, known or unknown, contingent or noncontingent, liquidated or unliquidated, senior or subordinate, asserted or unasserted, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing, or the transfer of the Purchased Assets to the Buyer (including, without limitation, any Successor or Other Liabilities or rights or claims based thereon) shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing against the Buyer, or their respective assets or properties, including, without limitation, the Purchased Assets, the Interests of any kind or nature whatsoever such Person had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Purchased Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding) against the Buyer, or their respective assets or

38

properties, including the Purchased Assets; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, or their respective assets or properties, including the Purchased Assets; (c) creating, perfecting, or enforcing any Interest against the Buyer, or their respective assets or properties, including the Purchased Assets; (d) asserting any setoff, or right of subrogation, of any kind against the Buyer or its respective assets or properties, including the Purchased Assets; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) to the extent prohibited by section 525 of the Bankruptcy Code, revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

38. Except with respect to Permitted Encumbrances and Assumed Liabilities, or as provided in the APA, and without limiting other applicable provisions of this Sale Order, the Buyer is not, by virtue of the consummation of the Sale, assuming, nor shall it be liable or responsible for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) in any way whatsoever relating to or arising from the Debtors, the Purchased Assets, or the Debtors' operation of their businesses or use of the Purchased Assets on or prior to the Closing Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Closing Date or are to be observed, paid, discharged, or performed on or prior to the Closing Date (in each case, including, without limitation, Successor or Other Liabilities and any liabilities that result from, relate to, or arise out of tort or product liability claims), or any liabilities calculable by reference to the Debtors or their assets or operations (including by reference to the Debtors'

experience or similar ratings), or relating to continuing conditions existing on or prior to the Closing Date, including with respect to any of the Debtors' predecessors or Affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to Successor or Other Liability.

39. None of the Buyer nor any of its affiliates, equityholders, successors, and assigns, nor any of their professionals shall have, incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and other Transaction Documents and the entry into and consummation of the Sale, except as expressly provided in the APA and this Sale Order. Neither the Debtors, nor any of their respective affiliates, equityholders, successors, and assigns, nor any of their professionals shall have, incur any liability to, or be subject to any action by, the Buyer arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and other Transaction Documents and the entry into and consummation of the Sale, except as expressly provided in the APA and this Sale Order.

## V. Other Provisions

40. **<u>Good Faith of Buyer</u>**. The transactions contemplated by the APA and this Sale Order are undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not alter, affect, limit, or otherwise impair the validity of the Sale (including the assumption, assignment, and/or transfer of the Assigned Contracts and Assigned Leases), unless such authorization and consummation of the Sale are duly stayed pending such appeal. The Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full

40

137915.000001\4938-4395-2794.6

rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. As a good faith purchaser of the Purchased Assets, the Buyer has not entered into any agreement with any other potential bidders and has not colluded with any potential or actual bidders, and therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Buyer, and the Sale may not be avoided, pursuant to section 363(n) of the Bankruptcy Code.

41. **Back-Up Bidder**. [BACK-UP BIDDER] is hereby approved as the Back-Up Bidder and [BACK-UP BIDDER]'s bid is hereby approved and authorized as the Back-Up Bid. Pursuant to the Bidding Procedures Order, the Back-Up Bidder is directed to keep its bid open for acceptance by the Debtors until the date which is the earlier of (i) sixty (60) days following the entry of this Sale Order, (ii) consummation of the Transaction(s) with the Buyer, and (iii) the release of such Back-Up Bid in writing by the Debtors (in consultation with the Consultation Parties) (the "**Back-Up Termination Date**"). If the APA of the Successful Bidder terminates in accordance with its terms, so long as the Back-Up Termination Date has not occurred, the Debtors, in consultation with the Consultation Parties, are authorized to consummate the Transaction(s) with the Back-Up Bidder without further order of this Court, upon twenty-four (24) hours' advance notice filed with the Court, and the Back-Up Bidder and the Back-Up Bid shall be entitled to all of the findings and protections of this Sale Order, in all respects, provided to the Buyer. Notwithstanding the foregoing, affected landlords or contract counterparties shall have seven (7) days from the filing of a notice of intent to proceed with the Back-Up Bidder to object to the approval of the assumption and assignment of any contract or lease by the Back-Up Bidder.

42. **Bulk Sales, Bulk Transfer, or Similar Laws**. No "bulk sales," "bulk transfer," or any similar law (including without limitation those relating to taxes) of any state or other

41

jurisdiction shall apply in any way to the transactions authorized herein, including without limitation the APA and Sale.

43. **Bankruptcy Rules Satisfied or Waived**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6006(d) are hereby expressly waived and shall not apply. Time is of the essence in closing the Sale. Accordingly, the Debtors and Buyer are authorized and empowered to close the Sale immediately upon entry of this Sale Order.

44. **Failure to Specify Provisions**. The failure to include or specifically reference any particular provision of the APA and other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA and other Transaction Documents be authorized and approved in their entirety.

45. **Conflicts**. To the extent that this Sale Order is inconsistent with the Motion, the terms of this Sale Order shall control and govern. To the extent that there are any inconsistencies between the terms of this Sale Order, on the one hand, and the APA and other Transaction Documents, on the other hand, the terms of this Sale Order shall control and govern. To the extent that any plan of reorganization or liquidation, or any order of any type or kind entered in these Chapter 11 Cases or any subsequent chapter 7 case into which these Chapter 11 Cases may be converted, conflicts with or derogates from the terms of the APA (or any ancillary agreements or instruments delivered pursuant thereto) or this Sale Order, the terms of the APA (or any ancillary agreements or instruments delivered pursuant thereto) and this Sale Order shall control and govern to the extent of any such conflict or derogation. Unless otherwise provided herein, to the extent

42

this Sale Order is inconsistent with the Bidding Procedures Order or the terms of the APA, this Sale Order shall govern.

46. **Transaction Document Modifications**. The APA and other Transaction Documents may be modified, amended, or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof without further notice to or order of this Court, so long as any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates and does not otherwise conflict with this Sale Order; *provided, however*, that notice shall be provided to the Committee.

47. **Automatic Stay**. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, without the need for further order of this Court, to allow the Buyer and the Debtors to deliver any notice provided for in the APA and to allow the Buyer and the Debtors to take any and all actions permitted under the APA and other Transaction Documents.

48. **Further Assurances**. From time to time, as and when requested by the other, the Debtors and the Buyer, as the case may be, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including, such actions as may be necessary to vest, perfect or confirm, record, or otherwise, in the Buyer its right, title, and interest in and to the Purchased Assets and the Assigned Contracts and Assigned Leases, subject to the provisions of the APA.

49. **Retention of Jurisdiction**. This Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the APA and other Transaction Documents, and any amendments thereto and any waivers and

43

consents given thereunder, and to adjudicate, if necessary, any and all disputes concerning or in any way relating to the Sale, including retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Buyer, (b) interpret, implement, and enforce the provisions of this Sale Order, including the injunctions and limitations of liability set forth in this Sale Order, (c) decide any disputes concerning this Sale Order and the APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APA and this Sale Order including the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets and any Assigned Contract or Assigned Lease and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Interests (other than the Permitted Encumbrances and the Assumed Liabilities) and the resolution of the Preserved Objections, and (d) enter any orders under sections 105, 363, and 365 of the Bankruptcy Code, or otherwise, with respect to the Purchased Assets and the Assigned Contracts and Assigned Leases.

# # # END OF ORDER # # #

Order submitted by:

Charles A. Beckham, Jr. (TX #02016600)
Ian T. Peck (TX #24013306)
Martha Wyrick (TX #24101606)
**HAYNES AND BOONE, LLP**
2801 N. Harwood Street
Suite 2300
Dallas, TX 75201
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
Email: charles.beckham@haynesboone.com
        ian.peck@haynesboone.com
        martha.wyrick@haynesboone.com

Vincent E. Lazar (admitted *pro hac vice*)
Derek L. Wright (admitted *pro hac vice*)
Angela M. Allen (admitted *pro hac vice*)
**JENNER & BLOCK LLP**
353 N. Clark Street
Chicago, Illinois 60654

44

137915.000001\4938-4395-2794.6

Telephone: (312) 222-9350
Facsimile: (312) 527-0484
Email: vlazar@jenner.com
       dwright@jenner.com
       aallen@jenner.com

*Counsel to the Debtors and Debtors in Possession*

45

**Exhibit A**

**APA**

137915.000001\4938-4395-2794.6

# **Exhibit B**

## **Preserved Objections**

**Exhibit D**

**Form of Patient Records Custody Agreement**

<u>**FORM OF**</u>
<u>**PATIENT RECORDS CUSTODY AGREEMENT**</u>

This PATIENT RECORDS CUSTODY AGREEMENT (this "<u>Agreement</u>") is made and entered into as of this [●] (the "<u>Effective Date</u>"), by and between [●] (collectively, "<u>Asset Sellers</u>") and [●] ("<u>Buyer</u>").  Asset Sellers, on the one hand, and Buyer, on the other hand, are individually referred to herein as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Except as set forth herein, all capitalized terms not otherwise defined herein shall have the meaning ascribed to them in that certain Asset Purchase Agreement dated March 31, 2026 between the Omnicare, LLC, a Delaware limited liability company ("<u>Seller</u>"), the subsidiaries of Seller party thereto, and Buyer (the "<u>APA</u>").

**RECITALS**

**WHEREAS,** Asset Sellers are engaged in the provision of prescription drug distribution services, medication management services, and pharmaceutical consulting services to assisted living facilities, skilled nursing facilities, and facilities within the Mental Health Group Home segment and Intermediate Care Facilities for Individuals with Intellectual and Developmental Disabilities segment of Asset Sellers (collectively, the "<u>Business</u>"), which services include (i) dispensing, packaging, labeling, and delivering prescription medications and over-the-counter medications, (ii) providing clinical pharmacy services, medication therapy management, and medication review services, (iii) providing pharmacy consulting services related to regulatory compliance, formulary management, and drug utilization review, (iv) infusion therapy services and specialty infusion services, (v) dispensing of medical supplies, durable medical equipment, and other similar healthcare-related products, and (vi) acting as a pharmaceutical repackager;

**WHEREAS**, as part of the transactions contemplated under the APA, effective as of the Closing Date of the APA, Asset Sellers seek to transfer all of  Transferred Records (as defined in the APA) to Buyer via the Migration (as that term is defined in the APA) as contemplated by the APA (the date on which the Migration is successfully completed (the "Migration Date");

**WHEREAS**, pursuant to the terms hereof, Buyer acknowledges and agrees to the transfer of such Transferred Records effective as of the Closing Date upon the terms and conditions set forth herein;

**WHEREAS**, Buyer is desirous of receiving the Transferred Records to serve as records custodian for the Transferred Records and, effective as of the Closing Date and, after the Migration Date, will accept responsibility for the Transferred Records in accordance with the terms hereof; and

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **<u>Custodial Agreement</u>.**

   a.      <u>Title</u>.  The Parties acknowledge, to the extent permissible pursuant to applicable Law, that, effective as of the Closing Date, the Transferred Records shall be the property of Buyer,

4902-0151-3369.v16

provided that Asset Sellers shall continue to serve as the record custodian and be responsible and liable for the Transferred Records until the Migration Date in each Asset Seller's capacity as a independent covered entity under HIPAA (as defined under the APA). To the extent permissible pursuant to applicable Law, effective as of the Closing Date, Asset Sellers hereby assign and transfer to Buyer all of Asset Sellers' ownership rights in and to the Transferred Records. Asset Sellers represent and warrant that they have the full right and authority to transfer the Transferred Records and that the Transferred Records were created, maintained, used, disclosed, and transferred in compliance with applicable Law. Asset Sellers shall use best efforts to ensure that all Transferred Records are correct and contain accurate information. Upon transfer of the Transferred Records as of the Migration Date, Buyer shall be responsible for maintenance, archiving and safekeeping of the Transferred Records during the Retention Period (as hereinafter defined) as contemplated under the APA and shall maintain and use the Transferred Records in compliance with HIPAA and HITECH (as those terms are defined in the APA), including but not limited to 45 C.F.R. Parts 160 and 164 Subparts A and E (the "Privacy Rule"), Subparts A and D (the "Breach Notification Rule") and Subparts A and C (the "Security Rule"), and all other applicable federal and state laws (collectively herein the "HIPAA Regulations") in its capacity as an independent covered entity.

b. <u>Records Custodian Designation</u>. The Parties acknowledge and agree that this Agreement is intended to and shall constitute the written agreement and documentation of Buyer's role as custodian of records of the Transferred Records as of the Migration Date, including without limitation, any designation and/or documentation requirements as set forth in applicable Law, including without limitation and to the extent applicable, State Board of Pharmacy regulations. Asset Sellers shall provide Buyer, on or before the Closing Date, a schedule identifying the jurisdictions applicable to the Transferred Records.

c. <u>Scope of Agency</u>. Buyer shall maintain the Transferred Records following the Closing Date for the minimum period required by Law (the "Retention Period"). During the Retention Period (following the Migration Date), Buyer agrees that:

i. Buyer shall provide Asset Sellers and their Affiliates at Asset Sellers' sole cost, copies of the Transferred Records as reasonably may be needed for purposes of: (i) providing Transition Services to the patients who are the subjects of the Transferred Records, (ii) providing expert testimony, consultation, audit, quality assurance, investigation or other proceeding by any third party payor or Governmental Authority involving Asset Sellers or any of their Affiliates; (iii) the defense of any legal proceeding brought against Asset Sellers or any physicians or Affiliates; or (iv) responding to legal, governmental, or professional inquiry regarding services rendered to patients prior to the Closing (as that term is defined in the APA). All requests for copies of records shall be made in writing, shall describe the specific records requested and the purpose of the request.

ii. Following the Closing Date and until the Migration Date, Asset Sellers shall maintain the confidentiality of all of the Transferred Records using reasonable security safeguards, and shall be permitted only to use and disclose information from the Transferred Records as permitted by the terms of this Agreement (including for the

2

purposes set forth in the foregoing clause (i)) or as required by Law, including without limitation, HIPAA and the HIPAA Regulations and applicable state Law.

iii.     Following the Migration Date, Buyer shall maintain the confidentiality of all of the Transferred Records.

iv.     Asset Sellers shall remain responsible for responding to patient requests for the Transferred Records received prior to the Migration Date. Following the Migration Date, Buyer shall process all requests for release of copies of or to access Transferred Records pursuant to applicable legal requirements, HIPAA and the HIPAA Regulations and applicable state Law.

v.     Asset Sellers shall notify Buyer promptly, and in no event later than two Business Days after discovery, of any unauthorized access, use, or disclosure of the Transferred Records following the Closing Date until the Migration Date that would result in a Material Adverse Effect (as the term is defined in the APA).

vi.     To the extent permitted under HIPAA and HIPAA Regulations and applicable state Law Buyer may use and disclose Transferred Records for "payment", "treatment" and "health care operations" purposes (as such terms are defined under HIPAA), or other lawful purposes so long as such uses and disclosures occur in a manner consistent with applicable Law.

d.     <u>Retention</u>.  Buyer's obligations under this Agreement shall continue as to each Transferred Record, including all copies or extracts thereof, in whatever media format the Transferred Record may be retained, until the end of the Retention Period. Nothing herein shall prohibit Buyer from transferring the Transferred Records and/or destroying the Transferred Records following the end of the applicable minimum retention period required by Law or regulation to the extent such transfer and/or destruction of Transferred Records is consistent with applicable Law.

2. **Patient Notice.**  Asset Seller shall develop and send,  at Asset Sellers' sole expense,  a notice to the patients who receive or received services from Asset Sellers in accordance with applicable Law,  which notice shall be subject to Buyer's review and approval, which shall not be unreasonably withheld, informing such patients of the relationship between the Parties, with such notice detailing that: (i) Buyer or its respective Affiliate or agent will maintain custody of the Transferred Records, and (ii) that a copy of the Transferred Records of a patient will be sent to any other provider or entity upon such patient's written direction, at Asset Sellers' expense (if prior to Migration Date), at Buyer's expense (if after Migration Date), or the patient's expense, as appropriate.

3. **Migration of Records.**  Asset Sellers and Buyer have agreed to  the Migration of Transferred Records as set forth in the APA. Upon completion of the Migration of the Transferred Records, Asset Sellers shall no longer maintain a copy of the Transferred Records and shall destroy or remove the Transferred Records in a compliant manner in accordance with applicable Law.

**4. Confidentiality.** This Agreement shall be maintained in confidence by the Parties and shall not be disclosed to any third party, except as required by Law or in connection with the administration of the Chapter 11 Cases.

**5. Compliance.** Asset Sellers and Buyer shall comply in all material respects with all applicable Federal and state statutes, rules, regulations and with the standards of any and all Governmental Authorities and regulatory and/or accreditation bodies with jurisdiction over Asset Sellers and Buyer, their operations and activities. The Parties agree that this Agreement should be construed and the Parties agree to take such actions as may be necessary to administer this Agreement, and shall at all times act in a manner consistent with and in compliance with applicable Law or regulation. Failure by Asset Sellers or Buyer to comply with any applicable Law or regulation with respect to matters related to this Agreement shall be considered a material breach of the Agreement.

    a. Asset Sellers agrees that they shall remain the sole medical record custodian for the Transferred Records and shall maintain all liability associated therewith until the Migration Date, including without limitation any liability related to Breaches, Security Incidents (as such terms are defined under HIPAA), violations of HIPAA, failure to provide timely access to the Transferred Records, or failure to comply with information blocking requirements as set forth in the regulations promulgated pursuant to the 21st Century Cures Act (together, "Record Regulatory Liability").

    b. Buyer agrees that it shall be the sole medical record custodian for the Transferred Records and shall maintain all liability associated therewith following the Migration Date, including without limitation any Record Regulatory Liability.

    c. Buyer acknowledges that if, and to the extent applicable: (i) for the limited purpose of providing custodial services for Transferred Records identified by Asset Sellers as subject to 42 C.F.R. Part 2 ("Part 2") (collectively, "Part 2 Records"), Buyer is fully bound by Part 2; and (ii) if necessary, Buyer will resist in judicial proceedings any efforts to obtain access to "patient identifying information" related to "substance use disorder" "diagnosis," "treatment," or referral for treatment except as permitted by Part 2 (as such terms are defined in Part 2). The Parties acknowledge that, if and to the extent applicable, Buyer's obligations under this Agreement, as well as obligations as a "qualified service organization" (as that term is defined in Part 2) with regard to Part 2 Records, shall terminate with regard to Part 2 Records as the right, title, and interest in and to such Part 2 Records is transferred to Buyer pursuant to Section 1.a.

**6. Miscellaneous.**

    a. Governing Law; Venue. This Agreement and all actions (whether at law, in contract, in tort or otherwise) arising out of or relating to this Agreement, the negotiation, validity or performance of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws except to the extent the law of the State of New York is superseded by Chapter 11 of Tittle 11 of the United States Code, 11 U.S.C. §§ 101-1532. All actions and

proceedings (whether at law, in contract, in tort or otherwise) arising out of or relating to this Agreement, the negotiation, validity or performance of this Agreement shall be heard and determined in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") and, to the extent the Bankruptcy Court does not have or does not accept jurisdiction to adjudicate such matter may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in New York County, State of New York, and the Parties irrevocably submit to the jurisdiction of such courts (and, in the case of appeals, the appropriate appellate court therefrom), in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.

b.   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument, such counterparts acceptable by original signature, facsimile transmission (whether directly from one facsimile device to another by means), electronic communication (email or .pdf), photocopy or any combination thereof.

c.   Successors.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, executors, administrators and permitted assigns.

d.   Assignment.  This Agreement, and the rights or obligations contained herein, shall not be assigned by any Party without the prior consent of the other Parties, which consent may not be unreasonably withheld, conditioned or delayed.

e.   Notices.  Notices under this Agreement shall be given in writing and shall be deemed effectively given when personally delivered, one day after being deposited with nationally recognized overnight courier, or three days after being deposited in the United States mail, certified /return receipt requested, postage prepaid, to the following addresses or to such other address as may be specified in a notice to the other Party in accordance with this Section 6(e).

if to Asset Sellers:                              [Insert]

with a copy, which does not constitute
notice, to:

5

if to Buyer:                                    [Insert]


with a copy, which does not constitute
notice, to:


     f.  <u>Amendment</u>.  Unless otherwise specifically provided in this Agreement, this Agreement may not be amended, modified or assigned, in whole or in part, without the written consent of all of the Parties.

     g.  <u>Severability</u>.  Should any provision of this Agreement or application thereof be held invalid or unenforceable, the remainder of this Agreement shall not be affected and shall continue to be valid and enforceable to the fullest extent permitted by law unless to do so would defeat the purpose of this Agreement.

     h.  <u>Waiver</u>. The failure by any Party at any time to require performance of any provision of this Agreement shall not constitute a waiver of such provision and shall not affect the right of such Party to require performance at a later time.

     i.  <u>Integration</u>.  This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter contained herein and supersedes and voids any previous agreements or understandings between the Parties hereto as to the subject matter of this Agreement.


*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the Effective Date set forth above.

ASSET SELLERS


By: _____
Print Name: _____
Title: _____

BUYER


By: _____
Print Name: _____
Title: _____

**Exhibit E**

**Form of Power of Attorney**

# FORM OF
# POWER OF ATTORNEY

## LIMITED POWER OF ATTORNEY
## FOR USE OF DEA REGISTRATION NUMBER, DEA ORDER FORMS, AND OTHER
## PERMITS

[Entity] ("Entity") located at [Address] ("Registrant"), is licensed to operate a pharmacy and/or act as a pharmaceutical repackager (the "Business") under the laws of the State of [State] and is an active registrant with the Drug Enforcement Administration ("DEA").

As a result of a transaction to be effective as of [Effective Date] ("Transaction"), Registrant will transfer certain of its assets related to the Business to [new operating entity]. For the purposes of this Limited Power of Attorney, [new operating entity] as it exists and operates after the Transaction shall be deemed the "Agent."

Registrant hereby has made, constituted, and appointed, and hereby make, constitute and appoint Agent as Registrant's agent and true and lawful attorney-in-fact for the purposes of utilizing Registrant's controlled substances registrations, DEA registration, and any other licenses, permits, and registrations required under the laws of the United States or the state pharmacy boards to continue Business operations for Registrant (collectively, the "Permits"), as specifically listed in Exhibit 1.  Agent may act in this capacity until such time as Agent or its designee obtains new controlled substances registration(s), DEA registration(s) and such other Permits for Agent, but in no event shall this Limited Power of Attorney continue more than ninety (90) calendar days after the effective date of the Transaction, unless, despite Agent's good faith efforts, the issuance of new controlled substances registrations, DEA registrations and such other Permits for Agent is delayed by the applicable governmental agency.  Registrant further grants this Limited Power of Attorney to Agent to act as the true and lawful agent and attorney-in-fact of Registrant, and to act in the name, place, and stead of Registrant, to execute renewal applications, to execute applications for books of official order forms, to sign such order forms in requisition for controlled substances whether on official order forms or electronic, and to appoint an appropriate designee to execute applications for books of official order forms and sign such order forms in requisition for controlled substances whether these orders be on official order forms or electronic, in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. § 828) and Part 1305 of Title 21 of the Code of Federal Regulations.

Registrant recognizes it remains legally responsible for its controlled substances registration(s), DEA registration and other Permits during the period in which this Limited Power of Attorney is in effect.  Therefore, Registrant grants this Limited Power of Attorney based upon the following covenants and warranties of Agent: (a) Agent shall follow and abide by and comply with all federal and state laws governing the regulation of controlled substances and pharmacy practice at all times while utilizing this Limited Power of Attorney; and (b) Agent, or its designee, shall make application for and pursue its own controlled substances registration(s), DEA registration and other Permits required for the distribution of pharmaceuticals, including, but not limited to, controlled substances at the Registrant's location as soon as practicable.

4921-8405-0844.v2

The undersigned is authorized to sign the current application for registration of Registrant under the Controlled Substances Act.

IN WITNESS WHEREOF, Registrant and Agent have executed this Limited Power of Attorney as of [DATE].

REGISTRANT

_____
WITNESS

By:
Name: _____
Title:

_____
WITNESS

AGENT

By:                                          _____
Name: _____   WITNESS
Title:

_____
WITNESS

EXHIBIT 1 TO LIMITED POWER OF ATTORNEY


[List of controlled substances registrations, DEA registration, and Permits to be inserted]

**Exhibit F**

**Initial Draft of Transition Services Agreement**

FORM OF

**TRANSITION SERVICES AGREEMENT**

This TRANSITION SERVICES AGREEMENT (this "**Agreement**"), is dated as of [●], by and among CVS Pharmacy, Inc., a Rhode Island corporation ("**CVS**"), Omnicare, LLC, a Delaware limited liability company ("**Omnicare**"), and [●], a [●] ("**Buyer**"). CVS, Omnicare, and Buyer are each individually referred to herein as a "**Party**," and collectively referred to herein as the "**Parties**."

RECITALS

A.     On September 22, 2025 (the "**Petition Date**"), Omnicare filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Bankruptcy Court**").

B.     Reference is made to that certain Asset Purchase Agreement made by and among Buyer, on the one hand, and Omnicare and the subsidiaries of Omnicare party thereto, on the other hand, dated March 31, 2026, (the "**Purchase Agreement**"), pursuant to which, among other things, at the Closing (as defined in the Purchase Agreement), Omnicare agreed to sell certain assets of the Business (as defined in the Purchase Agreement) to Buyer.

C.     The Purchase Agreement provides that, in connection with the consummation of the transactions contemplated thereby, the Parties will enter into this Agreement pursuant to which CVS, Omnicare, or their Affiliates (as defined in the Purchase Agreement) (each, in such capacity, a "**Service Provider**") will provide to Buyer (the "**Service Recipient**") certain transitional services during a transition period beginning on the Effective Date.

D.     On [●], the Bankruptcy Court entered an order (the "**Sale Order**") approving the Purchase Agreement and authorizing Omnicare to consummate the transactions contemplated thereunder upon the terms and subject to the conditions set forth in the Purchase Agreement and the Sale Order.

E.     In connection with the closing of the transactions contemplated by the Purchase Agreement, Omnicare is selling, transferring, and assigning to Buyer, and Buyer is acquiring and assuming from Omnicare, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and the Sale Order, the Purchased Assets and Assumed Liabilities (each as defined in the Purchase Agreement) upon the terms and subject to the conditions set forth therein.

F.     To facilitate the continued operation of the Business by Buyer, from and after the Closing, the Parties desire to set forth the terms and conditions for transitional services by entering into this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by the Parties as follows:

1.      Definitions. Capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Purchase Agreement. As used in this Agreement, the following capitalized terms shall have the following meanings:

"**Effective Date**" means the Closing Date under the Purchase Agreement.

"**Excluded Services**" means any service not set forth on Exhibit A, and includes without limitation the services described on Exhibit B hereto, all of which services are explicitly excluded from the scope of Services provided hereunder.

"**Insolvency Event**" means, with respect to any Person, (a) such Person commencing a voluntary case or other proceeding, or an involuntary case or other proceeding being commenced against such Person and remaining undismissed and unstayed for a period of sixty (60) days, in either case, seeking relief with respect to such Person or its debts under any applicable bankruptcy, reorganization, insolvency or other applicable Law now or hereafter in effect or seeking the appointment of a trustee, receiver or liquidator, custodian or other similar official of such Person or any substantial part of its property, (b) such Person consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, (c) such Person admitting in writing its inability to pay its debts generally as they become due or generally failing to pay such debts as they become due, (d) such Person making or consenting to any assignment of any material portion of its assets for the benefit of creditors or (e) corporate dissolution of such person.

"**Transition Period**" means, with respect to each Service, the duration of such Service as set forth on Exhibit A, including the commencement date (which, unless stated otherwise, shall be the Effective Date) and the date on which such Service terminates.

2.      Services.

2.1     Provision of Services. During the applicable Transition Period and subject to the terms and conditions contained in this Agreement and as further set forth on Exhibit A hereto, CVS or Omnicare, as applicable, shall use, or shall cause the applicable Service Provider to use commercially reasonable efforts to provide (or, to the extent permitted by this Agreement, procure the provision) to Buyer the services described on Exhibit A hereto (each, a "**Service**," and collectively, the "**Services**"), which Exhibit A shall set forth, with respect to each Service (i) the Service Provider entity for such Service, (ii) a description of the Service to be provided, (iii) the Transition Period applicable to such Service, (iv) the fees, if any, for such Service, and (iv) such other terms and conditions that are applicable to such Service.

2.2     Precedence. Each Service shall be subject to the terms of this Agreement; provided that, in the event that Exhibit A contains a provision with respect to such Service that conflicts with the provisions set forth in this Agreement, such provision of Exhibit A shall prevail, but only to the extent such provision of Exhibit A expressly states that it controls over the Agreement and only with respect to the applicable Service.

- 2 -

2.3     Subcontracting.    Service Provider may subcontract its obligations to perform any Service to any of Service Provider's Affiliates or to any third party (such third party, a "**Third Party Service Provider**").

2.4     Performance Standards.    Service Recipient acknowledges that Service Provider is not in the business of providing Services in the manner contemplated in this Agreement. Each Service Provider shall perform the respective Services (a) if such Services were provided by Service Provider prior to the Effective Date and Service Provider is able to provide such Services in substantially the same manner after the Effective Date, in the manner, to the extent and at a time that is substantially consistent with the manner in which such Service Provider provided or caused to be provided such Services immediately prior to the Effective Date; (b) in accordance with applicable Law and the terms and conditions of this Agreement; and (c) in accordance with any other terms or conditions specified in Exhibit A.

2.5     Use of Services.    Service Recipient's usage of the Services, including with respect to purpose, scope, manner and volume, shall be in full compliance with applicable Law and, to the extent applicable, be substantially consistent with the usage of similar services in the time period immediately preceding the Closing by the Business. Service Recipient shall not resell any Services to any Person or permit the use of the Services by any Person other than Service Recipient. In no event shall Service Provider be obligated to provide any Service to Service Recipient for any purpose other than to facilitate, on a transitional basis, Service Recipient's ability to conduct the Business as substantially conducted immediately preceding the Effective Date.

2.6     Limitation on Services.    Except as expressly set forth in Exhibit A with respect to a specific Service, in providing the Services, Service Provider shall not be obligated to: (a) hire any additional employees; (b) maintain the employment of any specific employee(s); (c) purchase, lease or license any additional equipment or software; (d) make any capital investment to provide or continue providing the Services; (e) apply for any licenses, permits authorizations or approvals, if any, in connection with the Services set forth in Exhibit A; or (f) renew or renegotiate any Third Party Agreement (defined below) or enter into a new or replacement contract for the services or items provided pursuant to any Third Party Agreement.

Service Provider shall have the right, in its sole discretion, to (x) designate which personnel it will assign to perform the Services, and (y) remove and replace such personnel at any time. All employees and other Representatives of Service Provider shall be deemed for all purposes (including compensation and employee benefits) to be employees or Representatives solely of Service Provider and not to be Representatives of Service Recipient. In performing their respective duties hereunder, all such Representatives of Service Provider shall be under the direction, control and supervision of Service Provider (and not of Service Recipient), and Service Provider shall have the sole right to exercise all authority with respect to the engagement (including termination of engagement), assignment and compensation of such Representatives.

2.7     Transitioning.    Not later than [XX] days following the date hereof, Buyer shall prepare and deliver to CVS and Omnicare the principles and milestones with respect to the separation of the Business from the services to be provided under this Agreement ("**Migration Principles and Milestones**"). Service Recipient shall use commercially reasonable efforts to

- 3 -

reduce or eliminate Service Recipient's dependencies on the Services as soon as reasonably practicable, but in any event no later than the expiration of the term applicable to each respective Service. Without prejudice to the foregoing, Buyer shall, within [XX] days of the Closing, prepare a migration plan describing the orderly transfer of the Services from Service Provider to the Service Recipient upon termination of this Agreement based on the Migration Principles and Milestones ("**Migration Plan**"). CVS and Omnicare, as applicable, shall reasonably cooperate with Buyer in preparation of the Migration Plan. The Parties shall review and update the Migration Plan on a regular basis during the Term as may be necessary.

2.8    Interruption of Services. Service Provider may cease or suspend providing the applicable Services to Service Recipient if and to the extent such suspension is (a) required by or necessary to comply with applicable Law, (b) necessary due to regularly scheduled maintenance, alterations, repairs or replacements with respect to the applicable Services or the facilities used to provide such Services, (c) necessary due to emergency maintenance, alterations, repairs or replacements with respect to the applicable Services or the facilities used to provide such Services, or (d) necessary due to termination or non-renewal of a Third Party Agreement (defined below).   In addition, Service Provider may cease or suspend providing a Service to the extent Service Recipient is in material breach of (a) the terms of this Agreement with respect to such Service, or (b) applicable Law, and in each case has failed to cure such breach within fifteen (15) days (or, in the case of any payment default, within ten (10) days) following the receipt of written notice from Service Provider describing in reasonable detail such breach. Notwithstanding the foregoing, no failure or delay by Service Provider in exercising any right under this Section 2.8 shall operate as a waiver of rights hereunder or under Section 6.3, nor shall any single or partial exercise of such rights preclude any other or further exercise of such rights or the exercise of rights under Section 6.3.

2.9    Transitional Nature of Services. The Parties acknowledge that the Services are transitional in nature and that each Service Provider may implement changes or modifications to the Services from time to time, provided that (a) Service Recipient is treated in a non-discriminatory manner with respect to such implementation compared to other businesses of Service Provider receiving substantially the same services as such Services provided to Service Recipient by Service Provider, and (b) Service Provider notifies Service Recipient of such changes or modifications in substantially the same manner (in content and timing) compared to other businesses of Service Provider receiving substantially the same services as such Services provided to Service Recipient by Service Provider.

2.10    Access. Service Recipient shall provide to the applicable Service Provider (a) information and materials reasonably requested by such Service Provider, (b) reasonable access to its premises, facilities, information, equipment and personnel, and (c) other cooperation and assistance, in each case under clauses (a) to (c), to the extent required or reasonably necessary for such Service Provider to provide the applicable Services to Service Recipient or as set forth in Exhibit A with respect to such Service.

2.11    Dependence on Service Recipient. Service Recipient acknowledges and agrees that Service Recipient's timely provision of the information, materials, access or other cooperation described in Section 2.10 is essential to the performance of each of the Services it

receives.  CVS, Omnicare, and the applicable Service Provider shall not be liable in any way for any deficiency, failure or delay in performing the applicable Services to the extent resulting from any Service Recipient's failure to comply with Section 2.10.

2.12    Impossibility.  Service Provider shall not be required to provide or cause to be provided any Service if (i) the performance of such Service is made impossible due to any act or omission of Service Recipient or any of its Affiliates, or (ii) providing such Services violates or, in Service Provider's opinion, would reasonably be expected to violate any applicable Law.

3.    Services Management.

3.1    Service Managers.  Exhibit A shall designate an individual as a principal Service Manager for operational communications between each Service Provider and Service Recipient concerning Services to be provided hereunder (the "**Service Manager**").  Service Provider or Service Recipient may, in its sole discretion, replace its Service Manager from time to time by providing written notice of such replacement to the Service Recipient or Service Provider, as the case may be, together with the relevant contact information for the individual replacing the then-current Service Manager.

3.2    Problem Resolution.  In the event a problem or issue arises in connection with a Service, good faith telephonic negotiations shall be conducted between Service Provider's and Service Recipient's respective Service Managers (or such Service Manager's designee) within ten (10) Business Days following a written request from either Service Provider or Service Recipient.  If the Service Managers (or his or her designee) are unable to resolve such problem or issue within ten (10) Business Days after the Service Provider and Service Recipient have commenced such discussions, then either Service Provider or Service Recipient, by written request to the other party, may request that such problem or issue be referred for resolution to an officer of the business unit receiving or providing such Services, and such officers will discuss in good faith a resolution of such problem or issue.  If the officers for each Service Provider and Service Recipient do not agree to a resolution within fifteen (15) Business Days after the reference of the matter to them, then any unresolved dispute shall be resolved pursuant to Section 8.6.

3.3    Third Party Licenses and Consents.  In the event that any third party consent is required under the terms of any agreement between Service Provider, on the one hand, and a third party (including a Third Party Service Provider), on the other hand, (a "**Third Party Agreement**") in order for Service Provider to provide the Services to Service Recipient (a "**Third Party Consent**"), then CVS or Omnicare, as applicable (each on behalf of itself and any Service Provider that is an Affiliate of CVS or Omnicare, as applicable, providing Services) shall (a) in a commercially reasonable timeframe notify the Service Recipient of such Third Party Consent and (b) use, or cause the applicable Service Provider to use, commercially reasonable efforts to obtain such Third Party Consent, which, for the avoidance of doubt, shall not include an obligation to pay any amounts or grant any contractual accommodations unless the applicable Service Recipient commits to making such payment directly or reimburses Service Provider for the value of such other contractual accommodation in advance.  Subject to its obligation to use commercially reasonable efforts, Service Provider shall have no liability under this Agreement arising from the failure to obtain any Third Party Consent necessary to provide the Services or the termination of

- 5 -

any Service by any third party providing such Service or the termination of any Third Party Agreement.  If: (i) Service Provider's costs, fees or expenses increase under the terms of a Third-Party Agreement; or (ii) the vendor demands or is entitled to additional costs, fees or expenses now or in the future, as a result of Service Recipient receiving benefits under such Third Party Agreement, then, (A) notwithstanding any provision to the contrary on Exhibit A, Service Recipient shall be liable for its proportionate share of all increased amounts under subsection (i), and (B) Service Recipient will bear all of the increased amounts under subsection (ii), in each case as such amounts are determined by Service Provider in good faith.

4.      Service Fees and Payments.

4.1      Service Fees; At-Cost.  The service fee to be paid by Service Recipient to Service Provider for the Services to be performed by such Service Provider shall be the lesser of the specified charge set forth on Exhibit A and the actual costs incurred by Service Provider as determined by Service Provider in its sole discretion (the "**Fees**").  Notwithstanding any provision to the contrary herein, from time to time during or after the Term, CVS and Omnicare may reconcile their or Service Provider's actual costs incurred in rendering any applicable Service (the "**Actual Cost**") with the Fees invoiced and paid by Service Recipient and, to the extent Service Recipient paid in excess of Actual Cost, CVS or Omnicare, as applicable, shall promptly pay such overage to Service Recipient and provide a written statement setting forth the Actual Cost and the related reconciliation.

4.2      Payments.  Except as otherwise set forth in Exhibit A with respect to the Services being provided thereunder:

(a)      for each Service provided, CVS or Omnicare, as applicable, shall, in a commercially reasonable timeframe after the end of each month, deliver to Buyer an invoice setting forth the Fees accrued with respect to the Services provided during such month (it being understood that line item detail will not be provided), together with any applicable taxes;

(b)      Fees shall be invoiced and payable in US Dollars; and

(c)      the Fees due under each invoice shall be due within ten (10) days of receipt of the invoice (for each invoice, the "**Payment Due Date**") and, unless otherwise specified in Exhibit A with respect to such Service, shall be directly payable to CVS or Omnicare, as applicable.  With respect to any Fees owing but not paid by Buyer by the Payment Due Date, interest shall be applied to such unpaid amounts, calculated based on a rate up to 12% per annum (or on a higher rate if Service Provider is charged such higher rate by a third party) retroactively from the Payment Due Date.

4.3      Taxes.  All amounts to be paid by Buyer under this Agreement (including, without limitation, the Fees) are exclusive of all sales taxes, value added taxes, goods and services taxes, consumption taxes, transfer taxes, and other similar taxes (collectively, "**Transaction Taxes**") required by applicable Law to be applied or withheld with respect to such amounts. CVS and Omnicare, as applicable, shall be entitled to charge and collect from Buyer the amount of any Transaction Taxes that Service Provider determines it is required by law to collect, and shall remit such taxes to the appropriate tax authorities. Buyer shall be responsible for the assessment and

- 6 -

payment of any such Transaction Taxes that are required to be self-assessed by Buyer.  Buyer may withhold from any amounts to be paid under this Agreement any taxes (other than Transaction Taxes) required to be withheld with respect to such amounts by Buyer under applicable Law provided, however, that if Buyer is required to deduct or withhold any Tax from any amounts otherwise due and payable to CVS or Omnicare pursuant to this Agreement, Buyer shall provide advanced notice (which in any event shall be no later than fifteen (15) days prior to making any such deduction or withholding) of any required deduction or withholding and shall reasonably cooperate in good faith with CVS or Omnicare, as applicable, to reduce or eliminate any such deduction or withholding that otherwise would be required under applicable Law (including by giving CVS or Omnicare, as applicable, the opportunity to provide any applicable withholding certificates or other forms to Buyer or otherwise establish an exemption from such deduction or withholding).  In the event Buyer withholds any such taxes from its payments to CVS or Omnicare, Buyer shall promptly furnish to CVS or Omnicare, as applicable, official tax certificates or receipts (or, if such certificates or receipts are not available, other documentation evidencing such payment) as evidence of such tax payments, and Buyer shall cooperate with CVS or Omnicare, as applicable, and take all actions reasonably necessary in order to (a) secure a reduction or elimination of such taxes, or (b) support any claim made by CVS or Omnicare, as applicable, to any appropriate Governmental Body for any credits based on Buyer's withholding of such taxes.

5.     Warranty; Limitation of Liability; Indemnities.

5.1     Disclaimer of Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ALL SERVICES ARE PROVIDED HEREUNDER ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED.  EACH PARTY HEREBY EXPRESSLY DISCLAIMS ALL EXPRESS AND IMPLIED WARRANTIES OF ANY KIND IN CONNECTION WITH THE SERVICES OR OTHERWISE IN RELATION TO THIS AGREEMENT, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, AND ANY WARRANTIES THAT MAY ARISE FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

5.2     Consequential and Other Damages.  EXCEPT WITH RESPECT TO BUYER'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 5.5 BELOW, NO PARTY SHALL BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES WHATSOEVER WHICH IN ANY WAY ARISE OUT OF, RELATE TO OR ARE A CONSEQUENCE OF, THEIR RESPECTIVE PERFORMANCE OR NONPERFORMANCE HEREUNDER OR THE PROVISION OR USE OF, OR FAILURE TO PROVIDE OR USE, ANY SERVICE PROVIDED HEREUNDER, INCLUDING WITH RESPECT TO LOSS OF BUSINESS, LOST PROFITS, LOSS OF USE OR DATA, BUSINESS INTERRUPTIONS OR CLAIMS OF CUSTOMERS.

5.3     Limitation of Liability.  Subject to Section 5.4, the aggregate liability of CVS, Omnicare, and each Service Provider in connection with or related to this Agreement or any act or omission in connection herewith (including the performance or breach hereof), or from the

sale, delivery, provision or use of any Service provided under this Agreement, whether in contract, tort (including negligence and strict liability) or otherwise, shall not exceed the total fees actually paid to the applicable Service Provider in respect of the Service giving rise to the liability.  For the avoidance of doubt, the liability of CVS and Omnicare for their respective covenants and obligations as a Service Provider hereunder, shall be several and not joint.

5.4     Sole Remedy.   Service Recipient's sole and exclusive remedy for any breach by Service Provider in connection with the provision of Services shall be the performance (or re-performance) of the Services by the applicable Service Provider.

5.5     Buyer Indemnity. Buyer on behalf of itself and its Affiliates hereby agrees to indemnify, defend and hold harmless CVS, Omnicare, and each Service Provider and each of their Affiliates from and against any and all claims, losses, actions, demands, liabilities, costs and expenses regardless of the cause of action, (including reasonable attorneys' fees and costs and expenses related thereto) (collectively, "**Losses**") suffered or incurred by CVS, Omnicare, or any Service Provider or any of their Affiliates as a result of or in connection with any Losses arising from (i) the terms of this Agreement, (ii) Service Provider's or any of its Affiliates' performance of the Services hereunder, or (iii) Service Recipient's use of and access to Service Provider's facilities, sites, or computer systems (collectively, the "**Facilities and Systems**").

5.6     Indemnification Procedure.  CVS or Omnicare, as applicable, will provide prompt notice to Buyer upon learning of any occurrence or event that may reasonably be expected to result in an obligation of Buyer under Section 5.5 and will consult with Buyer in the defense of the occurrence or event.  Failure to provide prompt notice pursuant to the foregoing will not relieve Buyer of its obligations under Section 5.  CVS or Omnicare, as applicable, shall have the right to participate in the defense of third party claims through counsel of its own choosing.  If Buyer does not assume full control over the defense of a claim submitted to Buyer by CVS or Omnicare, then CVS or Omnicare, as applicable, will have the right to defend the claim in such manner as it may deem appropriate, at Buyer's cost and expense.  Buyer will not compromise or settle any claim unless (i) CVS or Omnicare, as applicable, approves the compromise or settlement; and (ii) such compromise or settlement provides for a full, complete and final release of CVS or Omnicare, as applicable, and any of their Affiliates, and does not assign any culpability to CVS or Omnicare, as applicable, or any of their Affiliates.

6.     Term and Termination of Services.

6.1     Agreement Term.  This Agreement shall remain in full force and effect until the later of (i) the expiration or termination of all Transition Periods for Services or (ii) a date that is [_____] after the Effective Date (the "**Term**"). Notwithstanding any provisions of this Agreement to the contrary, if the Purchase Agreement is terminated or the Closing shall not occur, then this Agreement shall be null and void *ab initio*. All provisions of this Agreement are subject to, and contingent upon, the occurrence of the Closing, and shall be of no force and effect if such Closing does not occur.

6.2     Services Term.   Unless otherwise set forth in Exhibit A, or otherwise mutually agreed in writing by the Parties or terminated pursuant to Section 6.3, (i) each Service

- 8 -

shall commence on the Effective Date, and (ii) each Service shall terminate on the expiration or termination of the applicable Transition Period, or if not set forth in Exhibit A, on the date that is [_____] after the Effective Date.

6.3     Termination.

(a)     Services.  Except as otherwise stipulated in Exhibit A with respect to a specific Service, each Service shall be individually terminable (and its termination shall not in itself have any effect on this Agreement or any other Service):

(i)     by either Service Provider or Service Recipient in the event of material breach by the other party with respect to such Service, including any failure to make payments in accordance with Section 4.2 above, that remains uncured following not less than thirty (30) days (or, in the case of any payment default, within fifteen (15) days) written notice specifying the breach and providing an opportunity to cure such breach to the reasonable satisfaction of the non-breaching Party;

(ii)     by Service Recipient for convenience on not less than thirty (30) days prior written notice of termination to Service Provider, provided, that where Exhibit A requires, with respect to certain groups of Services, as indicated therein by the notation "**Dependent Services**", such Dependent Services may not be terminated independently and may only be terminated together with the Services in the same Dependent Services category;

(iii)     by Service Provider if Service Provider reasonably believes or has a reasonable basis to believe that (A) Buyer or Service Recipient is in material breach of applicable Law, provided that such breach remains uncured following not less than fifteen (15) days written notice specifying the breach and providing an opportunity to cure such breach to the reasonable satisfaction of the Service Provider; or (B) performance of a Service would reasonably be expected to violate any applicable Law (including by reason of Service Provider having a reasonable belief or a reasonable basis to believe that Service Recipient does not possess the necessary licenses, permits authorizations or approvals); and

(iv)     by Service Provider upon the occurrence of an event described in Section 2.8 above.

(b)     Agreement and Services.  A Party (the "**Terminating Party**") may terminate this Agreement and applicable Services if another Party owing obligations to the Terminating Party hereunder with respect to such Services (the "**Breaching Party**") (i) materially breaches an obligation owed to the Terminating Party and such breach remains uncured following not less than thirty (30) days written notice specifying the breach and providing an opportunity to cure such breach to the reasonable satisfaction of the Terminating Party, or (ii) undergoes an Insolvency Event.

6.4     Effect of Termination; Survival of Certain Obligations.  Sections 1, 4, 5, 6.4, 7, and 8 shall survive any termination or expiration of this Agreement.  Notwithstanding termination of this Agreement or any of the Services individually, Service Recipient shall be liable

- 9 -

for all invoiced amounts for Services rendered up to and including the date of termination of such Service.

       7.       Confidentiality; Records.

       7.1      Confidentiality.

       (a)      Confidential Information.  For purposes of this Agreement, "**Confidential Information**" means any and all non-public, confidential or proprietary information and materials disclosed by CVS, Omnicare, or Buyer (each, a "**Disclosing Party**") or their Affiliates or Representatives to another Party (a "**Receiving Party**") or its Affiliates or Representatives (whether in writing, or in oral, graphic, electronic or any other form) in connection with the provision of Services as contemplated by this Agreement.  For the avoidance of doubt, the Parties agree that any Protected Health Information ("**PHI**") exchanged between them shall be governed by the Business Associate Agreement ("**BAA**") attached hereto.

       (b)      Confidentiality.  Each Party, as Receiving Party on behalf of itself, its Affiliates and its employees, officers, directors, contractors and agents ("**Representatives**"), agrees to keep all Confidential Information of Disclosing Party in strict confidence, and take at least the same degree of care as it would use for its own non-public, confidential or proprietary information of a similar nature (but in no event less than reasonable care) to protect the confidentiality and avoid the unauthorized use or disclosure of Disclosing Party's Confidential Information, except that (i) in the case of a Service Provider as Receiving Party, Service Provider may disclose Confidential Information of Service Recipient to (A) its Affiliates and its or their Representatives and/or (B) Third Party Service Providers and its or their Representatives, in each case to the extent necessary to provide the applicable Services under this Agreement, and (ii) in the case of Service Recipient as Receiving Party, Service Recipient may disclose Confidential Information of Service Provider to (A) its Affiliates and its or their Representatives and/or (B) Third Party Service Providers and its or their Representatives, in each case to the extent necessary to receive the applicable Services under this Agreement; provided, that, in each case under clauses (i) and (ii), the recipient of such Confidential Information is bound by confidentiality obligations and use restrictions that are no less protective of such Confidential Information than the terms set forth in this Section 7.1.  Further, Receiving Party shall only use Confidential Information of Disclosing Party solely for the purposes of performing its obligations and exercising its rights under and in accordance with this Agreement.

       (c)      Exceptions.  Receiving Party may disclose Confidential Information of Disclosing Party to the extent (i) reasonably necessary in connection with the enforcement of this Agreement, or (ii) Receiving Party is legally requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil, criminal, judicial, statutory, regulatory, legislative or similar requirement or process or by federal or state securities or other statutes, regulations or laws or the rules, requirements or guidance of any securities exchange or self-regulatory organization), to disclose such information; provided that Receiving Party shall take reasonable steps to give Disclosing Party with sufficient prior notice of such disclosure in order to contest such disclosure or seek, at its sole expense, an appropriate protective order limiting the scope of such disclosure and shall disclose only that portion of the such Confidential

Information which Receiving Party is advised by its counsel is reasonably required to be disclosed. In addition, the obligations under this <u>Section 7.1</u> shall not apply to information that the Receiving Party can demonstrate to be (A) information that is already or becomes generally available to the public at the time of disclosure to Receiving Party other than as a result of any act or omission of Receiving Party, or a breach by Receiving Party, its Affiliates or its Representatives of their obligations hereunder or any other confidentiality obligation Receiving Party may have to Disclosing Party or its Affiliates; (B) information that becomes rightfully known to Receiving Party on a non-confidential basis from a source other than Disclosing Party, its Affiliates or its Representatives who does not owe any confidentiality obligation against Disclosing Party; or (C) is independently developed by Receiving Party without any use of, access to or reference to any Confidential Information of Disclosing Party.

(d)     <u>Return of Confidential Information</u>.  At the request of the Disclosing Party after termination of this Agreement or the Services being provided hereunder, the Receiving Party shall (and shall cause each Person who received Confidential Information) make all reasonable efforts to promptly destroy or return all materials containing any Confidential Information (including any copies thereof) promptly upon receipt of such request, but in no case later than sixty (60) days after receipt of such request; <u>provided</u>, <u>however</u>, that the Receiving Party may retain copies of the Disclosing Party's Confidential Information stored on backup disks or in backup storage facilities automatically produced in the ordinary course of business or to the extent required to comply with applicable Law.  Any Confidential Information so retained will be held subject to the confidentiality and use limitations of this Agreement.  Upon request of the Disclosing Party, the Receiving Party shall certify in writing that all such materials have been returned to the Disclosing Party or destroyed.

(e)     <u>Injunctive Relief</u>.  Each Party acknowledges and agrees that, in the event of an unauthorized use, reproduction, distribution or disclosure of any Confidential Information, an adequate remedy at law would not be available and, therefore, injunctive or other equitable relief would be appropriate to restrain such use, reproduction, distribution or disclosure, whether threatened or actual.

(f)     <u>Access and Security</u>.

(i)     If any Service Recipient is given access to any Facilities and Systems in connection with the Services, such Service Recipient (the "**Accessing Party**") shall (and shall cause any and all of its Representatives who are given such access to) exercise reasonable care using such Facilities and Systems and comply with all of such Service Provider's reasonable workplace rules, security policies, including policies attached hereto as <u>Exhibit C</u>, limitations, procedures and requirements informed or disclosed to Accessing Party (collectively, "**Security Regulations**"), and shall not (and shall cause its personnel who are given such access not to) compromise or circumvent any security or similar measures employed by such Service Provider.  The Accessing Party shall (and shall cause its Representatives who are given such access to) access and use only those Facilities and Systems for which it has been granted the right to access and use, and shall use such Facilities and Systems only for the purposes authorized by the applicable Service Provider.

- 11 -

(ii)     The Accessing Party shall use commercially reasonable efforts to ensure that only those of its Representatives who are specifically authorized to have access to the Facilities and Systems access such Facilities and Systems, and shall use commercially reasonable efforts to prevent any unauthorized access, use, destruction, alternation or loss of information contained in such Facilities and Systems by the acts or omissions of its Representatives, including notifying its Representatives of the restrictions set forth in this Agreement and the Security Regulations.

(iii)     The Accessing Party shall comply with applicable Laws concerning data protection, privacy and protection of personal information in connection with its (or its Representatives') access or use of the Facilities and Systems.

7.2     Records.   Each Party will maintain reasonable records relating to the Services and will maintain such records for at least two (2) years after termination or expiration of this Agreement and will make such records available to the other Parties or its designee during normal business hours upon reasonable request.

7.3     HIPAA Compliance.   The Parties acknowledge that they have entered into the BAA, attached hereto as Exhibit D and incorporated herein by reference, for the purposes of compliance with the privacy, security and breach notification provisions of the Health Insurance Portability and Accountability Act, as amended by Subtitle D of the Health Information Technology for Economic and Clinical Health Act, and their respective implementing regulations, all as may be amended from time to time ("**HIPAA**").   In the event that any provision of the BAA conflicts with this Agreement, including any attachments or exhibits hereto, then the provisions of the BAA will control.

7.4     Except as otherwise agreed to by the Parties in writing on Exhibit A, each Party will retain all right, title and interest in and to its respective intellectual property rights and data, and no license (other than as necessary for the provision or the receipt of the Services as specified on Exhibit A) or other right, express or implied, is granted under this Agreement by either Party to its intellectual property rights or data.

8.     General Provisions.

8.1     Notices.   All notices and other communications hereunder shall be in writing and shall be deemed duly delivered:   (a) four (4) Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid; (b) one (1) Business Day after being sent for next Business Day delivery, fees prepaid, via a reputable nationwide overnight courier service; (c) on the date of confirmation of receipt (or the first (1st) Business Day following such receipt if the date of such receipt is not a Business Day) of transmission by facsimile, in each case to the intended recipient as set forth below (or to such other address or facsimile telephone number as such party shall have specified in a written notice given to the other parties hereto); (d) if sent by email transmission prior to 6:00 p.m. recipient's local time, upon transmission when receipt is confirmed or (e) if sent by email transmission after 6:00 p.m. recipient's local time and receipt is confirmed, the business day following the date of transmission:

(a)     if to CVS or any Service Provider that is an Affiliate of CVS:

- 12 -

[CVS]
[Adress]
Attention: [●]
Fax: [●]
Tel: [●]

with a copy to (which copy shall not constitute notice):

Foley & Lardner LLP
321 N. Clark St.
Suite 3000
Attention: Geoff Goodman
e-mail: ggoodman@foley.com
Tel: 312-832-4514

(b)    if to Omnicare or any Service Provider that is an Affiliate of Omnicare:

[Omnicare]
[Address]
Attention: [●]
Fax: [●]
Tel: [●]

with a copy to:

[●]
[Address]
Attention: [●]
Fax: [●]
Tel: [●]

(c)    if to Buyer or any Service Recipient that is an Affiliate of Buyer:

[Buyer]
[Address]
Attention: [●]
Fax: [●]
Tel: [●]

with a copy to:

[●]
[Address]
Attention: [●]
Fax: [●]
Tel: [●]

- 13 -

8.2 <u>Counterparts; Facsimile</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

8.3 <u>Entire Agreement; Nonassignability; Parties in Interest</u>. This Agreement and the exhibits and schedules hereto: (a) together constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof; and (b) are not intended to confer upon any other Person any rights or remedies hereunder and shall not be assigned by operation of law or otherwise without the written consent of the other Parties. The Agreement may not be assigned by Buyer, whether by asset transfer, merger, operation of law, change of control or otherwise without the written consent of CVS and Omnicare. Any attempted or purported assignment or transfer in derogation of the foregoing provisions shall be a material breach of this Agreement and null, void and of no effect. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns.

8.4 <u>Amendment</u>. This Agreement may be amended only by execution of an instrument in writing signed on behalf of each of the Parties.

8.5 <u>Severability</u>. In the event that any provision of this Agreement or the application thereof becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties.

8.6 <u>Governing Law; Waiver of Jury Trial</u>.

(a) This Agreement and all actions (whether at law, in contract, in tort or otherwise) arising out of or relating to this Agreement, the negotiation, validity or performance of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws except to the extent the law of the State of New York is superseded by the Bankruptcy Code.

(b) All actions and proceedings (whether at law, in contract, in tort or otherwise) arising out of or relating to this Agreement, the negotiation, validity or performance of this Agreement shall be heard and determined in the Bankruptcy Court and, to the extent the Bankruptcy Court does not have or does not accept jurisdiction to adjudicate such matter may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in New Castle County, State of New York, and the parties irrevocably submit to the jurisdiction of such courts (and, in the case of appeals, the appropriate appellate court therefrom), in any such action or proceeding and irrevocably waive the defense of an inconvenient

forum to the maintenance of any such action or proceeding.  The parties agree that service of any court paper may be made in any manner as may be provided under the applicable Laws or court rules governing service of process in such courts.  The parties hereto agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

(c)     EACH PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AFTER HAVING RECEIVED ADVICE OF COUNSEL OF ITS CHOICE, ANY RIGHTS IT MAY HAVE TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM, OR DEFENSE (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY OF THE PARTIES HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. THE PARTIES AGREE THAT EITHER OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY DESIGNATED COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED FOR AGREEMENT BETWEEN THE PARTIES TO WAIVE THEIR RIGHTS TO TRIAL BY JURY IN ANY SUCH LITIGATION AND THAT ANY SUCH LITIGATION WILL INSTEAD BE TRIED BY A JUDGE SITTING WITHOUT A JURY.

8.7     Rules of Construction.  The Parties agree that they have been represented by counsel during the negotiation, preparation and execution of this Agreement and the other Transaction Documents, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document.

8.8     Interpretation.

(a)     When a reference is made in this Agreement to Sections, Schedules or Exhibits, such reference shall be to a Section of, or a Schedule or Exhibit to this Agreement unless otherwise indicated.

(b)     The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(c)     The words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation."

(d)     Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; and (iii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement.

(e)     Unless the context otherwise requires, the word "or" is not exclusive.

8.9     Relationship of the Parties.

- 15 -

(a)    Each Party, its Affiliates and any other persons or entities providing Services hereunder shall be deemed independent contractors hereunder and shall have no authority to act for or represent the other Parties or bind or commit the other Parties to any agreement or obligation.  Nothing in this Agreement shall be deemed or construed by the parties or any third party as creating the relationship of principal and agent, partnership or joint venture between the parties, it being understood and agreed that no provision contained herein, and no act of the parties, shall be deemed to create any relationship between the parties other than the relationship of independent contractor nor be deemed to vest any rights, interest or claims in any third parties.

(b)    No payment made pursuant to this Agreement or any other agreement between CVS and Buyer or Service Recipient shall be construed to induce or encourage the referral of patients, or induce the purchase, lease, order or arrangement for the furnishing of healthcare products or services.

(c)    Notwithstanding any provision of this Agreement, including Exhibit A, to the contrary, no Services provided under this Agreement shall include or shall be construed as constituting accounting, legal or Tax advice or shall create any fiduciary obligations on the part of CVS or any of its Affiliates (or any party acting on their behalf) to any Person, including to Buyer or any of its Affiliates, or to any plan trustee or any customer of any of them.

8.10    Force Majeure.  The obligations of Service Provider hereunder shall be suspended during the period and to the extent that Service Provider is prevented from complying with its obligations under this Agreement by any law or governmental order, rule, regulation or direction, whether domestic or foreign, or by any cause beyond the control of the Service Provider, including acts of God, strikes, lock outs and other labor disputes and disturbances, civil disturbances, accidents, acts of war or conditions arising out of or attributable to war (whether declared or undeclared), pandemics (including but not limited to the SARS-CoV-2 and COVID-19), shortage of necessary equipment, materials or labor, or restrictions thereon or limitations upon the use thereof, and delays in transportation.  In such event, the Service Provider shall give notice of suspension as soon as reasonably practicable to the Service Recipient stating the date and extent of such suspension and the cause thereof, and the Service Provider shall resume the performance of such obligations as soon as reasonably practicable after the removal of the cause and the Service Provider shall so notify the Service Recipient.

8.11    Further Assurances.  Each Party agrees that, from time to time, at the reasonable request of any other Party, it shall execute and deliver such instruments and documents and take such other actions as such other Party may reasonably request to effectuate the Services and to otherwise performs its obligations hereunder.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by each of them or their respective officers thereunto duly authorized, all as of the date first written above.

[CVS]

By:    _____
Name:
Title:

[Omnicare]

| By: | _____ |
|-----|-----|
| Name: | |
| Title: | |

[Buyer]

By:    _____
Name:
Title:

Exhibit A:

Services

X = the duration of the delivery of Services under this Agreement (current assumption = \_\_\_\_\_
months)

Service Manager: [\_] CVS, [\_\_\_] Omnicare

| Service Provider | Service | Service Description | Fee Type | Monthly Fees | Transition Period | Dependent Service |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | - |

<u>Exhibit B</u>:

Excluded Services[1]

---

[1] <u>NTD:</u>  To be completed based on <u>Exhibit A</u>.

Exhibit C:

IT and Data Security Policies

1.  Security Management Policy
2.  Risk Management Policy
3.  Operations Management Policy
4.  Security Monitoring and Response Policy
5.  Communications Management Policy
6.  Access Control Policy
7.  Network Security Policy
8.  Third Party Risk Governance Policy
9.  Application Development Policy
10. IT Management Policy
11. Incident Management Policy

297883871.11

4914-4153-0509.6

<u>Exhibit D:</u>

Business Associate Agreement

To come

**Exhibit G**

**List of Excluded Transition Services**

*CONFIDENTIAL AND PROPRIETARY*

**This information is provided for discussion purposes only; CVS is under no obligation to enter into an agreement with respect to any of the functions or services described herein.**

**The items below will continue to be supported by CVS during the sign-to-close period, but buyer needs to be prepared to assume these responsibilities at and post-closing.**

| # | Service Description | Comments |
|---|---|---|
| 1 | Corporate Compliance services (e.g., services that support developing and maintaining company code of conduct, compliance policies, ethics reporting line and investigations, auditing, employee exclusion/professional screening, privacy) | |
| 2 | Invoicing and payment processing related to the purchasing of pharmaceuticals or ancillary pharmaceutical supplies | |
| 3 | Invoicing and payment collections from customers for the provision of any pharmacy or consulting services | |
| 4 | Clinical, pharmaceutical, or consulting services to any customers or any patient services. | Only backfill required will be a medical director |
| 5 | Application development for conveying applications, with exception of normal course of business development planned prior to the Effective Time for non-conveying applications | |
| 6 | Installation or operation of any hardware or software owned, leased, or licensed to any of Company and its Affiliates (other than software of Service Recipients, installed prior to the Effective Date and any software embedded therein) | |
| 7 | Physical access to any data centers owned or controlled by CVS or its Affiliates | CVS will provide cooperation between sign and close to effect data migration; treated as a handoff activity, not a TSA service |
| 8 | Human resources services (e.g., compensation, benefits, recruiting) | Omnicare is exploring third party and buyer solutions |
| 9 | Access and use of general ledger controlled by CVS or its Affiliates | |
| 10 | Communications services (e.g., communications with employees, customers, governmental agencies regulatory bodies) | |
| 11 | Government Relations Services, including, but not limited to lobbying activities, etc | |
| 12 | Access to senior/executive leadership of CVS or its Affiliates | |
| 13 | Investor relations services | |
| 14 | Licensing services related to all pharmacy, wholesaler, and distributor property and operations | Omnicare exploring solutions to support licensing |
| 15 | Licensing and credentialing services for pharmacists, pharmacy technicians, nurses and other licensed professionals | Omnicare exploring solutions to support licensing |
| 16 | Legal services, including, but not limited to, regulatory advice, board of pharmacy representation, payer contracting, corporate services, labor and employment advice and representation, privacy and HIPAA support, data security counsel or breach response, real estate advice and counsel, and litigation support/management. | |
| 17 | Business transition or integration services, except as set forth on Exhibit A. | |
| 18 | Product strategy, pharmacy services, and sales services | |
| 19 | Branding/marketing services | Requires rebranding from CVS to Omnicare/buyer forms |
| 20 | Any involvement or participation in the purchasing, acquiring, or obtaining discounts on pharmaceutical products or supplies, including pharmaceutical rebates | Omnicare exploring wholesaler provided systems to support. |
| 21 | Any functions related to the submission, adjudication, or reversal of any claims submitted to third party payors or amounts charged to customers | |
| 22 | Any services related to inventory and order management | Omnicare exploring wholesaler provided systems to support |
| 23 | Any services related to receiving, distributing and/or warehousing of pharmaceutical products or supplies | Omnicare exploring wholesaler provided systems to support |
| 24 | Any services related to operating retail pharmacy locations | Pharmacies will need to be rebranded and reconfigured with Omnicare systems and hardware |
| 25 | Revenue recognition | |
| 26 | Any functional services or negotiation support for establishing new or maintaining current customers, including without limitation, any advice related to pricing or scope of services | |
| 27 | Any functional services or negotiation support for establishing new agreements or maintaining current agreements with non-conveying CVS' third-party providers (other than warm introductions to existing vendors and contacts for a period of 12 months following the Effective Date) | |
| 28 | Except as expressly set forth on Exhibit A, all other real estate management, construction and facilities maintenance services, including without limitation, transactional real estate services are excluded | |
| 29 | Except as expressly set forth on Exhibit A, all other Tax support services are excluded | Omnicare/buyer will need to create process for state level taxes |

**Exhibit H**

**<u>List of Potential Transition Services</u>**

This information is provided for discussion purposes only; CVS is under no obligation to enter into an agreement with respect to any of the functions or services described

**TSA Services  - Project Flint**

Assuming agreement on duration/cost, the items below may be supported by CVS throughout the duration of a TSA as needed.
Service Provider: CVS

| Function | # | Sub Function | Service Description | Charging Method | Comments | Dependent Service |
|---|---|---|---|---|---|---|
| IT | 1.1 | End User Device Support | Hardware, provisioning, access administration, and support required to support operations (but only to the extent consistent with the number of employees over the 12 months preceding the Effective Date, including 10% buffer to account for potential growth or business changes). Shipping charges related to the return of equipment will be passed through, including after the end of the Transition Period if equipment is utilized through the full Term of the Agreement. | Passthrough of CVS established yearly rates | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 1.2 | Workplace Technology - Telecommunications | Use of applicable telecommunications services | Passthrough of CVS established yearly rates | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 1.3 | Workplace Technology - Site Data Network infrastructure Support | Enterprise WAN/LAN support (network vendor costs charged through AP line item 3.1) | Fixed - Monthly | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 1.4 | Compute and Storage Infrastructure -  Data Center and Hosting | Data center, hosting services and enterprise support for Company-dedicated applications hosted in the enterprise affiliate data center (includes Disaster Recovery). | Fixed - Monthly | | This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 1.5 | IT Security - Enterprise Infrastructure Support | Enterprise support capabilities for user entitlement and access controls , and cyber security support with respect to devices originally provided by CVS. | Fixed - Monthly | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 1.6 | Flint IT - Enterprise Production Environment Support | Enterprise production support provided to Company while their business applications are active in the production environment | Pasthrough of CVS resource cost | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 1.7 | Corporate Managed Applications | Enterprise support and access to shared corporate managed applications | Fixed - Monthly | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| Real Estate | 2.1 | Facility Security | Enterprise support over security network at in-scope facilities (security vendor costs charged through AP line item 3.1) | Fixed - Monthly | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| Finance / Accounting | 3.1 | Accounts Payable | Passthrough vendor charges for services incurred supporting Buyer's operations during the Transition Period | Passthrough | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 3.2 | Travel & Expense | Passthrough employee T&E charges incurred during the Transition Period | Passthrough | Services will be provided for a maximum of 3 months | N/A |
| | 3.3 | Business Unit Accounting | Accounting support via sub-ledger reporting | Fixed - Monthly | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| | 3.4 | Sales & Use Tax | Sales & Use Tax support in line with current operations | Fixed - Monthly | | Data Center. This service is required as long as at least one pharmacy is operating in CVS IT environment |
| Divestiture Management Office (DMO) | 4.1 | Divestiture Management Office | Administration team for security and access administration of conveyed employee population | Passthrough of CVS resource cost | | Last pharmacy operating + 1 month |

**Exhibit B**

**Preserved Objections**

**Preserved Objections**

- Chicago Industrial Portfolio Owner LLC
- Plymouth International Spellmire OH LLC